1   PHILIP S. WARDEN (SBN 54752)
      philip.warden@pillsburylaw.com
2   CECILY DUMAS (SBN 111449)
      cecily.dumas@pillsburylaw.com
3   JUDY J. BAO (SBN 305560)
      judy.bao@pillsburylaw.com
4   PILLSBURY WINTHROP SHAW PITTMAN LLP
5   Four Embarcadero Center, 22nd Floor
    San Francisco, CA 94111-5998
6   Telephone:    415.983.1000
    Facsimile:    415.983.1200
7

8   Attorneys for Secured Creditors
    Stephen A. Finn and Winery Rehabilitation, LLC
9

10

11                  UNITED STATES BANKRUPTCY COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                          SANTA ROSA DIVISION

14

15

16  In re:                              )   Case No. 17-10065-AJ
                                        )   (Jointly Administered)
17  SULLIVAN VINEYARDS                  )
    CORPORATION,                        )   (Chapter 11)
18                                      )
              Debtor-in-Possession.     )   Date:      April 11, 2017
19                                      )   Time:      9:00 a.m.
                                        )   Courtroom: 99 E Street
20  _____ )              Santa Rosa, CA 95404
                                        )   Judge:     Hon. Alan Jaroslovsky
21  SULLIVAN VINEYARDS                  )
    PARTNERSHIP,                        )   NOTICE OF LODGMENT OF
22                                      )   REPORTER'S TRANSCRIPT DATED
              Debtor-in-Possession.     )   OCTOBER 7, 2015; DISTRICT COURT,
23                                      )   COUNTY OF DENVER, COLORADO;
                                        )   CASE NO: 15DR30434; IN RE MARRIAGE
24  _____ )   OF FINN

25

26

27  TO THE HONORABLE ALAN JAROSLOVSKY, UNITED STATES

28  BANKRUPTCY JUDGE, DEBTOR AND ALL INTERESTED PARTIES:
                                   - 1 -
                                            Case No. 17-10065-AJ
                                            4828-3933-0374.v1

PLEASE TAKE NOTICE that pursuant to Rules 9014 and 9020 of the Federal Rules of Bankruptcy Procedure and Rule 7030-1(b)(1)-(4) of the Local Bankruptcy Rules, Creditors Stephen A. Finn ("Finn") and Winery Rehabilitation, LLC ("Winery Rehab") hereby lodges the Reporter's Hearing transcript dated October 7, 2015; Case No. 15DR30434; District Court, County of Denver, Colorado; In Re Marriage of Finn (Exhibit A)

Dated: April 5, 2017

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: /s/ Philip S. Warden

Philip S. Warden (SBN 54752)
Cecily Dumas  (SBN 111449)
Judy J. Bao  (SBN 305560)
PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
philip.warden@pillsburylaw.com
cecily.dumas@pillsburylaw.com
judy.bao@pillsburylaw.com

*Attorneys for Creditors Stephen A. Finn
and Winery Rehabilitation, LLC*

4828-3933-0374.v1

# EXHIBIT A

1   DISTRICT COURT, COUNTY OF DENVER, COLORADO

2   Case No. 15DR30434, JAG Case No. 2015-1361J

3   _____

            HEARING (CONFIDENTIAL)
4             REPORTER'S TRANSCRIPT
               October 7, 2015
5   _____

6   In Re the Marriage of:

7   KELLEEN SULLIVAN FINN,

8   Petitioner,

9   and

10  STEPHEN A. FINN,

11  Respondent.

12  _____

13         The hearing in the above-entitled matter was
    taken on October 7, 2015, at Judicial Arbiter Group,
14  Inc., 1601 Blake Street, Suite 400, Denver, Colorado
    80202, before The Honorable R. Thomas Moorhead.
15         The transcript is a partial transcription of
    the proceedings that were had in the above-entitled
16  matter on the aforesaid date.
             Reported by:  Maria M. Orton, RPR
17

18

19

20

21

22

23      **H+G**

24

25  Hunter + Geist, Inc.

**303.832.5966**        1900 Grant Street, Suite 1025      ■ www.huntergeist.com
**800.525.8490**        Denver, CO 80203                  ■ scheduling@huntergeist.com

                        Your Partner in Making the Record

                Court Reporting, Legal Videography, and Videoconferencing

**1**

DISTRICT COURT, COUNTY OF DENVER, COLORADO
Case No. 15DR30434, JAG Case No. 2015-1361J

_____

HEARING (CONFIDENTIAL)
REPORTER'S TRANSCRIPT
October 7, 2015

_____

In Re the Marriage of:
KELLEEN SULLIVAN FINN,
Petitioner,
and
STEPHEN A. FINN,
Respondent.

_____

        The hearing in the above-entitled matter was
taken on October 7, 2015, at Judicial Arbiter Group,
Inc., 1601 Blake Street, Suite 400, Denver, Colorado
80202, before The Honorable R. Thomas Moorhead.
        The transcript is a partial transcription of
the proceedings that were had in the above-entitled
matter on the aforesaid date.
        Reported by: Maria M. Orton, RPR

**2**

A P P E A R A N C E S

For the Petitioner:
    STEVEN C. LASS, ESQ.
    JERREMY M. RAMP, ESQ.
    Lass Moses Ramp LLC
    1441 18th Street
    Suite 300
    Denver, Colorado 80202

For the Respondent:
    JORDAN M. FOX, ESQ.
    Sherman & Howard, L.L.C.
    633 17th Street
    Suite 3000
    Denver, Colorado 80202

    JAMES R. ROSE, ESQ.
    BuchalterNemer PLC
    1500 Railroad Avenue
    St. Helena, California 94574

    PETER G. BERTRAND, ESQ.
    BuchalterNemer PLC
    55 Second Street
    Suite 1700
    San Francisco, California 94105

**3**

I N D E X

WITNESSES PAGE
KELEEN SULLIVAN FINN
    Direct Examination by Mr. Lass   16
    Cross-Examination by Mr. Rose     64
    Redirect Examination by Mr. Lass     89
    Recross-Examination by Mr. Rose     93
STEPHEN A. FINN
    Direct Examination by Mr. Fox     108
    Cross-Examination by Mr. Ramp     150
    Redirect Examination by Mr. Fox     214
TERESA SULLIVAN
    Direct Examination by Mr. Bertrand     228
    Cross-Examination by Mr. Ramp     255
    Redirect Examination by Mr. Bertrand     267
    Recross-Examination by Mr. Rose     268
ANGELICA DE VERE
    Direct Examination by Mr. Bertrand     271
    Cross-Examination by Mr. Ramp     284
    Redirect Examination by Mr. Bertrand     301
ROSS SULLIVAN
    Direct Examination by Mr. Lass   306
    Cross-Examination by Mr. Rose     358
    Redirect Examination by Mr. Lass     371
MARIO ZEPPONI (By Telephone)
    Direct Examination by Mr. Rose   342
    Cross-Examination by Mr. Lass     351
DOUGLAS THAXTON
    Direct Examination by Mr. Bertrand     374
    Cross-Examination by Mr. Ramp     379

EXHIBITS     ADMITTED
    For the Petitioner:
Exhibit 2   Marital Agreement (with financial     27
        disclosure exhibits but excluding
        Respondent's tax returns)
Exhibit 3   Agreement Regarding 575 Circle Drive   36
Exhibit 4,   Photographs of Sullivan Vineyards   25
pp. 1-12

**4**

Exhibit 6   Stock & Partnership Interest Purchase   71
        Agreement, 8/12/11, between JoAnna
        Sullivan and Stephen Finn
Exhibit 7,   Text pages   44
page 1
Exhibit 7,   Text pages   45
page 2
Exhibit 7,   Text pages   46
page 3
Exhibit 7,   Text pages   46
page 4
Exhibit 7,   Text pages   48
page 5
Exhibit 7,   Text pages   222
page 8
Exhibit 7,   Text pages   50
pp. 7, 10, 19, 24
Exhibit 7,   Text pages   49
page 28
Exhibit 7,   Text pages   180
page 30
Exhibit 7,   Text pages   181
page 31
Exhibit 8   Proposed Amendment to Marital Agreement   40
Exhibit 9   Offer to Purchase Interest in   41
        Sullivan Vineyards
Exhibit 10   Letter from de Vere, 4/10/15   293
        "Our fiscal year has been an
        overwhelming success"
Exhibit 11   Letter from Steve Finn, 5/28/15   52
        Re Sale of Sullivan Vineyards
Exhibit 12   Order re: Verified Motion for   53
        Immediate Expanded Temporary Injunction

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 5 of 110

**5**

Exhibit 13    Letter from Steve Finn, 6/11/15,        186
              Re vineyard and injunction

Exhibit 14    Complaint for Declaratory Relief         54
              filed in Napa County, CA;
              Sullivan Vineyards v. Kelleen Sullivan
              Finn, et al., 8/4/15

Exhibit 15    Notice of Special Meeting of Board of    196
              Directors of Sullivan Vineyards
              Corporation, 9/1/15
Exhibit 17    Board of Directors minutes, 9/4/15       200
Exhibit 18    Ex Parte Petition to Appoint a            55
              Provisional Director filed in Napa
              County, CA; Sullivan Vineyards
              Corporation, 9/17/15

Exhibit 19    Employment Agreement of Angelica         298
              de Vere, 4/1/15
Exhibit 20    Employment Agreement of Teresa           259
              Sullivan, 4/13/15

Exhibit 21    Cash Flow Projections, 7/8/15            266

    For the Respondent:
Exhibit I     Partnership Agreement, 8/31/87           140
Exhibit J     First Amendment to Partnership           140
              Agreement, 6/5/90

Exhibit N     Letter from SVC to Respondent            126
              Providing Option Agreement, 4/6/12
Exhibit O     Notice of Exercise of Option, 5/1/14     129
Exhibit P     Warrant to Acquire Partnership           129
              Interests, 4/6/12

Exhibit Q     Notice of Exercise of Warrant, 5/1/14    129

Exhibit R     Loan and Security Agreement, 5/17/12     146

Exhibit HH    Affidavit of Mario Zepponi, 6/22/15      350

**6**

Exhibit II    Affidavit of Mario Zepponi from          350
              SVC action,  8/4/15

Exhibit JJ    Listing Agreement, 5/20/15               351

**7**

1      WHEREUPON, the following proceedings were
2  had:
3              *    *    *    *    *
4          THE COURT:  Good morning and welcome.
5  This is in re the marriage of Finn.  It is Denver
6  District Court Number 15DR30434.  It is JAG Case Number
7  2015-1361J.  I am Retired Judge Tom Moorhead.  And I am
8  administering -- sitting on this case with appointment
9  by the Chief Justice Nancy Rice.  And Maria Orton is
10  our court reporter today.  And I have told Maria if she
11  ever needs anyone to speak up or to slow down, to go
12  right head and make those comments.  So don't be
13  surprised, Maria has a speaking role here today.
14          What I would do at this time is ask
15  counsel to make their appearances for the record,
16  please.
17          MR. LASS:  Good morning, Your Honor.  My
18  name is Steve Lass, L-a-s-s, Registration Number 14176,
19  on behalf of the petitioner, Kelleen Sullivan Finn, who
20  is present at counsel table with me.  Also present is
21  my partner, Jeremmy Ramp, R-a-m-p.
22          THE COURT:  Mr. Ramp, good morning.
23          MR. LASS:  His registration number is
24  35409.  Also present at the moment are a couple of
25  witnesses, specifically the petitioner's sister,

**8**

1  Philomena, and brother, Ross Sullivan.
2          THE COURT:  Thank you.
3          MR. FOX:  Good morning, Your Honor.
4  Jordan Fox, Registration Number 23971, appearing on
5  behalf of respondent, Mr. Finn, who is present.  And
6  I'll have my co-counsel introduce themselves.
7          MR. BERTRAND:  Good morning, Your Honor.
8  Peter Bertrand, BuchalterNemer, appearing on behalf of
9  Steve Finn, and my partner, James Rose.
10          MR. ROSE:  Good morning, Your Honor.
11  James Rose appearing pro hoc vice on behalf of
12  Mr. Finn.
13          THE COURT:  Good morning.  I have had the
14  opportunity to review the motions, responses, and
15  replies.  I appreciate counsel getting those filed in a
16  timely fashion so I had an opportunity to review them.
17  It seems to me that the evidence is going to overlap a
18  bit from one motion to another.  And I'm curious as to
19  whether counsel has talked about the best method to
20  proceed today.
21          Mr. Lass and Mr. Jordan, what do you
22  gentlemen think?
23          MR. FOX:  Jordan is the first name, but
24  you are welcome to call me anything that you want.  I
25  think that works.  Jordan Fox.

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 6 of 110

**9**

1    THE COURT: I'm sorry, Mr. Fox.
2    MR. FOX: Your Honor, we have not
3  discussed it. The boldest motion, the motion that is
4  currently -- we believe should be heard first is our
5  motion to set aside the restraining order. The other
6  motion that is teed up for today is the motion granting
7  decree. I do agree, the testimony will likely overlap,
8  but we would like to begin our presentation.
9    THE COURT: Okay.
10    MR. LASS: And we, I don't think, can
11  agree on whether the sun will rise tomorrow. I do
12  represent the petitioner. There's actually a third
13  motion that's unruled upon at this time that was filed
14  actually first, and that was the motion for possession
15  of the 575 Circle Drive property. I do think the
16  motions overlap. And we don't have an agreement as to
17  who should go first.
18    THE COURT: Okay. What I would
19  suggest -- and, counsel, again, it will be -- I look
20  for your comments -- is maybe if we just start taking
21  evidence, start calling witnesses, if we have witnesses
22  available, and then after we take the evidence, then we
23  can get into legal argument and the order in which the
24  motions would then be -- be heard. What is your
25  thought on that, Mr. Fox?

**10**

1    MR. FOX: Your Honor, during our phone
2  status conference we teed up two issues for today.
3  Those issues were the motion to vacate the restraining
4  order and Ms. Finn's request for the entry of decree.
5  While it was acknowledged that there was a third motion
6  pending, that was not something that was identified to
7  be heard today.
8    We had originally scheduled today just to
9  hear the motion to vacate, and at Ms. Finn's request,
10  we added on the request for decree. So we would ask
11  that the issue on the Circle Drive residence not be
12  dealt with today. We have not identified exhibits or
13  brought witnesses to address that subject.
14    THE COURT: Mr. Lass.
15    MR. LASS: Well, I don't agree that that
16  was the agreement at the status conference. It's -- it
17  is an ancillary motion, because, frankly, if the Court
18  grants the wife's motion for entry of the decree, that
19  kind of moots the -- we don't need to decide the Circle
20  Drive motion. The problem we have now, I think, is
21  that we need direction from Your Honor as to who is
22  going to put which witnesses on first, and we don't
23  have an agreement on that.
24    THE COURT: Okay. Since Mr. Lass
25  represents the petitioner, I'm going to allow that to

**11**

1  control. And you can present your witnesses, Mr. Lass.
2    MR. FOX: Your Honor, if we could have
3  clarification on what motions we are hearing today?
4    THE COURT: We are for certain hearing
5  the two motions that you've identified. And then as
6  the evidence presents itself today, I'll make a
7  decision as to whether or not we can go on the third
8  motion, obviously, giving you time if you need
9  additional time, additional witnesses that aren't here,
10  or if there are exhibits that have not been identified
11  we can discuss that at the time.
12    MR. FOX: And that would be the primary
13  issue, because there's a lot of correspondence between
14  counsel and letters addressing the third issue that are
15  not identified by either party.
16    THE COURT: Great. Thank you. And,
17  again, the third issue?
18    MR. FOX: The third issue being Ms.
19  Finn's request to change her designation of residence.
20    THE COURT: Great. Thank you.
21    Mr. Lass, you may call your first
22  witness.
23    MR. LASS: And there's one other -- I
24  think, at least one other preliminary matter.
25    THE COURT: Go right ahead.

**12**

1    MR. LASS: Because I gathered, what the
2  Court's saying, you don't need an opening statement,
3  and I understand that. The --
4    THE COURT: And I have no problem with
5  you making opening statements. It seems to me that
6  maybe that would be something that's appropriate after
7  we have some testimony taken. That's all I was -- I
8  was suggesting.
9    MR. LASS: Okay. Well, we are willing to
10  waive opening statements if counsel is willing to waive
11  opening statements.
12    MR. FOX: Don't need to.
13    THE COURT: Don't need to waive or don't
14  need to make an opening statement?
15    MR. FOX: I think this thing's been
16  briefed adequately, Your Honor.
17    THE COURT: I appreciate that.
18    MR. FOX: And I did have a couple of
19  procedural issues, unless you were getting into those.
20    MR. LASS: That's what I was getting
21  into, to begin with. We have limited time. The case
22  is set for one day. That was primarily at the
23  husband's request that it be set for only one day. The
24  husband has provided us over the weekend with 130-plus
25  exhibits. That's two notebooks, double-sided. If we

3 (Pages 9 to 12)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 7 of 110

13

1 are going to get this done in one day, then contrary to
2 what I normally say, I would hope that the Court would
3 keep track of the time, because otherwise we will not
4 get done, and so that the parties have equal amounts of
5 time to present their cases. So that was -- that was
6 my procedural matter.
7 THE COURT: Great. Thank you. Mr. Fox.
8 MR. FOX: Thank you, Your Honor. Your
9 Honor, the procedural issue that I would like to
10 address is something that I have raised with Mr. Lass
11 and Mr. Ramp. It's a request that the Court seal the
12 file. One of the other issues we addressed during our
13 phone status conference was a deadline for Rule 16.2
14 disclosures, which is today. We have a tremendous
15 amount of financial information that we assert is
16 confidential, as well as -- to disclose in a Rule 16.2.
17 We also have many exhibits that we
18 believe are confidential. I would note that the
19 parties agreed in their marital agreement that the
20 proceeding would be confidential and that they would
21 request that the file be sealed. And so we would ask
22 the Court to enter an order that all exhibits,
23 proceedings, or documents introduced or exchanged
24 between the parties be held in a confidential nature.
25 THE COURT: Great. Thank you.

14

1 Mr. Lass, any objection to that?
2 MR. LASS: Yes, Your Honor. I'm sorry
3 this is the way we started off. Mr. Fox did prepare a
4 confidentiality -- a proposed confidentiality
5 stipulation. There are confidentiality issues, and
6 the -- one of the issues that arose was actually a
7 claim that perhaps the documents that were provided in
8 one case in Colorado couldn't be used in California.
9 That's the confidentiality issue.
10 I have no problem with the matter
11 being -- with the documents being kept confidential for
12 the time being until either we reach a stipulation or
13 we present it to the Court for an order, but in terms
14 of the short-term confidentiality, we object to that.
15 THE COURT: The Court will order that the
16 file is sealed. It will order that there be
17 confidentiality. And I'll look for counsel for prepare
18 an order consistent with that ruling for entry.
19 MR. FOX: Thank you, Your Honor. And the
20 last procedural issue that I had was concerning a
21 request for a sequestration order.
22 THE COURT: Thank you. The Court will
23 grant that request. Anyone who's going to be
24 testifying will have to remain outside. And I'll ask
25 counsel to pay attention to who comes and goes from the

15

1 courtroom, since I'm not aware of who your witnesses
2 are. So that will be granted.
3 MR. LASS: And -- and on the
4 confidentiality issue, my request is that it be sealed
5 temporarily until either we raise it with you, because
6 we haven't reach an agreement, or we submit an
7 agreement.
8 THE COURT: That's fine. Mr. Lass, you
9 may call your first witness.
10 MR. LASS: Okay. We have to excuse one
11 witness, Mr. Sullivan.
12 THE COURT: As a housekeeping matter,
13 lunch will be provided. We'll be taking a break about
14 every hour and a half or so. And we'll take a midday
15 break and shouldn't have to be too long since we'll
16 have lunch here for everyone.
17 MR. FOX: Thank you, Your Honor.
18 THE COURT: You are welcome.
19 MR. LASS: Your Honor, we'll first --
20 call as our first witness the wife, Kelleen Sullivan
21 Finn, please. And I have, Your Honor, our exhibit
22 books for the witness and for the Court.
23 THE COURT: Thank you.
24 * * * * *
25

16

1
2
3 KELLEEN SULLIVAN FINN,
4 having been first duly sworn to state the whole truth,
5 was examined and testified as follows:
6 DIRECT EXAMINATION
7 BY MR. LASS:
8 Q. Good morning.
9 A. Good morning.
10 Q. What's your name?
11 A. My name is Kelleen Frances Sullivan Finn.
12 Q. And how old are you, Mrs. Finn?
13 A. I'm 52 years old.
14 Q. Are you a shareholder in Sullivan
15 Vineyards Corporation?
16 A. Yes, I am.
17 Q. What is Sullivan Vineyards Corporation?
18 A. Sullivan Vineyards Corporation is an
19 entity owned by Sullivan Vineyards Partners that owns
20 the land, the farm, and the vineyard.
21 Q. Are there two entities, Sullivan
22 Vineyards Corporation and Sullivan Vineyards Partners?
23 A. Yes, there are.
24 Q. And Sullivan Vineyards, are you also a
25 partner in Sullivan Vineyards --

4 (Pages 13 to 16)

Case: 17-10065   Doc# 86   Filed: 04/05/17   Entered: 04/05/17 17:46:12   Page 8 of 110

**17**

1     A. Yes, I'm a --
2     Q. -- Partners?
3     A. -- general partner in Sullivan Vineyards.
4     Q. And I think you might have misspoke. Did
5 you mean to say that the partnership owns the
6 corporation or that the ownership overlaps?
7     A. The ownership overlaps. The Sullivan
8 Vineyards Corporation owns the inventory and the tanks.
9 I mean the inventory and the brand.
10    Q. Okay. And the partnership owns?
11    A. Owns the land and the house.
12    Q. Who are the other shareholders in
13 Sullivan Vineyards Corporation?
14    A. My husband is the majority shareholder at
15 Sullivan Vineyards Partners and Sullivan Vineyards
16 Corporation, and my brothers and sisters are the -- we
17 are the minority shareholders.
18    Q. And how many siblings do you have?
19    A. There's five of us, total.
20    Q. And you each own roughly equal --
21    A. 9.8 percent.
22    Q. And you understand there's some dispute
23 about the percentage ownerships in the corporation?
24    A. Yes, there is some dispute, but I don't
25 think that that's very important right now.

**18**

1    Q. Okay. And who are the other partners in
2 Sullivan Vineyards Partners?
3    A. In the partners -- in the partnership?
4 My brothers and sisters and Steve and myself.
5    Q. The same, roughly the same?
6    A. Yes, roughly the same.
7    Q. Okay. You are married to Stephen Finn,
8 who is here today?
9    A. Yes, I am.
10    Q. And you'd indicated that he's the
11 majority shareholder in Sullivan Vineyards Corporation.
12 Is he also the majority partner in the partnership?
13    A. Yes, he is.
14    Q. When were you married?
15    A. We were married June 18, 2011.
16    Q. Where were you married?
17    A. We were married in Maui on a beautiful
18 estate, oceanfront home.
19    Q. Owned by Mr. --
20    A. Yes, owned by Mr. Finn.
21    Q. Okay. When, roughly, did you separate
22 from Mr. Finn?
23    A. Around the middle of April.
24    Q. Any children born during your marriage?
25    A. No, we have no children.

**19**

1    Q. Let's talk for a little bit about
2 Sullivan Vineyards, the Sullivan Vineyards. And when I
3 speak of Sullivan Vineyards, is it fair to assume that
4 that includes both the partnership and the
5 corporation --
6    A. Yes, it is. Yes.
7    Q. -- in summary?
8    A. We refer to it as Sullivan Vineyards.
9    Q. Okay. When did your parents acquire the
10 real estate that eventually became Sullivan Vineyards?
11    A. Well, we began in 1972 is when we bought
12 our first vineyard. And '78, where the residence is
13 now.
14    Q. Okay. And what did the -- strike that.
15    Do you understand that your husband is
16 seeking permission to sell all of Sullivan Vineyards?
17    A. Yes, I understand that.
18    Q. And do you agree that Sullivan Vineyards
19 should be sold at this time?
20    A. No, I do not.
21    Q. Can you briefly summarize why you don't
22 believe that Sullivan Vineyards should be sold at this
23 time?
24    A. It's my understanding that in the
25 prenuptial agreement that the intention was to protect

**20**

1 my family's farm, and so I would be able to live there
2 forever and give it to my nieces and nephews.
3    MR. ROSE: Objection, speculation,
4 document speaks for itself.
5    THE COURT: One thing I'm going to
6 request is that whoever is going to cross-examine the
7 witness be the person that makes the objections. Thank
8 you. And could you please repeat your objection?
9    MR. ROSE: Yes. Speculation. The
10 document speaks for itself. There's no foundation for
11 that opinion.
12    THE COURT: Well, I think that it goes to
13 the witness's state of mind, so I'll allow it to stand.
14 The document does speak for itself.
15    Q. (BY MR. LASS) Go ahead. Other than the
16 marital agreement -- the question was, can you
17 summarize some of the reasons why you don't believe
18 that Sullivan Vineyards should be sold at this time.
19    A. Well, Sullivan Vineyards is my ancestral
20 home. I grew up there. My father built it. It's his
21 legacy, and I would like to protect it.
22    Q. What did the property -- what did the
23 property look like when your parents first acquired it?
24    A. When we first arrived it was just a hay
25 field, no trees. There was one small vineyard, a

scheduling@huntergeist.com               HUNTER + GEIST, INC.            303-832-5966/800-525-8490

Case: 17-10065   Doc# 86   Filed: 04/05/17   Entered: 04/05/17 17:46:12   Page 9 of 110

21

1  Chenin Blanc vineyard on it.  It had 8 acres at the
2  time.  It's 26.7 acres.  And we built -- we built the
3  home, we built the winery.  The Boy Scouts built the
4  winery.  It was -- we did it all by hand.  My brothers
5  planted the vineyard.
6      Q.  Okay.  Did you compile a couple of
7  photographs that might help illustrate your testimony
8  about the --
9      A.  Yes, I did.
10     Q.  -- development of the vineyards?
11     A.  Yes, I did.
12     Q.  Could you look at Exhibit 4 in the
13  notebook in front of you, please.
14     A.  This is as portrait of my father and my
15  mother --
16     Q.  You are looking at page 1?
17     A.  Yes, I'm looking at page 1 -- in the
18  winery.
19     Q.  Okay.  When was that taken, roughly?
20     A.  That was done in the 1990s.
21     Q.  Okay.  What about page 2?
22     A.  Page 2 is the house.
23         MR. ROSE:  Your Honor, since we have
24  limited time, I don't think this testimony is relevant
25  to the issues the Court is being asked to adjudicate.

22

1         THE COURT:  The objection will be
2  overruled.  I'm sure that Mr. Lass will go quickly
3  through it.
4      A.  This is the house that my father built
5  with my brothers.
6      Q.  (BY MR. LASS)  How many stories on the
7  house?
8      A.  There are three stories on the house.
9      Q.  And which --
10     A.  We live on the second story there is how
11  the -- the house is designed.  So it floats over the
12  vineyards.  So you have a 360-degree view mostly from
13  almost all of the rooms.
14     Q.  And what's that on top?
15     A.  Oh, there's just a small loft.
16     Q.  Okay.  And who built this house?
17     A.  My parents built this house.  They
18  designed it and built it.  It was their dream home.
19     Q.  Did you grow up in this house?
20     A.  From high school on, yes.
21     Q.  Okay.  What's page 3?
22     A.  This is a family portrait of my
23  grandmother's birthday, I think her 95th birthday.
24     Q.  Is that at the vineyard?
25     A.  Yes, it is.  It's in our backyard.

23

1      Q.  Page 4, please.
2      A.  This is my brother planting the back
3  Merlot vineyard in 1996.  We -- we planted every vine.
4  This is my other brother, my older brother, and he's --
5  you can see the house in the distance.  And they're
6  putting in the vineyard.
7      Q.  And did your family, then, personally
8  plant the vines?
9      A.  Yes, we did.
10     Q.  Okay.  What's page 6?
11     A.  This is a -- page -- okay.  Same, these
12  are my two brothers.
13     Q.  Okay.  Planting, okay.
14     A.  I'm taking the pictures.  This is -- my
15  brothers -- we didn't have a facility to crush grapes
16  at the time, so we put our -- when we were harvesting,
17  we'd put the bins in the back of the truck and take it
18  over to our neighbor's house, and we'd crush the
19  grapes.  And those are my two brothers and my father.
20     Q.  So did your family harvest the grapes as
21  well?
22     A.  Yes, we did.  I drove the tractor.
23     Q.  When was that picture taken?
24     A.  Oh, that was taken in the early 1990s,
25  '89 or '90.

24

1      Q.  Does the vineyard currently have the
2  ability to crush the grapes?
3      A.  Yes, we do.
4      Q.  Page 8?
5      A.  This is my mother at one of our harvest
6  parties.
7      Q.  At the vineyard?
8      A.  Yes.
9      Q.  What are harvest parties?
10     A.  Harvest parties are after you've picked
11  all the grapes and then all the wine is in the tanks
12  and it's fermenting, everybody is very excited.  And
13  there's a beautiful smell in the air of completion from
14  when the grapes are being done.
15     Q.  Okay.  What about page 9?  We are almost
16  done.
17     A.  Page 9, we have a jazz concert.  It was a
18  charity event, which we put on several every year.
19  This is my father, my mother, my older brother, who
20  mainly organized them, and then me.
21     Q.  Charity events held at the vineyard,
22  right?
23     A.  Yes.
24     Q.  And then page 10?
25     A.  Page -- my brother again.  And . . .

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 10 of
110

25

1     Q.  Okay.  Go ahead.
2     A.  Page 11, my father at harvest, very proud
3  of his grapes.
4     Q.  Okay.  Page 12?
5     A.  Page 12 is another photo, which became a
6  very famous picture of my father.  It's as if he's
7  sitting in this room right now.
8     Q.  And when was that taken?
9     A.  It was taken in the late 1990s.
10    Q.  Is your father currently living?
11    A.  No.  He is passed away at this time.
12    MR. LASS:  Your Honor, I would move for
13  the admission of only pages 1 through 12 of Exhibit 4.
14    THE COURT:  Any objection?
15    MR. ROSE:  None, Your Honor.
16    THE COURT:  Thank you.  They will be
17  admitted.
18    (Exhibit 4, pages 1 through 12, was
19  admitted.)
20    Q.  (BY MR. LASS)  I would like to ask you
21  some questions related to the ownership of Sullivan
22  Vineyards before your marriage to Mr. Finn.  Prior to
23  your marriage to Mr. Finn in 2011, who were the owners
24  of Sullivan Vineyards Corporation?
25    A.  Of the corporation, it was my parents,

26

1  they each owned 25 percent, and then the children owned
2  49 percent.  And when my father passed away, then that
3  went to my mother.
4     Q.  His shares went to your mother?
5     A.  His shares went to my mother.  And it was
6  just a very closely held family corporation.
7     Q.  What about ownership of the partnership
8  again prior to your marriage to Mr. Finn?
9     A.  The same.
10    Q.  Okay.  Prior to your marriage to Mr. Finn
11  did you sign a marital agreement?
12    A.  Yes, I did sign it.
13    Q.  How did you and Mr. Finn, when you spoke
14  about this agreement after you were married -- after
15  you were married -- how did you -- what did you refer
16  to this document as?
17    A.  We -- as the "pre-nup."
18    Q.  Okay.  And did you, in your
19  communications, abbreviate "pre-nup" into something
20  else, in texts or letters to each other?
21    A.  The "PN."
22    Q.  Please turn to Exhibit 2.  And please
23  turn to page 22.  Is that your signature on page 22?
24    A.  Yes, it is.
25    Q.  Would you recognize your husband's

27

1  signature if you saw it?
2     A.  Yes.
3     Q.  Is that his signature on --
4     A.  Yes, it is.
5     Q.  -- page 22?  Did you both sign it on two
6  different occasions?
7     A.  Yes, we did.
8    MR. LASS:  I'd move for the admission of
9  Exhibit 2.
10    THE COURT:  Any objection?
11    MR. ROSE:  No objection, Your Honor.
12    THE COURT:  Thank you.  Exhibit 2 will be
13  admitted.
14    (Exhibit 2 was admitted.)
15    Q.  (BY MR. LASS)  Why did you sign it twice?
16    A.  I don't know.
17    Q.  Okay.
18    A.  I thought we were reaffirming our love
19  for each other, actually.
20    Q.  Could you turn to Exhibit -- I'm sorry --
21  to page 5. -- to page 13.  I'm sorry.  And there's a
22  paragraph that's begins at 5.7.  Do you see that?
23    A.  Yes, I do.
24    Q.  And I want you -- and that says, "Upon
25  termination of our marriage by entry of a decree, Kelly

28

1  shall be entitled to receive the following."  Do you
2  see that?
3    A.  Yes.
4    Q.  And then in 5.7.2, the language says, "If
5  Steve owns any interest in Sullivan Vineyards or in any
6  entity owning the Sullivan Vineyards, Steve's entire
7  ownership interest, subject to all existing debt or
8  financial obligations."  Do you see that paragraph?
9    A.  Yes.
10    Q.  Okay.  Was that an important part of the
11  marital agreement to you?
12    A.  It was extremely important to me.
13    Q.  Why?
14    A.  Because I wanted to protect my family's
15  legacy and my father's legacy.  And I wanted to --
16  since I was giving up half of my husband's income and
17  half of his assets, appreciation of his assets, it was
18  what I was to receive.
19    Q.  Please turn to page 8.  Do you see
20  paragraph 4.2.1?
21    A.  Yes, I do.
22    Q.  And this provides -- what does this
23  generally provide, in your understanding?
24    A.  That I would receive a gift of $500,000 a
25  year as we were married.

Case: 17-10065   Doc# 86   Filed: 04/05/17   Entered: 04/05/17 17:46:12   Page 11 of 110

29

1    Q.  Okay.
2         MR. LASS:  And, Your Honor, I have to ask
3    a question of my partner, if I can.
4         THE COURT:  Go right ahead.
5         (Pause in the proceedings.)
6         MR. LASS:  Sorry, Your Honor.
7    Q.  (BY MR. LASS)  Then turn to page -- or
8    I'm sorry -- same page, paragraph 4.2.3.
9    A.  Yes.
10   Q.  And can you read that to yourself,
11   please.
12   A.  Yes.
13   Q.  And what is your understanding of what
14   that provides generally?
15   A.  That Steve was able to decide which --
16   what he would like to gift me for my yearly gift.
17   Q.  Uh-huh.  And could that have included the
18   gifts of any ownership in Sullivan Vineyards?
19   A.  You --
20        MR. ROSE:  Objection, that calls for a
21   legal conclusion, legal analysis.
22        THE COURT:  The objection will be
23   sustained as far as legal analysis.  It will be
24   overruled as far as allowing her to give her state of
25   mind.

30

1    A.  Okay.  Could you repeat the question,
2    please?
3    Q.  (BY MR. LASS)  Sure.  What was your state
4    of mind, your understanding, of whether Mr. Sullivan
5    could give you shares in Sullivan Vineyards Corporation
6    to satisfy this $500,000 obligation?
7    A.  He was not allowed to give me -- gift me
8    his -- a yearly gift of $500,000 as Sullivan Vineyards,
9    because it was already obligated to me.  I already
10   owned it.
11        MR. ROSE:  Objection.  That calls for a
12   legal conclusion or analysis and misstates the
13   document, Exhibit 2.
14        THE COURT:  Thank you.  The document,
15   again, will speak for itself; however, I'll allow the
16   answer to stand as to the witness's state of mind.
17   Q.  (BY MR. LASS)  Did your husband, after
18   your marriage, acquire an interest in Sullivan
19   Vineyards?
20   A.  Yes, he did.
21   Q.  Okay.  What were the circumstances under
22   which that occurred?
23   A.  He had negotiated for six months with my
24   mother beforehand.  I know -- it was my understanding
25   that he wanted to complete it before we got married,

31

1    but that didn't happen, so we completed it in August of
2    2011 afterwards.
3    Q.  Okay.  And whose shares did he acquire
4    and why --
5    A.  Oh, he acquired my mother's majority
6    interest.
7    Q.  Why was your mother willing to give --
8    why -- how old was your mother at the time she -- did
9    she sell her shares or give them to Steve?
10   A.  She sold her shares to Steve.
11   Q.  And how old was she at the time?
12   A.  She was 73 years old at the time.
13   Q.  And do you have an understanding of why
14   she did that?
15   A.  She was ready to retire --
16        MR. ROSE:  Calls for speculation.  It's
17   also hearsay.
18        THE COURT:  To the extent she has
19   personal knowledge, she can answer the question.
20   A.  She -- she had a stroke the year before,
21   and she was ready to retire.  She was done.  She had
22   worked really hard, and it was time.
23        One thing she did want to do, which was
24   very important --
25        THE COURT:  There's no question pending

32

1    right now.
2         THE WITNESS:  Oh, okay.  Thank you.
3    Excuse me.
4         THE COURT:  No problem.
5    Q.  (BY MR. LASS)  Were you still answering
6    the previous question?
7    A.  I was, but that's okay.
8    Q.  You paused.  Do you know whether she had
9    received other offers to purchase her interest in the
10   winery?
11   A.  Yes, she did.
12   Q.  Was it important to you that the
13   ownership of the winery remain in the name of the -- in
14   the family at that time?
15   A.  It was extremely important, and that's
16   why we chose to allow Steve to purchase and to -- the
17   shares into the family.
18        MR. ROSE:  Objection.  There's no
19   foundation that this witness had any involvement in the
20   negotiations of the sale of the -- of the winery shares
21   to Steve Finn by her mother.
22        THE COURT:  Thank you.  Objection will be
23   overruled.
24   Q.  (BY MR. LASS)  During your marriage,
25   after he acquired some ownership interest in the

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 12 of 110

---

**33**

1   business, did Mr. Finn put some money into the
2   business?
3      A.   Yes, he did.
4      Q.   And you discussed that with Mr. Finn?
5      A.   Yes, I did.
6      Q.   And was some of that in the form of a
7   loan to either the corporation or the partnership?
8      A.   Yes, it was.
9      Q.   Do you know for certain how much was
10   loaned by Mr. Finn?
11      A.   I don't know the exact number.
12      Q.   Okay. Have you seen as part of this case
13   his calculations about how much he claims is
14   outstanding in loans?
15      A.   That's changed, so I -- I have seen
16   several, actually.
17      Q.   Okay. And do you believe that the
18   accountings that you've seen accurately reflect the
19   amount of money that was loaned and is still
20   outstanding from the corporations to Mr. Finn?
21      MR. ROSE: Objection, Your Honor.
22   There's no foundation for that opinion.
23      THE COURT: Objection will be overruled.
24      A.   I'm not sure exactly what the total is,
25   but I do believe we owe him some money.

---

**34**

1      Q.   Do you concede --
2      A.   Yes.
3      Q.   -- that there are some loans, some amount
4   is owed to Mr. Finn by the corporation or the
5   partnership?
6      A.   Yes, but I -- I -- I considered those
7   capital contributions. I -- I thought he was putting
8   it into our -- I thought we were building this
9   together, actually.
10      MR. ROSE: Your Honor, move to strike
11   again. This is pure speculation and conjecture.
12   There's no foundation for these opinions.
13      THE COURT: It will be overruled.
14      Q.   (BY MR. LASS) You are familiar -- you
15   are a -- let's go back here for a second.
16      You are an owner, one of the shareholders
17   of the corporation?
18      A.   Yes, I am.
19      Q.   You are a partner in the partnership?
20      A.   Yes, I am.
21      Q.   Do you know whether the corporation or
22   the partnership owe money to anyone other than Mr.
23   Finn?
24      A.   Yes, we do.
25      Q.   Okay. Who is -- who is money owed to?

---

**35**

1      A.   We owe money to -- we owe $9.5 million,
2   roughly, about, to Silicon Valley Bank, which was -- in
3   2001 we started out with a $7.5 million loan, which we
4   increased to 9.5. And from that, Steve had put in $2
5   million, which he was -- it's my understanding that he
6   was paid back for that amount. And then he did later
7   on contribute capital contributions later on every
8   year.
9      Q.   Okay. And so money is owed to Silicon
10   Valley Bank?
11      A.   Yes.
12      Q.   Are there other major creditors of the
13   corporation or the partnership?
14      A.   Not to my understanding at this time.
15      Q.   What about Mr. Beckstoffer?
16      A.   Oh, we do owe him $90,000.
17      THE COURT: Could you spell that last
18   name?
19      THE WITNESS: I can.
20   B-e-c-k-s-t-o-f-f-e-r.
21      THE COURT: Thank you.
22      THE WITNESS: You are welcome.
23      Q.   (BY MR. LASS) Please turn to Exhibit 3.
24   After you signed the marital agreement did you agree to
25   an amendment to the marital agreement?

---

**36**

1      A.   Yes, I did.
2      Q.   And please look at page 3. Does your
3   signature appear on page 3?
4      A.   Yes, it does.
5      Q.   And did you sign it on or about April 19,
6   2013?
7      A.   Yes, I did.
8      Q.   And does Mr. Finn's signature also appear
9   on page 3?
10      A.   Yes, it does.
11      Q.   The date next to that is February 24,
12   2015; do you see that?
13      A.   Yes, I do.
14      Q.   Do you know what date he signed this
15   agreement?
16      A.   It looks like he signed it on February
17   24, 2015.
18      MR. LASS: I move for the admission of
19   Exhibit 3.
20      THE COURT: Any objection?
21      MR. ROSE: None.
22      THE COURT: Thank you. Exhibit 3 will be
23   admitted.
24      (Exhibit 3 was admitted.)
25      Q.   (BY MR. LASS) Do you know why it would

---

scheduling@huntergeist.com      HUNTER + GEIST, INC.      303-832-5966/800-525-8490

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 13 of 110

37

1    appear that he signed it almost two years after you
2    did?
3        A.  I have no idea.  I think because now he
4    realized it was important and he needed it.
5        Q.  During your marriage to Mr. Finn, where
6    did you live with him?
7        A.  We lived in three different places, four
8    actually.  We lived in Los Altos Hills, in California;
9    we lived in Circle Drive, in Denver; and we lived in
10   Maui, one -- about ten days for each of the places out
11   of the month.  We'd move around very quickly, if that's
12   your question.
13       Q.  And were those homes all owned by either
14   Mr. Finn or the two of you together?
15       A.  Yes, they were owned by Mr. Finn and
16   myself.  And we would go up to the winery once a month
17   during that time.
18       Q.  Did you have a -- did you have an
19   ownership interest in the Maui property?
20       A.  No, I do not have any ownership interest
21   in the Maui property.
22       Q.  And did you have an ownership in the Los
23   Altos Hills property?
24       A.  No, I do not own anything in Steve's
25   other homes.

38

1        Q.  Circle Drive?
2        A.  Circle Drive, yes, I own 50 percent.
3        Q.  Did there come a time in early 2015 when
4    your marriage to Mr. Finn became very troubled?
5        A.  Yes.
6        Q.  At about that time did your husband, Mr.
7    Finn, ask you to further modify the marital agreement?
8        A.  Yes, he did.
9        Q.  And approximately what time frame was
10   this in in 2015, just approximately?
11       A.  It was approximately the same day he
12   signed this amendment to the marital agreement,
13   actually.
14       Q.  Okay.  The same time he signed Exhibit 3
15   is what --
16       A.  Yes.
17       Q.  -- you were discussing, possibly another
18   amendment; is that what you said?
19       A.  Yes.  He brought home an amendment for me
20   to sign.
21       Q.  In the initial part of those discussions
22   what did Mr. Finn tell you -- what did he say to you
23   that he wanted to change in the marital agreement?
24       A.  He wanted me to confirm that it was his
25   separate property, the winery was his separate

39

1    property, and that he deserved it.
2        Q.  So how did he say that changed the
3    agreement, then?
4        A.  Oh, because then it wouldn't be obligated
5    to me in any way if we were to get a divorce.
6        Q.  Did he present you with a proposed
7    amendment to the agreement?
8        A.  Yes, he did.
9        Q.  Please turn to Exhibit 8.  Is this a
10   proposed amendment to the marital agreement that was --
11   is this -- is this a proposed marital agreement --
12   strike that.
13            Is this a proposed marital agreement
14   amendment that was presented to you by Mr. Finn,
15   through counsel, I assume?
16       A.  Yes.  This is the amendment that he
17   wanted me to sign.
18       Q.  And did you agree to sign it?
19       A.  No, I did not agree to sign it.
20            MR. LASS:  I'm sorry, Your Honor.  I
21   don't think I moved for the admission of Exhibit 8.
22            THE COURT:  Any objection?
23            MR. ROSE:  Your Honor, I think these are
24   negotiations.  I would object that the document is a
25   settlement negotiation.

40

1            THE COURT:  That objection will be
2    overruled.  Exhibit 8 will be admitted.
3            (Exhibit 8 was admitted.)
4        Q.  (BY MR. LASS)  Why did you not agree to
5    sign that amendment?
6        A.  Because it gave up -- I wasn't going to
7    be able to have -- I was going to have to give up the
8    winery and my father's legacy.  And it didn't make any
9    sense, because that's what we had -- that was the
10   original intention of the pre-nup.
11       Q.  Did your husband make other efforts after
12   you wouldn't agree to that to modify the marital
13   agreement?
14       A.  Yes, he did.
15       Q.  And what -- what -- what did he ask you
16   to do next?
17       A.  He then proposed a purchase agreement to
18   my brothers and sisters, and called them all to try to
19   convince them to sell him his [sic] shares, only with
20   the understanding that I would give up my shares and
21   that there was absolutely no way that he wanted me to
22   be involved with Sullivan Vineyards any longer.
23       Q.  Please turn to Exhibit 9.  What is
24   Exhibit 9?
25       A.  It's the purchase agreement that he sent

scheduling@huntergeist.com                    HUNTER + GEIST, INC.                    303-832-5966/800-525-8490

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 14 of
110

41

1　to my brothers and sisters.
2　　　Q.　And it looks like your name is at the
3　bottom, so was this purchase agreement also sent to
4　you?
5　　　A.　Yes, it was sent to me as well.
6　　　Q.　Did you agree to this proposal?
7　　　A.　No, I did not.
8　　　MR. LASS:　Move for the admission of
9　Exhibit 9.
10　　　THE COURT:　Any objection.
11　　　MR. ROSE:　No objection.
12　　　THE COURT:　Thank you.　Exhibit 9 will be
13　admitted.
14　　　(Exhibit 9 was admitted.)
15　　　Q.　(BY MR. LASS)　In the course of your
16　discussions with Mr. Finn in 2015 regarding his desire
17　to modify the marital agreement, did you exchange text
18　messages?
19　　　A.　Several.
20　　　Q.　Did you, actually, almost daily?
21　　　A.　Yes, daily.
22　　　Q.　Did you also have phone discussions with
23　him?
24　　　A.　Very rarely.　We barely spoke.
25　　　Q.　In the course of those communications,

42

1　did Mr. -- what did Mr. Finn say to you about what he
2　would do if you did not agree to amend the marital
3　agreement?
4　　　A.　That he would run the winery into the
5　ground and make sure that the bank called the note and
6　that it wouldn't be worth anything and you would get
7　nothing.
8　　　Q.　"You" being -- meaning you?
9　　　A.　Yes.
10　　　Q.　Please turn to Exhibit 7.　And looking
11　only at the first page of Exhibit 7, did you have text
12　communications with Mr. Finn on or about March 23 of
13　2015 about his desire to change the marital agreement?
14　　　A.　Yes.
15　　　Q.　And did you retain those text messages?
16　　　A.　Yes, I did.
17　　　Q.　How did you save them, and what -- did
18　you save them into some sort of written form?
19　　　A.　Yes, I did.
20　　　Q.　How did you do that?
21　　　A.　I put it into -- if you take it into
22　print and put it into a PDF, you can save the file and
23　then you can -- then it's in your computer, and you can
24　print it as you wish.
25　　　Q.　Okay.　And can you change it if it's in

43

1　the PDF format?
2　　　A.　No, you cannot.
3　　　Q.　On the first page of Exhibit 7, it
4　appears to me that there are messages that begin on the
5　left-hand margin and messages that begin in the middle
6　of the page.
7　　　A.　Yes.
8　　　Q.　Whose -- can you describe whose messages
9　are whose?
10　　　A.　The ones in blue are my responses and
11　texts to Steve, and the ones in white are Steve's.
12　　　Q.　I'm not sure that the Court's --
13　　　A.　Oh, so the darker -- the gray, the dark
14　gray, are mine, and the lighter ones on the left-hand
15　side are Steve's.
16　　　THE COURT:　Thank you.
17　　　Q.　(BY MR. LASS)　So we're all clear, so the
18　messages that begin on the left-hand margin are
19　Mr. Finn's?
20　　　A.　Yes.
21　　　Q.　And the ones in the middle of the page
22　are your feedback?
23　　　A.　Yes.
24　　　Q.　Okay.
25　　　MR. LASS:　Move for the admission of the

44

1　first page of Exhibit 7.
2　　　THE COURT:　Any objection?
3　　　MR. ROSE:　None, Your Honor.
4　　　THE COURT:　Thank you.　It will be
5　admitted.
6　　　(Exhibit 7, page 1, was admitted.)
7　　　Q.　(BY MR. LASS)　Did Mr. Finn tell you in a
8　text message on March 23, 2015, towards the middle of
9　the page, did he tell you this:　"You should want me to
10　be motivated to get the most value.　Today I am
11　motivated to run it into the ground so I can get paid
12　back or sell it quick for my return of cash and loan
13　guarantee.　You are not very understanding of human
14　nature"?　Is that what he said to you in that text?
15　　　A.　That's what he wrote in his text, yes.
16　　　Q.　Turn to Exhibit -- to page 2 of Exhibit
17　7, please.　Again, page 2 of Exhibit 7, does this
18　reflect text messages that you recorded and saved in
19　the manner you described?
20　　　A.　Yes, they are.
21　　　Q.　And, again, whose texts begin on the
22　left-hand margin?
23　　　A.　Steve's are on the left and mine are on
24　the right.
25　　　Q.　Okay.

11 (Pages 41 to 44)

Case: 17-10065　　　Doc# 86　　　Filed: 04/05/17　　　Entered: 04/05/17 17:46:12　　　Page 15 of 110

---

45

1      MR. LASS:  Move for the admission of page
2   2 of Exhibit 7.
3      THE COURT:  Any objection?
4      MR. ROSE:  None, Your Honor.
5      THE COURT:  Page 2 will be admitted.
6      (Exhibit 7, page 2, was admitted.)
7      Q.  (BY MR. LASS)  Did Mr. Finn tell you at
8   this time frame, on or about April 12, 2015, the
9   following:  "And my fault for agreeing to such a
10  generous pre-nup"?  Do you see that?
11     A.  Yes.
12     Q.  And did he tell you, "If I had realized
13  those terms in the PN, I would have never made it so
14  successful.  I would have asked for a change or I would
15  have put my wealth and talents elsewhere.  It is not
16  fair.  I signed it.  It is my fault.  But do not need
17  to make it worse for me, and I now need to protect
18  myself"?
19     A.  Yes.
20     Q.  Please turn to page 3 of Exhibit 7.  Are
21  you on page 3, Kelly?
22     A.  Yes, I'm on page 3.
23     Q.  I thought you were distracted.
24     A.  Excuse me.
25     Q.  That's okay.  Are these text messages

---

46

1   that you saved in the manner you've previously
2   described through the PDF formatting?
3      A.  Yes.
4      Q.  And, again, whose messages are on the
5   left-hand margin?
6      A.  Steve's are on the left and mine are on
7   the right.
8      MR. LASS:  Move for -- I'm sorry.  Your
9   Honor, move for the admission of page 3 of Exhibit 7.
10     THE COURT:  Any objection?
11     MR. ROSE:  None, Your Honor.
12     THE COURT:  Page 3 will be admitted.
13     (Exhibit 7, page 3, was admitted.)
14     Q.  (BY MR. LASS)  Please turn to page 4.
15  Are these, again, text messages saved by you in the
16  same manner you described?
17     A.  Yes.
18     Q.  And the same formatting of these text
19  messages?
20     A.  Yes.
21     MR. LASS:  Move for the admission of page
22  4 of Exhibit 7.
23     THE COURT:  Any objection?
24     MR. ROSE:  None, Your Honor.
25     THE COURT:  Page 4 will be admitted.

---

47

1      (Exhibit 7, page 4, was admitted.)
2      Q.  (BY MR. LASS)  Did Mr. Finn text you on
3   or about April 12, or approximately at that time,
4   quote:  The cash runs out after the next payroll.  FYI,
5   I have the power to sell the real estate because the
6   majority owner, per the partnership agreement, is
7   empowered.
8      Did he text that to you?
9      A.  Yes.
10     Q.  And did he text to you later on in the
11  same text, "As you already" -- excuse me -- "the PN
12  change I requested has little current value to me.  As
13  you already realized, long term I like to control my
14  destiny.  If you could get me out in 30 days or today
15  you can have the place for what I invested.  You cannot
16  because there is little additional value today"?  Did
17  he text you that?
18     A.  Yes, he did.
19     Q.  Finally -- or almost finally, I guess --
20     MR. LASS:  I'm sorry, Your Honor.  I
21  don't know if I moved for the admission of page 4 of
22  Exhibit 7.
23     THE COURT:  I believe you did.
24     MR. LASS:  Thank you, Judge.
25     Q.  (BY MR. LASS)  Please turn to page 5 of

---

48

1   Exhibit 7, okay?  You doing okay?
2      A.  Yes, thank you.
3      Q.  Okay.  Page 5 of Exhibit 7.
4      A.  Yes.
5      Q.  You had additional texts with Mr. Finn on
6   or about April 16, correct?
7      A.  Yes.
8      Q.  And did you save them in the same manner?
9      A.  Yes, I did.
10     Q.  And that formatting on page 5 is the same
11  as you previously described, correct?
12     A.  Yes.
13     MR. LASS:  And I move for the admission
14  of page 5 of Exhibit 7.
15     THE COURT:  Any objection?
16     MR. ROSE:  None, Your Honor.
17     THE COURT:  It will be admitted.
18     (Exhibit 7, page 5, was admitted.)
19     Q.  (BY MR. LASS)  Please turn to page 28.
20     THE COURT:  Same exhibit?
21     MR. LASS:  Same exhibit.  I'm sorry.
22     THE COURT:  Thank you.
23     Q.  (BY MR. LASS)  And did you continue to
24  have text messages with Mr. Finn into May?
25     A.  Yes, we did.

---

12 (Pages 45 to 48)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 16 of 110

49

1    Q.   And did you save those text messages in
2  the same manner?
3    A.   Yes, I did.
4    Q.   And is page 28 one of those text strings?
5    A.   Yes, it is.
6    MR. LASS:  And I would move for the
7  admission of page 28 of Exhibit 7.
8    THE COURT:  Any objection?
9    MR. ROSE:  None, Your Honor.
10   THE COURT:  It will be admitted.
11   (Exhibit 7, page 28, was admitted.)
12   Q.   (BY MR. LASS) Did Mr. Finn tell you in
13 one of those text messages toward the bottom, "What
14 does that have to do with the pre-nup?  Would you like
15 me to bankrupt it and you all lose all your equity"?
16   A.   Yes, he did.
17   Q.   And to expedite this, could you look
18 quickly at Exhibit 7, pages 7, page 10 -- also page 10,
19 page 19 --
20   A.   Yes.
21   Q.   -- and page 24?  Okay.  Are these pages
22 also text messages between you and Mr. Finn?
23   A.   Yes, they are.
24   Q.   Saved in the same manner as you've
25 described?

50

1    A.   Yes, they are.
2    MR. LASS:  Move for the admission of
3  pages 7, 10, 19, and 24 of Exhibit 7.
4    MR. ROSE:  That's fine.  No objection.
5    THE COURT:  They'll be admitted.
6    MR. FOX:  I apologize, Mr. Lass.  I'm
7  just writing down each one.  7, 10 --
8    MR. LASS:  7, 10, 19 and 24.
9    (Exhibit 7, pages 7, 10, 19, and 24, was
10 admitted.)
11   Q.   (BY MR. LASS) Do you know when -- what
12 day you filed the petition for dissolution of marriage
13 in Colorado?
14   A.   May 13.
15   Q.   Do you know what day Mr. Finn was served
16 with the papers?
17   A.   He was served on May 27.
18   Q.   After he was served, did Mr. Finn make
19 efforts to sell the winery business?
20   A.   Yes, he did.
21   Q.   Could you turn to Exhibit 11, please.
22 Before we talk about Exhibit 11, did you have a
23 conversation with Mr. Finn shortly after he was served,
24 the day or day after he was served, with the divorce
25 petition?

51

1    A.   Yes.  We are -- some sort of
2  conversation.  He was in his attorney's office the next
3  day.
4    Q.   He said he was?
5    A.   Yes, he said.
6    Q.   What did he tell you?
7    A.   He said he was there protecting his
8  interests.
9    Q.   And what else?
10   A.   And he said that I wasn't allowed to go
11 to any of our homes to -- so I could get my things.
12   Q.   Did he talk to you about selling the
13 winery?
14   A.   Yes, he did.
15   Q.   What did he say?
16   A.   He said he was going to sell it before --
17 before it was given to me.
18   Q.   Okay.  And now looking at Exhibit 11 --
19   A.   Yes.
20   Q.   -- is this a letter that you received on
21 or about May 28, 2015?
22   A.   Yes, it is.
23   Q.   And is it signed by Mr. Finn?
24   A.   Yes, it is signed by Mr. Finn.
25   MR. LASS:  Move for the admission of

52

1  Exhibit 11, please.
2    THE COURT:  Any objection?
3    MR. ROSE:  None.
4    THE COURT:  Exhibit 11 will be admitted.
5    (Exhibit 11 was admitted.)
6    Q.   (BY MR. LASS) Did you subsequently learn
7  that the property has been listed for sale sometime
8  during May?
9    A.   Yes, I did.
10   Q.   And did you agree that the property
11 should be listed for sale?
12   A.   No, I don't agree at all.
13   Q.   Did you at the time?
14   A.   No.
15   MR. LASS:  Your Honor, for simplicity, I
16 would move at this time for the admission of Exhibit
17 12.  It's part of the court file.  I think the Court
18 can take judicial notice of it.  And that is the
19 expanded temporary injunction that is the subject of
20 our hearing today, but I put it in the exhibit book for
21 the Court's --
22   THE COURT:  And you are moving for
23 admission of it?
24   MR. LASS:  Yes.
25   THE COURT:  Any objection?

scheduling@huntergeist.com                    HUNTER + GEIST, INC.                    303-832-5966/800-525-8490

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 17 of
110

53

1    MR. ROSE: No.
2    THE COURT: Exhibit 12 will be admitted.
3    (Exhibit 12 was admitted.)
4    **Q. (BY MR. LASS) You understand that you**
5    **obtained through your counsel, then, a restraining**
6    **order that -- it says what it says, but it generally**
7    **prevents him from selling the winery?**
8    A. Yes, it does.
9    **Q. Okay. Did you subsequently get served**
10   **with legal papers in legal proceedings in California?**
11   A. Several.
12   **Q. Did you have discussions with Mr. Finn**
13   **about those lawsuits?**
14   A. No, I did not.
15   **Q. Okay. Please turn to Exhibit 14. If you**
16   **could look at that briefly. Is that a complaint in one**
17   **of the lawsuits that is brought against you?**
18   A. Yes, it was the complaint -- one of the
19   complaints, yes.
20   **Q. Okay. And did you understand that**
21   **Mr. Rose, and perhaps Mr. Bertrand, his partner, were**
22   **representing the partnership and the corporation in**
23   **those lawsuits?**
24   A. Yes. I didn't understand how, if I'm a
25   shareholder, they could sue me, but that's okay. But,

54

1    as I understand it, yes.
2    **Q. What is your understanding of the status**
3    **of that lawsuit?**
4    MR. ROSE: Objection, Your Honor.
5    There's no foundation for that.
6    THE COURT: To the extent she has
7    personal knowledge she can testify to that.
8    **Q. (BY MR. LASS) Briefly.**
9    A. The judge wanted to put it on hold so
10   that we could get ourselves divorced here in Colorado
11   so it would become moot is what he said.
12   MR. ROSE: Misstates the record.
13   THE COURT: And the Court won't accept
14   that as an official status of the case, but will allow
15   it to stand as far as the witness's state of mind.
16   **Q. (BY MR. LASS) Please turn to Exhibit 18,**
17   **please.**
18   MR. LASS: Oh, and I would move for the
19   admission of Exhibit 14, Your Honor.
20   THE COURT: Any objection?
21   MR. ROSE: No.
22   THE COURT: It will be admitted.
23   (Exhibit 14 was admitted.)
24   **Q. (BY MR. LASS) Please turn to Exhibit 18.**
25   **What is this document? What is your understanding?**

55

1    A. This is an ex parte application, which --
2    this was a lawsuit brought against me so that they
3    could then hire a director to come into the middle and
4    oversee the company until we could make decisions.
5    **Q. And realizing --**
6    MR. LASS: Move for the admission of
7    Exhibit 18, please.
8    THE COURT: Any objection?
9    MR. ROSE: None.
10   THE COURT: Exhibit 18 is admitted.
11   (Exhibit 18 was admitted.)
12   **Q. (BY MR. LASS) Realizing that you are not**
13   **one of the lawyers in the case, what is your**
14   **understanding of the status of this lawsuit?**
15   A. It seemed as though at the time of the
16   day, the judge threw it out within 30 seconds and sent
17   everybody home.
18   **Q. The same judge?**
19   A. Yes, same judge.
20   MR. ROSE: And, Your Honor, I'm going to
21   object in that we have a lay witness. There's no court
22   record before this Court. We have a layperson opining
23   on what the judge did. It's really getting far afield.
24   THE COURT: I understand that. Again, it
25   doesn't state the -- I'm not accepting it as a

56

1    statement of the official record; however, to the
2    extent that she's a defendant in these actions and to
3    the extent she has an interest in the actions, I will
4    allow her state of mind, which she has testified to, to
5    stand.
6    **Q. (BY MR. LASS) Did you reside in Colorado**
7    **for at least 91 days before the petition for divorce**
8    **was filed?**
9    A. Yes, I did.
10   **Q. And have more than 91 days passed since**
11   **it was filed?**
12   A. Yes, it is.
13   **Q. And do you believe the marriage is**
14   **irretrievably broken?**
15   A. Yes, I do.
16   **Q. Is there any chance of reconciliation?**
17   A. No, I'm sorry, there isn't.
18   **Q. Are you asking the Court to enter a**
19   **decree of dissolution of marriage at this time?**
20   A. I am praying for a decree, please.
21   **Q. Why?**
22   A. Why? Because I would like to go home to
23   my family's farm. And I would -- I'm worried that the
24   winery is decaying on a daily basis with the
25   mismanagement that's going on at this time. And the

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 18 of 110

57

1  ice cream has melted. And I would like to take my ice
2  cream home, melted, and take care of my winery and take
3  care of my family's home. I have other brothers and
4  sisters and shareholders involved.
5      Q. Go ahead.
6      A. Sorry.
7      Q. That's okay. Do you want a drink of
8  water?
9      MR. LASS: May I approach, Your Honor?
10     THE COURT: Yes, you may.
11     THE WITNESS: Okay. Do you want me to
12 continue?
13     Q. (BY MR. LASS) Yes.
14     A. I understand that the company is being
15 destroyed. And I understand that it owes a tremendous
16 amount of money, when in 1972 and in '82 and up to the
17 '90s the value of the property was about $10 million
18 and we owed about $2 million on that property.
19        In the late 2000s, we -- the value of the
20 property was between 10 and 16 million, and we owed 5
21 to 7 million dollars at that time. And when my husband
22 came in, we needed an influx of cash. And we went to
23 another bank. And we -- within the last three and a
24 half years that we have been married -- before we were
25 married, the debt to value was below 50 percent. In

58

1  the last --
2      MR. ROSE: Objection. I'm going to move
3  to strike, Your Honor. This is no foundation. This is
4  nothing more than a narrative story. There's
5  absolutely no documents before this witness to support
6  any of these opinions.
7      THE COURT: Mr. Lass.
8      MR. ROSE: Pure speculation and
9  conjecture. And, in fact, it's argument.
10     MR. LASS: She's an owner. I think she
11 can testify about values. I didn't hear her last
12 comment, actually. I didn't hear her last ten words.
13     THE COURT: Did the court reporter get
14 the last ten words?
15        (The testimony on page 57, line 23
16 through 23, was read back as follows: "Before we were
17 married, the debt to value was below 50 percent.")
18     MR. LASS: I think as an owner she can
19 testify as to her recollection of all the financial
20 affairs related to the business.
21     THE COURT: Thank you. The objection
22 will be overruled.
23     A. So after we -- we were married and until
24 we were beginning our divorce proceedings, the debt to
25 value went up to over 90 percent. So I understand that

59

1  I am taking melted ice cream home, but I would like to
2  take my melted ice cream home.
3      Q. (BY MR. LASS) Do you believe that the
4  winery -- strike that.
5         Is it your position that the winery
6  should be sold at this time as requested by Mr. Finn?
7      A. No, I do not believe that the winery
8  should be sold, nor do I believe that it has to be
9  sold. And I believe that we can pay him back his
10 money.
11     Q. Do the -- your siblings agree that the
12 winery should be sold?
13     A. No, they do not believe, nor do -- no,
14 they don't want to sell.
15     Q. Are they opposed?
16     A. Yes, they are.
17     Q. To your knowledge, did the other partners
18 and shareholders of Sullivan Vineyards, other than Mr.
19 Finn, authorize the filing of the lawsuits against you
20 in California?
21     A. No, they're not interested -- no, they
22 didn't want to file a lawsuit against me. There was no
23 vote for that.
24     Q. One of the things that -- one of the
25 things that the Court could do in this process is not

60

1  grant the decree, not transfer ownership to you --
2      A. Uh-huh.
3      Q. -- and keep the restraining order in
4  place?
5      A. Yes.
6      Q. And, presumably, the result of that would
7  be that Mr. Finn would continue to operate the winery
8  until we have a final decree entered; do you understand
9  that, generally?
10     A. Yes.
11     Q. Are you concerned about that?
12     A. I'm extremely concerned about that.
13     Q. Why?
14     A. Why? Because I don't think that it --
15 the property is being managed correctly at all, and
16 there's priorities in certain bills that should be paid
17 and they're not being paid. And there's no profit at
18 this time in the winery, even though they made $3.25
19 million, but that's just in sales. They've lost money,
20 even though Steve put $4.25 million into the property
21 this year. Not alone this year, but --
22     Q. Do you -- do you believe that the winery
23 can be made -- well, strike that.
24        Do you believe that the corporation can
25 be made so that it can adequately fund the debt that

15 (Pages 57 to 60)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 19 of 110

61

1   has to be paid?
2       A.  Yes.
3       Q.  The expenses?
4       A.  Yes, I do believe that.  You can run this
5   winery for a million and a half to two million dollars.
6   You don't need to spend $4.25 million a year.
7           MR. ROSE:  Your Honor, move to strike.
8   There's absolutely no foundation for this opinion.
9   It's argument.
10          THE COURT:  It will be overruled.
11      Q.  (BY MR. LASS)  Jumping back in time to
12  2011, when you had the premarital agreement and your
13  husband was acquiring your mother's ownership interest,
14  did he talk to you -- with you at that time about why
15  he was buying your mother's interests?
16      A.  Yes, we talked about it a lot.
17      Q.  And what did he say to you at that time
18  about why he was doing that?
19      A.  He wanted me to own Sullivan Vineyards
20  and to give it to my family later on in life.  It was
21  something we were building together.
22      Q.  Until the last couple of weeks -- prior
23  to the last couple of weeks, where were you living?
24      A.  In the last couple of weeks?
25      Q.  No.  Prior to the last couple of weeks.

62

1       A.  Prior, I was living at the winery.
2       Q.  Okay.  And describe briefly how the
3   living arrangements and the business arrangements are
4   currently set up at the winery.
5       A.  The living arrangements are up on the
6   second story, but you have to access that through the
7   front door down below.  And there are offices that are
8   temporary offices that are not permanent to be there,
9   but they -- that's where they -- the offices are at
10  this time.
11          And there are three entrances into the
12  winery besides the front door.  There's a 60-foot
13  courtyard that you walk across, a gravel courtyard with
14  lots of tables and chairs where guests sit.  But -- and
15  then the winery, which is a smaller facility than the
16  house, which you saw the picture of.  It looks like a
17  barn.
18      Q.  The winery looks like a barn?
19      A.  Yes, it does.
20      Q.  And there's a house nearby?
21      A.  Yes.  And the house is right across the
22  courtyard.
23      Q.  Is it possible to get into the offices on
24  the first floor of the house without going through the
25  living quarters on the second floor?

63

1       A.  Yes.  Yes, there is.
2       Q.  And you were living on the second floor?
3       A.  Yes.
4       Q.  And who -- do you still have personal
5   property there?
6       A.  Do I still -- yes, I have all -- most of
7   my personal property there that I have that Steve has
8   shipped me.
9       Q.  Clothing and such?
10      A.  Yes.
11      Q.  And is there artwork on the walls?
12      A.  Yes, there is artwork on the walls.
13      Q.  Whose artwork -- who created the artwork?
14      A.  I created the artwork, and my father did.
15  We both were artists and we share the walls.
16      Q.  Okay.  I think we shouldn't -- well, and
17  where have you been living in the last couple of weeks?
18      A.  I've been staying with my brother and
19  some friends.
20      Q.  Why not at the winery?
21      A.  Because it's just very hostile there.
22  The -- the employees are extremely aggressive to me,
23  and they have hired someone to drill out my front door.
24  And they're aggressive and want to get me out of there.
25  And . . .

64

1       Q.  Okay.  And have some of those employees
2   actually filed a workplace domestic violence lawsuit
3   against you?
4       A.  Yes, they have.
5       Q.  And who are those employees?
6       A.  Angelica de Vere and Teresa -- and Teresa
7   Sullivan, who is not a relative of mine.
8       Q.  No relation?
9       A.  No.  Sonyia -- I'm sorry.  I don't know
10  her last name -- and Beth.  Because I have never really
11  formally met a couple of them, but yes.  And then
12  there's another woman, Trinity Scott, who is the head
13  of the retail room.  So . . .
14          MR. LASS:  Nothing further, Your Honor.
15          THE COURT:  Thank you.  Before we
16  break -- or before we have cross-examination, we'll
17  take a ten-minute break.
18          (Recess taken, 10:12 a.m. to 10:28 a.m.)
19          THE COURT:  Cross-examination.
20          MR. ROSE:  Thank you, Your Honor.
21              CROSS-EXAMINATION
22  BY MR. ROSE:
23      Q.  Ms. Finn, you were testifying towards the
24  close of your direct examination by your attorney that
25  the employees at the winery, you feel, are against you;

16 (Pages 61 to 64)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 20 of 110

65

1  is that correct?
2      A.  Yes.
3      Q.  And that those employees are also
4  responsible for financially driving this winery into
5  insolvency?
6      A.  Yes, I do believe that.
7      Q.  Okay.  You were present at the hearing
8  where the five employees that you've mentioned brought
9  a restraining order against you, were you not?
10     A.  Yes.
11     Q.  And you heard three of those employees
12 testify under oath that they believe that you tried to
13 run them over in the parking lot with your car?
14     A.  I heard what they said.
15     Q.  Okay.  You also heard one of the
16 employees say that she is in such fear of you that she
17 is now bringing a TASER and a Mace can to work.
18     A.  Yes.
19     Q.  And after that testimony, you elected not
20 to take the witness stand to refute those -- those
21 statements, didn't you?
22     A.  It wasn't advised for me to.
23     Q.  Okay.  You did not take the witness stand
24 to refute the allegations against you by those five
25 employees?

66

1      A.  No.
2      Q.  Okay.  In fact, the restraining order
3  from the employees at the winery is still in existence,
4  isn't it?
5      A.  It's -- it's on hold.  There was no
6  ruling.
7      Q.  You were in court last week when we went
8  in before Judge Stone and he extended the restraining
9  order until October 28?
10     A.  Yes.
11     Q.  Okay.  You've testified in direct
12 examination as to your opinion as to values and debt
13 ratios of the winery over the last several decades.
14 Did you bring any documents with you today to support
15 any of the debt ratio or value ratios?
16     A.  No, I did not myself.
17     Q.  Okay.  When Mr. Finn purchased the
18 majority ownership from your mother in 2011, what was
19 the value of the winery in 2011?
20     A.  Between 16 and 18 million dollars.
21     Q.  Okay.  Do you know what the debt ratio
22 was at the time Mr. Finn purchased the --
23     A.  It was less than 50 percent.
24     Q.  Less than 50 percent?  I want you to take
25 a look at Exhibit 6.

67

1      THE COURT:  Same exhibit book?
2      MR. ROSE:  Yes, Your Honor.
3      THE COURT:  Thank you.
4      Q.  (BY MR. ROSE)  Take a look at Exhibit 6,
5  which is a Stock and Partnership Interest Purchase
6  Agreement between JoAnna Sullivan and Stephen A. Finn
7  dated August 12, 2011.  Do you see that document?
8      A.  Yes, I do.
9      Q.  Okay.  You had testified that at some
10 point in time Mr. Finn purchased your mother's
11 interests in the winery, that your mother at the time
12 was, I believe, 72 or 73 years old, correct?
13     A.  Yes.
14     Q.  And that she had had a stroke?
15     A.  Yes.
16     Q.  Okay.  However, you consented to the sale
17 of the winery -- or your mother's interest in the
18 winery to Mr. Finn, did you not?
19     A.  Yes, I did.
20     Q.  Take a look at page 23 of Exhibit 6.  Is
21 that your signature --
22     A.  Yes.
23     Q.  -- where it says, "Acknowledged, accepted
24 and agreed:  Equity owners of SVP and SVC"?
25     A.  Yes.

68

1      Q.  In fact, Mr. Finn purchased your mother's
2  entire interest in the winery corporation, did he not?
3      A.  Yes, he did.
4      Q.  Okay.  And how much did he pay your
5  mother for her interest in the winery?
6      A.  He paid her $9,000 a month starting the
7  day she moves out of Sullivan Vineyards.
8      Q.  And what is the total consideration that
9  Mr. Finn is paying your mother for her -- we'll just
10 call it 51 percent interest in the winery?
11     A.  Well, he's paid four hundred and forty
12 thou -- four thousand dollars to date.
13     Q.  Isn't it true that the total purchase
14 price is approximately one million dollars?
15     A.  That's if she lives that long, yes.
16     Q.  Okay.
17     A.  But she's not in good health.  So --
18     Q.  So for one million dollars in 2011,
19 Mr. Finn purchases 51 percent of a company that's worth
20 over ten million?
21     A.  Yes.
22     Q.  Okay.  At the time you signed Exhibit 6,
23 did you read it?
24     A.  At the time?
25     Q.  Yes.

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 21 of
110

69

1    A.  No, I don't think I did.
2    Q.  You just signed it?
3    A.  Yes, I did.
4    Q.  Okay.  As you sit here today, do you have
5  an understanding if there's anything in Exhibit 6 that
6  restricts Mr. Finn from transferring or selling any of
7  the interests that he purchased from your mother?
8    A.  Yes.
9    Q.  Okay.  And what is that restriction?
10   A.  The pre-nuptial agreement.
11   Q.  Okay.  I'm not talking about the
12 pre-nuptial agreement.  I'm talking about Petitioner's
13 Exhibit 6, which was executed August 12, 2011.  August
14 12, 2011 is subsequent to the pre-nuptial agreement, is
15 it not?
16   A.  I would like to have a little bit of time
17 to review this document, if that's what you are asking
18 me.
19   Q.  Sure, that's fine.
20   A.  My understanding when this agreement was
21 written is that there was absolutely no need for Steve
22 to liquidate his investment, that if he were to put $5
23 million into this company, it would mean nothing to us
24 as a couple.  That was my understanding.  It was also
25 my understanding that it was for -- it was ours.  It

70

1  was us.  We were building this together.  It was the
2  one thing, since everything was his separate property,
3  that we were going to share together.
4    Q.  Okay.  That wasn't the question I was
5  asking.
6    A.  Excuse me, sir.
7    Q.  The question I have is Exhibit 6, which
8  you signed -- in fact, every member of your family
9  signed this document?
10   A.  Yes, they did.
11   Q.  Is there something in Exhibit 6 that
12 restricts Mr. Finn from transferring or selling his
13 interests that he acquired from your mother?
14   A.  I'm not enough familiar with this
15 document, but, I think, to answer your question, sir, I
16 think that you are correct that Steve would have the
17 right to sell this winery while we were married, yes.
18   Q.  Okay.  But, to your knowledge, as you sit
19 here today, there's nothing in Exhibit 6 which is the
20 document that actually transfers ownership from your
21 mother to Mr. Finn that restricts his ability to then
22 take those shares and sell them?
23   A.  I would need to read the document more
24 carefully.  I'm sorry.
25   Q.  I understand.  It's not a trick question.

71

1  I am just asking what -- if you have any knowledge of
2  that, since you did sign this document.
3        MR. LASS:  Objection, asked and answered.
4        THE COURT:  It will be overruled.  You
5  can answer, Ms. Finn.  Do you remember what the
6  question was?
7        THE WITNESS:  Um . . .
8        MR. ROSE:  Your Honor, I'll just withdraw
9  the question.  Let me do a follow-up.
10   Q.  (BY MR. ROSE)  At the time, Ms. Finn,
11 that you signed Exhibit 6, did you speak with your
12 siblings, who were also shareholders and owners of the
13 winery, regarding Mr. Finn's acquisition of your
14 mother's interest?
15   A.  Yes.
16   Q.  To your knowledge, did any of them read
17 this document before they signed it?
18   A.  I can't answer for them, but we were very
19 happy to keep it in our family.
20   Q.  Okay.  Now, you had indicated that --
21       THE COURT:  Do you wish to move admission
22 of Exhibit 6?
23       MR. ROSE:  I do, Your Honor.
24       THE COURT:  Any objection?
25       MR. LASS:  No objection, Your Honor.

72

1        THE COURT:  It will be admitted.
2        (Exhibit 6 was admitted.)
3    Q.  (BY MR. ROSE)  Ms. Finn, you'd indicated
4  also on direct examination by your counsel that Mr.
5  Finn has put in over $4 million into the Sullivan
6  Vineyards winery, whether it's the partnership or the
7  corporation; do you recall that testimony?
8    A.  Yes.
9    Q.  And you testified that it was a loan, and
10 then I believe you changed your testimony and said no,
11 these were actually capital investments, correct?
12   A.  I said both.
13   Q.  Okay.  As you sit here today, do you have
14 an understanding whether or not the 4.25 million, which
15 I wrote down is your testimony, was actually a loan to
16 Sullivan Vineyards or was it a capital contribution?
17   A.  I -- it's my understanding that some of
18 that is a capital contribution.  The first two million
19 was a loan, yes.
20   Q.  Okay.  So approximately 2.25 is a capital
21 contribution?
22   A.  It's my understanding.
23   Q.  Okay.  What is the basis of that
24 understanding?
25   A.  The basis of that understanding is when

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 22 of 110

73

1  my brother came in to help the winery to make the
2  transition, my younger brother, Ross Sullivan, that
3  he -- that they were going to take the loan from 7.5 to
4  9.5, Steve was going to loan $2 million, and then he
5  was going to be paid back in the escrow of -- of the
6  loan, when the -- when we got the loan he was going to
7  be paid back for that amount of money is my
8  understanding.
9         Q.  Okay.  Have you seen any documents that
10  support that?
11        A.  I have been asking for them, sir.
12        Q.  Okay.  Have you seen any documents that
13  would reflect that any of the money that Mr. Finn has
14  put into Sullivan Vineyards or the Sullivan family
15  partnership are capital contributions?
16        A.  I have seen paperwork that just states
17  that he has put money in.
18        Q.  Okay.  Do you have an understanding of
19  what Mr. Finn received in return for those capital
20  contributions?
21        A.  He has -- it's my understanding that he
22  has received interest for those -- it's -- I don't -- I
23  don't know.
24        Q.  You mean interest payments?
25        A.  Interest payments.  There's some interest

74

1  payments that I've seen on the books.
2         Q.  Okay.  So are you talking about the
3  entire 4.25 --
4         A.  I don't know.  I don't know.
5         Q.  Okay.
6         A.  I'm sorry that I can't answer that
7  question.
8         Q.  Okay.  Well, if Mr. Finn was putting in
9  capital contributions, has anybody in the family or
10  anybody other than your attorneys advised you that Mr.
11  Finn received a greater ownership interest in return
12  for those capital contributions?
13        A.  It has been stated that they're in -- in
14  a very confusing way that yes, that there were some --
15  some sort of ownerships, but there weren't -- there was
16  no proper paperwork for it.
17        Q.  Okay.  Do you know whose ownership was
18  given in return for Mr. Finn getting a grant of
19  ownership?
20        MR. LASS:  Your Honor, I'm going to
21  object on the grounds of relevance to the entire line
22  of questioning.  I know we've had some beginning
23  questioning.  But we've conceded -- we've admitted that
24  Mr. Finn is a majority owner, and we don't think that
25  it is relevant whether he's a 51 percent owner or a 60

75

1  percent owner, and this is a waste of time.
2         THE COURT:  Thank you.  The objection
3  will be overruled.
4         MR. ROSE:  I'll be brief, Your Honor.
5         Q.  (BY MR. ROSE)  Have you seen any
6  documents at all that would reflect what Mr. Finn
7  received, if, in fact, this was a capital contribution,
8  a greater ownership interest in the winery?
9         A.  I have not seen any checks or canceled
10  checks yet.  Thank you.
11        Q.  Okay.  Now, you testified also that you
12  believe that the company is being run into insolvency
13  by Mr. Finn; do you recall that testimony?
14        A.  Yes.
15        Q.  And when did this intentional conduct on
16  the part of Mr. Finn begin as far as running this
17  company into insolvency?
18        A.  I think after my husband decided he
19  wanted to get a divorce from me.
20        Q.  Okay.  And when would that be?
21        A.  In the beginning of the year.
22        Q.  Okay.  So January, February of --
23        A.  February, yes.
24        Q.  -- 2015?  What actions did Mr. Finn take
25  to begin running the Sullivan Vineyards company into

76

1  insolvency starting sometime in the beginning of 2015?
2         A.  Well, he came home after giving bonuses
3  to the CEO and the -- and the executive team, when he
4  told me that they were unwarranted bonuses, but he gave
5  them to them anyways because Angelica had convinced him
6  to take certain items, three items, off the books.
7         Q.  Other than giving bonuses to the CEO --
8         A.  Yes.
9         Q.  -- what steps has Mr. Finn taken to run
10  this company into insolvency?
11        A.  So then after the bonuses, then he signed
12  unapproved employment contracts with the CEO, CFO, and
13  the -- the CFO who had been working for us for two
14  months, and a marketing gal.  He signed extensive
15  employment contracts that gave them 4.8 percent net if
16  they were to sell the winery, the CFO and the CEO.  And
17  they were to receive, I would say, about two-thirds of
18  a salary that was not of industry standard.  $235,000
19  to sell 4,000 cases of wine is unheard of.  And, as
20  well, then, there was a five-year guarantee of
21  employment for the CEO and a three-year guarantee -- a
22  severance guaranty for the CFO.
23        Q.  So as you sit here today, it's your
24  opinion that because Mr. Finn gave bonuses and what you
25  considered to be a higher salary package to one of the

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 23 of
110

**77**

1    employees that the salary and bonuses of this one
2    employee are running this company into insolvency?
3        A.  That definitely encumbered the winery so
4    that if it needed to -- if I needed to take care of it,
5    then it would be -- it would be more difficult, yes.  I
6    do believe that.
7        Q.  Ms. Sullivan, do you know what the
8    monthly debt service is of Sullivan Vineyards?
9        A.  It's about -- I know that the salaries
10    are up to 90,000 a month.  It's $335,000, sir.
11        Q.  Okay.  For the salaries or the entire
12    debt service?
13        A.  The debt -- well, the debt service is
14    $58,000.  It used to be $33,000, but then at the summer
15    it increased 23,000.
16        Q.  Okay.  So all of this started in 2015?
17        A.  I think it started before that, sir, when
18    Steve loaned the -- there were several unapproved loans
19    to Sullivan Vineyards, without any board approval.  And
20    that's what encumbered the winery.  We didn't need the
21    money.
22        But the problem was, is that my
23    brother -- my family, the shareholders, had a different
24    vision for the winery than my husband had.  And he
25    wanted to grow it very quickly and -- and turn it into

**78**

1    a big Disneyland, and other shareholders just wanted to
2    make it more sustainable, keep it low key, and so that
3    we wouldn't encumber more debt.  We didn't want to do
4    that.  And that's what happened.  And that's why we are
5    here having this problem today, I think.
6        Q.  Okay.  Ms. Finn, you have been present at
7    all of the hearings in Napa County Superior Court
8    regarding actions taken against you for the sale of the
9    winery, have you not?
10        A.  Yes, I have.
11        Q.  Okay.  And you were at the first one
12    before Judge Diane Price; do you recall that?
13        A.  Yes, I do.
14        Q.  Do you recall making a representation to
15    Diane Price that you or your family members were going
16    to be paying in $300,000 to help the debt service at
17    that hearing?
18        A.  We were going to pay $90,000 to pay off
19    Beckstoffer, yes.
20        Q.  Isn't it true that you made that promise
21    at a later date, where you personally were going to
22    loan $90,000 to Sullivan Vineyards to pay Andy
23    Beckstoffer?
24        A.  Yes, I'm happy to do so even today.
25        Q.  Okay.  Now, that was actually a month

**79**

1    ago, wasn't it?
2        A.  Yes, it was a month ago.
3        Q.  In fact, didn't you recall that we
4    requested that the money be paid immediately?
5        A.  Yes, it was.  And I needed to get the
6    loan approved by the board of directors at Sullivan
7    Vineyards, and Jim Rose offered to write the promissory
8    note, which I never received.  So we couldn't move
9    forward with that until he -- until that came.
10        Q.  You have not paid in or loaned the
11    $90,000, correct?
12        A.  I have personally talked to the CFO of
13    Beckstoffer Vineyards, and we -- my brother and I both
14    spoke with Beckstoffer.  They are completely happy with
15    our terms.  They know I'm ready to pay the bill.
16    They're happy with my 90,000.  And I told them I was
17    just waiting for the promissory loan note from Sullivan
18    Vineyards' boards of directors for them to sign it and
19    they would receive their money.  And they are very
20    happy to work with me.  And we were shocked and
21    disappointed that the CEO, Angelica de Vere, did not
22    even bother to call Beckstoffer for -- for --
23        MR. ROSE:  Your Honor, I'm going to move
24    to strike --
25        A.  -- for terms.

**80**

1        MR. ROSE:  -- as unresponsive.  And it's
2    also hearsay with regard to any conversations with
3    Beckstoffer.
4        THE COURT:  The last portion will be
5    stricken.
6        Q.  (BY MR. ROSE)  Now, going back to your
7    promise to loan $90,000 to the winery.
8        A.  Yes.
9        Q.  Have you, in fact, made any arrangements
10    to make a $90,000 loan to Sullivan Vineyards?
11        A.  Yes, I have.  I am just waiting.
12        Q.  You are just waiting.  Okay.  And going
13    back to the original hearing before Diane Price, you
14    don't recall making a promise to loan $300,000 to Judge
15    Price?
16        A.  Not 300,000, but I told her that I would
17    be happy to take on the debt and the mismanagement of
18    Sullivan Vineyards.
19        Q.  Okay.  You don't recall representing to
20    Diane Price that you would make arrangements to loan
21    money to the winery to pay its existing debts that were
22    in -- that were delinquent?
23        A.  I'm sorry, sir, if I forgot, but I'm
24    happy to pay the 300,000 if you need that to keep the
25    company going.

20 (Pages 77 to 80)

Case: 17-10065   Doc# 86   Filed: 04/05/17   Entered: 04/05/17 17:46:12   Page 24 of
110

**81**

1     Q. Okay. Ms. Sullivan, were you aware that
2 in fiscal year 2011 the Sullivan Vineyards lost
3 $486,000?
4     A. Yes. I know -- I'm not too sure -- I was
5 not privy to all of the financials at that time, but I
6 know that they owed money, yes.
7     Q. Okay. And in fiscal year 2012 Sullivan
8 winery lost $509,000?
9     A. I did not know that.
10     Q. Okay. And fiscal year end 2013 Sullivan
11 Vineyards lost $594,000?
12     A. I did not know that.
13     Q. Okay. And fiscal year 2014 Sullivan
14 Vineyards lost $499,000?
15     A. The wine business is a very, very
16 difficult business.
17     Q. Okay. And that currently Sullivan
18 Vineyards is about 29,000 in the black.
19     A. Wonderful.
20     Q. Are you aware of --
21     A. Okay.
22     Q. -- that? Now, let's go back to the
23 marital settlement agreement that you testified to. I
24 believe that was Exhibit 2. Prior to marrying
25 Mr. Stephen Finn, as a precondition of that marriage

**82**

1 you had to enter into a premarital agreement; is that
2 correct?
3     A. Yes.
4     Q. That basically defined your financial
5 relationship with Mr. Finn post-marriage, after
6 marriage?
7     A. Yes.
8     Q. Including what would happen in the event
9 of a divorce?
10     A. Yes.
11     Q. In fact, you were represented by counsel
12 at the time that this document was negotiated and
13 prepared?
14     A. Yes. Yes, I was.
15     Q. And you received advice from counsel
16 prior to executing this agreement?
17     A. Yes, I did. Thank you.
18     Q. Now, on Exhibit 2, did you read Exhibit 2
19 prior to signing it?
20     A. Exhibit 2?
21     Q. Yes. That's the marital agreement.
22     A. Oh, yes, I did.
23     Q. Okay. I believe your attorney made
24 reference to the signature page and all that. Let's
25 take a look at page 10 of the marital settlement

**83**

1 agreement. Now, it was your understanding that all of
2 the provisions of the marital settlement agreement
3 would be binding and enforceable as a contract,
4 correct?
5     A. Yes.
6     Q. And you knew that by signing this -- that
7 by signing this document that you were entering into a
8 legal obligation with your soon-to-be husband,
9 Mr. Finn?
10     A. Yes.
11     Q. Let's take a look at paragraph 4.9. It
12 says, "Marital Counseling."
13     MR. ROSE: I'm going to read this for the
14 record, Your Honor.
15     Q. (BY MR. ROSE) "We agree that we will
16 participate in marital counseling, the terms of which
17 will be agreed upon by both parties for a period of six
18 months following the filing of a petition and before
19 entry of a decree." In parentheses it says, "Unless
20 the parties mutually agree otherwise." Do you recall
21 reading that at --
22     A. Yes.
23     Q. -- time you signed it?
24     A. Excuse me. Yes, I do remember.
25     Q. And, in fact, Mr. Finn has attempted

**84**

1 three times to arrange for marital counseling; isn't
2 that true?
3     A. No.
4     Q. You don't recall trying to go to a
5 mediation with Mr. Finn?
6     A. Oh, mediation, is that counseling? I
7 didn't know that.
8     MR. LASS: Objection, the question is
9 ambiguous.
10     Q. (BY MR. ROSE) Isn't it true that Mr.
11 Finn has attempted to go into counseling with you?
12     A. Is counseling mediation?
13     Q. What is your understanding?
14     A. We were going to see a psychologist, a
15 marriage counselor, is what that meant. I wrote it.
16     Q. Okay. Well, let me just ask you this:
17 Have you made any attempt to get into marital
18 counseling under the provisions of 4.9?
19     A. Only about a hundred times, sir. I
20 wanted to save my marriage.
21     Q. After the petition was filed, did you
22 attempt to go into marital counseling with your
23 husband?
24     A. No. My husband, April 10, told me that
25 he had absolutely no interest in going to counseling

85

1 and that he didn't have to because it didn't matter if
2 he breached any of the clauses in our agreement,
3 because -- he didn't want to.
4     Q. And that's what he told you?
5     A. Yes, he did.
6     Q. And when did he tell you that?
7     A. He told me that at Hillstone restaurant
8 on April 10.
9     Q. Okay.
10     A. It was about 9:30 p.m.
11     Q. Okay. Did you make arrangements or
12 attempt to make arrangements to go through marital
13 counseling as 4.9 of the agreement requires?
14     A. Yes, I did. I -- in the beginning --
15 actually, in the beginning, when he first gave me the
16 first amendment to that marital agreement that I didn't
17 want to sign, I said, "If we go to marriage counseling,
18 then that piece of paper won't mean anything anymore."
19 And he said he didn't -- refused to go to marriage
20 counseling and said that I needed it, so I went. I
21 went to a marriage counselor by myself.
22         And then I realized that I really wanted
23 to go to marriage counseling with my husband, because I
24 was -- I really wanted to save my marriage. And so we
25 went to go see Dr. Gottman, up in Orcas Island, on May

86

1 11, 12, and 13. We went to a marathon counseling
2 session, sir.
3     Q. Okay. After the petition for the
4 dissolution of your marriage was filed by you --
5     A. Yes.
6     Q. -- have you made arrangements or
7 attempted to make arrangements with Mr. Finn to go to
8 marital counseling?
9     MR. LASS: Objection, asked and answered.
10     THE COURT: It will be overruled.
11     Q. (BY MR. ROSE) I'm talking post-petition.
12     A. I was recommended not to talk to my
13 ex-husband any longer.
14     Q. Okay. Have you made arrangements to
15 communicate to Mr. Finn or Mr. Finn's attorneys to go
16 to marital counseling? Have you at -- to your
17 knowledge, has anybody made a written request upon
18 Mr. Finn by you to go to marital counseling
19 post-petition?
20     A. There has not been a written
21 recommendation because my husband said he didn't have
22 to do it.
23     Q. Okay. So all of this is just oral
24 discussions between you and your husband?
25     A. It's in texts. There's about a hundred

87

1 of them, at least.
2     Q. Okay. If you go to those text messages,
3 which I believe is Petitioner's Exhibit 7, I believe
4 you read from page 4; do you recall that?
5     A. Yes.
6     Q. And I believe you said that the texts on
7 the left-hand margin are Mr. Finn's and the right-hand
8 margin are your texts; is that correct?
9     A. Yes. Yes, they are.
10     Q. So under the top first paragraph, the
11 second paragraph text is your text back to Mr. Finn.
12 And I believe you testified from the upper paragraph.
13 I'm just going to read for the record the second
14 paragraph on page 4 that reads as follows: "I know
15 that the line item on the PN" -- by "PN," is that the
16 pre-nuptial agreement?
17     A. Yes, sir.
18     Q. Okay. "I know that the line item on the
19 PN isn't worth much. That is why I couldn't believe
20 that you were making such I [sic] big deal out of it.
21 Please call Sean Gildea and ask" -- "and talk with him.
22 He is a good business [sic]. My marriage is what is
23 important to me." You wrote that back to Mr. Finn, did
24 you not?
25     A. Yes, sir.

88

1     Q. Okay. Who is Mr. Coleson?
2     A. Oh, Mr. Coleson is a friend of the -- an
3 old friend of the family that was -- loved the wine
4 business and wanted to help my family at the time. And
5 he agreed to give $500,000 for a very small percentage
6 of unvoting rights shares to Sullivan Vineyards
7 Corporation.
8     Q. Mr. Coleson has an interest in the
9 winery, an ownership interest?
10     A. Not anymore, no.
11     Q. But he did at some point in time?
12     A. Yes, he did. It was -- he was just a
13 friend of my brothers.
14     Q. Does Mr. Coleson's wife have an interest
15 in the winery?
16     A. No, she does not, not that I know of.
17     Q. Okay.
18     MR. ROSE: Your Honor, I have nothing
19 further at this time.
20     THE COURT: Thank you. Redirect.
21     MR. LASS: I think so, Your Honor. If I
22 could have just a minute.
23     THE COURT: Sure.
24     (Pause in the proceedings.)
25

22 (Pages 85 to 88)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 26 of 110

89

```
1
2                     * * * * *
3           REDIRECT EXAMINATION
4    BY MR. LASS:
5           Q.  You testified on cross-examination by
6    Mr. Rose about these hearings in -- or a hearing in
7    California regarding a workplace domestic violence
8    case.
9           A.  Yes, I did.
10          Q.  Do you recall that?  Was the testimony of
11   the people who testified against you truthful,
12   completely truthful?
13          A.  No, they were not at all.
14          Q.  So why didn't you then take the stand to
15   testify, tell the truth?
16          A.  Because there was no work -- there was no
17   violence, so there was no -- there was no reason to
18   take the stand, because it wasn't true.
19          Q.  Were you agreeable at that time
20   voluntarily to, at least on a temporary basis, not live
21   in the home that's at the winery?
22          A.  Yes.  I agreed, because I didn't want to
23   obstruct their business.  And I wanted them to
24   continue.  I do -- I want them to do a great job.  I
25   want the winery to be successful.  So I'm happy for
```

90

```
1    them to be there working.
2           Q.  And was it impossible for the two of you
3    to co-exist in the winery; is that --
4           A.  It's completely impossible.
5           Q.  Does the restraining order that may or
6    may not be in place prevent you from living at the
7    winery?
8           A.  No, it does not at all.  But since my
9    front door was drilled out . . .
10          Q.  If you acquire your husband's -- if you
11   acquire the ownership interests in Sullivan Vineyards
12   that are currently held in your husband's name, do you
13   have the wherewithal with your family to manage it and
14   run the winery?
15          A.  Yes, I do.
16          Q.  Have you made arrangements in case that
17   were to happen?
18          A.  Yes, I have made a hundred percent
19   arrangements.  It's all taken care --
20          Q.  What have you done -- generally speaking,
21   what have you done to be prepared to operate the winery
22   if you or when you become the majority owner?
23          A.  I have a general manager who is extremely
24   experienced in the Napa Valley of restructuring
25   wineries that have been mismanaged.  We are going to
```

91

```
1    cut down our overhead.  And we are going to create a
2    more sustainable business.  I have --
3           Q.  Do you have management team lined up of
4    some sort?
5           A.  Yes.  I have a management team lined up.
6    I have -- I love our winemaker, but if he doesn't want
7    to stay, I have another winemaker that is very happy to
8    step in.  I have other salespeople that are happy to
9    step in if people leave.  And I have an operational
10   person.  And I have a compliance person who can deal
11   with the compliance.  And we are ready to go if that
12   is -- if I'm given the opportunity to do so.
13          Q.  Would -- did your brother Ross used to
14   have a management role in the winery?
15          A.  Yes.  For one year he was hired -- or two
16   years, he was hired to do the transition between my --
17   you know, the family winery and how it exists today.
18   So he . . .
19          Q.  And what was his title?
20          A.  His title was CEO.
21          Q.  Have you spoken with him about resuming
22   some sort of management role in the business?
23          A.  He would not take on the CEO position
24   again.  We want to have it professionally managed.  We
25   are looking forward to that.  He has another career as
```

92

```
1    well.  But we are -- we definitely want our family
2    participation again.  We want to be there.  We want to
3    give the tours.  We want to talk to the people about my
4    father's legacy and how we built the place.  And we are
5    happy to -- I mean, I have got all my art all over the
6    winery and all over the home.  And we want to bring
7    back that family feeling to the place.
8           Q.  Mr. Rose asked you some questions about
9    your husband's rights to sell the winery under the
10   marital agreement?
11          A.  Yes.
12          Q.  Do you -- and he asked you how -- what
13   you thought the agreement said, and I'm asking you a
14   similar question.  Do you think that your husband has
15   the right under the marital agreement to sell the
16   winery since the petition has been filed?
17          A.  No, I do not.
18          MR. ROSE:  Objection, Your Honor.  That's
19   a legal argument.
20          THE COURT:  Again, I'll allow it to stand
21   as far as her frame of mind.  It doesn't constitute a
22   legal -- I'm not accepting it as a legal opinion.
23          A.  It's my understanding that once I filed
24   for the petition that all assets froze.  No, I
25   didn't -- I don't believe he is able to sell it.
```

23 (Pages 89 to 92)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 27 of 110

93

1   MR. LASS: Nothing further, Your Honor.
2   THE COURT: Thank you. Recross.
3   MR. ROSE: Just a couple minutes.
4   THE COURT: Go right ahead.
5        RECROSS-EXAMINATION
6   BY MR. ROSE:
7   Q. Ms. Finn, the five employees that have --
8   currently have a restraining order against you, do you
9   believe that they are conspiring against you?
10  A. Yes, I do.
11  Q. Okay. And why are they conspiring
12  against you?
13  A. They work for my husband. They've --
14  they don't work for me.
15  Q. Do you know if any of the five that have
16  a restraining order even know Mr. Finn other than
17  Teresa Sullivan and Angelica de Vere?
18  A. Yes. He just took them all to lunch
19  about a week ago, actually.
20  Q. All the -- all the people that had a
21  restraining order against you?
22  A. I don't know. That's what I was told.
23  Q. Who told you that?
24  A. I was just -- it was told to me by one of
25  the staff.

94

1   Q. Who told you that?
2   A. Consuela, my housekeeper.
3   Q. Your housekeeper. Does she work in the
4   winery?
5   A. Yeah, she works for me.
6   Q. In fact, she was staying in the
7   residence. She does not work for the winery; is that
8   correct?
9   A. Yes.
10  Q. Okay. So you believe that these five
11  employees who got a restraining order are conspiring
12  against you to assist Mr. Finn in his attempts to run
13  the winery into insolvency?
14  A. Yes.
15  Q. Okay. You'd indicated in redirect from
16  your counsel that you have a management team in place
17  that's prepared to step in and take over the running of
18  Sullivan Vineyards?
19  A. I would have liked Angelica and her team
20  to take over, but I don't think that they like me very
21  much. So I think that I need to get a new team.
22  Q. Okay. That's not the question. The
23  question is, do you have a management team?
24  A. Yes.
25  Q. Okay. And who have you retained to be

95

1   your management team to take over the running of
2   Sullivan Vineyards?
3        THE WITNESS: Is that a question that I
4   can answer, sir?
5        THE COURT: Please answer the question.
6   A. Okay. Dan Zepponi. He would be our --
7   he is an expert in restructuring of wineries. He was
8   the vice president of Beringer's, an $11 million --
9   million-case winery. And he also ran the largest
10  winery in Canada, called Mission Hill.
11  Q. (BY MR. ROSE) And Mr. Zepponi has agreed
12  to work for you?
13  A. Yes.
14  Q. Do you -- do you have any kind of a
15  written document that you brought to court today?
16  A. I didn't bring a written document. I
17  didn't think I needed it.
18  Q. Okay. Have you asked Mr. Zepponi to
19  maybe testify that he's agreed to work for you?
20  A. Yes, I have. And he has agreed also to
21  be on the board of directors.
22  Q. Okay. But has he agreed to testify today
23  that he's agreed to take this position?
24  A. Yes. He would love to testify, actually.
25  He's not here today. I'm sorry.

96

1   Q. Okay. Let's -- we've stipulated that
2   telephonic testimony is acceptable.
3        MR. LASS: Objection, argumentative.
4        THE COURT: That is argumentative. It
5   will be stricken.
6   Q. (BY MR. ROSE) Other than Mr. Zepponi,
7   who else have you retained to be part of your
8   management team?
9   A. I have retained Rene and Maria Bowers.
10  And they are in sales and compliance and bookkeeping.
11  Q. And, again, have you brought any written
12  documents to court with you today to verify that you
13  have these relationships that you've testified about?
14  A. I didn't think I needed them today.
15  Q. Okay. How much are you paying Mr.
16  Zepponi to be the CEO of Sullivan Vineyards?
17  A. That's negotiable, sir.
18  Q. Have you reached an agreement with Mr.
19  Zepponi on what you are going to pay him?
20  A. We -- he has consulting fees, and then he
21  would -- if put in place, it would be a different fee.
22  Q. As you are sitting here today --
23  A. About $70,000.
24  Q. $70,000 a year?
25  A. Yes.

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 28 of 110

97

1    Q.  Okay.  And, again, you -- is there a
2    writing out there?  Is there a contract that you've
3    entered into with --
4    A.  Yes, I have signed -- I have a signed
5    contract.
6    Q.  Okay.  But you didn't bring it here
7    today?
8    A.  No.  I didn't think I needed it.  I'm
9    sorry.
10   Q.  Do you have access to that contract?
11   Maybe you can have it sent in by email or --
12   MR. LASS:  Objection, argumentative and
13   improper.
14   THE COURT:  That will be sustained.
15   Q.  (BY MR. ROSE)  Do you have access to this
16   document that you are referring to?
17   A.  Yes, I do.
18   Q.  Okay.  Is there someone who might be able
19   to email it to somebody here in Colorado?
20   THE COURT:  I would ask that you discuss
21   that with counsel.
22   MR. ROSE:  Okay.
23   THE COURT:  Anything as far as documents,
24   I think it's inappropriate to be questioning witnesses
25   about documents.  Counsel can take care of that,

98

1    please.
2    MR. ROSE:  I understand.  Okay.
3    Q  (BY MR. ROSE)  Anyone else on your
4    management team?
5    A.  Yes.  I have an LOI from an investor who
6    is excited and ready to go ahead.
7    Q.  Okay.  And, again, the letter of intent
8    is a commitment for how much money?
9    A.  I didn't think we were talking money.
10   THE WITNESS:  But would you like me to
11   answer that?
12   THE COURT:  Yes, please.
13   A.  It's for a couple million dollars and
14   30,000 a month for the next two or three years for cash
15   flow.
16   Q.  (BY MR. ROSE)  Okay.  And who is the
17   investor?
18   THE WITNESS:  I would prefer not to say,
19   but if you would like me to, I will, sir.
20   THE COURT:  Please do.
21   MR. LASS:  Objection.  Your Honor, I'm
22   going to object on the grounds of relevance.
23   MR. ROSE:  Well, she's testified.  We are
24   certainly entitled to know who this mystery person is.
25   THE COURT:  The objection will be

99

1    overruled.  You can answer the question.
2    A.  His name is John Valentine, but he's
3    bringing in ten different investors, one being Roger
4    Craig and Jimmy Duncan.
5    Q.  (BY MR. ROSE)  Okay.  And, again, there's
6    a letter of intent out there, but you didn't bring it
7    to court today?
8    A.  I have -- I can provide --
9    MR. LASS:  No.  Objection --
10   Q.  (BY MR. ROSE)  Okay.  I'm not asking you
11   to produce it.  I'm just asking if, in fact, there's a
12   document out there to support that testimony?
13   A.  Yes, sir.
14   MR. ROSE:  All right.  I have nothing
15   further, Your Honor.
16   THE COURT:  You can step down.
17   THE WITNESS:  Thank you.
18   THE COURT:  Mr. Lass, you may call your
19   next witness.
20   MR. LASS:  Your Honor, this is where my
21   concern about the timing comes in.  I think that our
22   next witness, if necessary, would be Ross Sullivan;
23   however, I think that his testimony is all in the
24   nature of rebuttal to what I expect from the husband's
25   witnesses.  And therefore we have no other witnesses at

100

1    this time.  And my concern is that we save him enough
2    time.
3    THE COURT:  Yeah.  I'm marking -- I'm
4    keeping track of time.
5    MR. LASS:  Okay.  Thank you.
6    MR. FOX:  Your Honor, may we have just
7    one moment?
8    THE COURT:  Certainly.  Go ahead.
9    MR. LASS:  Your Honor, could we take five
10   minutes?
11   THE COURT:  Sure.  Let's take a
12   five-minute recess.
13   (Recess taken, 11:09 a.m. to 11:13 a.m.)
14   MR. BERTRAND:  Your Honor, we move for
15   judgment on our motion to vacate the injunction.  It's
16   clear that the provisions of the marital agreement
17   provide that -- that the -- his interest in the winery
18   is his separate property and she has no rights to
19   control his separate property.  There's been no
20   evidence that has been submitted that changes the plain
21   meaning of the language in the marital agreement
22   itself.
23   I would further note that there's been no
24   evidence whatsoever that Mr. Finn has attempted to
25   transfer his ownership interest in the winery.  In

25 (Pages 97 to 100)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 29 of 110

101

1  fact, discussions with respect to the sale of the
2  winery do not involve his ownership interest. They
3  merely involve assets of the winery. So it's quite
4  clear -- and they've presented no testimony or
5  competent evidence that changes the plain meaning of
6  what the marital agreement says.
7        Mr. Finn's ownership interests in the
8  winery are his separate property. It provides that he
9  has the right to deal with his separate property
10 independently. There is nothing in the marital
11 agreement that purports to limit his ability to
12 transfer his ownership interest.
13       And, indeed, the injunction that was
14 entered was way overbroad and forces Mr. Finn into a
15 position of breaching his fiduciary obligations to the
16 California corporation, to the creditors, and the like.
17 So we think, as a matter of law, the injunction must
18 be -- must be vacated because it violates the marital
19 agreement, it was in excess of the Court's jurisdiction
20 to deal with the separate property. And so we would
21 ask at this time judgment on our motion to vacate.
22       THE COURT: And why do you say it was in
23 excess of the Court's jurisdiction to deal with his
24 separate property?
25       MR. BERTRAND: Because the -- Court

102

1  does not have the jurisdiction -- it has jurisdiction
2  over the marital property, but this is a clearly
3  separate property interest. So the Court does not have
4  the jurisdiction to deal with his separate property.
5        THE COURT: That being his percentage of
6  ownership; is that correct?
7        MR. BERTRAND: That's correct.
8        THE COURT: And -- but the wife also has
9  a percentage of ownership in the whole of SVP and SVC?
10       MR. BERTRAND: She does, but that
11 doesn't -- the -- first off -- I guess, the analogy I
12 would take is a winery is comprised of many different
13 assets; for example, wine is an asset. And I don't
14 think that anybody could credibly come before this
15 Court and argue that because she has a minority
16 ownership interest in the winery that she would have --
17 a family law court in Colorado would have the
18 jurisdiction to say, You can't sell wine. So
19 Mr. Finn's right to sell his -- his -- the assets of
20 the winery, it's the same -- it's the same thing.
21       So he's not purporting to deal with her
22 ownership interest in the winery at all. It's
23 merely -- the only discussion has been an asset sale of
24 the winery. So there is no attempt to sell her
25 ownership interest out from under her.

103

1        THE COURT: Thank you. Mr. Lass.
2        MR. LASS: Well, Your Honor, this has
3  been briefed probably to death for the Court. And I'm
4  happy to respond in a couple of brief ways if the Court
5  has questions. But to claim -- for the husband to
6  claim that he has a fiduciary duty to sell the winery
7  when every other shareholder is opposed to it seems way
8  out of line and inappropriate.
9        Second, I think the Imel case makes it
10 clear that once the petition is filed, as the Court
11 held, we hold that at the time the divorce action was
12 filed there vested in the wife her interest in the
13 property in the name of the husband. That case, it
14 seems to concern, although it wasn't clear, whether the
15 wife had an interest in the appreciation in the
16 husband's separate property.
17       This case, the wife clearly has a vested
18 interest in acquiring the husband's shares in the
19 winery. And the winery can't be sold unless the
20 husband sells -- the husband orchestrates the sale.
21       Also, the marital agreement, despite the
22 husband's sort of repeated assertions that the -- his
23 interest in the winery is his separate property, again,
24 is not so clear. The marital agreement itself says --
25 when it defines the general presumption of what's

104

1  separate, it says, Except as specifically provided in
2  this agreement, this is what's separate property.
3        And paragraph 2.3 says, without limiting
4  those general provisions in Section 2.2, the agreement
5  defines separate property. But it is separately
6  provided for in the document. In Section 5.7.2 it says
7  that upon entry of the decree, the Court -- or the
8  husband -- the interests in the name of the husband
9  should be -- become the wife's property.
10       This is similar, I suppose, to situations
11 where, for example, somebody buys a car. They have the
12 right to the car, but title hasn't been transferred
13 yet. That doesn't mean the person in possession can go
14 sell it. And that's the husband's position,
15 effectively. So I -- you know, Your Honor, we've
16 briefed this so much, I certainly don't know where to
17 start.
18       THE COURT: I have a question. I have a
19 question.
20       MR. LASS: Sure.
21       THE COURT: I know that the document
22 refers to the Sullivan Vineyard, or winery. I know the
23 document also refers to the wife's right to live at
24 Los Altos. Other than those references to that
25 separately owned property by Mr. Finn, is there

26 (Pages 101 to 104)

105

1  anywhere in the document that it calls out other
2  separately owned property, specifically?
3      MR. LASS: I don't think so.
4      THE COURT: Okay.
5      MR. LASS: I don't think so.
6      THE COURT: Thank you. Mr. Bertrand, any
7  more on that?
8      MR. BERTRAND: Yes, Your Honor. Very
9  briefly, looking at the contract itself, the definition
10 of separate property is incredibly broad, and the
11 definition of marital property is exceedingly narrow.
12 Now, if there was a restriction that was intended on
13 Mr. Finn's ability to deal with his ownership interests
14 in the Sullivan entities, it would have been called out
15 and said he cannot transfer this. I mean, that -- you
16 know, expressio onius, that basic contract --
17 construction premise, would apply here.
18     Both sides were represented by very
19 competent counsel. And if there was to be a
20 restriction preventing him from transferring his
21 interest, one would think that it would be located in
22 the contract itself, and it's not.
23     And, again, the notion that -- the --
24 further, the notion that -- that a restriction on his
25 transfer of his ownership interests translates to he

106

1  cannot discharge his fiduciary obligation as a member
2  of the board of directors for a California corporation,
3  California partnership, that goes beyond even the
4  broadest reading as possible.
5      This is a legal issue which we think is
6  ripe for determination now by Your Honor, and we would
7  request that the injunction be vacated at this point.
8      THE COURT: Okay. And in Colorado, he
9  has also a fiduciary relationship to his wife. And
10 though it doesn't call out any restriction from him
11 selling the Vineyards, it does call out that at the
12 time of the termination of the marriage any interest he
13 has in the Vineyard goes to the wife?
14     MR. BERTRAND: That is correct; however,
15 even under a fiduciary obligation, he doesn't have an
16 obligation to allow the winery to become insolvent and
17 to become worthless and for the winery to incur debts
18 that it cannot afford to pay and incur obligations to
19 employees that he can't afford to pay, et cetera,
20 et cetera.
21     So I would submit that, Your Honor --
22 that, given those circumstances, even if you say he has
23 some fiduciary obligation to the wife, there's no
24 limitation on his ability to deal with his separate
25 property. And those were specifically negotiated.

107

1      And I would point out that in the
2  contract itself, Section 5.1, the injunction itself, I
3  believe, violates Section 5.1 where it said that our
4  specific intent is that there shall be no litigation
5  between us and no court determination of our marital
6  rights in that event, since we intend this agreement to
7  accomplish that function. And Ms. Finn basically did
8  an end run around that to get a court order to restrict
9  Mr. Finn in dealing with his own separate property.
10     She did not negotiate for the right to do
11 that. In fact, she negotiated just the opposite, and
12 that's the effect of the marital agreement,
13 notwithstanding an argument that there's a -- there's
14 some type of fiduciary obligation.
15     THE COURT: Separate property that the
16 document, the contract that you are referring to, says
17 that upon termination of the marriage any interest that
18 he owns in that separate property becomes the wife's
19 property?
20     MR. BERTRAND: If he owns. If he owns at
21 the time.
22     THE COURT: Right. Thank you.
23     MR. BERTRAND: But it doesn't require him
24 to maintain ownership of the interest.
25     THE COURT: I guess that's the question.

108

1  The motion will be overruled.
2      MR. BERTRAND: Thank you.
3      THE COURT: You are welcome.
4      MR. FOX: Your Honor, I would call
5  Mr. Finn to the stand.
6      THE COURT: Thank you.
7      STEPHEN A. FINN,
8  having been first duly sworn to state the whole truth,
9  was examined and testified as follows:
10     DIRECT EXAMINATION
11 BY MR. FOX:
12     **Q. Mr. Finn, as a preliminary matter, there**
13 **are two books behind you that are exhibit books.**
14     MR. FOX: And, Your Honor, if I may
15 approach?
16     THE COURT: Yes, you may.
17     **Q. (BY MR. FOX) Mr. Finn, can you please**
18 **state your name and spell your name and then give the**
19 **court your address here in Colorado.**
20     A. Stephen A. Finn, F-i-n-n, is the spelling
21 my last name. Stephen is S-t-e-p-h-e-n. I live at 575
22 Circle Drive, Denver, Colorado 80206.
23     **Q. If you can turn -- if you wouldn't mind**
24 **grabbing the books behind you as well. And I'm going**
25 **to ask you to turn to Volume I, Exhibit A.**

Case: 17-10065      Doc# 86      Filed: 04/05/17      Entered: 04/05/17 17:46:12      Page 31 of 110

**109**

1  A.  Volume I, Exhibit A.
2  Q.  **This has already been admitted as your**
3  **marital agreement, but just for formality, if you can**
4  **turn to page 23 of the document -- or 22 of the**
5  **document, please.**
6  A.  Yes.
7  Q.  **Is that your signature?**
8  A.  It is.
9  Q.  **Over what period of time, length of time,**
10  **were you and Ms. Finn negotiating this marital**
11  **agreement?**
12  A.  I would say three to four months.
13  Q.  **And you heard Mr. Lass confirm that she**
14  **was represented by counsel.  You were also represented**
15  **by counsel in this matter?**
16  A.  That is correct.
17  Q.  **What was your intent regarding your**
18  **separate property being been brought into this**
19  **marriage?**
20  A.  It would continue to be my separate
21  property.
22  Q.  **And what was your intent regarding any**
23  **separate property that you acquired at any time during**
24  **the marriage?**
25  A.  That it would stay my separate property.

**110**

1  In fact, I had to identify it as other than separate
2  property before it could become anything else.
3  Q.  **And I'm going to walk you through various**
4  **provisions of the marital agreement.  If you could turn**
5  **to page 3, please.  I asked you about your**
6  **understanding.  Is this confirmed in paragraphs 2.1 and**
7  **2.2 that your property is your separate property?**
8  A.  Yes, it does.
9  Q.  **If you can go on to page 4, the last**
10  **sentence -- well, actually, let me just ask this**
11  **general question:  Is it your understanding that your**
12  **interest in Sullivan Vineyard Corporation and Sullivan**
13  **Vineyard Partnership is your separate property?**
14  A.  Yes, it is.
15  Q.  **Is it held in your separate name?**
16  A.  It is.
17  Q.  **Did Ms. Finn provide any capital or any**
18  **funds towards your interest in this purchase?**
19  A.  None.
20  Q.  **Last line of paragraph 2.2 on page 4.  Is**
21  **it your understanding that title shall control**
22  **ownership?**
23  A.  Yes, it is.
24  Q.  **You heard Ms. Finn indicate her**
25  **understanding or her belief that upon the filing of**

**111**

1  petition things changed.  What is your understanding of
2  how Colorado property law is affected by your marital
3  agreement?
4       MR. LASS:  Objection, Your Honor.  Calls
5  for a legal conclusion.
6       THE COURT:  That will be overruled.
7  A.  The pre-nup is very clear.  We negotiated
8  over a long period of time.  And it overrides Colorado
9  statutes.
10  Q.  **(BY MR. FOX)  I would like you to turn to**
11  **page 6, please.  I want to go over some of the**
12  **definitions that are in this agreement.  Do you see**
13  **paragraph 2.9.1 on the bottom of page 6?**
14  A.  I do.
15  Q.  **Your marriage is terminated by the entry**
16  **of a decree?**
17  A.  Yes.
18  Q.  **Looking on page 7, paragraph 2.9.3, again**
19  **it's sort of the same thing, your marriage is**
20  **terminated by the entry of a decree; is that right?**
21  A.  Yes.
22  Q.  **Just very quickly, I would like you to**
23  **take a look at paragraph 5. -- on page 13, paragraph**
24  **5.7.  When does this indicate your interest in Sullivan**
25  **Vineyards, if you have one, would transfer to your**

**112**

1  wife?
2  A.  Upon my divorce decree.
3  Q.  **Okay.  And you are reading from paragraph**
4  **5.7, "Upon termination of our marriage by entry of**
5  **decree."**
6  A.  Yes.
7  Q.  **Did you negotiate for time between the**
8  **filing of a petition and the entry of a decree to**
9  **liquidate these assets if you needed to?**
10  A.  Yes.  It was my experience in California
11  with friends is that it takes about a year to get a
12  divorce.  So I was very clear that I would not be
13  ambushed by a filing and it immediately becoming
14  Kelly's property.  I insisted during the negotiations
15  of the pre-nup that it be at only termination of our
16  marriage, because there would be so many complications
17  of financial, et cetera, and I assumed it would be
18  sold.
19  Q.  **Are you familiar with Ms. Finn's**
20  **financial status?**
21  A.  I have not seen current --
22  Q.  **Okay.**
23  A.  -- financial status.
24  Q.  **While you were together, did she have the**
25  **wherewithal or the resources to raise $15 million of**

scheduling@huntergeist.com     HUNTER + GEIST, INC.     303-832-5966/800-525-8490

113

1   funds to pay off the existing debt?
2        A.  No.
3            MR. LASS:  Objection, Your Honor,
4   speculation.
5            THE COURT:  It will be overruled.
6            You may answer.
7        A.  She did not.
8        Q.  (BY MR. FOX)  You heard her testify that
9   she had a letter of intent for $2 million.  Does the
10  current financing allow additional subordinated loans?
11       A.  No, it does not.
12       Q.  Absent satisfying the $15 million of
13  senior debt, is it possible for her to obtain
14  additional loans?
15       A.  It would be in violation of the Silicon
16  Valley Bank loan agreement.
17       Q.  I would like you to turn to paragraph 3.1
18  of the marital agreement.  I'll get you a page.  Page
19  7.  Does this specifically allow you to gift, sell,
20  transfer, or dispose of your separate property as you
21  wish?
22       A.  Yes, it does.
23       Q.  I would like you to turn to page 12,
24  paragraph 5.4, please.  Ms. Finn indicated that on the
25  filing of petition things freeze.  Does your marital

114

1   agreement say things freeze or are you still free to do
2   with as you want with your separate property?
3        A.  I'm free to do with as I want my separate
4   property.
5        Q.  Now, this paragraph 5.4 refers back to
6   paragraph 2.3, which is the definition of separate
7   property.  It also refers to paragraph 4.2.  I would
8   like you to go to paragraph 4.2 for a moment, please.
9   Paragraph 4.2 is on page 8.  Excuse me.
10       A.  Uh-huh.
11       Q.  Ms. Finn talked a little bit about this
12  provision.  You had agreed to gift Ms. Finn $500,000
13  per year of marriage; is that right?
14       A.  For a period of time, yes.
15       Q.  Okay.  For the first ten years, and we
16  are still within that time frame?
17       A.  Correct.
18       Q.  You've been married just about four
19  years?
20       A.  Yes.
21       Q.  Looking at paragraph 4.2.3, with her
22  consent, you could have gifted her some of the Sullivan
23  Vineyard in satisfaction of that obligation, correct?
24       A.  That is correct.
25       Q.  And is it your understanding that your

115

1   obligation on this $500,000 is prorated based on the
2   length of your marriage?
3        A.  Yes.
4        Q.  So if you were -- if she filed the
5   divorce petition at four and a half years, would you
6   owe -- rather than at three years and ten months, would
7   you owe her another $250,000?
8        A.  Yes.
9        Q.  And paragraph 4.2.3 says that with her
10  consent you can gift her parts of Sullivan Vineyard in
11  satisfaction of that post-petition obligation; is that
12  right?
13       A.  That is correct.
14       Q.  Does that -- is that consistent with your
15  understanding that it was your separate property to
16  gift or dispose of as you chose after the petition?
17       A.  Well, clearly, it is.  This was heavily
18  negotiated before our marriage.
19       Q.  There are other parts of this agreement
20  that are tied to the date of the petition as opposed to
21  the termination of the marriage.  Why was that
22  distinction made in the agreement?
23       A.  So I would not be in the vulnerable
24  position of being ambushed regarding the winery;
25  therefore, the winery was the one item that I insisted

116

1   I would have full reign until a final decree.
2        Q.  If it was your intent, as Ms. Finn
3   indicated, that whatever you put into the winery from
4   day one was hers, why doesn't it say it that way?
5        A.  Because that is not the truth.
6        Q.  If she had wanted it to be there, could
7   she have negotiated that whatever you invested would be
8   hers?
9        A.  I would never have agreed to it.
10       Q.  If you knew that whatever you invested
11  into this winery was hers, would you have put any money
12  into it?
13       A.  No, I would not have.
14       Q.  I would like to walk you through some of
15  the provisions that are tied to the filing of the
16  petition as opposed to the termination of marriage.
17  Can you look at paragraph 4.3, please --
18       A.  Yes.
19       Q.  -- on page 9?  This says that you are
20  obligated to assist with reasonable expenses prior to
21  the filing of the petition and that after the filing of
22  the petition you each pay your own expenses; is that
23  right?
24       A.  Yes, that's right.
25       Q.  And paragraph 5.4, we talked a little bit

29 (Pages 113 to 116)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 33 of
110

117

1  about this one, on page 12, specifically acknowledges
2  that upon the filing of a petition you can do as you
3  wish with your separate property; is that right?
4      A.  That's correct.
5      Q.  And paragraph 5.5, again, this is an
6  obligation here of maintenance that starts on the date
7  of the filing of the petition rather than termination
8  of marriage; is that right?
9      A.  That is correct.  And I am currently
10  paying all of those on time.
11      Q.  And 5.7.3 on page 13 talks about
12  assisting with her housing from the date of the filing
13  of the petition as opposed to the termination of
14  marriage; is that right?
15      A.  That is correct.
16      Q.  There are some provisions that are tied
17  to the termination of the marriage, as opposed to the
18  filing of a petition.  Taking a look at paragraph 5.6,
19  just above, on page 13:  Marital property is divided as
20  of the termination of the marriage, right?
21      A.  That is correct.
22      Q.  And if you own an interest in Sullivan
23  Vineyards at that time, that would transfer on the date
24  of your divorce, termination of your marriage?
25      A.  That is correct.

118

1      Q.  Mr. Rose spoke with Ms. Finn a little bit
2  about the counseling provision.  Was there a built-in
3  waiting period in your marital agreement, page 10,
4  paragraph 4.9?
5      A.  Six months.
6      Q.  Yes.  So at a minimum, you had six months
7  to liquidate your interest in the winery if you chose
8  to do so; is that right?
9      A.  That is correct.
10      THE COURT:  You are referring to the
11  counseling provision as giving a six-month period?
12      MR. FOX:  Yes, Your Honor.
13      THE COURT:  Okay.  Thank you.
14      MR. FOX:  One of the issues before the
15  Court is entry of the decree, and we're -- we have not
16  yet that six-month time frame, Your Honor.
17      Q.  (BY MR. FOX)  Did Ms. Finn make any
18  attempt after May 27, 2015, when she served you at your
19  board meeting, to seek counseling, as required by
20  paragraph 4.9?
21      A.  Well, she served me on May 27 at my board
22  meeting, and no, she has not.
23      Q.  Are you willing to attempt marital
24  counseling, as is required by your marital agreement,
25  for a period of six months?

119

1      A.  I am.
2      Q.  And would you ask the Court to not enter
3  any decree, at a minimum, until the end of that time
4  period?
5      A.  I would like to go to counseling, yes.
6      Q.  Ms. Finn referred to a discussion in
7  April of 2015.  Were things pretty heated at that time?
8      A.  They were.
9      Q.  Was Ms. Finn asking you to invest more
10  money into a failing operation?
11      A.  Yes.
12      Q.  And were you willing to do so absent
13  concessions from her?
14      A.  Yes.  I did invest $300,000 the week
15  before she filed for divorce.
16      Q.  Okay.  And I'll come back to that again.
17      Let's go over your ownership interest
18  first, and then we'll come back to those questions.
19  I would ask you to turn to Exhibit M, as in "Mary."
20      MR. LASS:  What exhibit?
21      MR. FOX:  M as in "Mary."
22      Q.  (BY MR. FOX)  What is Exhibit M?
23      A.  It's the ownership interests of all of
24  the partners and the corporate and the shareholders.
25      MR. RAMP:  I'm going to object to this

120

1  line of inquiry.  I think there is a dispute about
2  ownership, but I don't think it's relevant for
3  resolution today.
4      THE COURT:  That will be overruled.
5      MR. FOX:  Your Honor, I would ask that
6  the Court accept Exhibit M as a demonstrative exhibit,
7  and I'll go through the individual transactions that
8  make up this exhibit.
9      THE COURT:  Thank you.  Any objection to
10  this as a demonstrative exhibit?
11      MR. RAMP:  Well, I think more than a
12  demonstrative exhibit, it appears to be a summary
13  exhibit.  And I don't know that we've -- we haven't
14  gotten enough time, with the backup documentation
15  identified, to fit CRE 1006.
16      THE COURT:  It will be accepted as a
17  demonstrative exhibit at this time.  If, subsequently,
18  there's documentation presented that would challenge
19  some of the figures on this document, Mr. Fox, I would
20  assume that you would be willing to modify the
21  document; is that correct?
22      MR. FOX:  Absolutely, Your Honor.
23      THE COURT:  Thank you.
24      Q.  (BY MR. FOX)  I'm going to ask you to
25  stay on Exhibit M for a moment and turn to the smallest

30 (Pages 117 to 120)

121

1   book and turn to Exhibit 6.

2      MR. FOX: If I'm doing this right, Your

3 Honor, I would note that Exhibit 6 is identical to

4 Exhibit H. It is the stock and partnership agreement.

5 Exhibit 6 has already been admitted.

6      THE COURT: Thank you.

7      MR. FOX: And it may be easier to pull

8 Exhibit M out of the book.

9      Q. (BY MR. FOX) But Exhibit H, or Exhibit

10 6, this is the stock purchase agreement with your

11 mother-in-law, JoAnna Sullivan; is that right?

12      A. That is correct.

13      Q. If you can turn to page 2 of this

14 document, you initially purchased 510 shares of the

15 corporation -- let me make sure I got this right -- and

16 51 percent of the partnership?

17      A. Yes.

18      Q. And that's discussed on page --

19      MR. FOX: Your Honor, it's Bates-labeled

20 Number 2 on the bottom right. The cover page of this

21 exhibit did not have a page, so I will refer to the

22 numbers on the bottom right. And if that gets

23 confusing, anybody, please just let me know.

24      Q. (BY MR. FOX) Your stock purchase

25 agreement with your mother-in-law gave you an option to

122

1 purchase an additional 1.1 percent of the partnership;

2 is that right?

3      A. That is correct.

4      Q. Take a look at, again, Number 15, page

5 15, on the bottom right, paragraph 4.11.

6      A. Page 15?

7      Q. Yes.

8      A. Of Tab 6, correct?

9      Q. Correct. Okay. Bottom right-hand number

10 is page 15 --

11      A. Uh-huh.

12      Q. -- paragraph 4.11, option from seller to

13 purchase another 1.1 percent. Do you see that?

14      A. Yes, I do.

15      Q. Did you exercise that option to purchase

16 the additional 1.1 percent in Sullivan Vineyards

17 Partnership?

18      A. I did.

19      Q. Looking at Exhibit M in the book to your

20 left, as of August 12 of 2011, your initial purchase,

21 you owned 49.9 percent of the partnership and 48.57

22 percent, or 510 shares out a thousand-fifty, of the

23 corporation; is that right?

24      A. Yes.

25      Q. After you exercised that 1.1 percent

123

1 option, your ownership of the partnership went up to 51

2 percent?

3      A. That is correct.

4      Q. Okay. I understand you arranged or

5 assisted with financing with Silicon Valley Bank?

6      A. Yes.

7      Q. In 2012?

8      A. Yes.

9      Q. You personally guaranteed those -- that

10 debt with Silicon Valley Bank; is that right?

11      A. I did.

12      Q. If you can turn to Exhibit N, as in

13 "Nancy," what is Exhibit N? Is this the option

14 agreement?

15      A. This is the -- yes, this is the option

16 agreement for my additional purchase of 25 percent,

17 provided that my guarantee was not rescinded within 24

18 months.

19      Q. Now, this letter is dated April 6 of

20 2012?

21      A. Correct.

22      Q. Before I ask for admission, if you can

23 turn -- was your guarantee removed within two years, as

24 suggested by this letter?

25      A. No, it was not.

124

1      Q. And two years later, did you exercise the

2 option to purchase additional shares of the

3 corporation?

4      A. I did.

5      Q. Staying on Exhibit N, can you turn to the

6 last page, please, page 4.

7      A. Yes.

8      Q. Do you recognize the signature of Ross

9 Sullivan and Kelly Sullivan and -- I apologize -- is

10 that Caireen --

11      MS. FINN: "Caireen."

12      MR. FOX: The extra E was getting me

13 there.

14      Q. (BY MR. FOX) -- Caireen, C-a-i-r-e-e-n,

15 Sullivan?

16      A. Yes, I do.

17      Q. And if you go to page 3, there are other

18 family members' signatures there as well?

19      A. Yeah. Sean Sullivan and Ross Sullivan.

20      MR. FOX: Your Honor, I would ask for the

21 admission of Exhibit N.

22      THE COURT: Any objection? Hearing none,

23 I --

24      MR. LASS: Your Honor, I'm sorry. It may

25 or may not be the right time to make this objection,

scheduling@huntergeist.com     HUNTER + GEIST, INC.     303-832-5966/800-525-8490

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 35 of 110

125

1  but as a global objection, we got 139 exhibits covering
2  five years of history of this vineyard on Saturday
3  evening. If we are getting into complex issues of
4  transfer of ownership and the financials of this
5  company, we really have not had the opportunity to
6  review these documents, consult with an expert, and
7  deal with some of these. We are not prepared to rebut
8  the 139 exhibits that we received on Saturday for this
9  hearing.
10         We don't think it's relevant for what the
11 Court has to decide today. If the Court does decide
12 that it's going to be allocating partnership interests
13 today and deciding these issues, we would ask for
14 additional time to rebut and review this quantity of
15 information.
16         THE COURT: Mr. Fox, is this being
17 presented to have the Court allocate partnership
18 interests?
19         MR. FOX: Your Honor, in the pleadings
20 that Ms. Finn filed she said the ownership interest was
21 in dispute. She challenged the loans versus capital
22 contributions. I'm trying to show the Court what she
23 owns and how he owns it. This is a document signed by
24 Ms. Finn and Mr. Sullivan, who are both present. I
25 don't know how this is a confusing document.

126

1         Counsel agreed to do an exchange of
2  exhibits Saturday at 5 o'clock. This is an agreement
3  between counsel. They made in their motion for an
4  entry of decree the finances and the ownership an
5  issue. We addressed it.
6         MR. LASS: I don't believe that's true
7  that we put those in issue. We agreed -- this hearing
8  was set about two weeks ago. We agreed to an exchange
9  of exhibits on Saturday out of necessity. We have
10 about 20 of them. They have 140 of them. The -- it is
11 not specifically Exhibit N. It is the other 138 that
12 go with it that get into this issue.
13         There are disputes about what are loans,
14 what are capital contributions, what loans were
15 approved by the company, what loans were not approved
16 by the board. And we have not had time or the help to
17 go through and be prepared for that case today.
18         THE COURT: Okay. In the event that
19 additional time is necessary, that would be granted to
20 you. At this point I'm going to admit Exhibit N.
21         (Exhibit N was admitted.)
22         Q.  (BY MR. FOX) Exhibit O, can you identify
23 that document, please?
24         A.  This is the notice that I gave that I did
25 exercise.

127

1         Q.  So you purchased or acquired an
2  additional 262 new -- I may this say this wrong -- new
3  treasury stocks, treasury shares?
4         A.  Yes, they were treasury shares.
5         Q.  And so the total number of outstanding
6  shares increased by 262?
7         A.  That is correct.
8         Q.  Going back to Exhibit M just very
9  quickly, M as in "Mary," adding those 262 shares to the
10 510 you owned before, you now own 772 shares?
11        A.  That is correct.
12        Q.  Out of 13 -- 1,312 shares?
13        A.  Yes.
14        Q.  Your current interest in the corporation
15 is 58.84 percent?
16        A.  That is correct.
17        Q.  As long as we are on Exhibit M, is there
18 another owner other than a Sullivan or a Finn of the
19 corporation?
20        A.  Yes, Andrea Crow.
21        Q.  And that is Mr. Coleson's wife, or former
22 wife?
23        A.  That is correct.
24        Q.  Very quickly, Exhibits P and Q. This
25 is -- P is a warrant for interest in the partnership,

128

1  same terms, 25 percent?
2         A.  Yes.
3         Q.  And Exhibit Q is your notice of exercise
4  on May 1 of 2014?
5         A.  That is correct.
6         Q.  Going back to Exhibit M -- and, again,
7  this is with an additional 25 percent. The basis now,
8  125 percent. So rather than adding 25 percent to your
9  51, your new net interest in the partnership is 60.8
10 percent?
11        A.  That is correct.
12        Q.  And did you pay for both of those
13 interests?
14        A.  Yes, I did.
15        MR. FOX: Your Honor, I would ask for the
16 admissions of Exhibits O, P, and Q.
17        THE COURT: Objections? As stated
18 previously?
19        MR. LASS: Standing objection. And just
20 to highlight the issue here, Exhibit P is unsigned. We
21 are looking at documents that create this demonstrative
22 exhibit establishing what percentage of ownership he
23 has in this thing, and we don't even have a signed
24 document.
25        THE COURT: And I think that's

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 36 of 110

129

1  appropriate for cross-examination.  Exhibits O, P, and
2  Q will be admitted.
3          (Exhibits O, P, and Q were admitted.)
4          MR. FOX:  Thank you, Your Honor.
5          Q.  (BY MR. FOX)  I would like you to turn to
6  Exhibit D, which is the Verified Motion for Immediate
7  Expanded Temporary Injunction.  I just want to go
8  through some of the assertions that Ms. Finn made in
9  her request of the Court.  First of all, before we get
10 there, were you able to respond before the Court issued
11 its order?
12         A.  We were not able to respond.
13         Q.  Did the Court give you the appropriate
14 time or did the Court request an expedited briefing
15 schedule before it issued the order?
16         A.  I'm not sure what that means, but we were
17 not given --
18         Q.  I apologize.  Sometimes we do that.
19         THE COURT:  You know, it's much easier
20 for the Court to rule on it.  Not as messy.
21         MR. FOX:  You wouldn't have missed out on
22 anything important anyway.
23         Q.  (BY MR. FOX)  Let's just go through this,
24 because I think that that's some representations that
25 are made.  Paragraph 5, Ms. Finn is acknowledging that

130

1  she receives this interest on the termination of your
2  marriage, not when she filed the motion; is that right?
3          A.  That is correct.
4          Q.  Paragraph 6, she got the ownership
5  interests of the partnerships incorrect?
6          A.  That is right.
7          Q.  She indicated vast knowledge of the
8  partnership.  Do you think she had -- and the
9  corporation.  Do you think she really knows any of the
10 numbers for the partnership or the corporation?
11         A.  I don't think --
12         MR. LASS:  Objection, argumentative.
13         THE COURT:  That will be overruled.
14         A.  I don't believe she understands the
15 numbers at all.
16         Q.  (BY MR. FOX)  She didn't know the names
17 of all the owners or the percentages of ownerships?
18         A.  No.
19         Q.  Going back to Exhibit M, she said she had
20 9.8 percent of both entities.  Does she own 9.8 percent
21 of the corporation?
22         A.  No.  She owns a percentage -- one
23 point less than that.
24         Q.  About 9.3 percent?
25         A.  Or less.

131

1          Q.  Okay.  In paragraph 11, she claimed that
2  her interests in Sullivan Vineyards would be the main
3  asset she would be left with when the parties are
4  divorced.  I want to go over a little bit about what it
5  is that Ms. Finn is receiving under your marital
6  agreement.  She testifies she has an interest in Circle
7  Drive.  Approximately what is that interest worth?
8          A.  One and a half million dollars.
9          Q.  And was that funded with your annual
10 gifts?
11         A.  It was.
12         Q.  Does she own the house that her mother
13 currently resides in?
14         A.  Yes, she does.
15         Q.  Was that -- how much is that worth?
16         A.  Over $500,000.
17         Q.  Was that funded with your annual gift?
18         A.  Yes, it was.
19         Q.  So, at a minimum, she has $2 million of
20 assets?
21         A.  Plus more.
22         Q.  Okay.  Does she have significant jewelry
23 that you purchased for her during the marriage?
24         A.  At wholesale -- I recently talked to the
25 brokers -- it's worth well over one million dollars.

132

1          MR. LASS:  I'm going to move to strike
2  that.  That's hearsay.
3          THE COURT:  For the purposes of these
4  motions, I think I'll allow it to stand.  Objection
5  will be overruled.
6          Q.  (BY MR. FOX)  You purchased most of this
7  jewelry, I'm assuming?
8          A.  I purchased all of it.
9          Q.  Okay.  And you spent more than a million
10 dollars on it?
11         A.  I spent more than a million dollars, and
12 I bought it from wholesalers, for the most part.
13         Q.  And you are also giving her alimony of
14 20,000 a month for four years?
15         A.  That's correct.
16         Q.  Roughly, another million dollars?
17         A.  That is correct.
18         Q.  Altogether, about $5 million of total
19 assets?
20         A.  Four.
21         Q.  Four.  Two million in real estate, a
22 million in personal property, and a million in alimony.
23 I'm sorry.  You are right.  Four million.  What did
24 Ms. Finn have four years ago when you got married?
25         A.  She said she had $400,000.

---

133

1    Q.  So her net worth has gone up a thousand
2  percent in four years?
3    A.  Apparently.
4    Q.  Are you -- have you heard her testify in
5  other proceedings in the California actions?
6    A.  I have.
7    Q.  Do you recall her or her attorney
8  representing that her interest in Sullivan Vineyards is
9  not worth much?
10    A.  I heard that it was de minimis or
11  something like that, yes.
12    Q.  And that was her representation?
13    A.  That was her own representation, yes.
14    Q.  You heard her testify earlier today that
15  her acknowledgement that she doesn't receive -- or she
16  will not be entitled to a transfer of your interest in
17  Sullivan Vineyards until the date of the divorce.  Is
18  that what she testified to?
19    A.  That's what I heard, yes.
20    Q.  I want to talk a little bit about your
21  loans versus capital contributions.  How much does
22  Sullivan Vineyards currently owe to you in satisfaction
23  of loans that you have made to it?
24    A.  Including accrued interest, approximately
25  four and a half million dollars.

---

134

1    Q.  You heard Ms. Finn talk about $4.25
2  million, plus or minus; is that about right?
3    A.  Yes.
4    Q.  And have all of the loans that you've
5  made to the partnership been documented with bank
6  statements or . . .
7    A.  Everything has been thoroughly documented
8  by my CFO.
9    Q.  And that's Mr. Doug Thaxton?
10    A.  That is correct.
11    Q.  And he'll be a here a little later to
12  testify regarding the accounting of those loans?
13    A.  Yes, he will.
14    Q.  Was that 4.25 million, as Ms. Finn
15  acknowledges, made as a capital contribution to the
16  vineyard?
17    A.  No.
18    Q.  If it was made as a capital contribution,
19  would that have diluted the other owners' interest in
20  the vineyard?
21    A.  Yes.
22    Q.  You heard Ms. Finn testify that there was
23  roughly $10 million of equity in the vineyard at the
24  time of your acquisition, or at the time of the
25  marriage.  Was there $10 million of equity in that

---

135

1  vineyard at that time?
2    A.  They couldn't sell it, and I came in and
3  rescued it.  So I don't think so.
4    Q.  Let's go back to Exhibit 6, or H.
5    A.  Excuse me.  What exhibit?
6    Q.  Exhibit 6, or H, depending on which
7  exhibit book you have.  And they're identical, so
8  whichever book is handier.  Exhibit H should be the
9  stock and purchase agreements.
10    A.  Yes.
11    Q.  Before you got married to Ms. Finn, or
12  before you executed this document, was there a loan in
13  default?
14    A.  Yes, there was.
15    Q.  And if you can turn to --
16    A.  It was the Bank of Alameda.
17    Q.  Okay.  If you can turn to page 12 of the
18  document.  And I'm looking at paragraph 4.6.  Do you
19  see in paragraph 4.6 the reference to the Bank of
20  Alameda note?
21    A.  I do.
22    Q.  Did you buy that note to prevent a
23  foreclosure on the inventory?
24    A.  I did.
25    Q.  How much did you pay for that note?

---

136

1    A.  $380,000.
2    Q.  And this was at or about the time of your
3  marriage?
4    A.  The week before.
5    Q.  Looking at paragraph 4.5, did you agree
6  to loan additional money to the vineyard because it was
7  in financial distress?
8    A.  Yes, I did.
9    Q.  How much was that?
10    A.  Well, it says here up to $500,000, but it
11  was more than that.
12    Q.  I would like you to turn now to page 26
13  of this document.  Hopefully you are -- actually, let's
14  start on page 25.  Hopefully you are looking at
15  something that says Schedule 2?
16    A.  Correct.
17    Q.  Was this a list of additional debts that
18  were identified after most of the negotiation on this
19  had been done?
20    A.  Yes.
21    Q.  And turning to page 26, does this
22  identify another $120,000 of past due debt, lawsuits,
23  and credit card obligations?
24    A.  That is correct.
25    Q.  If you had not bailed out the vineyard at

---

34 (Pages 133 to 136)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 38 of 110

137

1 the time of your marriage, would it have been a going
2 concern?
3      A. It was -- it would have gone under. In
4 fact, by the time we got home from our honeymoon there
5 would have been no inventory to sell to generate
6 revenue. And they were already behind on their
7 mortgage payment, on the first and the second.
8      Q. To explain a little bit more about how a
9 vineyard works, you indicated that the Alameda note was
10 a note secured by the inventory. If you hadn't paid
11 off that note, what would have happened to the winery?
12      A. The Bank of Alameda was ready to come in
13 and take the inventory, wholesale it, and there would
14 have been no ability to generate revenue because they
15 would have taken all the wine, all the bottled wine,
16 all the bulk wine. And it's a three-year process to
17 rebuild the inventory.
18      Q. Three years from when you crush the
19 grapes until when you can actually sell it?
20      A. Three years from the beginning of the
21 growing season, yes.
22      Q. Okay. Was there deferred maintenance at
23 the vineyard at the time of your acquisition of
24 interest?
25      A. About $2 million worth.

138

1      Q. Okay. You heard Mr. Rose go over with
2 Ms. Finn the fact that the vineyard has been losing
3 half a million dollars per year. Absent your
4 additional loans, would the vineyard have survived?
5      A. No, it would not have.
6      Q. Are you familiar with the vineyard
7 financials today?
8      A. I am.
9      Q. Is it a going -- is it a viable, going
10 certain absent additional contributions from you?
11      MR. RAMP: Your Honor, I'm going to
12 object on two grounds. One is speculation. The second
13 ground is we are really getting into the territory of
14 expert opinion about whether a business is going to be
15 a going financial concern. And, again, Mr. Finn has
16 had access to 139 documents, CFOs, CEOs, private
17 office, everybody else.
18      We are entitled to, one, have notice of
19 what these opinions are going to be, and the bases for
20 them, in advance of today's hearing; and, two, an
21 opportunity to have an expert to rebut and have
22 somebody here who can say, This is a going concern.
23      THE COURT: We allowed leeway for Ms.
24 Finn. I'll allow that same leeway here. The objection
25 will be overruled.

139

1      MR. FOX: Thank you, Your Honor.
2      Q. (BY MR. FOX) When the injunction issued,
3 were you allowed to exercise your business judgment as
4 the chairman of the board of this corporation?
5      A. No, it was taken from me.
6      Q. And I apologize in advance if I'm mixing
7 up corporation and partnership. Please just correct
8 me, and I'll just refer to the "vineyard."
9      In your best judgment as the majority
10 owner of both the corporation and the partnership and
11 the chairman of the board, would it be best to
12 liquidate the assets of the partnership?
13      A. Without additional significant capital
14 infusions and dealing with the -- the loan at the bank
15 that is now in default, it will not survive. There is
16 no equity. It is insolvent. It has a negative net
17 worth of a million and a half dollars. There's
18 approximately a million dollars of accounts payables
19 that have been due for months.
20      Q. I would love to talk briefly about the
21 partnership agreements themselves. If you can turn to
22 Exhibit I, please. And to explain a little bit more to
23 the Court, the partnership owns the land -- what does
24 the partnership own versus what does the corporation
25 own?

140

1      A. The partnership owns all the real estate.
2 The corporation owns the inventory, the brand, and all
3 the equipment.
4      Q. Okay. Exhibit I, is this the original
5 partnership agreement for Sullivan Vineyards Partners?
6      A. Yes.
7      MR. FOX: Your Honor, I would ask for the
8 admission of Exhibit I.
9      THE COURT: Any objection?
10      MR. LASS: No objection.
11      THE COURT: Exhibit I will be admitted.
12      (Exhibit I was admitted.)
13      Q. (BY MR. FOX) I would like you to look at
14 Exhibit J, please. Exhibit J is the first amendment to
15 the partnership agreement. Are you familiar with this
16 document?
17      A. I am.
18      MR. FOX: Your Honor, I would ask for the
19 admission of Exhibit J.
20      THE COURT: Any objection?
21      MR. LASS: No objection.
22      THE COURT: Thank you. Exhibit J will be
23 admitted.
24      (Exhibit J was admitted.)
25      Q. (BY MR. FOX) Please take a look at the

35 (Pages 137 to 140)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 39 of 110

141

1  first page of Exhibit J. Does Exhibit J, the
2  partnership agreement, allow the majority owner to sell
3  the assets of the partnership?
4      A.  Yes, it does.
5      Q.  And I'm reading specifically for the
6  record. "Partners holding a majority interest may deem
7  advisable and proper to pledge the credit of the
8  partnership and any partnership assets for such
9  purposes, including without limitation the execution of
10 one or more deeds of trust on the partnership real
11 property" --
12     MR. FOX:  And I apologize. I'm talking
13 fast. I know that.
14     Q.  (BY MR. FOX) -- "and to sell any
15 partnership assets."
16     When did you let Ms. Finn know that you
17 thought it was best to sell the partnership?
18     A.  You know, I think the beginning of
19 February, and we continued to discuss it. I asked -- I
20 told her in March she needed to let her siblings know
21 that I was going to be selling.
22     Q.  Let's take a look at Exhibit 7, page 1.
23 Exhibit 7 is in the smaller book. These are the text
24 messages between you and Ms. Finn. The first note from
25 you -- you are on the left, Ms. Finn is on the right --

142

1  you let her know -- the dates are very difficult --
2  March 23 that you wanted to sell the winery?
3      A.  That is correct.
4      Q.  Did you believe the winery was viable in
5  March absent additional contributions from you?
6      A.  I did not believe it would survive, and
7  it needed to be sold.
8      Q.  How much money does the vineyard need now
9  to continue its operation?
10     A.  Well, it's a million dollars in accounts
11 payables that are past due.
12     Q.  Do the entities, either, have a million
13 dollars of assets that can be used to satisfy the
14 accounts payables?
15     A.  No, they do not.
16     Q.  Did Ms. Finn encourage you to obtain
17 additional financing or make additional loans to the
18 business in this March/April time frame?
19     A.  Yeah, she told me to lent it more money.
20     Q.  Did you make arrangements to lend it more
21 money or to secure more financing?
22     A.  I was able to get the bank to agree to
23 another $300,000 loan, provided that I make a $300,000
24 loan.
25     Q.  Did you make that $300,000 loan?

143

1      A.  I did. A week before Kelly filed for
2  divorce.
3      Q.  So early May of 2015?
4      A.  That is correct.
5      Q.  Ms. Finn introduced text messages
6  suggesting that you were motivated to run the winery
7  into the ground. Why would you have lent it $300,000
8  in May if in April you were trying to run it into the
9  ground?
10     A.  Well, history will show I wasn't running
11 it into the ground, but I was very frustrated at the
12 moment and said that would be one of my options, which
13 I would certainly never take. Instead, I lent it
14 another $300,000.
15     Q.  You were asked about Exhibit 8. You were
16 not asked -- excuse me. Ms. Finn was asked about
17 Exhibit 8, a proposed amendment to the marital
18 agreement. Why were you asking Ms. Finn to amend the
19 marital agreement in -- actually, I'm not sure what
20 time frame this is. This is not dated -- let's say
21 first quarter of 2015?
22     A.  I determined that it was going to take
23 probably a year for a number of years, if not
24 forever, to continue the winery growing and doing well.
25 And based upon the existing pre-nup, upon my death, the

144

1  total value of the winery would go to the Sullivan --
2  to Kelly and the Sullivan family. And I decided that
3  if I was going to continue putting more money into the
4  winery, I wanted the asset to go to my family upon my
5  death. And I explained to Kelly that I have lots of
6  options for improving the value of my estate, and the
7  winery was a really lousy option and a bad investment.
8      Q.  Exhibit 9 is a letter you sent to the
9  partners offering two and a half million, essentially,
10 for 100 percent, another 40 percent of the winery. Was
11 that fair value, or why did you come up with that
12 number?
13     A.  I came up with that number to keep peace
14 in the family. And I felt as though if I offered a
15 great deal more that Kelly and her siblings could
16 figure out how to divide it up. Kelly and I wrote it
17 together. We sketched it out in our family room in Los
18 Altos Hills on a yellow pad of paper. She and I did it
19 together. And I sent it off. And they changed their
20 mind.
21     Q.  Did Ms. Finn make representations to you
22 about her understanding of how the marital agreement
23 worked with regard to Sullivan?
24     A.  Yes.
25     Q.  And what did she tell you?

**145**

1   A. Well, we discussed that the fact that it
2 was very clear, and that my ownership would change
3 hands upon termination of the divorce or death.
4   Q. Did she encourage you not to loan money
5 or invest in the vineyard?
6   A. She encouraged me to loan the $300,000.
7   Q. Encouraged you. Excuse me. I added a
8 negative in there.
9   A. I would say she was hounding me for the
10 prior 30 days.
11   Q. Does it bother you that she waited a week
12 after you made the loan to file the divorce petition?
13   A. It seemed -- it seemed ruthless, and I
14 felt as though I'd been ambushed.
15   Q. During the two or three weeks from the
16 date of the filing of the petition until when you were
17 finally served, was she asking you to sign the loan
18 guarantee for another $300,000?
19   A. Yes, she was.
20   Q. Did you feel she was trying to trick you
21 or ambush you into investing or loaning more money to
22 the vineyard?
23   A. Well, in hindsight, yes. Once -- once I
24 realized she had filed two weeks before. It was
25 clearly an ambush.

**146**

1   Q. You mentioned that there -- the -- you
2 didn't think that the -- that you think the winery
3 needs about a million dollars to pay its current
4 account payables. Have any of your creditors, the
5 vineyard's creditors, placed you in workout status or
6 added additional terms to -- to your doing business?
7   A. Well, Silicon Valley Bank has already put
8 us in the workout group, so we are already in default.
9 And that's -- that's a disaster.
10   Q. Let's take a look at the Silicon Valley
11 Bank notes. Can you please turn to Exhibit R.
12   A. Would that be a number -- or which book?
13   Q. Letter R, as in "Ralph."
14   A. The big book. Yes.
15   Q. What is this document?
16   A. Well, it's the loan and security
17 agreement between the partnership and the bank.
18   MR. FOX: Your Honor, I would ask for the
19 admission of Exhibit R.
20   THE COURT: Any objection?
21   MR. LASS: No objection.
22   THE COURT: Thank you. Exhibit R will be
23 admitted.
24   (Exhibit R was admitted.)
25   THE COURT: Mr. Fox, how much more do you

**147**

1 have? Do you have a considerable amount?
2   MR. FOX: You know, I think I have less
3 than 15 minutes more on direct, Your Honor. Would that
4 work before we --
5   THE COURT: That works great, yeah.
6   Q. (BY MR. FOX) Turn to page 6 of this,
7 please. Are there some financial covenants associated
8 with this loan?
9   A. Yes, there are.
10   Q. Are you required to continue to make
11 subordinated debt or subordinated loans to the
12 vineyards to stay in covenant with the Silicon Valley
13 Bank note?
14   A. Yes.
15   Q. And is there any point in you making
16 loans if Ms. Finn wants to grab the vineyard from you?
17   A. No, there is not.
18   Q. I would like you to turn a couple more
19 pages, paragraph 15 -- sorry -- page 15, paragraph 6.
20 Are there negative covenants, things that, if they
21 happen, the loan will be placed in default?
22   A. Yes, there are.
23   Q. If more than -- if there's a change of
24 more than 25 percent of ownership, meaning if Ms.
25 Sullivan, Ms. Finn, receives on the date of the divorce

**148**

1 your interest, does that act as a negative covenant
2 triggering a default on the loan?
3   A. We'll default and the loan will be
4 called.
5   Q. And Ms. Finn acknowledged that the loan
6 is about nine and a half million dollars?
7   A. That is correct.
8   Q. We talked earlier about subordinated
9 loans. Your loan's about 4 and a quarter or 4 and a
10 half million dollars?
11   A. That is correct.
12   Q. Understanding how this loan works, will
13 Ms. Finn be allowed to obtain additional financing
14 without satisfying the senior credits?
15   A. No, she will not.
16   MR. FOX: Your Honor, if I may just have
17 one moment.
18   THE COURT: Yes, you may.
19   (Pause in the proceedings.)
20   Q. (BY MR. FOX) The last few questions,
21 Mr. Finn. Does the winery at this time have the
22 ability to satisfy the nine-and-a-half-million-dollar
23 loan to Silicon Valley Bank?
24   A. No, it does not.
25   Q. Does the winery have the ability to

37 (Pages 145 to 148)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 41 of 110

149

1   satisfy the 4-and-a-quarter- or
2   4-and-a-half-million-dollar loan to you?
3     A. No, it does not.
4     Q. When you determined that it was necessary
5   to liquidate the assets of the partnership, did you
6   obtain a Realtor to assist you?
7     A. I did.
8     Q. Who was that Realtor?
9     A. Mr. Zepponi.
10     Q. Same person Ms. Finn was referring to or
11   a relative?
12     A. Apparently, a brother.
13     Q. Mr. Zepponi, is he well known in the area
14   to be a vineyard salesperson?
15     A. He's the Number 1 broker in Napa Valley.
16     Q. Did Mr. Zepponi obtain a good-faith offer
17   to purchase the assets of the vineyard?
18     A. Yes, he has.
19     Q. For how much?
20     A. $18 million.
21     Q. Would that satisfy all of the
22   obligations, loans, and accounts payables that are owed
23   by the partnership and the corporation?
24     A. Yes, it would.
25     Q. Were you trying sell your partnership

150

1   interest or the assets of the partnership?
2     A. I was trying sell all the assets of the
3   partnership and of the corporation.
4     Q. Okay.
5     A. It would be an asset sale. It would not
6   be a corporate sale or partnership sale.
7     MR. FOX: Your Honor, I have nothing
8   further at this time on direct.
9     THE COURT: Thank you. Why don't we take
10   our lunch break. Would half an hour be adequate since
11   we have everything here? Would that work for --
12     MR. FOX: That would be great.
13     MR. LASS: Yes.
14     (Recess taken, 12:18 p.m. to 12:50 p.m.)
15     THE COURT: You may proceed.
16     CROSS-EXAMINATION
17   BY MR. RAMP:
18     Q. Good afternoon, Mr. Finn.
19     A. Good afternoon.
20     Q. Now that we got you full of lunch and
21   sleepy, it's my turn to ask you some questions. I'm
22   going to ask you to start by turning to Exhibit 2.
23   This is -- it's the smaller book in front of you to the
24   right corner. And this is the marital agreement that
25   you and Ms. Finn entered into, correct?

151

1     A. Correct.
2     Q. And it is dated June 9. I believe that's
3   when you signed it on, page 22.
4     A. That is correct.
5     Q. June 9, 2011, sir.
6     A. Yes.
7     Q. So it was about nine days before your
8   marriage, right?
9     A. That's right.
10     Q. I'm going as you to turn to page 3 of
11   that agreement. This is one of the provisions that
12   Mr. Fox had you looking at, 2.2. General presumption
13   of separate property. Are you with me?
14     A. I am.
15     Q. And it says, "Except as specifically
16   provided in this agreement, all property owned by
17   either of us during our marriage is presumed to be
18   separate property." Did I read that properly?
19     A. Yes.
20     Q. "Except as specifically provided in this
21   agreement." So I'm going to ask you to turn next to
22   page 13. Are you there?
23     A. Yes.
24     Q. Okay. I'm at provision 5.7. We have
25   looked at this before. "Additional provisions for

152

1   Kelly regardless of the length of the marriage. Upon
2   termination of our marriage by entry of a decree Kelly
3   shall be entitled to the receive the following." Did I
4   read that correctly?
5     A. Yes.
6     Q. And then provision 5.7.2 says, "If Steve
7   owns any interest in Sullivan Vineyards, or in any
8   entity owning the Sullivan Vineyards, Steve's entire
9   ownership interest subject to all existing debt or
10   financial obligations." Did I get that correct?
11     A. I believe so, yes.
12     Q. Okay. So it was your testimony on direct
13   that you spent months negotiating this marital
14   agreement, right?
15     A. I believe it was three.
16     Q. Three months. And who did you negotiate
17   with?
18     A. Well, I negotiated with Kelly.
19     Q. Okay. Was there anybody else involved in
20   those negotiations?
21     A. My attorney and her attorney.
22     Q. Anybody else?
23     A. I don't know of anyone else.
24     Q. Okay. And was that negotiation in
25   writing or oral conversations?

38 (Pages 149 to 152)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 42 of 110

153

1    A.   It was both.
2    Q.   Okay.  Is it fair to say there was lots
3 of back and forth during that three months of
4 negotiation?
5    A.   A tremendous amount.
6    Q.   Okay.  A lot of back and forth between
7 not just you and Kelly but the attorneys for you two,
8 right?
9    A.   Yes.
10    Q.   Okay.  And there were letters and emails
11 suggesting changes to this marital agreement, correct?
12    A.   I don't know what the letters and emails
13 were.
14    Q.   Okay.  So you don't remember any letter
15 or email in the course of the three or four months of
16 negotiations saying, This is a change I want in the
17 marital agreement?
18    A.   I don't recall.
19    Q.   Okay.  In your 139 exhibits you've
20 brought to trial today you don't have any email,
21 letter, or text message with Kelly, your lawyer, or her
22 lawyer, or between your lawyers, where you say
23 something like, I insist on time and the right to sell
24 Sullivan Vineyards prior to entry of a decree, correct?
25    A.   I don't know.  I haven't reviewed the 130

154

1 whatever they're called.
2    Q.   Do you know whether any such letter or
3 text message or email exists?
4    A.   I do not.
5    Q.   5. -- I'm going to ask you to look back
6 on 13, if you are still there.  5.7.2 does not anywhere
7 in that provision say she gets Sullivan Vineyards after
8 you've had time and the right to sell it, correct?
9    MR. FOX:  Objection, Your Honor.  The
10 document speaks for itself.
11    THE COURT:  I understand that.  And,
12 actually, that will be overruled.
13    What was the question?  I'm sorry.
14    Q.   (BY MR. RAMP)  Looking at 5.7.2, nowhere
15 in that provision does it say Kelly gets Sullivan
16 Vineyards after you've had the time and the right to
17 sell it, correct?
18    A.   No, it does not say that in 5.7.2.
19    Q.   Okay.  And if it was so important to you,
20 your lawyers could have requested that it be put in
21 there, correct?
22    A.   Oh, I think it's in the agreement very
23 clearly.
24    Q.   They could have put it in 5.7.2, couldn't
25 they have?

155

1    A.   They could have put it there and many
2 other places.  It is in other places.
3    Q.   So it's not in there?  And, in fact, your
4 testimony today was that you were relying on the six
5 months of marital counseling, if we mutually agree, to
6 give you enough time to sell this asset?
7    A.   I knew that would be the minimum amount
8 of time.
9    Q.   But that's what you are relying on for
10 time to sell this asset, correct?  That's your
11 testimony today?
12    A.   I knew that would be the minimum, yes.  I
13 don't know what else to answer.
14    Q.   Okay.  Now prior to today, you've not
15 requested marital counseling since being served with
16 the petition, correct?
17    A.   I was told Kelly was unwilling.
18    Q.   Well, who told you that?
19    A.   Friends.
20    Q.   Okay.  So there is no request that you've
21 made directly to Kelly or your attorneys or to Kelly's
22 attorneys requesting marital counseling pursuant to the
23 terms of this agreement?
24    A.   No, I haven't, and I will request them
25 now if you like.

156

1    Q.   What friends told you that she was
2 unwilling to counsel?
3    A.   I don't remember which.
4    Q.   Okay.  Do you remember what date you were
5 told that?
6    A.   No, I don't.
7    Q.   Okay.
8    A.   We have --
9    Q.   So you have no recollection of the people
10 who told you that, and you have no recollection of the
11 date you had that conversation?
12    A.   There were multiple conversations, and
13 you are correct.
14    Q.   But you don't even remember any of them?
15 There were multiple, and you don't remember a single
16 one of them?
17    A.   At this moment, that is correct.
18    Q.   Ms. Finn filed a petition for dissolution
19 of marriage where she alleged that the marriage was
20 irretrievably broken, correct?
21    A.   Yes.
22    Q.   Okay.  And you did not deny that
23 allegation in this court proceeding, correct?
24    A.   I didn't know -- was I to -- was I
25 supposed to deny it?

39 (Pages 153 to 156)

157

1   Q.   Well, you didn't file a --
2   A.   I did not.
3   Q.   -- response denying her allegation that
4   the marriage was irretrievably broken, correct?
5   A.   Correct.
6   Q.   You didn't file a response saying you
7   wanted to go to counseling, correct?
8   A.   Correct.
9   Q.   So today is the first time in five months
10  that Ms. Finn is hearing that you -- this claim that
11  you want to go to marital counseling, correct?
12  A.   I -- yes.
13  Q.   On direct you claimed that it seemed
14  ruthless and like an ambush, the timing of her filing
15  of the petition.  Do you remember saying that?
16  A.   Yes.
17  Q.   And she filed on May 13, 2015?
18  A.   Yes.
19  Q.   And you heard her testify that you two
20  were in a marathon marital counseling session May 11,
21  May 12, and May 13, correct?
22  A.   Yes.
23  Q.   And you walked out of that marital
24  counseling session, didn't you?
25  A.   I left a day early, yes.

158

1   Q.   Okay.  And that's when she filed the
2   petition for divorce, right, May 13?
3   A.   Yes.
4   Q.   All right.  So I would like to direct
5   your attention back to Exhibit 2, page 13, this
6   provision 5.7.2.  And I want to focus on the word "If"
7   Steve owns any interest in Sullivan Vineyards.  When
8   you two signed this marital agreement in June of 2011,
9   the day you signed it, you did not have any ownership
10  interest in Sullivan Vineyards, correct?
11  A.   I owned the inventory.
12  Q.   Did you have any ownership interest as a
13  partner of Sullivan Vineyards Partnership or any shares
14  of Sullivan Vineyards Corporation?
15  A.   No.
16  Q.   Okay.  But you and JoAnna Sullivan, Ms.
17  Finn's mother, had been discussing you purchasing her
18  interest in Sullivan Vineyards at the time you entered
19  into this agreement, correct?
20  A.   Yes.
21  Q.   And you two had been discussing it for
22  quite some time?
23  A.   That is correct.
24  Q.   So you would agree with me that 5.7.2
25  says, "If Steve owns any interest in the Sullivan

159

1   Vineyards," because you might not have completed the
2   purchase of Sullivan Vineyards, you might not have
3   acquired any interest in Sullivan Vineyards, correct?
4   A.   I'm not sure what you asked me.
5   Q.   I'm asking whether you agree with me that
6   5.7.2 says, "If Steve owns any interest in the Sullivan
7   Vineyards," because you might not have completed that
8   sale and you might not have owned anything of Sullivan
9   Vineyards, correct?
10  A.   Well, I think it's contemplating the day
11  of termination of the marriage.
12  Q.   Well, let me stop you.
13  MR. FOX:  Your Honor, may he be allowed
14  to finish answering his -- the question?
15  THE COURT:  Did you complete your answer
16  or did you have more?
17  THE WITNESS:  No.  That -- I think I did.
18  I'm not sure.
19  THE COURT:  Thank you.
20  Q.   (BY MR. RAMP)  I'm going to ask you to
21  turn to Exhibit 6.  It's in the notebook right in front
22  of you.
23  A.   Exhibit 6, the same . . .
24  Q.   Same notebook.  You got it.  So this is
25  the Stock and Partnership Interest Purchase Agreement

160

1   that you entered into with Ms. Finn's mother, correct?
2   A.   Yes.
3   Q.   And this is dated August 12, 2011?
4   A.   Yes.
5   Q.   And you signed this on page 18, correct?
6   A.   Yes.
7   Q.   So you entered into this contract to
8   purchase Ms. Finn's mother's ownership interest in the
9   vineyard about two months after the marital agreement,
10  right?
11  A.   That is correct.
12  Q.   And you would agree with me that JoAnna
13  Sullivan, Ms. Finn's mother, entered into this contract
14  to sell you her interest in Sullivan Vineyards only
15  after you had entered into the marital agreement with
16  her daughter, providing that any interest that you
17  owned in Sullivan Vineyards would revert back to her
18  daughter, correct?
19  A.   I don't agree with what -- with that.
20  Q.   So let's agree on the timing.  You
21  entered into a marital agreement with Ms. Finn in June
22  2011, correct?
23  A.   Correct.
24  Q.   5.7.2 of that agreement states any
25  interest you own in Sullivan Vineyards goes to Ms. Finn

40 (Pages 157 to 160)

161

1    upon entry of decree, correct?
2        A.  Upon entry of final decree, correct.
3        Q.  Two months later Ms. Finn's mother,
4    JoAnna Sullivan, entered into a contract with you
5    agreeing to sell you her majority interest in Sullivan
6    Vineyards, correct?
7        A.  Correct.
8        Q.  Let's turn to page 10 of Exhibit 6.  I
9    want to direct your attention to paragraph 3.4, please.
10   Just let me know when you are there, sir.
11       A.  I'm there.
12       Q.  Okay.  Great.  I'm looking at 3.4.  These
13   are representations that you made in this contract; is
14   that correct?  Well, let me ask you a separate
15   question.  3.4, the -- the title of it is Investment
16   Representations, correct?
17       A.  Yes.
18       Q.  Okay.  And the first one starts out,
19   "Buyer is an individual resident in the state of
20   Colorado," correct?
21       A.  Correct.
22       Q.  Okay.  And if we go back to page 2,
23   what's 2 in the lower right-hand corner, at the very
24   end of the first paragraph you will see, Stephen A.
25   Finn is identified as the buyer?

162

1        A.  Page 2?
2        Q.  Page 2, top paragraph, very last
3    sentence.  "Stephen A. Finn," in parentheses, "buyer"?
4        A.  Yes.
5        Q.  Are you with me?  Okay.  So you are the
6    buyer in this contract?
7        A.  Yes.
8        Q.  Okay.  So Representation A is that you
9    are an individual resident in the state of Colorado,
10   correct?
11       A.  Correct.
12       Q.  And 3.4B states that you have been
13   furnished with and have read the company's financial
14   statements and are familiar with it and understand the
15   contents, and it goes on a little bit, correct?
16       A.  Yes.
17       Q.  Okay.  3.4C, your representation in 3.4C
18   is that "The interests are being purchased for his own
19   account for investment purposes only and not for the
20   account of any other person and not with a view to
21   distribution, assignment, or resale to others, or to
22   fractionalization in whole or in part, and that the
23   offering and sale of the interest is intended to" --
24   da, da, da, da, da, da.
25       Let's start at the next sentence.  "In

163

1    furtherance thereof, buyer represents, warrants, and
2    agrees as follows:  (1) No other person has or will
3    have a direct or indirect beneficial interest in the
4    interests and buyer will not sell, hypothecate, or
5    otherwise transfer the interests except in accordance
6    with the Securities Act and applicable state securities
7    laws."
8        It goes on.  Did I read that correctly?
9        MR. FOX:  Objection, Your Honor.  The
10   contract speaks for itself.  This is not asking for an
11   opinion.  He's asking what the words say.
12       THE COURT:  That will be sustained.
13       MR. RAMP:  Okay.
14       Q  (BY MR. RAMP)  In Representation D you
15   represent that you have no need for liquidity in this
16   investment, and you are able to bear substantial
17   economic risks of an investment in the interest for an
18   indefinite period, and you can bear the economic risk,
19   and could afford a complete loss of such investment.
20   Was that true at that time?
21       MR. FOX:  Objection, Your Honor,
22   relevance.
23       THE COURT:  Overruled.
24       A.  Yes.
25       Q  (BY MR. RAMP)  Okay.  I'm going to ask

164

1    you to go to Exhibit 2, paragraph -- I'm sorry.
2    Exhibit 2 of the marital agreement, page 27.
3        A.  What page?
4        Q.  Page 27.
5        A.  I only have 25 pages.
6        Q.  Keep flipping.  Flip to the next one.  It
7    should say 27 at the bottom.
8        MR. RAMP:  May I approach, Your Honor?
9        THE COURT:  Yes.  Bottom left.
10       A.  I got it.
11       Q.  (BY MR. RAMP)  Okay.  These were your
12   financial disclosures made at the time that you entered
13   into the marital agreement in June of 2011?
14       A.  Yes.
15       Q.  And you list a net worth of between 166
16   million and 124 million?
17       A.  Yes.
18       Q.  And so the -- this was your financial
19   status at the time that you had entered into the
20   agreement with JoAnna Sullivan where you said you don't
21   need liquidity in Sullivan Vineyards and you can afford
22   a complete loss, correct?
23       A.  Correct.
24       Q.  And what's your current approximate net
25   worth?  Is it higher, lower, about the same?  Where is

41 (Pages 161 to 164)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 45 of 110

165

1       it.
2           A.   About the same.
3               MR. FOX:  Your Honor, this is not the
4       issues before the Court in the hearing today.
5               THE COURT:  It will be overruled.  You
6       may answer.
7           A.   It's about the same.
8           Q.  (BY MR. RAMP)  So you believe you have
9       between 124 million and 166 million in net worth; is
10      that correct?
11          A.   That is correct.
12          Q.   Okay.  And you have -- do you recall what
13      your tax returns will show your 2014 income will look
14      like?
15          A.   I think -- yeah.  I -- we've already
16      presented it to you.
17          Q.   Okay.  It's about $12 million --
18          A.   That's correct.
19          Q.   -- of income for 2014, correct?
20          A.   Yes.
21          Q.   And if you turn to Exhibit 5 in that
22      notebook in front of you, this is a draft of your 2014
23      tax return, just the 1040 form, correct?
24          A.   Yes.
25              MR. RAMP:  I'd move for the admission of

166

1       Exhibit 5.
2               THE COURT:  Any objection?
3               MR. FOX:  I do object, Your Honor.  This
4       is a return that was -- it's not signed, it's not been
5       filed, it's been prepared for two people.  This is not
6       a return Mr. Finn is filing.
7               THE COURT:  That will be sustained.  It
8       will not be admitted.
9           Q.  (BY MR. RAMP)  Are you today claiming
10      that the representations you made in the August 2011
11      purchase agreement are no longer true?
12              MR. FOX:  Objection, Your Honor.  The
13      question is a little bit vague.  If we could have more
14      clarity.
15              THE COURT:  If you could rephrase that,
16      please.
17              MR. RAMP:  Sure.  I certainly can do
18      that.
19          Q.  (BY MR. RAMP)  If you can look with me at
20      page 10 of Exhibit 6.  Are you today, for example,
21      stating that your representation that you, in D, 3.4D,
22      that you have adequate means for providing for your
23      current needs and possible personal contingencies, you
24      have no need for liquidity in the Sullivan Vineyards
25      investment, and you are able to bear the substantial

167

1       economic risks of an investment in the interests for an
2       indefinite period, and, finally, at the present time,
3       can bear the economic risk of an investment in the
4       companies and could afford a complete loss of such
5       investment?
6               Are you telling me today that those
7       representations are no longer true?
8               MR. FOX:  Objection, Your Honor, again,
9       on the grounds of relevance.  The issues before the
10      Court are not the parties' financial circumstances.
11      It's whether this is a separate property asset.
12              THE COURT:  It will be overruled.  You
13      may answer.
14          A.   When I signed this, I was committing half
15      a million dollars in cash.  Today I have four and a
16      half million dollars in cash.  And I need that
17      liquidity back.  It would definitely hurt me
18      tremendously to lose all my cash liquidity that is now
19      tied up in Sullivan Vineyards.  So I'm not exactly --
20      at the time it was true, because I committed half a
21      million, but now it's four and a half million.  So now
22      it would be -- and as you can see from my financials,
23      it's all of my current cash.
24          Q.  (BY MR. RAMP)  Well, I haven't seen
25      your -- your current financials, but -- all right.  So

168

1       let's -- let's move to -- let's move topics.
2               Is it fair to say that your marriage was
3       deteriorating in the spring of 2015?
4           A.   Oh, I think it had been troubled for a
5       couple of years, and we were working it out as best we
6       could.
7           Q.   Okay.  Is it fair to say there was a lot
8       of discussion about the health of your marriage and
9       marital problems in the spring of 2015?
10          A.   Yes.
11          Q.   Okay.  And we looked at some of the text
12      messages.  I'm going to direct your attention to
13      Exhibit 7, page 1, up at the top.  You sent Ms. Finn a
14      text message on March 23, 2015 saying, "I'm selling the
15      winery.  You should alert your family.  I'll be getting
16      paperwork done this week."  Correct?
17          A.   Correct.
18          Q.   And further down on that page, on March
19      23, you sent her a text saying, "You should want me to
20      be motivated to get the most value.  Today I'm
21      motivated to run it into the ground so I will get paid
22      back or sell it quick for my return of cash and loan
23      guarantees.  You are not very understanding of human
24      nature."  You admit to sending that text, correct?
25          A.   Yes.

42 (Pages 165 to 168)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 46 of 110

169

1  Q. Okay. And you admit that's exactly where
2  we are today; you claim the vineyard is run into the
3  ground and it needs to be sold quickly so that you can
4  get a return of your cash and loan guarantees, correct?
5  A. The vineyard has been run tremendously
6  well. Without continued infusions to continue to
7  improve it, which was the plan over the last few years,
8  yes, we have no funds and we are illiquid.
9  Q. Okay.
10  A. With the filing of the divorce motion,
11  there is no more business plan that was created for
12  long-term, patient capital.
13  Q. So you -- today your position is you want
14  it sold quickly for your return of cash and loan
15  guarantees, correct?
16  A. No, I don't want it sold quickly. I have
17  been working since the spring to get top dollar for it
18  and hiring Zepponi, the best broker, and being patient
19  and negotiating, and then having the -- being ambushed
20  with the TRO has done nothing but hurt the whole
21  situation.
22  Q. Okay. So you disagree with my use of
23  "quickly" from your email. You want it sold for your
24  return of cash and loan guarantees, correct?
25  A. There -- I want it sold for as much as we

170

1  can possibly sell it for so that all shareholders can
2  benefit as much as possible and that we are all proud
3  of the last four years of hard work that we've done.
4  Q. All right. So let's turn to page 2 of
5  Exhibit 7 in front of you. Do you see on the bottom of
6  page 2 there's a date stamp that says April 12, 2015?
7  A. This is the same -- this is the group of
8  texts?
9  Q. Yeah, Exhibit 7, page 2.
10  A. 3:56 p.m?
11  Q. Above that, actually. 3:47 p.m.
12  A. Okay. Yes, I see that.
13  Q. Okay. There's a text from you that says,
14  "If I had realized those terms in the PN" -- that
15  stands for "pre-nup," right?
16  A. Right.
17  Q. Okay. "If I had realized those terms in
18  the pre-nup, I would have never made it so successful.
19  I would have asked for a change or I would have put my
20  wealth and talents elsewhere. It is not fair. I
21  signed it. It is my fault. But I do not need to make
22  it worse for me, and I now will protect myself." You
23  admit sending those texts to Ms. Finn, correct?
24  A. Yes.
25  Q. And you are talking about making Sullivan

171

1  Vineyards so successful, aren't you?
2  A. I made it very successful.
3  Q. But in this text message you are talking
4  about making Sullivan Vineyards very successful,
5  correct?
6  A. Yes, I did make Sullivan Vineyards very
7  successful.
8  Q. Okay. Now, you are claiming in this
9  lawsuit that Sullivan Vineyards is yours to do with as
10  you wish, including selling it, correct?
11  A. That is correct.
12  Q. Okay. But if that was the intent, and if
13  it's yours to sell, according to agreement, you would
14  have every motivation to make it successful, wouldn't
15  you?
16  A. I have for four years.
17  Q. Okay. So that contradicts the text
18  message that you sent where you said, "If I had
19  realized those terms in the pre-nup, I would have never
20  made it so successful"?
21  A. I don't believe that contradicts what I
22  said at all.
23  Q. But if the pre-nup intended to give
24  Sullivan Vineyards to Ms. Finn, which is her
25  contention, then making it successful -- you making it

172

1  successful and it going to her would be something you
2  could complain about and say it was unfair, correct?
3  A. This all started because I realized that
4  my heirs had no opportunity to inherit Sullivan
5  Vineyards when I died. And that is why this all
6  occurred. It had nothing to do with our marriage. It
7  had to do with the term in the pre-nup.
8  Q. So in --
9  A. I was being asked to put a million
10  dollars a year in perpetuity into this investment that
11  then would not go to my heirs but to Kelly and her
12  heirs. That I determined after four years of pumping
13  the money in, a million a year approximately, and with
14  no end in sight.
15  It might become valuable someday, but it
16  was not going to be my asset or my heirs' -- actually,
17  my heirs' asset. And I decided I didn't want to do
18  that any longer. It was bad financial planning. And I
19  asked that we change it. And without the change, there
20  was no reason for me to go ahead and continue to build
21  it. The best thing to do, which I felt was always our
22  plan, was eventually sell it and get a capital gain for
23  everyone. And we had many discussions about at what
24  point would that be a viable position.
25  Q. Okay. So your position --

43 (Pages 169 to 172)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 47 of 110

173

1    A.  So I disagree with you.
2    Q.  Okay.  Let's move to page 7.  This is
3  April 19, 2015.  Do you see the date stamp -- they're
4  poor copies, but there's several date stamps that say
5  4/19/15 across the top to the bottom of the page.  Do
6  you see that?
7    A.  Very light.  Which one?
8    Q.  Well, I'm --
9    A.  4/19?  I see it.  There are three --
10  well, the whole page is dated.
11    Q.  Yeah.  I believe so.
12    A.  Yeah.
13    Q.  All right.  So you sent a text to Ms.
14  Finn -- I'm about in the middle of the page -- "Your
15  choice, SV ownership gets solved, then marriage
16  counseling.  I have compromised by agreeing to
17  counseling."  Correct?
18    A.  Yes.
19    Q.  So she's requesting to go to marital
20  counseling, and your response is that you won't go
21  until you two resolve Sullivan Vineyards ownership,
22  correct?
23    A.  Yes.
24    Q.  Let's turn to page 10.  I'm looking at
25  the top page.  The top date stamp says April 22, 2015.

174

1  Are you with me?
2    A.  Yes.
3    Q.  Okay.  And I'm going to start reading Ms.
4  Finn's text.  "Please do not destroy this beautiful
5  thing you created.  The joy of creating truly outlasts
6  the satisfaction of destroying something.  When you
7  destroy only leaves you more empty.  I will always love
8  you even if you destroy me.  And I will be there to hug
9  you, love you, and wipe your tears away too."
10    Your response was, "I'm holding it all
11  together against all odds.  You expect to give without
12  you settling the matter fairly.  You do not deserve
13  60 percent.  You did not earn it, pay for it, or put it
14  countless time both mental and physical."  Correct?
15  You admit sending that text to Ms. Finn, right?
16    A.  Absolutely.
17    Q.  And you are talking about the vineyard,
18  correct?
19    A.  Yes, that is correct.
20    Q.  You state you do not deserve 60 percent,
21  and you claim you have an approximate 60 percent
22  ownership interest in Sullivan Vineyards, right?
23    A.  That is correct.
24    Q.  So you are saying -- you are telling Ms.
25  Finn that she does not deserve your ownership interest

175

1  in the vineyard, correct?
2    A.  That is correct.
3    Q.  All right.  Let's turn to page 19.  I'm
4  looking at a date stamp of 5/5/15 across the top of the
5  page.  Does that look right?
6    A.  Yes, uh-huh.
7    Q.  And so you text Ms. Finn on May 5, 2015,
8  "I will be at the appointed place Monday.  If there is
9  no resolution of Sullivan Vineyards by Wednesday
10  afternoon, please be prepared to stay wherever you wish
11  except LAH."  That's Los Altos Hills, correct?
12    A.  That's correct.
13    Q.  So the house in -- one of the California
14  houses.  "The entire pre-nup is exceedingly generous
15  for four years of marriage.  SVPN overreach."  I
16  presume that stands for "Sullivan Vineyards pre-nup
17  overreach," correct?
18    A.  Correct.
19    Q.  "Next Wednesday at 4 p.m. will be the go
20  or no-go in our marriage, SV, and either living
21  together or moving on."  You admit to sending that text
22  to Ms. Finn, right?
23    A.  Yes.
24    Q.  So even though today you claim that
25  Sullivan Vineyards is yours to sell with no obligations

176

1  to Ms. Finn, in May of this year you thought the terms
2  of the pre-nup regarding Sullivan Vineyards were
3  overreaching and unfair to you, correct?
4    A.  Yeah.  I think they're very consistent
5  with the two things you just said.
6    Q.  But in May of 2015 you are claiming that
7  the provisions of pre-nuptial agreement regarding
8  Sullivan Vineyards were unfair to you, overreaching,
9  correct?
10    A.  Well, that's why in February I presented
11  the change to the pre-nup for me to continue investing
12  a million dollars a year for the winery business.
13    Q.  Page 24.
14    A.  I completely dis-- I completely agree
15  with what I just said to add to what you had to say.
16    Q.  Okay.  I'm going to have you look at page
17  24.  It's a date stamp of May 7, 2015.  About halfway
18  down, you texted Ms. Finn, "Release the Sullivan
19  Vineyards pre-nup.  Unless you do, we will continue to
20  decline as a couple.  You have agreed the SVPN is
21  unfair."  Correct?  You admit sending that text to Ms.
22  Finn?
23    A.  I'm trying to find it.
24    Q.  Oh, I'm sorry.  It starts with "Release
25  the SV pre-nup."  It's about halfway down the page.

44 (Pages 173 to 176)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 48 of 110

177

1    A.  Page 24.  Yes.
2    Q.  Okay.  You admit sending that text?
3    A.  I do.
4    Q.  So you had been trying get Ms. Finn to
5  sign an amendment to the marital agreement to remove
6  the provision that Sullivan Vineyards would revert back
7  to her in the event of divorce, correct?
8    A.  My motivation was I knew that I would be
9  able to sell the winery before divorce.  What I was
10 trying to protect was the asset going to Kelly's
11 family.  I wanted my 60 percent to be passed on to the
12 Finn family.
13   Q.  My question --
14   A.  There was no question that I was going to
15 sell it if Kelly filed for divorce and ambushed me.
16 That was why we had six months minimum for me to sell
17 it, rather than the provisions in the other part of the
18 pre-nup that said upon filing divorce action.
19       MR. RAMP:  Your Honor, I'm going to ask
20 that that answer be stricken as nonresponsive to the
21 question.
22       THE COURT:  It will stand.
23   Q.  (BY MR. RAMP)  Mr. Finn, my question to
24 you is, you had been trying to get Ms. Finn to sign an
25 amendment to the marital agreement to remove the

178

1  provision that Sullivan Vineyards reverts back to her
2  in the event of divorce; is that correct?
3       MR. FOX:  I'm going to object to the
4  characterization of the word "revert."  Ms. Finn did
5  not own the 60 percent.  It can't revert to her.
6       MR. RAMP:  I'm happy to change it to
7  "goes to her in the event of a divorce."
8       THE COURT:  Do you understand the
9  question?
10       THE WITNESS:  I think so.
11   A.  That is one of the provisions.
12   Q.  (BY MR. RAMP)  You two had been talking
13 about the third amendment, right, the proposed
14 amendment --
15   A.  Oh, my proposed amendment that --
16   Q.  Your proposed amendment.
17   A.  -- I gave her in February?  Yes.
18   Q.  Right.  Yeah.  And that third amendment,
19 the proposed amendment, removed the provision 5.7.2, in
20 which the -- your interest in Sullivan Vineyards went
21 to Ms. Finn in the event of a divorce, correct?
22   A.  Divorce or death, yes.
23   Q.  Okay.  Let's look at 5.7.
24   A.  Where is that?
25   Q.  I'm sorry.  Exhibit 2, page 13.  Are you

179

1  there?
2    A.  Page 13, 5. --
3    Q.  Of Exhibit 2, correct.  This provision
4  doesn't state that in the event of your death Sullivan
5  Vineyards goes to Ms. Finn.  It only states up at 5.7
6  that "upon termination of our marriage by entry of
7  decree, Kelly shall be entitled to receive the
8  following," correct?
9    A.  Yes, that is correct.
10   Q.  Okay.  All right.  I'm going to ask you
11 to turn to Exhibit 7, page 30.  Are you there?
12   A.  Yes.
13   Q.  Exhibit 7, page 30.  Are you on page 1 or
14 page 30?
15   A.  I'm on page 6.
16   Q.  Okay.
17   A.  Yes, I have it now.
18   Q.  Do you see about halfway down the page
19 there's a date stamp for May 13, 2015 at 8:58 p.m.?
20   A.  8:58, yes.
21   Q.  You texted -- you admit texting Ms. Finn
22 that "The fair comes once a year.  I accept that.  I
23 bought 60 percent of SV aboveboard.  I intend to
24 continue to own it and get clear title even with the
25 pre-nup.  I am a better friend than an enemy to the

180

1  Sullivan family."  You admit texting that to Ms. Finn,
2  correct?
3    A.  Yes, I agree.  I am a very good friend of
4  the Sullivan family.
5    Q.  And I'm going to ask you to turn --
6       THE COURT:  Do you want to admit page 30?
7  I don't know that page 30 has been admitted yet.
8       MR. RAMP:  I'll move for the admission of
9  page 30 of Exhibit 7.
10       MR. FOX:  No objection, Your Honor.
11       THE COURT:  Thank you.  It will be
12 admitted.
13       (Exhibit 7, page 30, was admitted.)
14       THE COURT:  At some point, someone may
15 want to move for the admission of the entire Exhibit 7.
16       MR. RAMP:  We'll see who's brave enough
17 to do that.
18   Q.  (BY MR. RAMP)  Turn to page 31 in Exhibit
19 7, please.  And about halfway down the page there's a
20 date stamp for May 16, 2015 at 4:17 p.m.  Do you see
21 that?
22   A.  I do.
23   Q.  Okay.  Do you admit texting Ms. Finn on
24 May 16 where you stated, "Look around the winery today.
25 Is it possible to even remember what a dump it was, as

181

1   I rescued it. Show that level of appreciation for how
2   I saved you, the winery, your mother, and siblings.
3   Enjoy the party. You are incapable of showing that
4   level of appreciation. You will own my 60 percent?
5   That's appreciation?" Do you admit sending that text?
6       A. Certainly.
7       MR. RAMP: Move for the admission of page
8   31 of Exhibit 7.
9       THE COURT: Any objection?
10      MR. FOX: No, Your Honor.
11      THE COURT: It will be admitted.
12      (Exhibit 7, page 31, was admitted.)
13      Q. (BY MR. RAMP) All right. I've seen
14  enough text messages. How about you? I'm going to
15  move on. I think we've gone through text messages back
16  and forth from about March to May. And I want to move
17  to when Ms. Finn files the petition.
18      I'm going to ask you to turn to Exhibit
19  11 in the notebook in front of you. This is a letter
20  from you. That's your signature on page 2, correct?
21      A. Yes.
22      Q. And this is a letter from you to the
23  partners at Sullivan Vineyards Partners, correct?
24      A. That is correct.
25      Q. So that's Ms. Finn and her siblings,

182

1   right?
2       A. It is.
3       Q. It's dated May 28, 2015?
4       A. It is.
5       Q. Okay. Does that help you recall the date
6   you were served with the divorce petition?
7       A. I believe I was served the day before in
8   my lobby, at my board meeting, at lunchtime, with my
9   employees present.
10      Q. Okay. So you were served May 27 with the
11  petition. This letter is sent the following day.
12  Correct?
13      A. Correct.
14      Q. When did you first learn that Ms. Finn
15  had filed the petition for divorce?
16      A. May 27 at approximately noon, as I was
17  walking through my lobby with my board members, with my
18  employees, I was served.
19      Q. You didn't know before May 27 at all?
20  You had no idea she had filed --
21      A. I had no idea until I was served in my
22  lobby.
23      Q. Now, the filing could not have come as a
24  complete surprise to you, though, correct?
25      A. It sure did.

183

1       Q. You've testified earlier about the
2   marriage deteriorating for years and certainly spending
3   the first part of 2015 talking about marital
4   difficulties, correct?
5       A. Correct.
6       Q. The last paragraph at the bottom of page
7   1 you wrote, "The purpose of this communique is to
8   advise you that Sullivan Vineyards is being listed for
9   sale for $20 million," correct?
10      A. Correct.
11      Q. And on page 2, at the end of the first
12  full paragraph, you state, "With the latest advances,
13  the aggregate indebtedness of SVP and SVC is about 14
14  and a half million dollars," correct?
15      A. Correct.
16      Q. In the next paragraph you state, "SVP is
17  general partnership. As a general rule, partners of a
18  general partnership are jointly and severally liable
19  for all the debts of the partnership. Each SVP partner
20  has this liability." Correct?
21      A. Correct.
22      Q. You are really trying to scare Ms. Finn
23  and/or her siblings into agreeing to the sale of
24  Sullivan Vineyards with the threat of 14 and a half
25  million dollars of liability, correct?

184

1       A. No.
2       Q. The end of the next paragraph, after
3   acknowledging that it's been a family business for many
4   years, you pronounce that the sale of Sullivan
5   Vineyards is the best practical solution, correct?
6       A. Correct.
7       Q. Now, your statements about Sullivan
8   Vineyards are not all bad in this letter. You note on
9   page 1, second paragraph, "Considerable progress has
10  been made in upgrading the operations and turning SVP
11  and SVC around," right?
12      A. Yes.
13      Q. And on page 2, third paragraph, you
14  state, "The combined companies are in much better shape
15  today than they were in 2011, but still need
16  substantial operating capital," correct?
17      A. Correct.
18      Q. All right. So in response to your letter
19  that you intended to sell Sullivan Vineyards, Ms. Finn
20  filed a motion for an immediate expanded temporary
21  injunction, right?
22      A. I don't know what the -- what the timing
23  was.
24      Q. Okay.
25      A. I know it was after that.

46 (Pages 181 to 184)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 50 of 110

185

1    Q.  May 28, you told Ms. Finn and her
2  siblings that you were selling the vineyard.  And if
3  you turn to page 12 -- I'm sorry -- Exhibit 12, there's
4  an order on that motion on June 9?
5    A.  Well, I told them -- I told Kelly to tell
6  her family in March I was selling the vineyard and the
7  winery.
8    Q.  All right.  So the Court on June 6 -- I'm
9  sorry -- June 9 granted this motion for immediate
10 expanded temporary injunction that restrained you from
11 selling Sullivan Vineyards, correct?
12   A.  Correct.
13   Q.  Okay.  So let me ask you to turn to
14 Exhibit 13.  This is a letter from you --
15   A.  Excuse me.  I need to get a drink of
16 water, please.
17   Q.  Can I hand you one?
18   A.  No, I'll get it.
19      (Pause in the proceedings.)
20      THE COURT:  You can take it with you to
21 the witness stand.
22   Q.  (BY MR. RAMP)  All right.  I'm on Exhibit
23 13.  Are you there with me?
24   A.  Yes.
25   Q.  Okay.  Thank you.  This is a letter dated

186

1  June 11, 2015.  And it's a letter from you.  Your
2  signature is on page 2, correct?
3    A.  Yes.
4    Q.  And it's to the partners of Sullivan
5  Vineyards Partners, correct?
6    A.  That is correct.
7    Q.  So, again, it's Ms. Finn and her
8  siblings?
9    A.  Yes.
10      MR. RAMP:  Okay.  I'm going to move for
11 the admission of Exhibit 13.  I don't believe it's been
12 admitted yet.
13      THE COURT:  Any objection?
14      MR. FOX:  No, Your Honor.
15      THE COURT:  Exhibit 13 will be admitted.
16      (Exhibit 13 was admitted.)
17   Q.  (BY MR. RAMP)  So this letter is dated
18 June 11, 2015.  That's two days after the Court enters
19 its order preventing you from selling Sullivan
20 Vineyards, right?
21   A.  Yes.
22   Q.  At the end of the first paragraph you
23 state, "Now I want you to be aware of a recent
24 development that will negatively impact SVP and SVC and
25 could destroy the value of your interests in these

187

1  entities," right?
2    A.  Correct.
3    Q.  And the recent development you are
4  talking about is the court's expanded injunction,
5  right?
6    A.  That is right.
7    Q.  In the last paragraph, your final
8  sentence, you say, "There is, in my opinion,
9  substantial risk that operations of the vineyards will
10 cease and the property will be at the mercy of
11 creditors," correct?
12   A.  Correct.
13   Q.  So your threat here to Ms. Finn and her
14 siblings is that unless they agree to sell the
15 vineyard, they'll lose the vineyard and their money?
16      MR. FOX:  Objection, Your Honor, to the
17 term of "threat."  This is not a threat.  Mr. Finn
18 indicated he's just providing information as the
19 chairman of the board.
20   A.  I would say --
21      THE COURT:  And the basis of the
22 objection?
23      MR. FOX:  It's argumentative, Your Honor.
24      THE COURT:  Okay.  That will be
25 sustained.

188

1    Q.  (BY MR. RAMP)  You are attempting to
2  persuade Ms. Finn and her siblings to agree to the sale
3  of the vineyard for fear that they lose the vineyard
4  and all of their money, correct?
5      MR. FOX:  Objection, Your Honor,
6  misstates the evidence.  As indicated by the
7  partnership agreement, he doesn't need their permission
8  to sell it.  So asserting that he's trying to persuade
9  them is argumentative.
10      THE COURT:  That will be overruled.
11   A.  I would send this letter to any
12 shareholders or partners.  It's good corporate
13 governance to let the people know -- let the
14 shareholders know of changes in the health and future
15 of an organization where I act as chairman.  This is
16 pretty standard stuff.
17   Q.  (BY MR. RAMP)  Okay.  Well, let's look at
18 page 1, the bottom of page 1.  You state that, "The
19 order has a significant impact on the viability of SVP
20 and SVC."  And you list four things:  "For example,
21 Number 1, any change in the management of SVP entitles
22 Silicon Valley Bank to accelerate the payment of its
23 loan in the unpaid amount of about $9 million.  Unless
24 SVP is able to pay the full amount of the bank's loan,
25 the bank could foreclose its deed of trust on the

189

1  property owned by SVP."  Is that correct?
2      A.  That was a fact.
3      Q.  So it's been about four months since you
4  wrote this letter, right?
5      A.  Yes.
6      Q.  And in that four months since you wrote
7  this, Silicon Valley Bank has not foreclosed on the
8  loan, have they?
9      A.  They have put us in the workout group.
10     Q.  Okay.  They have not foreclosed on the
11 loan, have they?
12     A.  Not yet, but it's imminent.
13     Q.  "Number 2, the lack of working capital
14 and tenuous financial condition of the entities could
15 result in the loss of the existing operating staff and
16 shutting down of operations," correct?
17     A.  That is a fact.
18     Q.  Okay.  That hasn't happened in the past
19 four months either, has it?
20     A.  It's about to.
21     Q.  That hasn't happened in the last four
22 months, has it?
23     A.  No, it has not.  It's about to.
24     Q.  "Number 3, SPV, as guarantor of the loans
25 made by Silicon Valley Bank to SVC, should expect a

190

1  demand for immediate payment of the credit extended to
2  SVC."  Has that happened?
3      A.  Only thanks to high level negotiations
4  with the bank.
5      Q.  So that has not happened either?
6      A.  Not yet.
7      Q.  Okay.
8      A.  But it's imminent.
9      Q.  Finally, you again state that the bank
10 and the creditors are coming after each one of the
11 partners, right?
12     A.  The potential is there.
13     Q.  Let's go back to page 1 of your letter of
14 June 11.  Towards the bottom of the page there's a
15 paragraph that reads -- where you state, "To continue
16 operation, the vineyards now need additional working
17 capital.  Unless the Sullivan family partners
18 individually supply the needed capital, it is highly
19 unlikely that any capital can be obtained without
20 further encumbering the vineyards.  I am now prohibited
21 from encumbering the property and you, as minority
22 partners, do not have the authority to do so.  In
23 addition, the order prohibits me from disposing of the
24 property or assets of Sullivan Vineyards.  This would
25 seem to include selling any of the wine inventory."

191

1          I've read that paragraph correctly,
2  haven't I?
3      A.  Word for word.  Yes, you read it
4  correctly.
5      Q.  And isn't it true that all of those
6  problems are no longer your problems if the Court
7  grants the decree and transfers the vineyard to Ms.
8  Finn?
9      A.  They're still my problems.
10         MR. FOX:  Objection, Your Honor.  Calls
11 for a legal conclusion.
12         THE COURT:  That will be overruled.
13     Q.  (BY MR. RAMP)  Your answer is that they
14 would still be your problems?
15     A.  They will still continue to be my
16 problems as well.
17     Q.  So if the Court were to enter the decree
18 today and your interest in Sullivan Vineyards would
19 transfer to Ms. Finn, it's Ms. Finn and her siblings'
20 problems -- problem to come up with additional working
21 capital for Sullivan Vineyards, correct?
22     A.  Well, I don't know whose responsibility
23 it will be at that point, because the loans will be
24 called.
25     Q.  Okay.  If the vineyard needs additional

192

1  working capital and you are no longer a partner or a
2  shareholder, it will be the -- the -- whoever are
3  shareholders and partners at that time to come up with
4  working capital, right?
5      A.  Well, the first mortgage will be called.
6  The second mortgage will be called.  So working capital
7  will -- a million dollars will not be the problem.
8  It's the 14 and a half million dollars that will be --
9  a foreclose, actually, will commence.  So that's really
10 the issue.
11     Q.  And if they came up with enough working
12 capital to satisfy those obligations, then they would
13 be okay?
14     A.  If they have a net worth of ten times the
15 borrowed amount to keep the first mortgage in place,
16 that would be true.  But they don't.  So it won't
17 happen.  So foreclosure is imminent if Kelly Sullivan
18 gets my position.
19     Q.  Let's turn to Exhibit 14.  This is the
20 Complaint for Declaratory Relief filed in Napa County,
21 California, correct?
22     A.  Correct.
23     Q.  It's dated August 4, 2015?
24     A.  Correct.
25     Q.  Okay.  And the plaintiffs are SVC and

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 52 of 110

193

1    SVP, right, Sullivan Vineyards Corporation and Sullivan
2  Vineyards Partners?
3        A.  Yes.
4        Q.  And the lawsuit is brought against Kelly
5  Sullivan Finn, right?
6        A.  That is correct.
7        Q.  And this was filed by Mr. Bertrand and
8  Mr. Rose, correct?
9        A.  Yes.
10       Q.  And they purport to represent the
11 Plaintiffs Sullivan Vineyards Corporation and Sullivan
12 Vineyards Partners, correct?
13       A.  What does that mean, "purport"?
14       Q.  They -- on this document they say they
15 represent Sullivan Vineyards Corporation and Sullivan
16 Vineyards Partners, right?
17       A.  They do, yes.
18       Q.  Okay.
19       A.  As chairman, I can verify that they do,
20 they do represent.
21       Q.  As chairman, did you authorize the filing
22 of this lawsuit?
23       A.  I did.
24       Q.  And when did you authorize the filing of
25 this lawsuit?

194

1        A.  Probably a few days before it was filed.
2        Q.  So approximately -- early August 2015?
3        A.  Yes.
4        Q.  And who's paid for the services of Mr.
5  Bertrand and Mr. Rose?
6        A.  The corporation and the partners.
7        Q.  All right.  So the point of this lawsuit
8  was to get a California order -- well, let's look at
9  page 7.  The prayer for relief is for a judicial
10 declaration that the temporary injunction does not
11 preclude plaintiffs from operating in the winery in the
12 ordinary course of business, or, two, consummating the
13 sale of all or substantially all of the winery's
14 assets, right?
15       A.  The reason for this lawsuit is that we no
16 longer had a judge in Colorado to hear this case.
17 Kelly had -- her attorney had resigned from her, and
18 she, before that, refused to appoint the arbitrator
19 that she agreed to appoint, so the regular judge took
20 us off the calendar.  So we had nowhere to go except to
21 a California court.  We would have preferred to have
22 been in a Colorado court to argue that this TRO was
23 inappropriate.  But we had nowhere to go and we were
24 frozen out.
25       Q.  Let me repeat my question.  On page 7,

195

1  under the Prayer for Relief, Number 1 states, "For a
2  judicial declaration that the temporary injunction does
3  not preclude plaintiffs from, one, operating in the
4  winery in the ordinary course of business, or, two,
5  consummating the sale of all or substantially all of
6  the winery's assets."  That's what it says, correct?
7        A.  Yes.
8        Q.  Okay.  So that's what you were asking the
9  California court to do, correct?
10       A.  That is correct.
11       Q.  Okay.  And the California court has
12 denied your request to sell the vineyard and/or all of
13 its assets, correct?
14       A.  The California court is contemplating it.
15       Q.  Okay.  You don't have an order granting
16 this motion, correct?
17       A.  Not yet.
18       Q.  So you have made essentially the same
19 case to a California court that this is an emergency
20 situation, that the vineyard's in financial dire
21 straits and needs to be sold immediately, and that
22 court has not granted your request for relief yet; is
23 that correct?
24       A.  That is correct.  We have a date of
25 October 28 to be heard.

196

1        Q.  Let's turn to Exhibit 15.  This is a
2  notice of a special meeting of the board of directors
3  of Sullivan Vineyards Corporation, correct?
4        A.  Yes.
5        Q.  Okay.  It's dated September 1, 2015?
6        A.  Correct.
7        Q.  And it's signed by Angelica de Vere,
8  correct?
9        A.  Yes, that's correct.
10            MR. RAMP:  I'm going to move for the
11 admission of Exhibit 15.
12            THE COURT:  Any objection?
13            MR. FOX:  No, Your Honor.
14            THE COURT:  It will be admitted.
15            (Exhibit 15 was admitted.)
16       Q.  (BY MR. RAMP)  All right.  So the
17 meeting's set for September 4, 2015, correct?
18       A.  Correct.
19       Q.  And it states, "The purposes of the
20 meeting will be to determine whether the corporation or
21 its assets should be sold, to consider offers for the
22 corporation and its assets, and to accept an offer,"
23 correct?
24       A.  Correct.
25       Q.  And did you request this special meeting

49 (Pages 193 to 196)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 53 of 110

197

1    of the board?
2        A.  I did.
3        Q.  And when did you request this meeting?
4        A.  I don't recall.
5        Q.  Shortly before September 1, 2015?
6        A.  Yes.
7        Q.  I'm going to ask you to turn to Exhibit
8    16, please.
9            MR. FOX:  I don't mean to interrupt, but
10   are you admitting 15?
11           MR. RAMP:  I'm sorry?
12           MR. FOX:  Did we admit 15?
13           THE COURT:  Yeah, he did that.
14           MR. FOX:  Just trying to keep straight on
15   that.
16           MR. RAMP:  Thank you.  I -- I need it.
17   Thank you very much.
18       Q.  (BY MR. RAMP)  Exhibit 16, do you
19   recognize this document?
20       A.  I'm not sure I ever saw this document.  I
21   don't think --
22       Q.  You don't know or you don't think you
23   did?
24       A.  I do not think I did.
25       Q.  It's dated September 23, 2015, correct?

198

1        A.  Correct.
2        Q.  And it's to your lawyer, Jordan Fox?
3        A.  Yes.
4        Q.  Okay.  And down towards the bottom, after
5    acknowledging that you called a special meeting of the
6    board of directors to vote on the sale of Sullivan
7    Vineyards --
8            MR. FOX:  Objection, Your Honor.  That's
9    reading from a document that's hearsay.
10           THE COURT:  And has not been admitted,
11   that's correct.  It will be sustained.
12       Q.  (BY MR. RAMP)  So your testimony is that
13   you never received a letter on September 3 from our
14   office -- I'm sorry -- from Ms. Finn's attorneys'
15   office?
16       A.  That is correct.
17       Q.  Let's move to Exhibit 17.
18           Let me go back real quick.  Is it usual
19   for your attorneys to sent you correspondence involved
20   in your legal cases?
21       A.  Sometimes I look at my emails, and
22   sometimes I don't read them all, and sometimes I put
23   them aside for future reference.  I don't know if I
24   received it or not.
25       Q.  So you may have just ignored

199

1    communication from your attorneys?
2            MR. FOX:  Objection, Your Honor.
3    Communications that my clients and I have is not
4    relevant to this proceeding.
5            THE COURT:  That will be sustained.
6        Q.  (BY MR. RAMP)  Let's look at Exhibit 17,
7    please.  This is the board of directors minutes for the
8    September 24, 2015 meeting?
9            (Pause in the proceedings.)
10           MR. FOX:  He's waiting for you to ask a
11   question.
12       Q.  (BY MR. RAMP)  Oh, I'm sorry.  I asked if
13   this is the board of directors minutes for the
14   September 24, 2015 meeting.  I thought you were
15   reviewing it to see whether you agreed.
16       A.  I agree it is.  I didn't realize it was a
17   question.  I apologize.
18           MR. RAMP:  Usually we get in trouble for
19   talking over each other.  It's rare that there's
20   deafening silence.  I'm sure Maria appreciated it for a
21   moment.  I'm going to move for the admission of Exhibit
22   17, please.
23           THE COURT:  Any objection?
24           MR. FOX:  Your Honor, I don't believe
25   he's the appropriate person, but Mr. Thaxton will be

200

1    here a little bit later, if that helps.
2            THE COURT:  Thank you.  It will be
3    admitted.
4            (Exhibit 17 was admitted.)
5        Q.  (BY MR. RAMP)  Now, this meeting was
6    attended by three board members: you, Angelica de Vere,
7    and Ross Sullivan, correct?
8        A.  Correct.
9        Q.  And Ross Sullivan is Ms. Finn's brother,
10   correct?
11       A.  Correct.
12       Q.  The meeting was also attended by Douglas
13   Thaxton; is that correct?
14       A.  Yes.
15       Q.  And Doug Thaxton has been employed by you
16   for the past 25 years, correct?
17       A.  Correct.
18       Q.  And he was your long-time CFO of Trust
19   Company of America?
20       A.  Correct.
21       Q.  He serves on the board of directors of
22   your company?
23       A.  Multiple companies.
24       Q.  Okay.  Multiple companies.  And he's the
25   CFO of your private office, right?

scheduling@huntergeist.com                    HUNTER + GEIST, INC.                    303-832-5966/800-525-8490

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 54 of 110

201

```
 1        A.  That is correct.
 2        Q.  The meeting was also attended by
 3   Mr. Bertrand and Mr. Rose, who are here with you today,
 4   correct?
 5        A.  That is correct.
 6        Q.  And two other lawyers from their office,
 7   Stuart Simon and Cecilia Palmer?
 8        A.  Yes.
 9        Q.  So essentially all of your people except
10   for Ross Sullivan, correct?
11        A.  I thought you said Ross was there.
12        Q.  Yeah.  I'm sorry.  All of those other
13   people were your people, correct?
14        MR. FOX:  Objection, Your Honor, to the
15   characterization.  It's argumentative.  These are
16   independent directors and attorneys, not my people.
17        THE COURT:  That will be sustained.
18        MR. RAMP:  I'll withdraw the question.
19        Q.  (BY MR. RAMP)  About halfway down the
20   page, the minutes read, "Mr. Bertrand asked Mr.
21   Sullivan whether he had supplied confidential cash flow
22   projections to attorney Charles Koss."  Are you -- do
23   you see where I am?
24        A.  I do.
25        Q.  Okay.  Mr. Koss is the California
```

202

```
 1   attorney defending Ms. Finn against the lawsuit filed
 2   by Mr. Bertrand and Mr. Rose, correct?
 3        A.  Correct.
 4        Q.  Okay.  So this is your lawyer asking Ms.
 5   Finn's brother if he supplied information about
 6   Sullivan Vineyards to Ms. Finn's attorneys, correct?
 7        A.  Correct.
 8        Q.  First sentence of the next paragraph,
 9   "Mr. Bertrand asked Mr. Sullivan if he provided Ms. de
10   Vere's compensation to Mr. Koss."  Did I read that
11   right?
12        A.  Yes.
13        Q.  And then the last sentence of that
14   paragraph, "Mr. Sullivan asked the purpose of these
15   questions, and Mr. Bertrand said that it goes to a
16   potential breach of fiduciary duty," correct?
17        A.  Correct.
18        Q.  So before the vote on September 4, this
19   board of directors meeting, your lawyer's threatening
20   Ms. Finn's brother with claims of breach of fiduciary
21   duty; is that right?
22        MR. FOX:  Objection, again, Your Honor,
23   on the grounds of argumentative.  There's not a threat
24   there.  It's a question.
25        THE COURT:  That will be sustained.
```

203

```
 1        Q.  (BY MR. RAMP)  You and your lawyers are
 2   exploring a claim against Ms. Sullivan's brother for a
 3   breach of fiduciary duty, correct?
 4        MR. FOX:  Objection, Your Honor,
 5   relevance to these proceedings.
 6        THE COURT:  It will be sustained.
 7   Document speaks for itself.
 8        Q.  (BY MR. RAMP)  At that meeting the vote
 9   was held.  Ms. de Vere voted to sell.  Mr. Sullivan
10   voted not to sell.  And you abstained from voting.
11   Correct?
12        A.  Correct.
13        Q.  And at the board meeting do you recall
14   Mr. Ross Sullivan objecting to Ms. de Vere voting?
15        A.  Yes.
16        Q.  And he objected to her voting because she
17   gets a bonus in the event of the sale of the vineyard,
18   correct?
19        A.  Actually, she gets more compensation if
20   the winery is not sold than if it is sold.
21        Q.  Let me -- let me break it down.
22   Ms. de Vere receives a bonus, a sales bonus, in the
23   event of the sale of the company, correct?
24        A.  Correct.
25        Q.  Okay.  And Mr. Sullivan objected to
```

204

```
 1   Ms. de Vere voting on this issue because she had an
 2   interest in the event that the vineyard was sold,
 3   correct?  That was his objection?
 4        MR. FOX:  Objection, again, Your Honor.
 5   This is asking Mr. Finn to speculate as to why
 6   Mr. Sullivan was doing something.
 7        THE COURT:  The objection will be
 8   overruled.
 9        A.  Could you repeat the question?
10        Q.  (BY MR. RAMP)  Sure.  Mr. Sullivan stated
11   that his objection to Ms. de Vere voting was because
12   she was interested and would benefit in the event that
13   the vineyard was sold, correct?
14        A.  Does it say that here?
15        Q.  That's not my question to you.  My
16   question was, at the meeting Mr. Sullivan objected to
17   Ms. de Vere voting, right?
18        MR. FOX:  Your Honor, if it's not in the
19   document, then it's hearsay.
20        THE COURT:  I think he's asking a direct
21   question to the expert witness of his recollection of
22   what occurred at that meeting.  Is that correct?
23        MR. RAMP:  Correct.
24        THE COURT:  The objection is overruled.
25        A.  I don't -- I don't recall conversation.
```

51 (Pages 201 to 204)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 55 of 110

205

1    Q. (BY MR. RAMP) There's nothing in the
2  minutes reflected about Mr. Sullivan's objection to Ms.
3  de Vere voting, correct?
4    A. I didn't see anything.
5    MR. FOX: Objection, Your Honor. There
6  is no evidence of such an objection at this point.
7  This witness does not recall the testimony concerning
8  that.
9    THE COURT: I think the question was
10  similarly it's not -- that that is not reflected in the
11  minutes. Objection's overruled.
12    Q. (BY MR. RAMP) All right. Let's turn to
13  Exhibit 18.
14    MR. RAMP: And I do believe Exhibit 18
15  has been admitted into evidence.
16    MR. FOX: If not, it's the pleading. I
17  don't object to it.
18    Q. (BY MR. RAMP) This is another lawsuit
19  that you filed in Napa County, California, correct?
20    A. Is it considered a lawsuit or is this --
21    THE COURT: Gosh, I don't know.
22    A. I didn't think it was considered a
23  lawsuit.
24    MR. FOX: Your Honor, I'll stipulate that
25  there was a request for a replacement board member.

206

1  Whether it's a lawsuit or --
2    THE WITNESS: What else can we call it?
3    THE COURT: Is that stipulation
4  acceptable?
5    MR. RAMP: I -- I think so. I'm just not
6  sure what to call it.
7    MR. FOX: I would ask Mr. Bertrand what
8  it's called.
9    THE COURT: It's actually an ex parte
10  petition to appoint a provisional director is what it
11  is.
12    Q. (BY MR. RAMP) So you filed this ex parte
13  petition to appoint a provisional director, correct?
14    A. Correct.
15    Q. And you filed it on September 17, 2015,
16  correct?
17    A. Yes.
18    Q. So that was about two weeks after the
19  special board meeting?
20    A. Correct.
21    Q. And it's filed by another attorney,
22  Bruce -- I'm sorry for the last name -- Miroglio?
23    A. Yes.
24    Q. And Mr. Miroglio indicates at the top
25  that he's representing you, correct?

207

1    A. That is correct.
2    Q. So because of the injunction in Colorado
3  and the vote of the board, you are asking the
4  California court to appoint a provisional director,
5  right?
6    A. That is correct.
7    Q. And you picked W. Scott Snowden for this
8  role?
9    A. Judge Snowden, yes.
10    Q. And you asked the court to grant this
11  person all the rights and powers of a director,
12  correct?
13    A. Correct.
14    Q. And that would include the power to sell
15  the vineyard and/or its assets, correct?
16    A. Correct.
17    Q. So it's another attempt by you to bypass
18  this court's injunction and --
19    MR. FOX: Your Honor, this is dealing
20  with the corporation. The partnership owns land. The
21  vineyard owns -- the corporation owns something other
22  entirely. Mr. Finn doesn't need permission to seek the
23  sale of the assets of the partnership. There isn't a
24  similar provision for the corporation, if I'm saying
25  that right. And the board needs to approve the sale of

208

1  the corporation assets which does not include the lands
2  and the significant assets.
3    MR. BERTRAND: The question was also
4  argumentative.
5    THE COURT: As that was just stated by
6  Mr. Fox, are you willing to accept that as a
7  stipulation as to what is being requested here?
8    MR. FOX: I think the document speaks for
9  itself. He's -- in light of the injunction, the
10  corporation still needs to act. He sought to deal with
11  that appropriately under California corporate law to
12  have a replacement director appointed.
13    THE COURT: The objection will be
14  sustained. The document speaks for itself.
15    MR. RAMP: Okay.
16    Q. (BY MR. RAMP) And the California court
17  has not granted this motion, correct?
18    A. That is correct.
19    Q. All right. Let's move to bonuses. Were
20  bonuses paid to the winery staff in 2015?
21    A. Yes, they were.
22    Q. And when were the bonuses paid?
23    A. After -- after the fiscal year was
24  concluded.
25    Q. And tell me what month that is.

52 (Pages 205 to 208)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 56 of 110

209

1      A.   Probably -- well, it's March 31, so they
2   were probably paid in April.
3      Q.   April of 2015, correct?
4      A.   I know they were paid.  I don't know what
5   date.
6      Q.   Approximately April 2015?
7      A.   Yes.
8      Q.   And who received a bonus?
9      A.   The CEO, the VP of finance, and the head
10   of our sales and marketing department.
11      Q.   Okay.  So in names, that's Angelica de
12   Vere?
13      A.   Correct.
14      Q.   She's the CEO?  The VP of finance was
15   Teresa Sullivan?
16      A.   Yes.
17      Q.   And what's the name of the person who's
18   the head of sales?
19      A.   Sonyia.  Sonyia Gallia, or something like
20   that.
21      Q.   Okay.  And how much did they receive,
22   collectively?
23          MR. FOX:  Objection, Your Honor,
24   relevance.
25          THE COURT:  That will be sustained.

210

1          MR. RAMP:  Your Honor, if I could just
2   respond to it briefly.
3          THE COURT:  Go ahead.
4          MR. RAMP:  I don't intend to argue with
5   you.
6          THE COURT:  No, that's all right.
7          MR. RAMP:  Part of the claim here is that
8   the vineyard is and has been a financial disaster and
9   is going down the drain.  Giving out bonuses six months
10   ago, I think it relevant, as is the quantity of that
11   bonus.  Is it $5,000 or is it hundreds of thousands of
12   dollars.
13          THE COURT:  The objection will be
14   sustained.
15      Q.   (BY MR. RAMP)  Who decided to give the
16   bonuses?
17      A.   They were negotiated the prior year, and
18   there were milestones for them to reach.  And they were
19   in their employment agreements as a percentage of their
20   compensation, provided that milestones were reached.
21   Milestones were reached, and they were paid.
22      Q.   Did they get the maximum bonus?
23      A.   There isn't a minimum or a max.  There
24   is -- they either get it or they don't.
25      Q.   So, for example, I believe Angelica de

211

1   Vere says she gets a performance bonus of 35 percent of
2   her base salary.  Did she get the 35 percent?
3      A.   Yes.
4      Q.   And those are performance bonuses that
5   are based on the achievement of the company's annual
6   financial guest and employment targets, right?
7      A.   Revenue, profit, expense.  That would be
8   revenue growth, profit achievement, and expense.
9      Q.   Okay.  So the vineyard met all of those
10   performance standards and bonuses were given in 2015,
11   correct?
12      A.   That is correct.
13      Q.   Okay.  For the record, could you open up
14   Exhibit P that's in front of you.  It's the big book,
15   one of the -- Volume I of the big book.  Now, you
16   referred to this document on your direct exam as a
17   document -- one of the documents that -- that you base
18   your current ownership percentages on in SVP and SVC,
19   correct?
20      A.   Yes.
21      Q.   And you admit that on pages 4 and 5 this
22   document is not signed?
23      A.   This document is not signed.
24      Q.   I'm going to move to a different topic.
25          You've claimed that your attempts to sell

212

1   Sullivan Vineyards are driven by your fiduciary duties
2   to the other partners and shareholders of Sullivan
3   Vineyards, right?
4      A.   Yes.
5      Q.   You agree with me that all other
6   shareholders and partners of Sullivan Vineyards are
7   opposed to the sale of Sullivan Vineyards, correct?
8      A.   The minority shareholders are opposed.
9      Q.   Okay.  So that's everyone else other than
10   you, correct?
11      A.   Yes.  I don't know about Ms. Coleson.
12      Q.   Okay.
13          MR. RAMP:  Your Honor, can I have -- I
14   think I've got about five minutes at most.  Can I just
15   have one minute real quick?
16          THE COURT:  Absolutely.
17          (Pause in the proceedings.)
18          THE COURT:  Go right ahead.
19          MR. RAMP:  Okay.  Thank you, Your Honor.
20      Q.   (BY MR. RAMP)  Mr. Finn, if the Court
21   does not enter the decree today and vacates the
22   injunction, you intend to sell Sullivan Vineyards
23   immediately, correct?
24      A.   I will entertain offers, yes.  Would you
25   re- -- would you say that again, please?

53 (Pages 209 to 212)

**213**

1   Q. So if the Court doesn't grant our
2 requested relief, which is entering the decree, and the
3 Court gives you your requested relief, which is
4 vacating the injunction, essentially, if there is no
5 prohibition from selling the vineyard, you will sell
6 it, won't you?
7   A. I think that is absolutely the best
8 course of action for the situation, yes.
9   Q. And that will have the effect of taking
10 the Sullivan Vineyards away from Ms. Finn and the
11 Sullivan children, correct?
12   A. It will have the effect of protecting all
13 of the assets, the employees. And it will also give
14 all the shareholders a little bit of money that was
15 never there before, because there is some equity in the
16 business.
17   Q. And your view of the sale, at least, is
18 that you will receive the four and a half million
19 dollars of loans that you allege are valid and accurate
20 and over 50 percent of any profit from the sale,
21 correct?
22   A. I don't think there will be any profit
23 for me.
24   Q. Okay. So you think that you'll receive
25 $4.5 million, correct?

**214**

1   A. (Deponent nodded head up and down.)
2   MR. FOX: You need to answer verbally.
3   A. "Yes." Excuse me. I believe that is
4 true.
5   Q. (BY MR. RAMP) And if you will receive no
6 profit, then you will be the only one who gets any
7 money in the event of the sale of Sullivan Vineyards,
8 correct?
9   A. I'm the only one that put any money in.
10   Q. Okay. So you will get money and no one
11 else will, correct?
12   A. I'll get my money back. No one else has
13 money to be -- to get back.
14   Q. Do you understand that there could be
15 value to the vineyard for Ms. Finn and her siblings
16 that's not measured on a profit and loss statement?
17   MR. FOX: Objection, relevance. It's not
18 relevant to the matters before the Court.
19   THE COURT: That will be sustained.
20   MR. RAMP: I have nothing further.
21   THE COURT: Redirect.
22   MR. FOX: Thank you, Your Honor.
23   REDIRECT EXAMINATION
24 BY MR. FOX:
25   Q. Does the Sullivan Vineyards, Sullivan

**215**

1 Partnership Corporation, have the ability to meet
2 payroll?
3   A. We have the ability to meet one more
4 payroll.
5   Q. If payroll is not met, do the individual
6 partners or shareholders have personality liability?
7   A. Yes, they do.
8   Q. If the assets are liquidated, will you be
9 able to satisfy that liability protecting all the
10 shareholders and partners?
11   A. Yes.
12   Q. Do you believe that you have a fiduciary
13 duty to protect the interests of the various partners
14 in addition to yourself?
15   A. I always have felt that way.
16   Q. And you were asked to take a look at
17 Exhibit P, the warrant. The copy that's in the exhibit
18 book is not signed. Was it signed by Mr. Sullivan and
19 the other Sullivan family members?
20   A. I assume so.
21   Q. Did you receive it from Mr. Sullivan?
22   A. I didn't keep the records, so I don't
23 know.
24   Q. The -- Exhibit 18, which is the request
25 for a substitute director, ex parte petition to appoint

**216**

1 a provisional director, is that matter set for hearing
2 later this month?
3   A. I don't know.
4   Q. Okay. I would like you to go to --
5   MR. FOX: Your Honor, may I have just one
6 moment?
7   THE COURT: Okay.
8   Q. (BY MR. FOX) The board notes on Exhibit
9 17 suggest that the board is deadlocked without you
10 voting and that there's really nothing else to do with
11 this insolvent corporation other than seek a
12 replacement director to break that tie; is that your
13 understanding?
14   A. That's my understanding.
15   Q. And is that your request to the
16 California court to allow the corporation to continue
17 to operate because of the injunction here in Colorado?
18   A. That is correct. Judge Snowden is the
19 regarded retired judge as the expert in the wine
20 business in Napa Valley --
21   Q. Had he been --
22   A. -- and arbitrator.
23   Q. -- proposed as a possible mediator at
24 different points?
25   A. Yes, he had.

217

1  Q.  Have you offered to have auditors come in
2  if Ms. Finn disbelieves the financial reports that your
3  management team is presenting?
4      A.  Yes.  We have invited them to bring in
5  their forensic accountants over the last few months,
6  and they have not done so.
7      Q.  Have they indicated to the court in
8  California that -- or have they acknowledged that that
9  offer was made to them?
10     A.  It was made to them at the court
11 proceeding.
12     Q.  I'm going to change the order a little
13 bit.  I would like to go back to paragraph 5.2.  Sorry.
14 Exhibit 2, paragraph -- let's see, 5.7.2.
15     A.  Of which -- of which document?
16     Q.  Exhibit 2.
17     A.  Oh, excuse me.
18     Q.  Which is the marital agreement.
19     A.  Okay.  Great.  Excuse me.
20     Q.  You indicated in paragraph 5.7 that you
21 understood this also to affect rights upon death.  Is
22 that your understanding of this agreement?
23     A.  That is correct.
24     Q.  Was the term "termination of marriage"
25 specifically defined in this agreement?  I would ask

218

1  you to turn to page 7, paragraph 2.9.3.  Was
2  "termination of marriage" specifically inclusive of
3  your death?
4      A.  Yes.
5      Q.  And so you understood --
6      A.  Oh, "death or" --
7      Q.  Death or to your decree?
8      A.  Right.
9      Q.  And you understood that upon your death
10 any interest that you owned in Sullivan Vineyards would
11 pass to Ms. Finn rather than to your heirs?
12     A.  That is correct.
13     Q.  You had some questions asked of you about
14 the timing of the negotiation with your mother-in-law
15 and the marital agreements.  For how long were you
16 negotiating to acquire the interest in Sullivan
17 Vineyards from Ms. JoAnna Sullivan?
18     A.  I believe we started talking in
19 January -- January or February.
20     Q.  Six months prior to the marriage?
21     A.  Yes.
22     Q.  Was Ms. Finn asking you on a regular
23 basis to assist with the finances of the vineyard at
24 that time?
25     A.  She was asking me to give advice to her

219

1  mother.
2      Q.  And were requests for money made while
3  you were on your honeymoon?
4      A.  Prior to the honeymoon, the week prior.
5      Q.  I would like you to look at Exhibit 6,
6  please, paragraph 3.4, paren C, C as in "Charlie."
7      A.  Excuse me.  What page?
8      Q.  Page 10 on the bottom right.  Page 9 of
9  the document.  Paragraph 3.4.  Let me know when you are
10 there.
11         MR. FOX:  Your Honor, if I may approach.
12         THE COURT:  Yes.
13         MR. FOX:  I'm in Exhibit C -- I'm sorry.
14 Exhibit 6, not Exhibit 2.
15         THE WITNESS:  Okay.  Sorry.
16         MR. FOX:  The stock purchase agreement.
17         THE COURT:  Okay.  Thank you.
18     Q.  (BY MR. FOX)  Ms. Finn testified that the
19 intent was that you were going to buy this winery for
20 the two of you to own and create together.  In your
21 negotiations with her mother, you specifically
22 represented you are buying it for your own account, not
23 for anyone else, correct?
24     A.  That is correct.
25     Q.  And on the next page you indicated you --

220

1  essentially, if it's going to be sold, it will be done
2  in accordance with the Securities Act and applicable
3  law?
4      A.  Correct.  That was pretty much
5  boilerplate, I believe.
6      Q.  Let's take a look at the text messages.
7  I'm sorry to take us back there.
8      A.  Where are they?
9      Q.  Exhibit 7, page 1.
10     A.  Okay.
11     Q.  There is what appears to be a heated
12 discussion in March where you made the statement, You
13 should help me to make it grow, not to --
14 not to run it into the ground.
15         Were you still actively working for the
16 success of the vineyard after this date?
17     A.  Yes.
18     Q.  Did you actively loan money to the
19 vineyard after this date?
20     A.  Yes, absolutely.
21     Q.  Were you still seeking additional
22 contracts or sales or promotions for the vineyard after
23 this date?
24     A.  I -- I -- you know, I had definitely very
25 much of a part-time job here.  I mean . . .

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 59 of 110

221

1      Q. Did Ms. Finn make any investments to the
2 vineyard after that date?
3      A. No, she's never made any investments.
4      Q. Did she actively seek contracts for the
5 sale of wine after that date?
6      A. No.
7      Q. Did she assist in any way with the
8 vineyard at that -- after that date?
9      A. Not to my knowledge.
10      Q. I would like you to turn to page 7,
11 please. Make sure I'm looking -- page 7. You were
12 asked about questions regarding counseling. In the
13 middle, Mr. Ramp said you -- SV ownership gets solved,
14 then marriage counseling?
15      A. Yes.
16      Q. You went to marriage counseling without
17 SV ownership being solved, correct?
18      A. That's correct.
19      Q. You were focusing on solving the
20 marriage, not worrying about that issue when you agreed
21 to counseling, correct?
22      A. Yes.
23      Q. Would you do counseling today if
24 Ms. Sullivan -- Ms. Finn was willing to do so?
25      A. Yes.

222

1      Q. Do me a favor and turn to page 8. These
2 are some text messages between you and Ms. Finn
3 discussing a workout. Did she say give me $4 million,
4 and I'll walk away from the vineyard?
5      A. She said give me $4 million and I'll give
6 you what you want in changing the pre-nup.
7      Q. So is she really, in your opinion,
8 focused on preserving this family asset or does she
9 just want money?
10      A. She wants money.
11      MR. LASS: Objection, Your Honor. It's
12 speculation. It's argumentative.
13      THE COURT: It will be overruled.
14      Q. (BY MR. FOX) And your answer was that
15 she's just after money?
16      A. She's after money.
17      MR. FOX: Your Honor, I would ask for the
18 admission of page 8 of Exhibit 7.
19      THE COURT: Any objection?
20      MR. LASS: No objection.
21      THE COURT: Page 8 will be admitted.
22      (Exhibit 7, page 8, was admitted.)
23      Q. (BY MR. FOX) On page 10 of the
24 documents, this discussion back and forth between you
25 and Ms. Finn, was this all in regards to you asking her

223

1 to change the provisions to allow you to invest and
2 leave the asset to your heirs?
3      A. Yes.
4      Q. And on page 19, the SVPN overreach
5 comment was also, Look, I don't want to invest more
6 money in this if it's not going to go to my heirs?
7      A. That is correct.
8      Q. On page 24, at the time you executed the
9 pre-nup, did you anticipate putting up -- having to put
10 in a million dollars per year in perpetuity?
11      A. No, I did not.
12      Q. Did you think it was fair to drain that
13 much of your separate property towards an asset that
14 wouldn't go to your heirs?
15      A. No. That's what I concluded in January
16 of this year. I couldn't do it any longer.
17      Q. On page 24, you were asked about your
18 text message. You sent a text message to Ms. Finn,
19 "Release the SV pre-nup." Last sentence, "You have
20 agreed that the SVPN is unfair." What did Ms. Finn
21 tell you about the pre-nup as it relates to the
22 Sullivan Vineyards transfer on the date of your death
23 or divorce?
24      A. She agreed it was unfair, but she said,
25 Too bad. She also told friends of ours it was unfair.

224

1      Q. Finally, with my last thing on the text
2 messages, turn to page 31, please. Now, these text
3 messages are on May 14 and 16. I want you to look at
4 the one on the 16th. She filed for divorce on May 13.
5 Were you aware of it at that time?
6      A. No.
7      Q. Your text message, to me, looks like you
8 are reaching out to her to try to work on the marriage.
9 Third message, "If we're not [sic] together, it
10 dramatically reduces the likelihood that we'll stay
11 married. Do you care anymore?" Are you trying to
12 engage with her in the efforts to save your marriage?
13      A. Yes.
14      MR. RAMP: Object to that. That's
15 leading and comes close to Mr. Fox testifying.
16      THE COURT: It will be overruled, but be
17 careful you're not leading.
18      Q. (BY MR. FOX) What was your intent with
19 that provision?
20      A. I assumed we were working out our
21 marriage at this point. I did not know that Kelly had
22 given up.
23      Q. And this was after your marathon two- or
24 three-day session?
25      A. Well, two days, and I left after the --

56 (Pages 221 to 224)

225

1     MR. RAMP:  Objection, Your Honor, it's
2  leading again.
3     THE COURT:  Please repeat the question.
4     MR. FOX:  Sure.
5     Q.  (BY MR. FOX)  Was this after your -- when
6  was your therapy session with Ms. Finn?
7     A.  It was two days before she filed.
8     Q.  Roughly, May 10 or 11 is, I think, what
9  Mr. Ramp said?
10     A.  Yeah.
11     Q.  Were you still trying to work on the
12  marriage after that therapy session failed?
13     A.  Well, that's -- I left the session in
14  Washington state, and I told them I wouldn't come back
15  for the third day because I saw no -- nothing positive
16  coming out of this marathon marriage session.
17     And I wasn't able to even do the
18  paperwork required in advance, because the professor's
19  system was broken.  So I couldn't go through the
20  questionnaire and he couldn't do my profile.  And by
21  the end of the second day, it was -- and then we went
22  out to dinner that night and Kelly walked out at
23  dinner.  So it was pretty clear to me that this was not
24  the venue that was going to work to save our marriage.
25     Q.  Were you willing to try other venues?

226

1     A.  Yes.  And that's -- this email is a
2  pretty good example of that.
3     Q.  I would like to turn back to some of the
4  financials now.  Exhibit 13, please, in the small book.
5  This should be your June 11 letter.
6     A.  Yes.
7     Q.  What's your understanding -- you were
8  asked about threats that you were -- made.  This letter
9  is related to the partnership; is that right?
10     A.  Yes.
11     Q.  Do you need permission of the partners to
12  sell the assets of the partnership?
13     A.  I do not.
14     Q.  You identified four concerns or --
15  related to it.  The first one, if there is a change in
16  partnership ownership, does that trigger, in your
17  understanding, a breach of the loan covenants?
18     A.  Yeah, the loan will be called.  It's in
19  workout now, and it will be absolutely called at that
20  point.
21     Q.  Have there -- Number 2, on the next page,
22  you said, Look, there's no capital, tenuous financial
23  conditions.  Are you able to pay all of the bills for
24  the winery today?
25     A.  We are a million short, and it's all aged

227

1  payables.
2     Q.  At this point are you able to get new
3  glassware for the vineyard without paying cash?
4     A.  No.  Our vendor has canceled our accounts
5  payable -- due to the accounts payables.
6     Q.  What's the status of the loan with
7  Silicon Valley Bank?
8     A.  It's in the -- it's in the workout group,
9  so we are -- we are one step from foreclosure -- being
10  called.
11     Q.  How often is the bank checking in
12  regarding the status of this injunction or this
13  proceeding?
14     A.  We are to give them daily reports of any
15  changes that we are aware of on a daily basis.
16     Q.  And is it your understanding that the
17  partners are jointly and severally liable for any debts
18  of the partnership?
19     A.  Yes, they are.
20     MR. FOX:  Your Honor, if I may have a few
21  moments.
22     THE COURT:  Yes, you may.
23     (Pause in the proceedings.)
24     MR. FOX:  Your Honor, nothing further.
25     THE COURT:  Recross.

228

1     MR. RAMP:  None, Your Honor.
2     THE COURT:  Thank you.  You may step
3  down.  That was a look of relief.  Let's take a
4  ten-minute recess.
5     (Recess taken, 2:30 p.m. to 2:45 p.m.)
6     MR. BERTRAND:  If it may please the
7  Court, I would like to call to the stand Teresa
8  Sullivan.
9     TERESA SULLIVAN,
10  having been first duly sworn to state the whole truth,
11  was examined and testified as follows:
12     DIRECT EXAMINATION
13  BY MR. BERTRAND:
14     Q.  Can you describe to the Court your title
15  at Sullivan Vineyards and what your job duties are.
16     THE COURT:  First, if you would state
17  your name for the record.
18     A.  My name is Teresa Sullivan.  T-e-r-e-s-a.
19  Last name, S-u-l-l-i-v-a-n.  I'm not a relation of the
20  Sullivans here, just for clarification.
21     Q.  Okay.  And so can you tell the Court what
22  your job title is at Sullivan Vineyards?
23     A.  Certainly.  I'm vice president of finance
24  and business operations.
25     Q.  And you started in January --

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 61 of 110

229

1  A. I started at the end of January of this
2  year, so I've been with the company a little less than
3  eight months.
4       THE COURT: A little nervous?
5       THE WITNESS: Me? Why? Is it in my
6  voice? It's dry.
7       THE COURT: Well, it's because you're at
8  altitude.
9       THE WITNESS: Is that it? I've been
10 drinking water nonstop.
11      Q. (BY MR. BERTRAND) Okay. So -- so can
12 you tell the Court what it is that you do for Sullivan
13 Vineyards?
14      A. I have -- well, obviously, financial
15 oversight of all the books and records and production
16 of monthly financials, income statements, P&Ls, balance
17 sheets, cash flow. I work a lot on the annual plan,
18 strategic plan, budgeting, long-term plans.
19 Operationally, just making sure that the business,
20 winery production, all of that, is flowing smooth.
21      I have HR responsibilities, so I need to
22 make sure that any employment issues that arise are
23 being taken care of and that we are abiding by
24 California corporate law.
25      Q. Okay. So the focus of your testimony

230

1  here today is going to be on the financial condition of
2  Sullivan Vineyards, okay?
3       A. Yeah.
4       Q. So we are talking about both Sullivan
5  Vineyards Corporation and Sullivan Vineyards
6  Partnership.
7       A. Partnership, okay.
8       MR. LASS: And, Your Honor, just so
9  you -- we are clear, we have the standing objection
10 that we don't believe that the financial status of
11 Sullivan Vineyards Corporation is relevant to the
12 motions that need to be decided. That's sort of a
13 standing issue, but I thought I would better raise it
14 again.
15      THE COURT: Okay. That would be a
16 continued standing objection. Thank you.
17      MR. BERTRAND: I would also note for the
18 record, Your Honor, that in our original motion, our
19 forthwith motion with respect to the temporary
20 retraining order, we put in substantial evidence with
21 respect to the financial condition of the -- of the
22 winery.
23      And one of the issues, and why I disagree
24 with counsel, is one of the issues presented here is
25 that Mr. Finn is being precluded from discharging his

231

1  fiduciary duties to maximize the value of the winery
2  assets. And so we think that information is relevant
3  and will be relevant to your ultimate determination.
4       THE COURT: Okay. You may proceed.
5       MR. BERTRAND: Thank you so much.
6       Q. (BY MR. BERTRAND) All right. So you are
7  the custodian of records?
8       A. Yes.
9       Q. Okay. And you are directly involved in
10 the preparation of, for example, various financial
11 statements for the winery?
12      A. Yes.
13      Q. Okay. Can you tell the Court about your
14 prior experience.
15      A. Sure. I'm a senior finance executive
16 with over 25 years of experience. Started my career at
17 Nestle and moved up through the ranks. I was with
18 Nestle for ten years. When I left, I was the North
19 America finance director for all Coffee-Mate. I went
20 to Charles Schwab. I was director of corporate
21 investment planning for them. I had oversight of a
22 $400 million budget. When I left Schwab, I went to
23 eBay, senior vice president of business development.
24 Had oversight of $180 million division, 52 direct
25 reports.

232

1  I did two startup companies subsequent to
2  that. Started my career in the wine industry in 2000.
3  Started with Foster's, which is the former Beringer
4  enterprise. Started in the luxury division. Ended up
5  running all North America finance. Became the lead
6  analyst on their largest project, an $800 million
7  balance sheet divestiture project, for which I received
8  the chairman's award for outstanding contribution to
9  business.
10      Started my own firm in 2006. Left for
11 personal reasons in 2011. And then my dream is to be
12 at a luxury property, so I was with a small Australian
13 firm for a while, and then ultimately ended up here at
14 Sullivan.
15      Q. Okay. And Sullivan would be a luxury
16 property --
17      A. Yeah. It's a dream property, actually.
18 It's -- it's lovely.
19      Q. Okay. And it's referred to as luxury
20 because of the high-end --
21      A. Price point, type of --
22      THE COURT REPORTER: Please wait for him
23 to finish completely before --
24      THE WITNESS: Sorry.
25      Q. (BY MR. BERTRAND) So when you are

58 (Pages 229 to 232)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 62 of 110

233

1 talking about luxury, you are talking about price point
2 of the wine that's sold, et cetera?
3     A. Aesthetic, how it's marketed, branded,
4 all that, yes.
5     Q. Okay. And you've been involved as part
6 of your job duties in the marketing and branding of the
7 Sullivan Vineyards wines, correct?
8     A. A little bit. I would have to say that
9 that really is owned by Angelica and subsequently
10 Sonyia, who is head of marketing and sales.
11     Q. All right. So based on your involvement
12 as a VP of finance, are you familiar with, for example,
13 the status of the payment of accounts payable for
14 Sullivan Vineyards?
15     A. Yes, I am.
16     Q. All right. Can you describe to the Court
17 what the current situation is in terms of the amount of
18 accounts payable that are due from Sullivan and how
19 many or how much is past due?
20     A. Collectively, we are in debt, current
21 debt, of 1.2 million. I would say 70 percent of that
22 is more than 60 days past due. And to put that in
23 perspective, I have $19,000 in the bank. The accounts
24 payable does not include payroll, which is another
25 $90,000 a month.

234

1     Q. All right. And then with respect to
2 payroll, are there other contractual obligations that
3 are required to be paid upon termination?
4     A. Yeah. Accrued PTO. So in that number,
5 let's say, if an employee wanted to resign tomorrow --
6 and most of my employees have a significant amount of
7 PTO that's been accrued -- with my existing bank
8 balance, I couldn't even meet my obligations under
9 California law where I would be able to service them a
10 final check as well as what they're owed.
11     Q. And is it your understanding that you
12 have to pay a final check within 24 hours?
13     A. You have to pay it at the time of
14 termination in California.
15     Q. All right. And if you don't, then
16 there's certain personalities that --
17     A. And I'm liable for suit.
18     Q. Right. So you would be liable for suit
19 and -- and other individuals --
20     A. Yes. And damages and whatnot, correct.
21     Q. Okay. So you have $19,000 cash on hand.
22 You have $90,000 -- is that twice a month for payroll?
23     A. Yeah. Bimonthly payroll of 45,000,
24 correct.
25     Q. Okay. And then -- and then your accrued

235

1 PTO is how much?
2     A. About a hundred thousand.
3     Q. Okay. And with respect to the
4 outstanding payables that you have, there's been
5 reference to a Beckstoffer payable of $90,000?
6     A. That's correct.
7     Q. Are you familiar with that?
8     A. Yes, I'm very familiar with that.
9     Q. Okay. And the Beckstoffer payable was
10 for bulk juice?
11     A. That's correct.
12     Q. And the bulk juice is used in an aspect
13 of the business, which is the volume sales, right?
14     A. Right. It's a channel that Angelica
15 developed. And right now it's really the only viable
16 channel that we have to generate enough cash to pay off
17 the long-term debt.
18     Q. So you don't pay Beckstoffer, the
19 likelihood of you getting juice next year to be able to
20 do that --
21     A. Well, even from a cash perspective, I'm
22 not going to be in a position to buy it right now for
23 570,000 due in January. So it's already at risk.
24     Q. All right. And Beckstoffer, it being
25 grape juice, is there something known as a "growers

236

1 lien"?
2     A. He can place a growers lien. And at this
3 point in time, that's close to an imminent threat,
4 because we are way behind. That final payment was due
5 in May. And I've received several demand letters now.
6 He also has the right to come and reclaim the juice.
7 He can take the inventory back. That's another option.
8 But he would more than likely take a growers lien
9 position first. And that growers lien would put us in
10 violation of Silicon Valley Bank.
11     Q. Right. Is it your understanding that a
12 growers lien primes all bank liens?
13     A. That I'm not sure.
14     Q. So Beckstoffer is -- was due in May?
15     A. Yeah.
16     Q. We are now in October. Can you tell the
17 Court how often you've been hearing from Beckstoffer
18 about wanting payment?
19     A. I would say now it's weekly. He's the
20 largest grower in the Valley. And to lose him, there
21 is no other Rutherford sourcing that could be obtained.
22     Q. And having the Rutherford appellation
23 attached to your wine is important in volume --
24     A. It's paramount for this -- for the client
25 that we sell this volume program to.

59 (Pages 233 to 236)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 63 of 110

237

1      Q.   Okay.  So you're in --
2      A.   It's critical.
3      Q.   -- danger of losing a program that
4  generates how much in revenue per year?
5      A.   This year we are targeting 1.8 million.
6  It's significant.  It's all the growth.
7      Q.   Out of a total of how much?
8      A.   4 million, so half.
9      Q.   Okay.  All right.  So significant.  Now,
10  you've been in court when Ms. Finn has been in court
11  where the Beckstoffer payable has been discussed,
12  correct?
13      A.   I was in court on two times when the
14  $90,000 Beckstoffer payment was brought up; that is
15  correct.
16      Q.   Okay.  And did you hear Ms. Finn tell the
17  Court that she was going to write the check to pay
18  Beckstoffer?
19      A.   Both occasions Ms. Finn clearly stated
20  she would write the check on that day, and she made
21  that declaration to the same judge two times.  And we
22  have never received the funds.
23      Q.   All right.  And were you in court when
24  the judge expressed his surprise that the $90,000 had
25  not yet been paid?

238

1      A.   Yes, he was disappointed.
2      Q.   Okay.  All right.  And so in addition to
3  Beckstoffer, which jeopardizes a major distribution
4  channel that you have, can you describe to the Court
5  other past-due payables and how they impact the
6  operation of the business?
7      A.   Well, I mean, at this stage of the game
8  everything's past due.  What I'm basically trying to do
9  now with cash that I get in the door is going towards
10  everything that I can keep -- to keep the company in
11  compliance:  Don't miss a payroll.  Don't miss a
12  principal payment.  Don't miss an interest payment.
13  Make sure that I'm financing all the compliance
14  requirements, you know, for our state and licensing
15  regulations.  Nothing that would be a huge hiccup to
16  the business.
17      So everything else is building back up.
18  I mean, but now we are to the point where we are so far
19  past due that -- I mean, I just got notice yesterday of
20  the second credit hold, and it's with the largest glass
21  supplier.  So -- this is a really small valley, when
22  you are talking about vendors and you're talking about
23  your production.  Everybody knows everybody.  Everybody
24  knows this business is in trouble.  And as soon as my
25  glass provider put a lien -- or basically a credit

239

1  hold, the label guy's going to know, the cork guy's
2  going to know, everybody knows.  So that will all
3  follow suit.  So . . .
4      Q.   All right.  And can you describe to the
5  Court how critical it is to be put on credit hold from
6  your glass supplier?  What does that mean for the
7  business?
8      A.   Well, the problem with the credit hold
9  now is not just this moment in time.  It has to do with
10  the prior credit history when the Sullivans were
11  running it, and they were running it -- it got to the
12  point where they were only COD.  And that's the
13  direction that this is going to head.
14      Q.   Okay.  So can you buy bottles to put --
15      A.   Not right now, I cannot.
16      Q.   So you just -- are just finishing
17  harvest; is that correct?
18      A.   We just finished harvest and we would be
19  gearing up for a bottling in early February, which
20  would require me to begin purchasing production
21  supplies in early December.
22      Q.   Okay.  So you can't buy the bottles to
23  put the wine in?
24      A.   No, we cannot.
25      Q.   Can you tell the Court about how often

240

1  you are getting calls from your creditors?
2      A.   Daily.
3      Q.   All right.  And is it disrupting your
4  business?
5      A.   I don't know if I can say it's
6  disrupting.  I mean, there's points in time where,
7  truth be told, I don't take the call because I have got
8  nothing I can say to them at this stage.  I can't make
9  a promise.  I don't have funds.  My hands are tied.
10      Q.   All right.  And can you tell the Court
11  what it's like for your personally not knowing whether
12  you have enough money to make payroll and your
13  inability to pay for basic supplies?
14      A.   It's hard.  It's really hard.
15      Q.   And this has been going on for how long?
16      A.   Well, I mean, you know, we got the
17  injunction in late May, as I recall.  And that shut
18  down the financing, but it did more than that.  As soon
19  as Kelly moved on the property, all -- we lost all
20  event revenue.  So it wasn't just $300,000 of financing
21  that we lost.  We lost another two-something in events.
22  So it was a half-a-million-dollar hit.  I haven't been
23  able to recover from that.
24      Q.   Okay.  And when you say when Kelly came
25  on the property -- would you rent out the residence for

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 64 of
110

241

1    events?
2         A.  Yes.
3         Q.  **Okay.  And that would generate between**
4    **one and two hundred thousand dollars a year?**
5         A.  Over.  This year we were planning on over
6    that.  We had a very large event planned for November
7    that was going to bring in a significant amount of
8    revenue, and that had to go away.
9         Q.  **Have you been --**
10        THE COURT:  For this coming November?
11        THE WITNESS:  Yes.  Sorry.
12        Q.  **(BY MR. BERTRAND)  Have you been in**
13   **contact with Silicon Valley Bank?**
14        A.  Yes.
15        Q.  **All right.  And have you discussed with**
16   **anyone at Silicon Valley Bank the effect of the**
17   **injunction that was issued out of the Colorado court?**
18        A.  Yes.
19        MR. RAMP:  Objection.  That calls for
20   hearsay.
21        THE COURT:  That will be sustained.
22        A.  Most of the direct conversation --
23        THE COURT:  That means you can't answer.
24        THE WITNESS:  Oh, I'm sorry.
25        THE COURT:  That's okay.

243

1    that communication, what, if anything, has she done.
2         MR. BERTRAND:  Very good, Your Honor.
3         Q.  **(BY MR. BERTRAND)  So have you had**
4    **communications with respect to Silicon Valley Bank?**
5         A.  Yes.  And when they raised the concern --
6         THE COURT:  Don't -- you can't say what
7    they said, but you can say what you did as a result of
8    having conversations with --
9         A.  I was asked to prepare a --
10        THE COURT:  Again, just what you did.
11        A.  I prepared a cash flow statement for them
12   to show them the risk that the business was facing.
13        Q.  **(BY MR. BERTRAND)  All right.  And the**
14   **cash flow statement that you prepared, did it show any**
15   **long-term viability of the business?**
16        A.  No.
17        Q.  **In your opinion, does Sullivan Vineyards**
18   **have any long-term viability?**
19        MR. RAMP:  Your Honor, I'm going to
20   object.  This goes back to our objection about 139
21   exhibits, Mr. Finn having access to all this
22   information, the employees, the staff.  And we are
23   right now getting into expert opinion, viability of
24   this business.  It's not appropriate.  It's not been
25   disclosed.  The bases have not been disclosed.  She's

242

1         Q.  **(BY MR. BERTRAND)  Well, has anyone from**
2    **SVB expressed any concern to you about the existence of**
3    **the injunction?**
4         MR. RAMP:  Also hearsay.
5         THE COURT:  That will be sustained.
6         MR. BERTRAND:  Well, it's not being asked
7    for the truth of the matter stated.  It's being -- it's
8    being offered for, you know, whether or not there's
9    been an expression of concern and whether it's having
10   an impact on the business.
11        THE COURT:  It's still hearsay.
12        MR. RAMP:  Which would be the truth of
13   the matter asserted.
14        MR. BERTRAND:  Okay.  All right.
15        Q.  **(BY MR. BERTRAND)  So there have been a**
16   **number of hearings in California, correct?**
17        A.  Yes.
18        Q.  **All right.  And has anyone from Silicon**
19   **Valley Bank asked you to keep them apprised of what**
20   **occurs at the hearings?**
21        A.  Yes.  And they specifically --
22        MR. RAMP:  Objection, that's hearsay as
23   well.
24        THE COURT:  What you can ask is if she's
25   had communication with the bank, and as a result of

244

1    not been endorsed as an expert.  We have had no
2    opportunity to prepare or rebut this case.
3         MR. BERTRAND:  Well, if -- if I might,
4    Your Honor, in our witness designation she was
5    designated on testifying about whether the business had
6    an ongoing viability or not.
7         THE COURT:  The objection will be
8    overruled.  I will allow her testify.
9         MR. BERTRAND:  Thank you very much.
10        A.  At this stage of the game, without an
11   significant infusion of capital, no.
12        Q.  **(BY MR. BERTRAND)  All right.  And how**
13   **much do you need in terms of immediate capital?**
14        A.  1.6 to 1.7 million.
15        Q.  **All right.  And is there any source that**
16   **you are available [sic]?**
17        A.  Not at this time.
18        Q.  **All right.  Now, you received -- or**
19   **strike that.**
20        **The company has received correspondence**
21   **from Silicon Valley Bank, correct?**
22        A.  Yes.
23        Q.  **All right.  And was that correspondence**
24   **received after the issuance of the injunction or**
25   **before?**

61 (Pages 241 to 244)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 65 of
110

245

1  A.  After.
2  Q.  Okay.  I would like to have you take a
3  look at a document, a couple of them.  In the -- there
4  are two binders.
5  A.  Okay.
6  Q.  And the binder that has the tabs with
7  the -- there's four A's in a row on it, so it starts
8  tab triple A.  And if you go to the tab that is
9  quadruple A --
10  A.  Four A's?
11  Q.  -- there's a letter dated -- yeah, four
12  A's -- there's a letter dated June 17, 2015.
13  A.  Yes.
14  Q.  All right.  Is that a letter that -- that
15  the company has received or the company's lawyers
16  received from counsel for Silicon Valley Bank?
17  A.  Yes.
18  Q.  And it's dated June 17, 2015, correct?
19  A.  Yes.
20  Q.  And that was after the issuance of the
21  injunction, correct?
22  A.  Yes.
23  Q.  All right.  And then were you asked to
24  provide periodic updates?
25  A.  Financial status, yes.

246

1  Q.  Okay.  All right.  And then there's a
2  reference in -- if you go to the second page of -- of
3  Exhibit -- of Document Number AAAA, the letter --
4  MR. RAMP:  Your Honor --
5  Q.  (BY MR. BERTRAND)  -- Item Number 7 on
6  the second page --
7  MR. RAMP:  Your Honor, I'm going to
8  object.  This is hearsay.
9  THE COURT:  That will be sustained.
10  Q.  (BY MR. BERTRAND)  All right.  Well, let
11  me move to Exhibit CCCC.  It's, again, a letter from
12  Silicon Valley Bank dated August 21, 2015.
13  MR. RAMP:  And again I'm going to object.
14  This letter is hearsay.
15  THE COURT:  That will be sustained.
16  Q.  (BY MR. BERTRAND)  Okay.  Did you receive
17  this letter from Silicon Valley Bank?
18  A.  Yes.
19  Q.  And what did you do in response to it?
20  A.  Let me just read specifically here.
21  MR. RAMP:  This -- this -- well, this
22  exhibit is hearsay.  I don't know that it's appropriate
23  for the witness to be reading from it.
24  THE COURT:  As long as she doesn't -- she
25  can tell what the exhibit is, but whether or not she

247

1  reads from the content, we come to your objection.  I
2  mean, if she can identify it, if she can't identify it.
3  And then if there's a question about the content of it,
4  then you can raise your objection as to hearsay.
5  Q.  (BY MR. BERTRAND)  The pending question
6  has to do -- what, if anything, did you do in response
7  to this?
8  A.  I sent the requested cash flow document
9  that was required by September 3.
10  Q.  Okay.  Did the receipt of this letter
11  dated August 21, 2015, did that raise a concern for you
12  as the VP of finance?
13  A.  Yes.
14  Q.  Okay.  Can you tell the Court why?
15  A.  Shortly after this letter was submitted
16  to the company, we were informed that they were going
17  to be turning our account over to the senior director
18  of distressed assets, Mr. Brian Bell.
19  Q.  Okay.
20  MR. RAMP:  Your Honor, I'm going to
21  object.  That's hearsay.
22  THE COURT:  That is hearsay.  It will be
23  stricken.
24  Q.  (BY MR. BERTRAND)  And when you received
25  the letter dated June 17, 2015, what effect, if any,

248

1  did it have on your state of mind about your
2  relationship with the -- with Silicon Valley Bank?
3  A.  Well, it's a concern anytime the bank's
4  involved.
5  Q.  Okay.
6  A.  I mean, they -- you know, they have very
7  strict requirements.  They were receiving all of our
8  monthly and quarterly financials.  They were very well
9  aware how quickly the debt was amassing.
10  Q.  Okay.  Very good.  Now, you were -- you
11  were outside of the courtroom after a hearing in
12  California where Ross Sullivan was present, correct?
13  A.  That's correct.
14  Q.  All right.  And -- and there was a
15  conversation about the financial difficulties facing
16  the company, correct?
17  A.  Yes.
18  Q.  All right.  And what was Mr. Sullivan's
19  proposed solution?
20  MR. RAMP:  Your Honor, I'm going to
21  object.  That's hearsay.
22  THE COURT:  The objection will be
23  sustained.
24  MR. BERTRAND:  All right.
25  Q.  (BY MR. BERTRAND)  Did -- has -- did

249

1     **Mr. Sullivan offer to -- strike that.**
2         **I would note that Mr. Sullivan is going**
3 **to be testifying here.**
4        THE COURT: You can ask him.
5        MR. BERTRAND: Okay. All right. Very
6 good.
7     **Q. (BY MR. BERTRAND) All right. Now, going**
8 **back to the operations of the business, you've**
9 **indicated that you don't have a ready source to cover**
10 **the one-point-six-to-seven million dollars you need**
11 **immediately to keep the business operating, correct?**
12     A. That's correct.
13     **Q. And looking at a long-term prospect, you**
14 **know, getting past this immediate**
15 **one-point-six-or-seven million dollars, does the**
16 **business have the ability to continue to sustain**
17 **itself?**
18     A. No.
19     **Q. Okay. And can you explain to the Court**
20 **why that is.**
21     A. Well, I mean, a couple of reasons. One,
22 without a significant infusion of cash, we are not
23 going to be over all this debt. But on top of that,
24 the growth that we are seeking to be able to pay off
25 the long-term debt, which makes the business viable

250

1 requires more capital -- capital investments.
2         I mean, the wine industry is very
3 capital-intensive. And it's -- you need patient
4 capital. And by that, I mean when you produce vintage
5 one, that working capital is tied up for three years
6 until you sell it. So for three years, as you are
7 building a business, you've got three years' worth of
8 expenses parked, parked, parked, parked, until you can
9 finally take that to market.
10         And so the turnaround there, it's -- it's
11 not a quick one. And a lot of cash goes in and a lot
12 of cash has to stay there until you start to sell. And
13 when you are selling and growing, you know, it's -- you
14 only have enough cash to come in to me what your
15 original baseline was. And then as soon as you start
16 growing again, you need another capital infusion. And
17 the only way the capital stops is when you finally
18 plateau at the point at which you are trying to take
19 the business to whatever that level is.
20        MR. RAMP: Your Honor, at the risk of
21 beating a dead horse, I'm going to make the same
22 objection. This is expert testimony --
23        THE COURT: I think we've gone beyond the
24 effect of the immediate injunction. I understand what
25 the financial officer is dealing with there, but when

251

1 we start talking about two, three years down the road,
2 we are getting into operation of the vineyard that I
3 think goes beyond any decision this Court has to make.
4        MR. BERTRAND: Okay. Very well. I think
5 that it is relevant to the decision, Your Honor. And
6 the inability to have cash right now prevents --
7        THE COURT: I hear that. I understand
8 that.
9        MR. BERTRAND: Okay. Very good.
10     **Q. (BY MR. BERTRAND) Now, the Sullivan**
11 **family operated the winery, correct?**
12     A. Yes.
13     **Q. And based on the books and records of the**
14 **of the winery when Ross Sullivan was involved in the**
15 **operation of the winery, what was it -- was it making a**
16 **profit or was it losing money on an annual basis?**
17     A. It was consistently losing somewhere
18 between a half a million and 600 thousand a year.
19     **Q. So every -- year after year after year**
20 **under Ross Sullivan's management the winery was losing**
21 **money?**
22     A. Can I just clarify?
23        MR. RAMP: Objection, it's leading. And,
24 two, I'm not sure it's relevant.
25        THE COURT: I don't think it's relevant.

252

1 It will be sustained.
2        MR. BERTRAND: Okay. Very good, Your
3 Honor.
4     **Q. (BY MR. BERTRAND) Okay. Now, with**
5 **respect to the winery and its -- its creditors, has the**
6 **Sullivan family come forward with any money whatsoever**
7 **to assist?**
8     A. Not at this time. It was offered, but it
9 was never provided.
10     **Q. Okay. And offered, for example, Kelly**
11 **Sullivan saying she was going to put in 90,000?**
12     A. And Ross telling Angelica and myself that
13 he was going to put in 300, him and the family,
14 collectively the family.
15     **Q. That was a promise that was made -- can**
16 **you tell the Court when?**
17        MR. RAMP: Objection, leading.
18        THE COURT: You have been leading.
19        MR. BERTRAND: Okay. I was just asking
20 for when. It's not a yes -- it's just when.
21        THE COURT: Yeah, this question was okay.
22 It was the two preceding --
23        MR. BERTRAND: I apologize, Your Honor.
24        THE COURT: No problem. I understand.
25     A. I don't remember the exact date. It was

63 (Pages 249 to 252)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 67 of 110

253

1  shortly after we lost the financing with Silicon Valley
2  Bank when I knew I was going to be in trouble. So
3  somewhere within a few weeks of that.
4     Q. (BY MR. BERTRAND) Okay. So that would
5  have been somewhere in the June time period?
6     A. That's my recollection.
7     Q. All right. Okay. And so as you sit here
8  today, knowing the financial condition of the winery as
9  you do, does it have the ability to continue paying
10 payroll?
11    A. You know, it's the Catch-22. It's what I
12 choose to do with the funds. But I mean, there is so
13 much debt right now that, as a finance person, I'm
14 not -- I'm kind of at that point where I can't in good
15 faith continue to add more debt to that, knowing I
16 can't meet my obligations.
17    Q. Now, there's been an offer to purchase
18 the winery for $18 million?
19    A. I've been told that. I haven't seen
20 anything.
21    MR. RAMP: Objection, leading, and
22 there's a lack of foundation.
23    THE COURT: It is leading. It's also
24 hearsay. And there is a lack of foundation. So it
25 will be sustained.

254

1     Q. (BY MR. BERTRAND) All right. If there
2  were an offer to purchase the winery for $18 million,
3  would that give the winery the ability to pay off its
4  creditors in full, pay its employees and its suppliers?
5     A. Yes.
6     Q. And would there be money left over to pay
7  money to the shareholders and the partners?
8     A. Yes.
9     Q. Okay. Do you know how much would be left
10 over? Do you have an estimate?
11    A. If the entire debt total is 16 and a half
12 and a realistic price is 18 million, there would be a
13 million and a half after everything was said and done.
14    Q. Okay. All right. And then if -- if the
15 company is unable to proceed with the sale --
16    A. Right.
17    Q. -- what would your recommendation to
18 management be to do?
19    MR. RAMP: Objection --
20    THE COURT: That will be sustained.
21    Q. (BY MR. BERTRAND) In the absence of
22 having the ability to come up with funds to pay your
23 current operating expenses, how long do you believe
24 that the business can stay in existence?
25    A. We are planning to close the doors.

255

1     Q. Okay. And how imminent would that be?
2     A. A couple weeks, end of this month.
3     MR. BERTRAND: Okay. Very good. Nothing
4  further, Your Honor.
5     THE COURT: Thank you.
6  Cross-examination.
7     CROSS-EXAMINATION
8  BY MR. RAMP:
9     Q. Good afternoon, Ms. Sullivan.
10    A. Good afternoon.
11    Q. Who is paying for your travel and stay in
12 Colorado today?
13    A. The company. Steve. Steve.
14    Q. Mr. Finn?
15    A. Yeah.
16    Q. And you prepared for today's hearing with
17 Mr. Finn's attorneys, correct?
18    A. Yes.
19    Q. Who hired you to be the vice president of
20 finance and operations of Sullivan Vineyards
21 Corporation?
22    A. Stephen.
23    Q. Okay. And you said you've been at
24 Sullivan Vineyards for less than a year, right?
25    A. That's correct.

256

1     Q. Since about January of 2015?
2     A. Yeah, late January.
3     Q. Okay. And when you were hired, did they
4  inform you that the company was in financial trouble?
5     A. Yes.
6     Q. And when did you -- so you knew when you
7  took this job that the company was in financial
8  trouble?
9     A. I knew it was in a turnaround situation,
10 being backed by a man with a lot of capital. And I was
11 even told in the interview I would never have to be in
12 a position to worry about money.
13    Q. Because why?
14    A. Because Steve -- because of Steve's
15 involvement.
16    Q. So you guys would never have to worry
17 about money because of Mr. Finn?
18    A. Uh-huh.
19    Q. Has Mr. Finn said anything to you about
20 making sure that you will be okay in these -- no matter
21 what happens with the vineyard?
22    A. It only came up -- and this was shortly
23 after my employment -- and I don't know Mr. Finn very
24 well, and I certainly don't know his relationship with
25 his wife, but it was made clear to me that there was

64 (Pages 253 to 256)

257

1 some risk. And Steve put in place what, truth be told,
2 is a very standard industry contract. And in most
3 positions, if you were to go into a turnaround
4 situation, that would be right up front with your offer
5 letter.
6     **Q. Have you been told that you will be taken**
7 **care of in this action, made sure you are okay?**
8     A. I don't -- I'm not really sure I
9 understand what you are asking me.
10     **Q. Well, if you are owed money, has Mr. Finn**
11 **told you that he'll pay it?**
12     A. Has he told me that he's personally going
13 to pay it?
14     **Q. Personally or otherwise.**
15     A. I have an employment contract with the
16 company. That's it.
17     **Q. Okay. So nobody's ever told you that Mr.**
18 **Finn would take care of you?**
19     A. No.
20     **Q. When did you first learn of the marital**
21 **difficulties between the parties?**
22     A. It was late. I mean, honestly, I don't
23 have that relationship with him, so I was removed from
24 that.
25     **Q. When did you first hear it, not just from**

258

1 **him?**
2     MR. BERTRAND: Objection, relevance.
3     A. When she filed for divorce.
4     **Q. (BY MR. RAMP) When she filed for**
5 **divorce?**
6     THE COURT: One moment. Objection will
7 be overruled.
8     **Q. (BY MR. RAMP) So you had no idea there**
9 **was any marital difficulties until May of 2015?**
10     A. For the most part. I mean, there were
11 rumors, but I don't -- you know, I don't really listen
12 to all that.
13     **Q. So rumors before May of 2015?**
14     A. Just a little bit, but not a lot. Like I
15 said, I don't have that relationship with Mr. Finn.
16 The conversations go between Mr. Finn and Angelica de
17 Vere.
18     **Q. I'm going to ask you to turn to Exhibit**
19 **20 in the small notebook in front of you. This is your**
20 **employment agreement with Sullivan Vineyards**
21 **Corporation, correct?**
22     A. Yes.
23     **Q. And it's dated 4/13/2015?**
24     A. Yes, that's correct.
25     **Q. Okay. And if you turn to the last page**

259

1 of the exhibit.
2     MR. BERTRAND: I'm going to object, Your
3 Honor. There is no relevance to her employment
4 agreement.
5     THE COURT: Well, I guess we'll find out
6 whether there is or not. Overruled at this point.
7     MR. BERTRAND: Very good. I'm just
8 concerned in terms of timing, getting this done today.
9     THE COURT: I understand.
10     **Q. (BY MR. RAMP) And on the last page this**
11 **is signed by only you and Mr. Finn, correct?**
12     A. That's correct.
13     MR. RAMP: I'm going to move for the
14 admission of Exhibit 20.
15     THE COURT: Objection?
16     MR. BERTRAND: I don't think it's
17 relevant to anything.
18     THE COURT: Thank you. It will be
19 admitted.
20     (Exhibit 20 was admitted.)
21     **Q. (BY MR. RAMP) All right. So up at the**
22 **top of the page in Recitals A, the second sentence,**
23 **"The company currently employs employee as vice**
24 **president, finance and operations, a position employee**
25 **has held since January 21, 2015. The company further**

260

1 acknowledges that employee has successfully expanded
2 the company's business, sales, and reputation,"
3 correct?
4     A. Yeah, that's what it says.
5     **Q. So you had been there for two months,**
6 **two, three months?**
7     A. Yeah.
8     **Q. And they were giving you an employment**
9 **contract that acknowledges that you've successfully**
10 **expanded the company's business, sales, and reputation,**
11 **correct?**
12     A. That's correct.
13     **Q. And did you have an agreement before this**
14 **one for the first couple of months?**
15     A. I had my standard offer letter.
16     **Q. Okay. And this -- is your base salary**
17 **higher in this contract versus your offer letter?**
18     A. No.
19     **Q. Okay. So it's the same salary?**
20     A. It's less.
21     **Q. Okay. So there was a decrease in your**
22 **salary?**
23     A. This one does not provide a provision
24 for -- wait. I want to make sure I'm thinking about
25 the same thing.

65 (Pages 257 to 260)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 69 of 110

261

1    Q.  Well, for example, down on the bottom of
2 page 1, base salary --
3         MR. BERTRAND:  May she be allowed to
4 answer the question?
5    A.  Yes.  This is -- this is the same as
6 my -- this is the same as the fundamentals that were in
7 my offer letter; that's correct.
8    Q.  (BY MR. RAMP)  Okay.
9         THE COURT:  I believe she just answered
10 the question.  Thank you.
11    Q.  (BY MR. RAMP)  And the contract also
12 provides you are eligible for a performance bonus,
13 correct?
14    A.  Yes.
15    Q.  And have you received a performance
16 bonus?
17    A.  No, I have not received a performance
18 bonus.
19    Q.  Did you receive any bonus?
20    A.  Zero.
21    Q.  Okay.  In the big book, Volume II --
22    A.  Is that the one with the three and four
23 letters?
24    Q.  Yeah.
25    A.  Okay.

262

1    Q.  And it's -- all right.  So in terms of
2 all these exhibits that Mr. Finn has brought to trial
3 today, the most recent P&L that we have is May of 2015.
4 I'm going to ask you to turn to Exhibit DDDDDD.  It's
5 at the very end of the --
6    A.  Six Ds.  I don't have a P&L behind six
7 Ds.  I have an agreement regarding 575 Circle Drive.
8         MR. RAMP:  Can I approach, Your Honor?
9         THE COURT:  Yes, you may.
10        MR. FOX:  I was just complaining to
11 Mr. Ramp that numbers are much easier than letters.
12        THE COURT:  They are.  Generally what I
13 suggest is that you go from -- petitioner go from 1 to
14 100 and then you go from 101 to 200 and alternate that
15 way so that we stay away from --
16        MR. FOX:  Nice suggestion, Your Honor.
17        THE COURT:  It's too late.
18        MR. RAMP:  It wouldn't have helped with
19 the 139 exhibits that Mr. Fox brought.
20    Q.  (BY MR. RAMP)  All right.  So, Ms.
21 Sullivan, we are on Exhibit DDDDDD.
22    A.  Okay.
23    Q.  This is the May P&L?
24    A.  Yes.
25    Q.  May of 2015.  This shows for the month of

263

1 May a total income, up at the top of page 1, of
2 $542,000?
3    A.  Yes.
4    Q.  And after cost of goods sold, gross
5 profit for the month of May of 348,000, correct?
6    A.  Yes, that's correct.
7    Q.  Okay.  And over on page 3, after
8 expenses, this P&L shows for the one month of May 2015
9 net income of $162,000; is that correct?
10    A.  Yes, that's correct.
11    Q.  And you testified on direct that your
12 opinion of cash flow projections -- essentially,
13 there's no long-term viability to this company; is that
14 correct?
15    A.  That's correct.
16    Q.  Okay.  But your cash flow projections
17 didn't always show that.  As recently as July of 2015,
18 you ran a cash flow projection that showed cash each
19 month through the end of 12/31/2015, correct?
20        MR. BERTRAND:  Objection, argumentative.
21        THE COURT:  Overruled.
22    A.  What's the date on that?  Can I see it?
23        MR. RAMP:  Your Honor, can I approach and
24 distribute copies?
25        THE COURT:  Yes.

264

1    Q.  (BY MR. RAMP)  Handing you what's been
2 marked as Petition's Exhibit 21.
3    A.  What's the date on this?  I can't even
4 read my own writing.  Well, there's several items of
5 debt that have not -- are not on here yet because they
6 weren't effective debt as of July.
7    Q.  Well, let's take a look at this.  This is
8 dated -- a cash flow projection -- 7/8/2015, correct?
9    A.  Yes.
10    Q.  Up at the top?
11    A.  Yeah.  It's just very small.
12    Q.  And you prepared this, right?
13    A.  Yes.
14    Q.  And it looks like -- so the first entry,
15 you have available cash of about $163,000, according to
16 this statement, correct?
17    A.  That's unavailable cash.  That's revenue.
18    Q.  Okay.  So the line that says Available
19 Cash?
20    A.  The line that says Available Cash would
21 be balance, which would be 44,000.
22    Q.  Okay.  I was referring to the line
23 itself.  So apparently Available Cash doesn't mean
24 available cash?
25    A.  It means cash coming into the business

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 70 of
110

**265**

1 available for use. That's not the same as net cash.

2     Q. Okay. So for identification purposes,

3 the line that says Available Cash --

4     A. Yes.

5     Q. -- the line next to that is 163,000?

6     A. Yes.

7     Q. And then if we go down to the bottom, the

8 balance is 44,000, correct?

9     A. That's correct.

10     Q. And you think the balance is the

11 important number for us to look at?

12     A. The balance is important, but even more

13 important is the line item below the title of the

14 document which says, "Assumes no AP."

15     Q. Uh-huh, until October 1.

16     A. That means I'm not paying any of the debt

17 that's on my books. This is my survival cash plan to

18 cover the covenants with the bank.

19     Q. And so your survival cash plan has you

20 ending on 12/31 with a balance of $212,247, right?

21     A. Yes, in this particular model. Yes.

22       MR. RAMP: I'm going to move for the

23 admission of Exhibit -- Petitioner's Exhibit 21.

24       THE COURT: Objection?

25       MR. BERTRAND: No objection.

**266**

1       THE COURT: Thank you. It will be

2 admitted.

3       (Exhibit 21 was admitted.)

4     Q. (BY MR. RAMP) And this cash flow

5 projection on Petitioner's Exhibit 21, this is after

6 paying the Beckstoffer payment that we've heard so much

7 about, correct?

8     A. Which one? Are we still on the same

9 document?

10     Q. Yeah, Exhibit 21. Over in the left-hand

11 column there is an entry for Beckstoffer payment --

12     A. Yeah. That's, based on this, assuming

13 everything goes as planned, meaning all the wine still

14 sold, orders come in, the club drops the way it was

15 supposed to.

16     Q. Right. It's a cash flow projection.

17     A. I was targeting to pay Beckstoffer in

18 November, this coming November.

19     Q. So ending the year with $212,000 and

20 satisfying the Beckstoffer payment, correct?

21     A. Yes.

22       MR. RAMP: Okay. I have nothing further

23 for Ms. Sullivan.

24       THE COURT: Thank you. Redirect.

25       MR. BERTRAND: Yes, Your Honor.

**267**

1

2       * * * * *

3       REDIRECT EXAMINATION

4 BY MR. BERTRAND:

5     Q. Very briefly, Ms. Sullivan, the cash flow

6 model that is Exhibit -- is Petitioner's Exhibit 21,

7 that was done in July, correct?

8     A. Yes.

9     Q. All right. Subsequent to July, did you

10 discover -- strike that.

11       Subsequent to this cash flow model, did

12 you discover other liabilities, short-term liabilities,

13 that had not been accounted for?

14     A. There were packaging materials, that we

15 would have been gearing up for the August bottling, but

16 there was also a short-term note that had been

17 misclassified into long-term debt of 490,000. So

18 that's not in this.

19     Q. So there was a $500,000, roughly --

20     A. Yes.

21     Q. -- obligation that was not reflected?

22 And that note was due in what month?

23     A. That was due March 31, 2015.

24     Q. Okay. And does that have PTO for

25 employees?

**268**

1     A. This?

2     Q. Yes.

3     A. No.

4     Q. Okay. So it doesn't deal with any kind

5 of a cost associated with termination of employees?

6     A. No, it does not.

7     Q. All right. Does this cash flow

8 projection, based upon your discovery of the

9 approximate $500,000 short-term liability and the other

10 obligations you are aware of, do you still project that

11 as of December that there would be $200,000 available?

12     A. No, we'd -- we'd be negative.

13     Q. Okay. And do you have an estimate as to

14 how far negative you would be?

15     A. Using this or all debt?

16     Q. Using all debt.

17     A. All debt would be million dollars

18 negative.

19     Q. A million dollars negative.

20       MR. BERTRAND: Okay. Nothing further.

21       THE COURT: Anything further?

22       MR. RAMP: Very briefly.

23       RECROSS-EXAMINATION

24 BY MR. RAMP:

25     Q. You just referenced a misclassified

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 71 of 110

269

```
1     liability, correct?
2         A.  Yes.
3         Q.  Okay.  And it was in the amount of almost
4     a half a million dollars, right?
5         A.  490,000.
6         Q.  And it was classified as long-term debt,
7     correct?
8         A.  Yes.
9         Q.  Okay.  And that debt was to Stephen Finn,
10    correct?
11        A.  It was provided to the company to finance
12    the Beckstoffer wine.
13        Q.  That's not my question.  The loan is from
14    Stephen Finn, correct?
15        A.  That's correct.
16        Q.  Okay.  And moving it to short-term
17    liabilities has the effect of creating a more emergency
18    situation, a more dire short-term financial situation,
19    correct?
20        MR. BERTRAND:  Objection, argumentative.
21        THE COURT:  That will be overruled.
22        THE WITNESS:  I answer that, right?
23        THE COURT:  Go ahead.
24        A.  It would be my obligation to state all
25    debt, regardless of who -- who the obligation is owed
```

270

```
1     to.
2         Q.  (BY MR. RAMP)  That's not my question.
3     My question is moving it from a long-term debt to a
4     short-term debt, it makes it more of an emergency
5     financial situation to deal with right now, correct?
6         A.  700,000 is still an emergency situation,
7     with or without that note.
8         Q.  Okay.  So my question to you is moving it
9     from a long-term debt to a short-term debt means that's
10    a debt we have to deal with right now, correct?
11        A.  It has to be acknowledged to be dealt
12    with right now, that's correct.
13        MR. RAMP:  I have nothing further.
14        MR. BERTRAND:  Very briefly, Your Honor.
15        THE COURT:  Wait a minute.  You can't.
16    You are finished.  No surrebuttal.
17        MR. BERTRAND:  Okay.  We're good.  Thank
18    you.
19        THE COURT:  You may step down.
20        MR. LASS:  Your Honor, could we have two
21    minutes, private?
22        THE COURT:  Sure.
23        MR. FOX:  Your Honor, do you mind if Ms.
24    Sullivan remains in the courtroom?
25        THE COURT:  That's fine with me as long
```

271

```
1     as counsel has no objection.
2         MR. LASS:  Our client objects to Ms.
3     Sullivan staying and listening.  That's up to the Court
4     to decide.
5         THE COURT:  We'll have you step out.
6         (Pause in the proceedings.)
7             ANGELICA DE VERE,
8     having been first duly sworn to state the whole truth,
9     was examined and testified as follows.
10        THE COURT:  Would you please state your
11    name for the record, please.
12        THE WITNESS:  Angelica de Vere.
13            DIRECT EXAMINATION
14    BY MR. BERTRAND:
15        Q.  Good afternoon, Ms. de Vere.  Can you
16    advise the Court of your title and your position at the
17    Sullivan Vineyards Corporation?
18        A.  I'm the chief executive officer at
19    Sullivan Vineyards and the president of the board.
20        Q.  And when did you start?
21        A.  May 1, 2013.
22        Q.  All right.  And can you describe for the
23    Court your duties as the CEO.
24        A.  I oversee all aspects of the business,
25    production, finance, sales, and marketing.  And I have
```

272

```
1     ultimately responsibility for strategic vision and
2     execution of that vision.
3         Q.  All right.  And does that also require
4     that you be familiar with the financial condition of
5     the corporation?
6         A.  Yes, it does.
7         Q.  And the partnership?
8         A.  Yes, it does.
9         Q.  All right.  And are you familiar with the
10    financial condition of Sullivan Vineyards?
11        A.  Yes, I am.
12        Q.  All right.  Do you work with, for
13    example, the CFO, Mr. Thaxton, and the VP of finance,
14    Ms. Sullivan, in terms of going over the financial
15    performance of the company?
16        A.  Yes, I do.
17        Q.  All right.  Now, when you started in May
18    of 2013 -- I believe it was, right?
19        A.  That's correct.
20        Q.  -- can you tell the Court roughly what
21    the revenues were that were being generated by the
22    company?
23        A.  Top-line revenue at that time was right
24    around a million dollars.  There was a one-off sale of
25    distressed case goods that inflated that up to, I
```

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 72 of 110

**273**

think, about 1.4, but it wasn't repeatable. And prior
to that it had been around seven and eight hundred
thousand dollars consistently year over year.

    Q. Okay. And had the company been making
money or losing money?

    A. It was losing significant amounts of
money, about half a million dollars every year.

    Q. All right.

    A. Net income.

    Q. All right. And then since the time you
took over as CEO, what has -- has the revenue grown,
stayed the same, gone down?

    A. The revenue has tripled since I started.

    Q. All right. And can you describe to the
Court how you were able to triple the income?

    A. Well, there were a couple of very
specific ways. We introduced some new sales channels
that didn't exist before. We focused on e-commerce,
online sales. We focused on outboard sales, otherwise
known as telemarketing. Those have been very
successful for us. But most importantly, we
implemented a new directed trade strategy with one
wholesale-type partner that will move 7,000 cases for
us this year, which never existed prior, and 4,000
cases last year.

**274**

    Q. All right. And is that the sales through
WTSO?

    A. That's correct.

    Q. All right. And how much does that throw
to the -- to the revenue line?

    A. Well, it's about 50 percent margin, and
we will do 1.7 million this year.

    Q. Okay. Very good.

    A. Just rough figures.

    Q. Now, prior to your starting at Sullivan,
did you have prior experience in the beverage industry?

    A. Yes, I did.

    Q. Okay. Can you describe for the Court
what your experience was.

    A. I have 16 years in the wine industry. I
began with Constellation Wines US, which is the largest
wine company in the world, running ten brands, $28
million worth of business for them, Robert Mondavi,
Franciscan, very well-known brands. And then I was
recruited from there to go work for 1-800-Flowers
running their wine division as a general manager, which
is primarily focused on digital and online sales. And
then I was recruited directly from 1-800-Flowers to be
the CEO of Sullivan Vineyards.

    Q. Okay. And can you describe to the Court

**275**

what the current financial condition is of Sullivan
Vineyards winery?

    A. It is currently insolvent. We cannot
make our obligations, our debt obligations.

    MR. RAMP: Your Honor, I'm going to ask
that that be stricken. We are again getting into
expert testimony. For all of the reasons I've stated
over and over again, that makes this unfair and
prejudicial to Ms. Finn.

    THE COURT: Overruled. The answer will
stand.

    Q. (BY MR. BERTRAND) So when you say that
Sullivan Vineyards is insolvent, it's not paying its
debts as they come due?

    A. That's correct.

    Q. And can you describe to the Court what
the current financial condition is, for example, how
much you have in the way of accounts payable or that
are currently due?

    A. We have over a million dollars in
accounts payable. 70 percent of that is more than 60
days past due.

    Q. And how would you describe the
significance of being 60 days past due in this
particular industry in terms of the impact on Sullivan

**276**

Vineyards?

    MR. RAMP: Objection.

    THE COURT: That will be sustained. I
think you've gone far enough into the financial
background.

    MR. BERTRAND: Very good.

    Q. (BY MR. BERTRAND) All right. Now, there
was a cash flow projection that was created by Ms.
Teresa Sullivan at some point, correct?

    A. Yes.

    Q. And was there a misclassification of
obligations that were owed by the company?

    A. Yes, but not by Teresa Sullivan. That
was by the previous accountant that had . . .

    Q. Okay. And can you explain to the Court
what occurred. How is it that it was misclassified?

    A. I'm not totally clear about --

    THE COURT: I think this is duplicative
of the testimony we just heard, is that correct, from
Ms. Sullivan? Reaffirming what Ms. Sullivan just
testified to?

    MR. BERTRAND: Well, yes and no. There
was a -- the misclassification has to do with --
there -- there was an argument or an inference being
argued that somehow the misclassification was not

277

1    legitimate. And I'll just ask you --
2         THE COURT: For the purpose -- for that
3    limited purpose, I'll let you ask a question about
4    that.
5         MR. BERTRAND: All right. Very good.
6         THE COURT: Do you wish to be heard for
7    the record?
8         MR. RAMP: I do wish to be heard for the
9    record. There's been no foundation laid that Ms. de
10   Vere has knowledge of this, and I believe she just said
11   that she doesn't know exactly what happened. So I
12   don't think it's appropriate to get into this on that
13   basis.
14        THE COURT: Thank you.
15        You can ask the question.
16        MR. BERTRAND: Thank you.
17        Q.  (BY MR. BERTRAND) Okay. Are you
18   familiar with the note that was misclassified?
19        A.  Yes, I signed it.
20        Q.  And what was the due date of the note?
21        A.  March 31, 2015.
22        Q.  All right. And a note that had a due
23   date of March of 2015, would that typically be
24   classified as a long-term obligation or a short-term
25   obligation?

278

1         A.  Well, in this case, it was a short-term
2    obligation, but it was classified as a long-term
3    obligation. Is that what you're asking?
4         Q.  Yes. Thank you. Now, with respect to
5    the current operations of the business, do you have
6    sufficient funds to -- to enable you to continue
7    operating?
8         A.  No.
9         Q.  All right. And is the company currently
10   being required to incur obligations that it does not
11   have the ability to pay absent a sale?
12        A.  Yes, it is.
13        Q.  Okay. And can you describe for the Court
14   what those obligations are.
15        A.  Well, they're as simple as accruing PTO,
16   for example, with the employees. It's also purchasing
17   glass and bottling materials for the next bottling that
18   we would need to do in order to -- to continue with our
19   bulk program. The list is very long.
20        Q.  All right. And in the past, had the
21   company -- when it had short-term cash needs, would Mr.
22   Finn make loans to assist it in covering those cash
23   flow needs?
24        A.  Yes, he did.
25        Q.  All right. And you received a

279

1    correspondence from Silicon Valley Bank, correct?
2         A.  Yes, I did.
3         Q.  All right. In response to one of the
4    letters that you got from Silicon Valley Bank, were you
5    requested to provide cash flow analyses for the bank?
6         MR. RAMP: I'm going to object. That's
7    hearsay.
8         THE COURT: That will be sustained.
9         Q.  (BY MR. BERTRAND) Well, did you prepare
10   cash flow analyses for Silicon Valley Bank?
11        A.  Teresa did, yes.
12        Q.  All right. And what did those cash flow
13   analyses show?
14        A.  That --
15        MR. RAMP: Objection, that's hearsay.
16        MR. BERTRAND: No, it's not.
17        THE COURT: She didn't prepare it. You
18   asked her what it showed that Teresa had prepared; is
19   that correct?
20        MR. BERTRAND: Yes.
21        Q.  (BY MR. BERTRAND) You reviewed the cash
22   flow projections?
23        A.  Yes, I did.
24        Q.  And you approved them, as the CEO?
25        A.  Correct.

280

1         THE COURT: That's okay.
2         Q.  (BY MR. BERTRAND) Part of your ordinary
3    job duties, right?
4         A.  Yes, I would always review them.
5         Q.  Okay. And what did they show?
6         A.  They showed that we would be in a
7    cash-negative position --
8         MR. LASS: That's hearsay. Ask that it
9    be stricken.
10        Q.  (BY MR. BERTRAND) All right. Thank you.
11        MR. RAMP: Your Honor, that's hearsay.
12   She's testifying as to the contents of a document
13   that's not here before us.
14        THE COURT: I don't know if you saw, but
15   I almost objected.
16        MR. BERTRAND: I would -- I would also
17   note for the record that all morning long we heard
18   Ms. Finn testify as to all kinds of documents that have
19   never been produced and --
20        THE COURT: And Mr. Finn, also, yeah. We
21   try to give equal leeway. And I think this is all
22   duplicative. It is sustained.
23        MR. RAMP: Your Honor, I do have to ask
24   that that be stricken from the record.
25        THE COURT: It will be stricken. Last

281

1　answer will be stricken.
2　　Q. (BY MR. BERTRAND) Okay. So if -- strike
3　that.
4　　　　Have you thought about what you would
5　recommend the company do if it's unable to complete a
6　sale?
7　　THE MR. RAMP: Your Honor, I'm going to
8　object to that question.
9　　THE COURT: That will be overruled.
10　　You can answer.
11　　A. Yes, I've thought about it.
12　　Q. (BY MR. BERTRAND) And what would your
13　recommendation to the board of directors be?
14　　A. Without an infusion of long-term
15　capital -- or an infusion of capital or long-term
16　patient capital, I believe that our only answer is to
17　sell the asset at this point.
18　　Q. All right. And you were at -- you
19　attended a board meeting where the issue as to whether
20　or not the company should entertain offers --
21　　A. Yes.
22　　Q. -- occurred, correct?
23　　A. Yes, I did.
24　　Q. All right. And you voted in favor of
25　entertaining offers for the sale of the business?

282

1　　A. I voted in favor of the consideration of
2　an offer, yes.
3　　Q. All right. Okay. And can you explain to
4　the Court why you -- why you voted in favor of that.
5　　THE WITNESS: I'm trying not to answer
6　too fast.
7　　THE COURT: You're doing just fine.
8　　A. So -- I'm sorry. Can you repeat the
9　question?
10　　Q. (BY MR. BERTRAND) Yes. Can you explain
11　to the Court why you voted in favor of considering a
12　sale of the business.
13　　A. I voted in favor because I do not see any
14　other option for us in the absence of the two things
15　that I previously mentioned, which are not forthcoming
16　at this time. And I do not see how it would be
17　possible to secure commercial lending given our current
18　relationship with our bank. And I don't see any
19　capital being put into the business, despite promises
20　that have been made along the way.
21　　Q. And have you been present when promises
22　have been made by the Sullivan family to put money into
23　the business?
24　　A. Yes, I have.
25　　Q. Okay. Can you describe to the Court what

283

1　occurred in those discussions.
2　　MR. RAMP: Your Honor, I'm going to
3　object. I think it calls for hearsay.
4　　THE COURT: If you would delineate to the
5　petitioner wife, I think that is not hearsay --
6　　MR. BERTRAND: Yeah, sure.
7　　THE COURT: -- but as to others, it would
8　be hearsay.
9　　MR. BERTRAND: Okay. Very good.
10　　Q. (BY MR. BERTRAND) With respect to Mrs.
11　Finn, have you been present when there were discussions
12　involving her committing to put money into the
13　business?
14　　A. Yes, twice.
15　　Q. Okay. And did that occur in court?
16　　A. Yes.
17　　Q. All right. And can you tell the Court
18　what you recall Ms. Finn saying in that regard.
19　　A. I remember Mrs. Finn's attorney, Mr.
20　Koss, suggesting that she was offering to put $90,000
21　in the first time, and it was a very similar
22　conversation the second time.
23　　Q. Okay. And do you recall whether Ms.
24　Sullivan confirmed that?
25　　A. Yes, she did.

284

1　　Q. Okay. All right. Very good.
2　　MR. BERTRAND: I have nothing further at
3　this time, Your Honor.
4　　THE COURT: Thank you.
5　Cross-examination.
6　　　　CROSS-EXAMINATION
7　BY MR. RAMP:
8　　Q. Good afternoon, Ms. de Vere.
9　　A. Good afternoon.
10　　Q. Who's paying for your travel and stay in
11　Colorado?
12　　A. Mr. Finn.
13　　Q. And you prepared for today's hearing with
14　Mr. Finn's attorneys, correct?
15　　A. That's correct, and the corporate
16　attorneys.
17　　Q. The corporate attorneys who are also
18　representing Mr. Finn personally in this divorce,
19　correct?
20　　A. Yes.
21　　Q. Mr. Bertrand and Mr. Rose?
22　　A. Correct.
23　　Q. Who hired you to be the president and CEO
24　of Sullivan Vineyards?
25　　A. Stephen Finn.

285

1    Q.  When did you first learn of the marital
2  difficulties between the parties?
3         MR. BERTRAND:  Objection, relevance.
4         THE COURT:  That will be overruled.
5    Q.  (BY MR. RAMP)  You can answer.
6    A.  I -- I would say that I became aware that
7  there were issues -- I certainly didn't understand how
8  complex they were -- in April of 2015.  It may have
9  been March, but I don't exactly remember.
10    Q.  March or April of 2015?
11    A.  Yes.
12    Q.  Can you please turn to Exhibit 19.  It's
13  in the small -- I think it's the one that's actually
14  stacked up.  You are in the wrong book.
15    A.  Oh.
16    Q.  That one right there (indicating).  This
17  is your -- I'm sorry.  Are you there?
18    A.  Yes, I'm there.
19    Q.  Okay.  Exhibit 19 is your employment
20  agreement with Sullivan Vineyards Corporation, correct?
21    A.  Yes, it is.
22    Q.  And it's dated April 1, 2015?
23    A.  Yes.
24    Q.  And if you turn to the last page of
25  Exhibit 19, this is signed by only you and Mr. Finn,

286

1  correct?
2    A.  That is correct.
3    Q.  Okay.  Let's go back to page 1.
4    A.  Okay.
5    Q.  Your base salary was increased from 200
6  to 235 thousand dollars in this contract, correct?
7    A.  Yes.
8    Q.  So that was about an 18 percent increase
9  in your salary earlier this year, right?
10    A.  Actually -- I'm sorry.  It was not
11  increased from 200.  It was increased from 210 to 235.
12    Q.  Okay.  I'm going to --
13    A.  My original contract -- my original offer
14  was for 200, but I had received a raise after the first
15  year that took me to 208 or 210 and then 235 in the
16  second year.
17    Q.  Was there any writing, any contract, in
18  which -- do you have a new employment agreement?
19    A.  No.
20    Q.  Okay.  So you just got --
21    A.  With the raise, you mean?
22    Q.  With the raise.
23    A.  No, huh-uh.
24    Q.  Okay.  Let's look at page 2, paragraph F,
25  Sale of the Company.

287

1    A.  Uh-huh.
2    Q.  This provides that you will receive 4.8
3  percent of the company's net proceeds in the event of a
4  sale, correct?
5    A.  That is correct.
6    Q.  And this is a new provision, right?
7    A.  That is a new provision.
8    Q.  So it wasn't in your old contract?
9    A.  No, it was not.
10    Q.  So you only got this, right, in April of
11  2015?
12    A.  Correct.
13    Q.  So you have a financial interest in
14  Sullivan Vineyards being sold?
15         MR. BERTRAND:  Objection, argumentative,
16  assumes facts not in evidence.
17         THE COURT:  That will be overruled.  She
18  may answer.
19    A.  Yes, by that definition, I do have a
20  financial interest.
21    Q.  (BY MR. RAMP)  And you voted to sell
22  Sullivan Vineyards, correct?
23    A.  I voted to consider a sale, yes.
24    Q.  Mr. Ross Sullivan objected to you voting
25  at the September 4 special board meeting based on your

288

1  self-interest in the sale of the company, correct?
2         MR. BERTRAND:  Objection, hearsay.  Also
3  assumes facts not in evidence.
4         THE COURT:  That will be overruled.
5         You may answer.
6    A.  He probably did.  He objects to most
7  things that I say in meetings.
8         THE COURT:  I'm glad we got to hear that.
9         THE WITNESS:  Had to be said.
10    Q.  (BY MR. RAMP)  Is it -- along those
11  lines -- you opened the door -- isn't it fair to say
12  that there's Team Steve and there's Team Kelly?
13    A.  I think it would be fair to say.
14    Q.  Okay.
15    A.  But I personally try not to take that
16  position.
17    Q.  Well, you are in litigation --
18    A.  Clearly.
19    Q.  -- with Ms. Finn?
20    A.  Yes.
21    Q.  So I -- you know, you might not try to
22  take that position, but there you are?
23    A.  Yes.
24    Q.  So on Team Kelly there's Kelly and her
25  brother Ross, correct?

72 (Pages 285 to 288)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 76 of
110

289

```
 1        A.  Yes.
 2        Q.  And then there is everybody else, right?
 3        A.  That's right.  On the side of the
 4   corporation, yes.
 5        Q.  So September 4 special board meeting you
 6   voted to sell the company, correct?  I'm sorry.  You --
 7        MR. BERTRAND:  Objection.
 8        Q.  (BY MR. RAMP)  -- voted to consider sale?
 9        THE COURT:  I hope that your re-forming
10   the question took care of that objection.
11        Q.  (BY MR. RAMP)  On September 4 you voted
12   to consider sale of the company and its assets?
13        A.  Yes, I did.
14        Q.  And that's what Mr. Finn wants as well,
15   right?
16        A.  Yes, I assume that's what he wants as
17   well.
18        Q.  I'm going to ask you to turn to Exhibit
19   DD.
20        A.  In a different book?
21        Q.  Yeah.  It's going to be in --
22        A.  Should I keep this one open?
23        Q.  No.  Thank you.  It's going to be in
24   Volume I of the big binder.
25        A.  Oh.
```

290

```
 1        Q.  Exhibit DD is a declaration of yours
 2   dated June 22, 2015?
 3        A.  Uh-huh.
 4        Q.  And it was submitted in support of one of
 5   the California lawsuits, correct?
 6        A.  That's correct.
 7        Q.  Okay.  And the declaration was prepared
 8   by Mr. Bertrand's and Mr. Rose's office, right?
 9        A.  Yes, I believe so.
10        Q.  You paint a bleak picture for Sullivan
11   Vineyards in this declaration, don't you?
12        A.  From a cash perspective, yes.
13        Q.  Okay.  And in paragraph 4 you state --
14   I'm sorry.  I'm in Exhibit DD.
15        MR. FOX:  Your Honor, I apologize.  I
16   don't mean to interrupt too much.  Exhibit DD was an
17   affidavit done in the Colorado proceeding.
18        MR. BERTRAND:  Right.
19        MR. RAMP:  Okay.
20        Q.  (BY MR. RAMP)  So this was a declaration
21   signed by you, but it was attached to a Colorado
22   pleading?
23        MR. FOX:  Yeah.  The motion to
24   reconsider.
25        MR. RAMP:  Yeah.
```

291

```
 1        Q.  (BY MR. RAMP)  Okay.  The motion to
 2   reconsider filed in Colorado.  There have been a lot of
 3   declarations.  I wasn't keeping them straight.
 4        A.  Okay.
 5        Q.  In paragraph 4 you state on June 22, "We
 6   have today in the bank 220,000.  We have outstanding
 7   debts in the amount of 536,000, which continue to grow
 8   as committed purchases of capital equipment and
 9   bottling supply payments come due."  Is that correct?
10        A.  That is correct.
11        Q.  And then let's just turn to the next
12   exhibit, EE.  Okay.  This is a declaration -- this
13   one's for the Napa County, California case, correct?
14        A.  Yes.
15        Q.  Okay.  And it's dated August 4, 2015?
16        A.  I'm sorry.  Which one?
17        Q.  So I'm on Exhibit EE, page 1.
18        A.  Okay.  I'm sorry.  I'm on the wrong page.
19        Q.  No, you are fine.  Exhibit EE.
20        A.  EE, yeah.
21        Q.  And so page 1 should say Superior Court
22   of the State of California, County of Napa.
23        A.  Yes, it does.
24        Q.  And over on the right-hand side, about
25   halfway down, Declaration of Angelica de Vere.
```

292

```
 1        A.  Yes.
 2        Q.  And it's dated August 4, 2015?
 3        A.  That's correct.
 4        Q.  And you filed this declaration in support
 5   of the California lawsuit, correct?
 6        A.  That is correct.
 7        Q.  Okay.  And this was also prepared by Mr.
 8   Bertrand's and Mr. Rose's office?
 9        A.  Yes, I believe so.
10        Q.  Okay.  All right.  So you paint the same
11   kind of bleak picture for Sullivan Vineyards in this
12   declaration, right?
13        A.  Yes.
14        Q.  Okay.  In paragraph 4 of this one,
15   though, you state, "We have today in the bank
16   approximately 320,000," right?
17        A.  Correct.
18        Q.  So between your June bleak picture and
19   your August bleak picture, the bank account balances
20   went up by $100,000, right?
21        MR. BERTRAND:  I'm going to object to the
22   question as argumentative.
23        THE COURT:  That will be overruled.
24        A.  Yes, that's correct.
25        Q.  (BY MR. RAMP)  Okay.  And it goes on to
```

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 77 of 110

293

1  state in paragraph 4, "We have outstanding debts in the
2  amount of approximately 446,000 which continues to grow
3  as committed purchases of capital equipment and
4  bottling supply payments come due," right?
5       A.  That's correct.
6       Q.  So from June to August your
7  declarations -- your bank account balances went up by
8  $100,000 and your debt went down by $90,000, correct?
9       A.  That's correct.
10      Q.  Let's look at Exhibit 10.  That's going
11 to be in the small exhibit notebook.  That's the one.
12 Are you there?
13      A.  Yes, I'm there.
14      Q.  Okay.  And this is a letter from you to
15 the shareholders dated April 10, 2015, correct?
16      A.  That's correct.
17      MR. RAMP:  Okay.  I'm going to move for
18 the admission of Exhibit 10.
19      THE COURT:  Any objection?
20      MR. BERTRAND:  No, Your Honor.
21      THE COURT:  Exhibit 10 will be admitted.
22      (Exhibit 10 was admitted.)
23      Q.  (BY MR. RAMP)  So I'm going to read --
24 why don't you follow along with me -- on page 1.
25 "Dear shareholders, as we complete the close of our

294

1  fiscal 2015 year and begin another chapter in the
2  history of Sullivan Vineyards, I would like to share an
3  overview of the past year's business as well as a
4  glimpse into the near future."
5       Paragraph 2, "Our fiscal year has been an
6  overwhelming success.  Sullivan Vineyards has achieved
7  unprecedented growth in revenue and net income, closing
8  our year at 200 percent to plan."  Right?
9       A.  Yes.
10      Q.  Okay.  And you show a total revenue that
11 year of $3.5 million, right?
12      A.  That's correct.
13      Q.  On the next page you go on to talk about
14 a few significant milestones for the winery?
15      A.  Yes.
16      Q.  So on the top of page 2 you talk about
17 you increased overall production in volume by 39
18 percent over the prior year?
19      A.  Right.
20      Q.  And improvements in the wine quality,
21 correct?
22      A.  Yes.
23      Q.  You write to the shareholders that you
24 increased the gross revenue by 40 percent, correct?
25      A.  Yes.

295

1       Q.  Okay.  And then it states that you
2  increased profit by 1,098 percent over the prior year,
3  correct?
4       A.  That is correct.
5       Q.  Okay.  Let's turn to page 4.  This is a
6  chart attached to your letter.  And it shows
7  everything's going up, right?
8       A.  There was really no other way to go.  We
9  were starting at a half-a-million-dollar loss, or near
10 there.  Obviously, these are approximations.  And when
11 we start talking -- I just want to point out that when
12 we start talking about increases of -- whatever it was,
13 a thousand --
14      Q.  Ninety-eight percent.
15      A.  -- ninety-eight percent, it's still
16 only -- you know, the budget was $15,000 of net income.
17 So we are not talking about significant amounts of cash
18 here.  We're just talking about a significant
19 improvement over previous years' performance.
20      Q.  So on page 4, my question is all of these
21 things are aiming up, right?
22      A.  Yes.
23      Q.  Okay.  And you are projecting revenue of
24 over $4 million in 2016, right?
25      A.  That's correct.

296

1       Q.  So your April 10 letter paints a pretty
2  positive picture --
3       A.  Absolutely.
4       Q.  -- of Sullivan Vineyards?  Okay.  And you
5  received a bonus in 2015, right?
6       A.  Yes, I did.
7       Q.  And you received your full bonus?
8       A.  Yes, I did.
9       Q.  Okay.  And do you know what other
10 employees at Sullivan Vineyards received bonuses?
11      A.  Sonyia Grabski, our VP of sales and
12 marketing, received her bonus.  Jenni Velasquez, who is
13 the operations manager, received hers.  Jeff Cole, who
14 is our wine -- assistant winemaker for Scott McLeod,
15 also received his bonus.
16      Q.  I'm sorry.  Jeff Cole and Scott McLeod
17 both --
18      A.  No, not --
19      Q.  -- received bonuses?
20      A.  -- Scott.  He works with Scott McLeod.
21 Scott McLeod is our winemaker.  But he's an assistant
22 winemaker to Scott McLeod.  He received his bonus.  I
23 believe Beth Matulich received a partial bonus because
24 she had just recently been promoted into her position,
25 so it was prorated.  And I -- I believe Trinity Scott

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 78 of 110

297

1 may have also received a partial bonus, but, again,
2 newly promoted into her position, and it would have
3 been a partial, not a full year's.
4      **Q. And, at least in your case from your --**
5 **your employment contract, your bonus is based on**
6 **essentially performance of the company? The company**
7 **performs well, you get a bonus, right?**
8      A. My bonus is based on achieving sales
9 plans that are approved at the beginning of the year
10 and presented in front of the board. If we achieve
11 those net income targets -- and it's generally net
12 income, but revenue is also taken into consideration
13 when weighing the bonus -- determines whether or not I
14 qualify for that bonus, and the same time for my staff.
15      **Q. And your employment agreement states that**
16 **the bonuses are determined by achievement of the**
17 **company's annual financial, guest, and employment**
18 **targets, right?**
19      A. Employment targets?
20      **Q. Well, let's look at it. Exhibit 19.**
21      A. Yes, thank you.
22      **Q. Page 2. Top of page 2.**
23      A. Yes, I see.
24      **Q. Paragraph B, Performance Bonuses. In**
25 **addition to your -- to the employee's base salary,**

298

1 **employee shall be eligible for a performance bonus of**
2 **35 percent of your base salary, determined by**
3 **achievement of the company's annual financial, guest,**
4 **and employment targets, correct? That's what it says?**
5      A. That is what it -- that's exactly what it
6 says. I don't -- I couldn't even tell you what an
7 employment target is. So as long as I have been
8 employed at Sullivan Vineyards, the goals have been
9 around revenue and net income. Visitor traffic
10 translates into revenue and net income, but we don't --
11 I'm not directly measured on that.
12      MR. RAMP: I have been notified I
13 apparently did not offer Exhibit 19 into evidence, so
14 I'd like to do that at this time.
15      THE COURT: Okay. Any objection?
16      MR. BERTRAND: No, Your Honor.
17      THE COURT: That will be admitted.
18      (Exhibit 19 was admitted.)
19      **Q. (BY MR. RAMP) You talked on direct exam**
20 **about things that the vineyard needs to acquire, debts**
21 **that are -- that are being incurred. One of the things**
22 **you talked about is new bottles and how you can't get**
23 **new bottles. You guys don't need new bottles until**
24 **February of 2016, correct?**
25      A. That's probably correct, but we are on

299

1 credit hold with them now as a result of our poor
2 payment history.
3      **Q. And you can pay cash or COD, correct?**
4      A. Of course, if we have cash, we could.
5      **Q. You testified on direct about -- and**
6 **we've heard it a couple of times -- about Ms. Finn**
7 **saying she was going to pay a certain amount for**
8 **Sullivan Vineyards Corporation, put a certain amount**
9 **into Sullivan Vineyards, correct?**
10      A. Specifically to cover the payment due to
11 Andy Beckstoffer for the $90,000 that's been past due
12 since May in order to avoid the possibility of a
13 growers lien.
14      **Q. Okay. So were you there when, I believe**
15 **it was Mr. Rose, said that he was going to prepare a**
16 **promissory note to cover that -- that amount of money**
17 **and get to it Ms. Finn?**
18      MR. BERTRAND: Objection, assumes facts
19 not in evidence.
20      THE COURT: That will be sustained.
21      **Q. (BY MR. RAMP) Has there been a**
22 **promissory note that's come across your desk that Ms.**
23 **Finn would sign when she gave the money?**
24      A. No.
25      **Q. Okay. The -- you talked about what the**

300

1 vineyard looked like when it was with the Sullivan
2 family. And you talked about much smaller revenues?
3      A. Yes.
4      **Q. It also had much smaller debts at that**
5 **time, didn't it?**
6      A. I can't speak to the level of debt before
7 I got there.
8      **Q. It was a smaller operation?**
9      A. It was a smaller operation.
10      **Q. And there's been a bunch of capital**
11 **improvements, a bunch of capital infused to make**
12 **Sullivan Vineyards much bigger under Mr. Finn's**
13 **ownership, correct?**
14      A. I don't know that I would use the word
15 "bigger" as much as I would classify it as more
16 profitable. The improvements that were made -- for
17 example, building a new tasting room to attract more
18 visitors to drive more revenue -- not necessarily to
19 drive more, but to drive better.
20      **Q. Was there a million-dollar roof put on**
21 **the place recently?**
22      A. On the residence, not on the winery.
23      **Q. Okay. But that's part of Sullivan**
24 **Vineyards Partnership, right?**
25      A. It is.

Case: 17-10065    Doc# 86 · Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 79 of 110

301

1    Q.   Okay.  And other things.  Was there a
2   security system, an elaborate security system, just
3   recently installed?
4    A.   I wouldn't say that it was elaborate, but
5   there was a -- there were video cameras installed, yes.
6    Q.   How much was that?
7    A.   About $8,000, all said and done.
8    Q.   Okay.
9        MR. RAMP:  I have nothing further.  Thank
10  you.
11       THE COURT:  Thank you.  Redirect.
12       MR. BERTRAND:  Yes.
13          REDIRECT EXAMINATION
14  BY MR. BERTRAND:
15   Q.   Ms. de Vere, just very briefly, you were
16  asked questions about a bonus that you were paid this
17  year.  Do you recall those questions and answers?
18   A.   Yes.
19   Q.   All right.  Were the benchmarks for you
20  to qualify for the bonus, were those set in April of
21  2015, when you were paid --
22   A.   No.
23   Q.   -- or were they set sometime prior to
24  that?
25   A.   The goals would have been set the prior

302

1   year, so 2014.  April 1 is the beginning of our fiscal
2   year, so they would have been assigned on April 1 of
3   2014, and agreed upon, and paid at the end of March of
4   2015 for that fiscal year.
5    Q.   So the bonus you got paid was pursuant to
6   an agreement that existed 12 months before?
7    A.   Oh, absolutely.
8    Q.   All right.  You were asked questions
9   about debt with respect to the winery.  Can you
10  describe whether there was deferred maintenance with
11  respect to the physical plant or the winery?
12   A.   So when I arrived in May of 2013 there
13  was quite a lot of construction that had already been
14  completed, particularly on the side of the residence.
15  So I won't be able to speak to the improvements there.
16  But I can certainly speak to the improvements that were
17  made on the winery side.  All of the production
18  equipment was incredibly outdated and nonperforming.
19  Scott McLeod, who is our consulting winemaker,
20  suggested that we would never make wine that would --
21       MR. RAMP:  Objection, hearsay.
22       THE COURT:  That will be sustained.
23   Q.   (BY MR. BERTRAND)  Okay.  Did you
24  determine, as the CEO, that there were certain capital
25  improvements that were necessary?

303

1    A.   Absolutely.
2    Q.   All right.  And so is that part of the
3   debt load that the company has is to pay for capital
4   improvements?
5    A.   Yes.  In every other position I've ever
6   had with any other corporation, it is part of the
7   planning process that you sit down and you go through
8   and plan what your capex is going to be for that
9   upcoming year.  And then you prioritize the things that
10  must be done and things that it would be nice to be
11  able to do, and then you determine what you can do
12  based on the amount of cash you have, or where it's
13  most needed.  So that, for us, is a normal practice
14  that we do every single year as part of our budgeting
15  process.
16   Q.   So, for example, were tanks replaced?
17   A.   Yes.
18   Q.   And --
19   A.   And barrels.
20   Q.   Go ahead.
21   A.   And barrels.
22   Q.   And barrels.  Okay.  And that would be
23  kind of a normal operating --
24   A.   Absolutely.
25   Q.   -- expense?

304

1    A.   Uh-huh.
2    Q.   Okay.  They weren't gold-plated or
3   anything?
4    A.   No.  They were French, but they were not
5   gold-plated.
6    Q.   Okay.  All right.  Now, you were asked
7   some questions about a letter that was sent to the
8   shareholders.  I believe it was Exhibit 10.  Were the
9   statements contained in the letter accurate?
10   A.   At that time they were accurate, yes.
11   Q.   Okay.  All right.  And with respect to
12  your prior declarations -- you were asked some
13  questions about what your prior declarations said.
14  Were you aware of the misclassified promissory note
15  when you were describing the amounts that were
16  obligations, short-term obligations, that were owed by
17  the company?
18   A.   I'm sorry.  Can you ask that again?
19   Q.   Yeah.  So counsel pointed to Exhibits DD
20  and EE and said you said this was what the cash
21  position was at this point in time and the cash
22  position was at another point in time, and then it
23  referenced other -- other obligations that would come
24  in and affect cash flow?
25   A.   Right.

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 80 of
110

305

1      **Q.** All right. And at the time you signed
2 those declarations, had it been discovered that your
3 accountants had misclassified the $500,000 note?
4      **A.** I don't believe so. I'm sorry. Which
5 one was it, DD?
6      **Q.** I believe it was DD and EE.
7      **A.** The date on that -- honestly, I do not
8 remember exactly the day that that was discovered, but
9 the way that this reads makes me think that I
10 probably -- yeah, I was -- I'm certainly not referring
11 to that in Number 4. It does not include that number
12 in Number 4.
13      **Q.** So it did not include the approximately
14 half a million dollars?
15      **A.** Yes. It was like 515,000 with accrued
16 interest, so it couldn't possibly be in there.
17      **Q.** Do you recall how the misclassification
18 of the note was discovered?
19      **A.** I -- I was made aware of it by Teresa
20 Sullivan.
21      MR. RAMP: Objection, hearsay then.
22      THE COURT: That will be sustained.
23      **Q.** (BY MR. BERTRAND) And you looked at the
24 physical promissory note itself, right?
25      **A.** Yes, I signed it. I signed the original

306

1 document.
2      **Q.** Okay. Very good.
3      **A.** I just can't speak to how it was
4 misclassified.
5      MR. BERTRAND: All right. Nothing
6 further, Your Honor.
7      THE COURT: Recross.
8      MR. RAMP: No, none, Your Honor. Thank
9 you.
10      THE COURT: Thank you.
11      Shall we take five minutes?
12      (Recess taken, 4:14 p.m. to 4:45 p.m.)
13      MR. LASS: Should we proceed?
14      THE COURT: Okay.
15      MR. LASS: I call Ross Sullivan, please.
16      THE COURT: Mr. Sullivan, step forward.
17      ROSS SULLIVAN,
18 having been first duly sworn to state the whole truth,
19 was examined and testified as follows:
20      DIRECT EXAMINATION
21 BY MR. LASS:
22      **Q.** Mr. Sullivan, could you please state your
23 name.
24      **A.** Ross Anthony Sullivan.
25      **Q.** And what is your current relationship to

307

1 Sullivan Vineyards Corporation?
2      **A.** I'm currently a shareholder in Sullivan
3 Vineyards Corporation and a director on the board of
4 directors.
5      **Q.** And what is your current relationship to
6 Sullivan Vineyards Partnership?
7      **A.** I am a general partner in the California
8 general partnership.
9      **Q.** And are you a minority shareholder in the
10 corporation?
11      **A.** Yes.
12      **Q.** And a minority shareholder in the
13 partnership?
14      **A.** Yes.
15      **Q.** Very briefly, how old were you
16 approximately when your parents first acquired the
17 properties that became Sullivan Vineyards?
18      **A.** I was --
19      **Q.** Approximately.
20      **A.** -- approximately ten years old.
21      **Q.** What did the property look like when your
22 parents first acquired it?
23      **A.** Well, there were two properties at the
24 time. One of them had a small vineyard on it of old
25 head-pruned vines. It was approximately 4 acres. And

308

1 the other acquired second to that was an open field
2 with a small portion of it planted in Chenin blanc
3 grapes.
4      **Q.** And did you participate in planting the
5 grapes in the remaining parts of the vineyard?
6      **A.** I have, and -- I have. I did then and
7 have since, yes.
8      **Q.** Okay. Jumping back to the present or the
9 recent past, do you -- did you previously hold another
10 position with the corporation or the partnership, an
11 executive kind of position?
12      **A.** Yes. Throughout the years previously,
13 I've held several different positions, but most
14 recently I was the president and CEO.
15      **Q.** And during what time frame were you
16 president and CEO of --
17      **A.** During the transaction from my mother's
18 retirement in 2011 to approximately May 2013.
19      **Q.** Without telling me the substance of the
20 discussions, have you had discussions over the years
21 with your mother concerning ownership of the winery and
22 who should be owners of the winery? Without telling me
23 the substance.
24      **A.** Yes, I have.
25      **Q.** Okay. And based on those discussions, do

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 81 of 110

---

309

1  you have an agreement with your -- you are married?
2      A.  Yes, I am.
3      Q.  And you have an agreement with your
4  spouse of some sort regarding ownership of the winery
5  in the event you get divorced?
6      A.  Yes, I do.
7      Q.  What is that agreement?
8      MR. ROSE:  Your Honor, there's no
9  relevance to this.
10     THE COURT:  I'll allow the question to be
11 asked and answered.
12     A.  The agreement I have with my spouse is
13 that any ownership in the winery would either transfer,
14 under certain circumstances, to my children or directly
15 back to the family.
16     Q.  (BY MR. LASS)  Okay.  While you were
17 chief executive officer -- was that your title?
18     A.  Yes, sir.
19     Q.  -- did you have interactions with
20 Mr. Finn regarding contributions by him or payments by
21 him to the business?
22     A.  Yes, I did.
23     Q.  And were you aware, at least during that
24 time frame, of payments that he made into the business?
25     A.  Yes, I was.

---

310

1      Q.  Were those payments made to the
2  corporation or the partnership, or both?
3      A.  They were made under cir- -- excuse me.
4  Under certain circumstances, they were made to both.
5      Q.  Okay.  What was the first significant
6  loan, or payment, I guess, that Mr. Finn made into the
7  business?
8      A.  The first significant loan was -- was the
9  purchase of a note from Fremont Bank for a sum of
10 $380,000.
11     Q.  And --
12     A.  Excuse me.  Bank of Alameda.
13     Q.  And that was shortly after -- was that
14 shortly after he acquired his interest in the business?
15     A.  It actually was before he acquired any
16 interest in the business.
17     Q.  And after he acquired an interest in the
18 business, did he subsequently make an approximately $2
19 million payment into the business?
20     A.  Over the course of many, many months and
21 under -- under a development plan where we replanted
22 vineyards, paved some roads, and did some
23 infrastructure improvements, and cleaned -- if you
24 will, reorganized the business, yes, there was an
25 approximately $2 million contribution.

---

311

1      Q.  In what time frame did this occur?
2      A.  Between August of 2011 and May of 2012.
3      Q.  Was that loan repaid, paid back, to
4  Mr. Finn?
5      A.  In that month of May 2012 we refinanced
6  the winery with Silicon Valley Bank, and there was a $2
7  million addition to that line from the previous loan
8  buyout in which $2 million went back to Mr. Finn.
9      Q.  Okay.  Did you have discussions after
10 that time with Mr. Finn about additional payments of
11 some sort that he wanted to make to the business?
12     A.  Oh, there were many discussions regarding
13 additional funds coming into the business.
14     Q.  And did -- were these discussions
15 regarding possible capital improvements to -- the
16 business, to the properties?
17     A.  Yes, they were.
18     Q.  And tell us little bit about those, what
19 was proposed and --
20     A.  Well, what was proposed at that time, we
21 were looking at --
22     MR. ROSE:  Your Honor, I'm going to
23 object.  This is vague as to time.
24     THE COURT:  If you could tie it --
25     MR. LASS:  Sure.

---

312

1      THE COURT:  -- down with the time frame,
2  that would be helpful.
3      Q.  (BY MR. LASS)  So we are starting with
4  the time frame when the Silicon Valley Bank loan was
5  made and the time that you stopped being CEO, during
6  that approximate time.
7      A.  To summarize this, all throughout Steve's
8  early involvement in the family business, he had a
9  saying, "Why wait?  Let's invest.  Let's make these
10 improvements.  Let's do these things now so as to get a
11 better return later."  That was a common theme
12 throughout all of those discussions.  So . . .
13     Q.  And so what were some of the things that
14 he wanted to do?
15     A.  So yes, we need to -- it was proposed at
16 that time -- we wanted to -- to renovate the winery
17 structure.  It had been built in -- designed and built
18 in -- the finished building in 1982-'83 time frame and
19 had not been updated since.  There was insulation,
20 wiring, a lot of improvements that needed to be made.
21 In addition, there was county compliance issues with
22 ADA bathrooms and so on.  So many winery improvements.
23     At that time Steve also wanted to make
24 huge improvements to the residence.  There were some
25 things that needed to be done, some deferred

---

78 (Pages 309 to 312)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 82 of
110

313

1   maintenance, and -- but there were -- so several
2   architects were -- were hired for the residence. There
3   were many different design options, and an enormous
4   amount of money was spent upgrading the residence.
5       Q. Did you express your feelings or your
6   thoughts about these improvements to Mr. Finn? What
7   were those, if you did?
8       A. Well, I was concerned with how the
9   partnership would address those issues, in terms of
10   money going out. And I was concerned about making sure
11   we spent the money correctly on the business, where we
12   could get a return, and where it made sense, that it
13   wouldn't affect our revenue. So . . .
14       Q. And would the improvements to the
15   resident affect -- affect the revenue?
16       A. Not at all.
17       Q. Wouldn't have helped the revenue or hurt
18   the revenue?
19       A. No, sir.
20       Q. We've heard testimony from several people
21   already about the distinction between Sullivan
22   Vineyards Corporation and Sullivan Vineyards Partners.
23       A. Yes.
24       Q. And we don't need to repeat that, but
25   where -- having been former CEO and as current owner of

314

1   both entities, where does the primary value lie, in the
2   partnership or the corporation?
3       A. In -- it lies in two areas.
4       MR. ROSE: Objection, Your Honor.
5   There's no foundation for that. This also asks for, I
6   believe, an expert opinion.
7       THE COURT: It will be overruled.
8       Q. (BY MR. LASS) Go ahead.
9       A. The value lies in two areas: one, the
10   actual property, the vineyard; and, two, in the winery
11   and the winery permit, okay? And people could say that
12   there's a third in terms of the lifestyle and the
13   residence in Napa Valley.
14       Q. Where does the primary value lie?
15       A. In the property.
16       Q. Could you turn in the smaller book in
17   front of you to Exhibit 15, please. This is already in
18   evidence. Mr. Sullivan, is this a notice you received
19   on or about September 1, 2015 of a special meeting of
20   the board of directors?
21       A. Yes, it is.
22       Q. You received that because you were on the
23   board of directors, correct?
24       A. Yes, sir.
25       Q. And did you, in fact, attend the meeting

315

1   that was called on that day?
2       A. I -- I called in. I made a --
3       Q. Telephone appearance?
4       A. -- telephone appearance.
5       Q. If you turn to Exhibit 17, please, do you
6   recognize that document?
7       A. I do.
8       Q. Now, this document's already in evidence.
9   Again, does the document accurately reflect other
10   persons that you understood were in attendance at that
11   meeting?
12       A. It does, yes.
13       Q. What was your understanding of the
14   purpose of the meeting?
15       A. Well, I understood the purpose of the
16   meeting was to make a vote as to the corporation's
17   ability to sell itself or its assets.
18       Q. Okay.
19       A. And the -- and the vineyard, as it
20   describes here.
21       Q. In the notice?
22       A. In the notice, yes.
23       Q. And what transpired at the meeting? Let
24   me go back.
25       Was a vote taken at the meeting?

316

1       A. There was a vote taken at the meeting,
2   yes.
3       Q. And what people voted?
4       A. I -- I voted, and Ms. de Vere voted.
5       Q. And did you voice any objections to
6   Ms. de Vere voting?
7       A. I voiced several objections to her
8   voting.
9       Q. Why? What were the objections? I'm
10   sorry.
11       A. Well, first of all, I was -- I was -- I
12   voted because I thought -- I'm sorry. I objected
13   because rather than selling and spending our energies
14   trying to sell the vineyard and winery, or parts of it,
15   as they were so described, our energies should have
16   been put to sales and revenue and finding alternatives
17   to selling to -- to maintain those. And I also
18   objected to her voting because she was conflicted by
19   her employment agreement. She was incentivized by Mr.
20   Finn to receive some net proceeds from the sale, which
21   was in contradiction to her role as CEO.
22       Q. And Mr. Finn abstained?
23       A. Yes, he abstained.
24       Q. Is this the only version of these minutes
25   you've ever seen?

79 (Pages 313 to 316)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 83 of 110

317

1      A. No. This is the retracted [sic] version
2  of the minutes. There is another version that was
3  published that didn't show any of the objections.
4      Q. So this is the longer version?
5      A. This is definitely the longer version,
6  yes.
7      Q. At the beginning of the meeting, at least
8  according to the minutes, the minutes reflect you being
9  asked a number of questions by Mr. Bertrand. Did that
10 happen?
11     A. Yes, it did. It was actually kind of
12 awkward, because he started the meeting -- I'm sorry.
13     Q. Go ahead.
14     A. Well, the meeting hadn't even started
15 yet, and Mr. Bertrand started questioning me as to
16 some -- some -- and those questions are described
17 there. I can -- I can read them --
18     Q. Okay. No.
19         MR. ROSE: Your Honor, again, this is not
20 relevant.
21         THE COURT: Is that an objection?
22         MR. ROSE: Yes.
23         THE COURT: It will be overruled.
24     Q. (BY MR. LASS) Was anything on the notice
25 of agenda -- was there anything on the notice of the

318

1  meeting that indicated that you -- purpose -- a purpose
2  of the meeting was to question you about documents that
3  you had produced your sister?
4      A. No, there was no agenda in that regard.
5  And that's why I asked Mr. Bertrand at that point what
6  he was intending with these questions.
7      Q. And did you ask at the meeting who Mr.
8  Bertrand and his three colleagues were representing?
9      A. I did, yes.
10     Q. What did they say?
11     A. They told me they represented Sullivan
12 Vineyards Corporation.
13     Q. Do any versions of the minutes of this
14 meeting that -- you've seen several -- do any of those
15 versions describe the basis for your objection for
16 Ms. de Vere voting based on the fact that she had a
17 conflict?
18         MR. BERTRAND: Object, assumes facts not
19 in evidence.
20         THE COURT: That will be overruled.
21     Q. (BY MR. LASS) You've seen several
22 versions of minutes of the --
23     A. There's two versions of the minutes.
24     Q. And any -- either of those versions
25 reflect --

319

1      A. The version --
2      Q. -- reflect that the basis for your
3  objection was what you perceived to be a conflict of
4  interest on behalf of Ms. de Vere?
5      A. Neither version of these minutes reflect
6  my objection made regarding her employment contract and
7  conflict.
8      Q. How much did Mr. Finn wish to spend on
9  improvements to the residence part of the winery?
10     A. I remember in early discussions, it was
11 to the tune of a million dollars.
12     Q. And did you express to Mr. Finn your
13 thoughts about that issue?
14     A. I did. I said I didn't want the
15 partnership to -- to be obligated to that. And he told
16 me that it was his -- going -- his improvements to the
17 winery to benefit -- to his and Kelly's benefit.
18     Q. Could you turn to Exhibit 10, please.
19 This is already in evidence. Is this a letter you
20 received as a shareholder in Sullivan Vineyards
21 Corporation?
22     A. Yes, it is.
23     Q. When you read this letter did you believe
24 that it accurately portrayed the financial condition of
25 the company at that -- at that time?

320

1      A. I did believe it was a good indication of
2  the health of the business at the time.
3          MR. LASS: 21?
4          THE COURT REPORTER: It's tucked in the
5  pocket of the exhibit book.
6      Q. (BY MR. LASS) Okay. This one you need
7  reading glasses for, some of us do. Let me get my
8  glasses.
9          Did you attend a meeting, either in
10 person or by phone, sometime in the middle of July
11 where the financial projections for the corporation
12 were discussed?
13     A. Yeah. I asked for a meeting with
14 Angelica and Teresa Sullivan to discuss this ongoing
15 concern for the cash infusions that they were asking
16 for into the business. And I said, "Hey, we need to
17 meet on this. Why haven't we met on this already?
18 There's other issues at hand." We discussed several
19 things at this meeting.
20     Q. And who attended this meeting?
21     A. So this was a meeting between myself,
22 Angelica, and Teresa Sullivan.
23     Q. Okay. And was Mr. Finn present?
24     A. He was not present.
25     Q. Was this cash projection provided to you

80 (Pages 317 to 320)

321

1  at the meeting?
2      A.  Yes, it was.
3      Q.  At the time you received this in -- did
4  you receive this in mid-July sometime?
5      A.  It was -- the meeting was on July 15
6  where I received this.
7      Q.  And at the time you received this, did
8  you have any reason to believe that this was not an
9  accurate projection of the cash flow of the corporation
10  from July 1 through December 31, 2015?
11     A.  I thought it was a good representation of
12  the cash flow model that was caveated with the fact
13  that, okay, we have some cash flow deficits.  What will
14  we do about it?  How will we get through the year?  Can
15  we -- I asked several questions:  Can we manage through
16  this without cash infusion?  What would be a minimum
17  cash infusion if we did need to make that?
18         I did say I would take that to the family
19  and shareholders to discuss it.  And if it was possible
20  to get through the end of the year with a minimum cash
21  infusion, how would we then pay that money back if we
22  did put some money in.
23     Q.  So when you left the meeting did you
24  believe that there was a way to keep the winery
25  operating in normal course through the end of the year?

322

1      A.  I believed that there were alternatives
2  to how the winery was currently being managed.  I
3  believed that -- and I asked them in the meeting what
4  the confidence was in being able to achieve this, and
5  Teresa said it was achievable.
6      MR. ROSE:  Objection, Your Honor.  It's
7  hearsay.
8      THE COURT:  That will be sustained as far
9  as what Teresa said.
10     A.  Okay.  So I was -- I believed, leaving
11  that meeting, that we could, if we met these
12  numbers . . .
13     Q.  (BY MR. LASS)  Okay.  And --
14     A.  Have a -- yeah.
15     Q.  Go ahead.  I'm sorry.
16     A.  That there were alternate ways of dealing
17  with this cash flow problem.
18     Q.  And do you still believe that?
19     A.  I do.
20     Q.  Have the revenues, gross revenues, at
21  least, of the winery been increasing over the last year
22  or two, at least as referenced in the Exhibit 10 letter
23  to you?
24     A.  Yes, they have.
25     Q.  There was -- has been discussion about

323

1  the claim that there's a short-term liability that had
2  previously been booked as a long-term liability and
3  none of that shows up on the cash flow.
4      MR. ROSE:  Your Honor, that's leading.
5  Objection.
6      Q.  (BY MR. LASS)  Does any of that show up
7  in the cash flow?
8      A.  At that time it had not --
9      THE COURT:  That will be overruled.  You
10  may answer.
11     MR. LASS:  I'm sorry, Your Honor.
12     THE COURT:  That's okay.
13     Q.  (BY MR. LASS)  Go ahead.
14     A.  Okay.  You are referring to a note that
15  was given to the corporation by Mr. Finn, I think for
16  the sum of $490,000.  I'm aware of it now, but I was
17  not aware of it at the time it was given to the
18  corporation.  It was not endorsed by the board of
19  directors.  It was a note that Angelica signed for
20  directly from Mr. Finn, as they say.  And, no, it was
21  not on the books prior to it appearing for demand just
22  recently.
23     Q.  Is that the only loan Mr. Finn alleges he
24  made that was not processed through the board, or are
25  there others?

324

1      A.  I believe there are others.
2      Q.  As you sit here today, as a partner in
3  Sullivan Vineyards Partnership, can you tell me for
4  certain what percentage of the partnership is owned by
5  Mr. Finn?
6      A.  I can tell you for certain he owns 51
7  percent.  I cannot tell you for certain that his claims
8  for more than that were exercised correctly.
9      Q.  Okay.  And as you sit here today, can you
10  tell me for certain what percentage ownership interest
11  Mr. Finn has in Sullivan Vineyards Corporation?  The
12  percentage of shares, I should say.
13     A.  I -- I believe he has 51 percent.  And
14  for the same reason, I cannot tell you that his claim
15  for more than that is correct.
16     Q.  Why can't you tell me?
17     A.  Because there -- because it's pretty
18  ambiguous as to when -- if he exercised any warrants,
19  when that actually occurred, and if any notifications
20  were given to the shareholders and for how much.
21     Q.  Can you -- as you sit here today, can you
22  tell me for certain the amount of the loans that are
23  owed by either the corporation or the partnership to
24  Mr. Finn?
25     A.  I cannot tell you with any certainty the

81 (Pages 321 to 324)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 85 of 110

325

1  exact amount.
2       **Q. Why not?**
3       A.  Well, I don't believe they've been booked
4  properly.  I don't believe that the shareholders or the
5  board of directors acknowledged all of the loans
6  correctly.  And I don't believe that the
7  shareholders -- I'm sorry -- the partners, partnership,
8  endorsed additional loans to the partners, as they
9  should have been per the partner agreement.
10      MR. ROSE:  Move to strike the last
11 portion as a legal conclusion, Your Honor.
12      THE COURT:  That will be overruled.
13      **Q.  (BY MR. LASS)  Could you turn in the**
14 **notebook in front of you to Exhibit 9, please.  This**
15 **has been admitted into evidence and has been talked**
16 **about by both your sister and Mr. Finn.  Have you seen**
17 **this document or anything like this document before?**
18      A.  Yes.  I have received a document just
19 like this addressed to me, where the offer was made
20 directly to me as well.
21      **Q.  Okay.**
22      A.  It appears to be the exact -- very
23 similar.
24      **Q.  What was your -- did you talk with Mr.**
25 **Finn about this?**

326

1       A.  I did.  Yes, I did.
2       **Q.  What did you tell him?**
3       A.  Well, I told him I didn't feel this was a
4  legitimate offer, for several reasons.  One
5  specifically is at Line Item Number 3 is that it -- my
6  offer -- or his offer to me to purchase my shares was
7  contingent upon Kelly Sullivan modifying her premarital
8  agreement, and that wasn't something I could -- I could
9  decide on.  How could the offer be good to me if it was
10 contingent on something my sister was going to do?
11      **Q.  And have you talked to your sister --**
12 **without saying what you discussed, or what she**
13 **discussed, have you talked to your sister about how she**
14 **felt about this provision about modifying her marital**
15 **agreement?  Have you talked to her about that?**
16      A.  Yes.  Yes, I have talked to her.
17      **Q.  And based on that discussion, did you**
18 **have an understanding of -- of what position she'd take**
19 **on that particular issue, paragraph 3?**
20      A.  I -- well, I -- she was very upset about
21 that, because she didn't understand how it -- how it
22 was going to affect her agreement.
23      **Q.  Okay.  In your opinion -- strike that.**
24 **As a partner in the partnership and an**
25 **owner -- shareholder in the corporation, would you be**

327

1  **satisfied if for a relatively short period of time the**
2  **corporation was not generating enough cash flow to pay**
3  **the debt, but you still owned the land?  Fair question**
4  **or not?**
5       MR. ROSE:  Your Honor, I don't understand
6  that.  Objection, the question is vague and somewhat
7  ambiguous.  I'm not sure I follow it.
8       THE COURT:  If the witness understands
9  it, I believe it's an appropriate question.
10      Mr. Sullivan, do you understand the
11 question?
12      (Pause.)
13      **Q.  (BY MR. LASS)  Sounds like maybe not.**
14 **The pause --**
15      A.  Please reask the question.
16      THE COURT:  I think I understand the
17 question, but he didn't ask me.
18      MR. LASS:  I think I understand the
19 question, too, but --
20      **Q.  (BY MR. LASS)  Go ahead if you understand**
21 **the question.**
22      A.  You're -- you're referring to the asset
23 value of the land being able to cover the -- cover the
24 debt?
25      **Q.  Right.**

328

1       A.  There's a tremendous value in the land.
2  And if you looked at a debt-to-value ratio for the
3  property and land versus, you know, what the
4  corporation could produce in terms of net -- if you
5  had -- if you had to sell everything, I think it would
6  satisfy all of the debt.
7       **Q.  Well, my question is, would you be**
8  **willing to, as a shareholder in the corporation,**
9  **tolerate at least some months of loss --**
10      A.  Okay.
11      **Q.  -- loss -- negative revenue for the**
12 **corporation?**
13      A.  Yes.  Let me answer the question as it
14 pertains to our industry.  The wine industry is very
15 cyclical.  It has peak periods of revenue and very slow
16 periods.  And there's very intense periods of capital
17 requirements -- harvest and -- picking the grapes and
18 harvest, and that's a very intense period of capital
19 infusion.  And there's -- there's times when you have
20 to buy -- and bottling is a huge capital requirement.
21      And those occur at different times
22 throughout the year.  And the revenue that you need to
23 bottle, the money you need to bottle, does not always
24 align with your peak influx of cash from sales.
25      **Q.  When does the influx of cash usually**

scheduling@huntergeist.com                    HUNTER + GEIST, INC.                    303-832-5966/800-525-8490

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 86 of 110

329

1    come, what months in the year?
2          A.  There's -- good sales typically flow in
3    in May and just prior to the holidays, in the October,
4    November and then -- those are the three
5    biggest periods, yeah.
6          Q.  And when do the expenses sort of --
7          A.  So expenses, now, in the fall.  We are
8    just finishing a very expensive period, which is the
9    harvest.  And depending on how you schedule your
10   bottling, which can be done throughout the year, two
11   times a year, but typically just prior to -- just prior
12   to harvest, your harvest time frame.  So you've got to
13   be prepared.  You've got to plan for those expenses,
14   offset with your revenue streams.
15         Q.  There was testimony earlier today about
16   the current amount of debt of the business, although it
17   wasn't clear whether it was the corporation or the
18   partnership.  Is there -- there was some test- -- there
19   was some testimony that there's between 1.6 and 1.7
20   million of current debt; is that correct?
21         MR. ROSE:  Objection, no foundation.
22         THE COURT:  Overruled.
23         A.  There's a -- there's -- well, there's a
24   substantial debt on the property, the corporation.
25         Q.  (BY MR. LASS) I'm not talking about the

330

1    Silicon Valley Bank.  I'm not talking about the claimed
2    loans from Mr. Finn.  I'm talking about other debt that
3    is current debt.
4          A.  Are you referring to payables?
5          Q.  Yes.
6          A.  I would have to -- to look at the -- look
7    at the accounting, but that does not sound -- that does
8    not sound reasonable.
9          Q.  Does it sound accurate?
10         A.  No, it does not sound accurate.  I -- I
11   would need to see evidence of that.  Is it possible?
12         Q.  Are you -- are you at least somewhat
13   familiar with capital gains tax issues?
14         A.  Yes.
15         Q.  You are not a --
16         A.  In a layman's sense, yes.
17         Q.  Okay.  You are not an accountant?
18         A.  Right.
19         Q.  There was some testimony -- actually, not
20   everyone testified to this effect, but some testimony
21   that if the winery were sold for $18 million that there
22   was going to be some equity to distribute to the
23   owners, the shareholders and the partners.
24         A.  Uh-huh.
25         Q.  Have you spoken with your tax accountant

331

1    about what would happen taxwise if the property were
2    sold and some amount of money came to you as a partner
3    or shareholder?  Have you spoken with him --
4          MR. ROSE:  Objection, hearsay.
5          THE COURT:  That is not calling for
6    hearsay.  Overruled.
7          A.  The answer is yes.  I'm very concerned.
8          Q.  (BY MR. LASS) Okay.  Okay.  And I think
9    you are -- without -- do you have an understanding of
10   what the tax effect would be?
11         A.  As I understand the tax effect of selling
12   my shares, if you will, selling the winery and property
13   at this time --
14         MR. ROSE:  Objection, Your Honor.  This
15   is opinion testimony.  This is not -- he's not a
16   designated expert.  This is going way outside of the
17   statement submitted by opposing counsel as to the scope
18   of Mr. Sullivan's testimony, paragraph 3.
19         THE COURT:  As to the answer that has
20   been given thus far, it doesn't call for hearsay, it
21   doesn't call for expert opinion.  It's only stated that
22   yes, he has an understanding of what his tax
23   consequences would be.  So to that extent, I'll allow
24   it.
25         MR. ROSE:  Okay.

332

1          Q.  (BY MR. LASS) Go ahead.
2          A.  So I'm going to be affected two ways from
3    the sale of this.  There's carry-forward losses when
4    there was -- when losses were taken through the
5    partnership, so -- to the tune of -- it personally
6    would affect me to the tune of about $100,000,
7    $140,000, in addition to any capital gains tax at, I
8    believe, 30 percent from the State of California and
9    federal tax on top of that.
10         So at the end of the day, if I was to
11   receive $200,000, I would have to pay the carry-forward
12   losses that were -- that I took the benefit of many
13   years prior.  And I would have to pay capital gains on
14   whatever portion of -- that I was given.  So not --
15   nothing, essentially, would be left over.
16         MR. ROSE:  Objection, Your Honor.  Move
17   to strike.  That was an expert opinion.
18         THE COURT:  I'll allow it to stand.  It's
19   his opinion of what his personal tax consequences would
20   be, so I'll allow it to stand.
21         Q.  (BY MR. LASS) To your knowledge, as a
22   partner in the partnership and shareholder in the
23   corporation, is some money currently owed to
24   Mr. Beckstoffer?
25         A.  Yes.

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 87 of
110

## 333

1    Q.  Okay.  And what is his role?  Why is he
2  owed money?
3    A.  Well, last summer the winery purchased
4  bulk wine from Mr. Beckstoffer, and there was a payment
5  schedule made.  And it was -- that has not been
6  fulfilled.  So I believe there's $90,000 on the books
7  still owed Mr. Beckstoffer, $90,556.
8    Q.  And have you had discussions with
9  Mr. Beckstoffer or someone on his behalf concerning
10  this debt?
11    A.  I have.
12    Q.  Who -- which entity owes the debt?
13    A.  The corporation.
14    Q.  And based on those discussions, do you
15  have an understanding of -- of the time frame in which
16  the corporation would be allowed to pay that debt?
17    MR. ROSE:  Objection, Your Honor, to the
18  extent it calls for hearsay.
19    THE COURT:  One moment.  Could you read
20  back the question?
21    (The last question was read back as
22  follows:  "And based on those discussions, do you have
23  an understanding of -- of the time frame in which the
24  corporation would be allowed to pay that debt?")
25    THE COURT:  That will be overruled.  You

## 334

1  may answer.
2    A.  Speaking directly with Chris Carriuolo,
3  the CEO of Beckstoffer Vineyards --
4    Q.  (BY MR. LASS)  You can't --
5    MR. ROSE:  Your Honor, he can't --
6    THE COURT:  Yeah.  I was just asking for
7  your understanding as a --
8    THE WITNESS:  Oh, okay.  My --
9    Q.  (BY MR. LASS)  You had discussions.  You
10  can't tell us what you were told.  You can tell us what
11  your understanding is.
12    MR. ROSE:  Your Honor, I'll further
13  object that if his understanding is hearsay, it's still
14  hearsay.
15    THE COURT:  That will be overruled.
16    A.  Can I say speaking directly with, I was
17  told or --
18    Q.  (BY MR. LASS)  No, you --
19    A.  My understanding is if we want terms with
20  Mr. Beckstoffer, he will offer terms for six months at
21  4 percent.
22    MR. ROSE:  Your Honor, move to strike.
23  That's clearly a -- it's a hearsay answer.
24    THE COURT:  That will be granted, and we
25  will strike that answer.

## 335

1    MR. LASS:  I'm splitting hairs here, but
2  I don't know what part of the answer should be
3  stricken.  His first -- the first part of the answer
4  was that they could receive terms.  The second part of
5  the answer was the specifics of the terms.
6    THE COURT:  I think that the -- his
7  understanding as a shareholder and member of the board
8  that terms are available, I think that that can stand.
9    MR. LASS:  Okay.
10    Q.  (BY MR. LASS)  As shareholder in the
11  corporation and a partner in the partnership, have you
12  had an opportunity to look at the loan documents with
13  Silicon Valley Bank?
14    A.  Most of the documents I have seen.
15    Q.  Okay.  And there's been some amendments
16  to the loan documents?
17    A.  Yes.
18    Q.  Have you seen those too?
19    A.  I believe I've seen all of the current
20  amendments, but I've not seen all of the correspondence
21  between Sullivan Corporation and the bank.
22    Q.  That recent correspondence, you mean --
23    A.  I believe there's been recent
24  correspondence, but I have not had access to it.
25    Q.  Okay.  As the CEO of the corporation, did

## 336

1  you have a chance to look at the financial records
2  while you were CEO?
3    A.  Yes.
4    Q.  Realizing you are not a C.P.A., do you
5  have a layman's understanding of the difference between
6  capital expenses and operating expenses?
7    A.  Yes.
8    Q.  Did you have discussions with Mr. Finn
9  about the treatment of certain expenses?
10    A.  I did.  I also spoke with his CFO at the
11  time, David Runberg, regarding those issues.
12    Q.  And what were the -- what was the nature
13  of the discussions?  What was said?
14    MR. ROSE:  Objection to the extent it
15  calls for hearsay from the former CFO.
16    THE COURT:  That will be sustained.
17    Q.  (BY MR. LASS)  Okay.  Let's talk about
18  your discussions -- strike that.
19    What did you say to either the CFO or Mr.
20  Finn regarding this?  Not what did they say to you, but
21  what did you say to them?
22    A.  I was always concerned about maintaining
23  operational discipline so that we did not exceed -- our
24  operating costs would not exceed our revenues so we
25  could create a sustainable business.

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 88 of 110

337

1     Q.   Okay.  And did you speak with them about
2  the categorization of expenses?
3     A.   Mostly I spoke with Mr. Runberg regarding
4  that issue.
5     Q.   Okay.  Without telling me what he said to
6  you, what did you say to him?  Did you have concerns
7  about how things were being categorized?
8     A.   I did.  And there was a -- Mr. Runberg
9  had a method in terms of, you know, dollar amounts,
10  whether it would be expensed or -- or capitalized.  And
11  my concerns were that, well, even though we were only
12  spending something like $800 a month on a certain item,
13  that at the end of the year it would exceed that
14  threshold as a total.
15           And it was an item that may be -- for
16  instance, stainless steel fittings.  Where a fitting,
17  you might buy ten of them for $150, they don't exceed
18  the capital gains threshold.  But they last forever,
19  and you need to have them to operate the business.  And
20  so certain things like that were being expensed rather
21  than capitalized, but where their cumulative value
22  would normally have been capitalized if you bought them
23  all at once.
24     Q.   Okay.  There's been testimony,
25  Mr. Sullivan, about an Andrea -- I believe it's Andrea

338

1  Crow -- being a shareholder in the corporation?
2     A.   That is correct.
3     Q.   Is she -- does she have a voting -- is
4  she a voting shareholder or she is a nonvoting
5  shareholder?
6     A.   I believe the Andrea Crow issue -- it
7  should be considered the Wayne Coleson/Andrea Crow
8  issue --
9     Q.   Right.
10     A.   -- Wayne Coleson being the husband,
11  Andrea Crowe the ex-wife -- they had filed bankruptcy in
12  their divorce.  And somewhere in between, those
13  nonvoting shares, we believe, ended up with Andrea
14  Crow.  But I have not seen --
15     Q.   My question is, are they voting shares or
16  nonvoting shares?
17     A.   They're nonvoting shares.
18     Q.   Okay.  Has the board of directors of the
19  corporation voted to sell all of the assets of the
20  corporation?
21     A.   Yes.
22     Q.   Has the board of directors voted to
23  sell -- you had one vote, we already know already.
24     A.   Oh, other than that vote?
25     Q.   Right.  I'm sorry.  The question was vote

339

1  in favor -- strike that.
2           Has the board of directors had a vote in
3  which it was a favorable vote for the sale of the
4  shares?
5     A.   No.
6     Q.   And have the shareholders voted, taken a
7  formal vote, on whether the corporation should be sold?
8     A.   The minority shareholders have voted.
9     Q.   Okay.  And what was that vote?
10     A.   That vote was "no."
11     Q.   It was unanimous?
12     A.   It was unanimously "no."
13           MR. ROSE:  Your Honor, I'm going to
14  object.  The answer is hearsay.
15           THE COURT:  That will be overruled.
16           MR. LASS:  One moment, Your Honor.
17           THE COURT:  Okay.  Thank you.
18     Q.   (BY MR. LASS)  If the Court does not
19  grant the decree of divorce to your sister at this
20  time, and if the Court does not let Mr. Sullivan
21  attempt to sell the business --
22     A.   Mr. Finn.
23     Q.   Mr. Finn.  I'm sorry.  Let's try again.
24           If the Court does not enter the decree of
25  divorce or in some other way award his shares, the

340

1  shares in his name, to your sister, and if the Court
2  does not grant Mr. Finn's request to be allowed to sell
3  the business, do you have concerns about what might
4  happen to this business in the next few months?
5           MR. ROSE:  Objection, calls for
6  speculation and conjecture, Your Honor.
7           THE COURT:  That will be overruled.  He
8  can answer.
9     A.   I'm -- I am greatly concerned, because a
10  tremendous amount of energy is being put towards this
11  divorce and not running the business.  And the staff
12  has been engaged in the divorce and not in running the
13  business, so I --
14           MR. ROSE:  Move to strike.  That's
15  conjecture and speculation.
16           THE COURT:  We have had -- we have had
17  testimony all day long about what's going to happen, so
18  I think it is appropriate for him to answer.  There's
19  been leeway all day given.
20           You may answer the question.
21     Q.   (BY MR. LASS)  Talk about your concerns.
22  Talk about your concerns.
23     A.   Well, a tremendous amount of time and
24  effort has been put towards being here and not in
25  running the business.  The employees are engaged in a

scheduling@huntergeist.com                    HUNTER + GEIST, INC.                         303-832-5966/800-525-8490

341

1  campaign to facilitate the divorce and facilitate the
2  sale of the business and not in creating revenue and
3  generating revenue. So, yeah, I'm greatly concerned.
4  That's a -- it's a mistake of any business.
5      Q.  Do you acknowledge -- one way or the
6  other, do you acknowledge that Mr. Finn may, in fact,
7  be a creditor of either the corporation or the
8  partnership, or both?
9      A.  Or both. I acknowledge that he is a
10 creditor, yes.
11      Q.  Okay. If your sister becomes the
12 majority shareholder and majority partner through this
13 legal proceeding, will the corporation or the
14 partnership still owe money to Mr. Finn?
15     A.  I believe that will be the case.
16         MR. LASS:  Thank you. Nothing further,
17 Your Honor.
18         THE COURT:  Thank you. Why don't we
19 start redirect [sic]. We are going to have to take a
20 break in about ten minutes, though, to take care of
21 cars.
22         MR. LASS:  Yeah. You stay here. We are
23 going to start some questions and take then a break?
24         THE COURT:  And during that time we can
25 also see about getting the witness on the telephone.

342

1          MR. LASS:  Okay.
2          MR. FOX:  I'm just going to run down the
3  hall while they're getting organized.
4          MR. LASS:  I'll get some water.
5          THE COURT:  We'll take the break now
6  then.
7          (Recess taken, 5:42 p.m. to 5:52 p.m.)
8          MR. ROSE:  There's been a stipulation
9  that you can testify over the phone. We'll have the
10 judge swear you in.
11         THE COURT:  Yes.
12             MARIO ZEPPONI,
13 having been first duly sworn to state the whole truth,
14 was examined and testified as follows:
15          DIRECT EXAMINATION
16 BY MR. ROSE:
17     Q.  Mr. Zepponi, briefly state for the record
18 what your occupation is.
19     A.  I am an advisor to wineries and breweries
20 and distilleries in mergers and acquisitions. So we
21 sell wineries, breweries and distilleries.
22     Q.  Do you hold a California broker's
23 license?
24     A.  Yes, I do.
25     Q.  Are you or have you also been a

343

1  licensed -- an attorney in the state of California?
2      A.  That's correct.
3      Q.  Okay.
4      A.  I am.
5      Q.  And for how many years have you been
6  involved in the business of representing buyers and
7  sellers for wineries and vineyards and related
8  businesses?
9      A.  Since the early 2000s.
10     Q.  Okay. Approximately -- and, again, your
11 best estimate -- how many winery and vineyard sales are
12 you normally involved in on an annual basis?
13     A.  Between -- anywhere from eight to
14 fifteen.
15     Q.  Okay. At some point in time were you
16 contacted by a Mr. Stephen Finn to list a winery
17 located in the Napa Valley by the name of Sullivan
18 Vineyards?
19     A.  Yes.
20     Q.  Okay. And do you recall approximately
21 when that was?
22     A.  I'm going to say that it was in the
23 spring of this year of 2015, sometime --
24     Q.  And did Mr. -- go ahead.
25     A.  To the best of my recollection, it was

344

1  sometime around March/April.
2      Q.  Okay. Did Mr. Finn explain to you why he
3  was contacting you to inquire as to you facilitating
4  the sale of Sullivan Vineyards?
5      A.  He did.
6      Q.  Okay. And what did he describe to you
7  was the situation of Sullivan Vineyards?
8      A.  He indicated that -- at the time of the
9  initial meeting that he had invested money in the
10 winery; the winery was not performing up to par, and
11 that it was likely going to require even more
12 investment; and as a result of that, it probably was an
13 opportune time to take a look at a sale. At the time
14 he did not really go into detail about the marital
15 dispute. That came out a little bit more in a second
16 meeting.
17     Q.  And when did that second meeting occur,
18 approximately?
19     A.  Probably within one to two weeks
20 following the first meeting.
21     Q.  Okay. At some point in time did your
22 company enter into an engagement letter for the purpose
23 of selling the winery?
24     A.  Yes.
25     Q.  Okay. Were exhibits sent to you prior to

86 (Pages 341 to 344)

345

1   your testimony today?
2       A.  Would you please repeat the question.
3       Q.  Yes.  Were documents --
4       A.  I'm at the -- I'm at the -- I'm at the
5   airport, and I'm going to try and get in a closed area
6   where I can hear a little bit better.
7       Q.  Okay.  Were documents sent to you prior
8   to your testimony today?
9       A.  Yes.
10      Q.  For you to review?
11      A.  Yes.
12      Q.  And that you would be asked questions
13  regarding these documents for your testimony today?
14      A.  Yes.
15      Q.  Okay.  And what documents were sent to
16  you?
17      A.  A letter of intent was sent to me, an
18  engagement letter was sent to me, and I believe my
19  declaration that I had signed one or two months ago was
20  sent to me.
21      MR. ROSE:  Okay.  For the record, we will
22  refer to Exhibit HH, which is a declaration signed by
23  Mario Zepponi on June 22, 2015.
24      Q.  (BY MR. ROSE)  Mr. Zepponi, when the --
25  do you recall that that was one of the declarations

346

1   that was sent to you prior to today's testimony?
2       A.  Yes.
3       Q.  Okay.  And did you review that
4   declaration to refresh your recollection as to what you
5   stated in your declaration?
6       A.  Yes.
7       Q.  Okay.  The declaration that you signed on
8   June 22, 2015, which is Exhibit HH, upon reviewing that
9   declaration, are all of those statements true and
10  correct, as to your knowledge, under penalty of perjury
11  under the laws of the State of California?
12      A.  Yes.
13      MR. LASS:  Your Honor, I'm going to
14  object and ask that the answer be stricken on the
15  grounds that HH is a prior, apparently, consistent
16  statement, and it's hearsay, and the witness is here
17  and he can testify.  But the admission of the --
18  actually, it hasn't been offered yet.  He shouldn't be
19  allowed to testify as to an exhibit that hasn't been
20  offered and to which we will object.
21      THE COURT:  Okay.
22      MR. ROSE:  Your Honor, I could just go
23  through and read the declaration and ask him to
24  attest --
25      THE COURT:  That objection will be

347

1   overruled, but I do want you to -- you do need to
2   create a foundation.
3       MR. ROSE:  Sure.
4       Q.  (BY MR. ROSE)  Mr. Zepponi, did you sign
5   a declaration under penalty of perjury dated June 22,
6   2015?
7       A.  Yes.
8       MR. ROSE:  Okay.  And if the Court would
9   like, I can read the declaration.  It's one page.  The
10  Court is looking at it.
11      I, Mario Zepponi, declare as follows:
12  I'm a licensed real estate broker licensed in the state
13  of California, License Number 01218588.
14      Number 2, I am the principal owner of
15  Zepponi & Company, a California corporation.
16      Number 3, on May 22, 2015 I listed for
17  sale the Sullivan winery and assets located at 1090
18  Galleron Lane, Rutherford, Napa County, California.
19      Number 4, the list price for the winery
20  is $20 million.
21      Number 5, based upon my experience of
22  being a licensed real estate broker specializing in the
23  sale of winery and vineyard assets for well over 15
24  years in the Napa Valley, it is my professional opinion
25  that the true, fair market value of this winery is

348

1   somewhere between 16 to 18 million dollars, that the 20
2   million list price is at the very high end of market
3   value and probably will not be realized in open market
4   conditions.
5       Number 6, on June 17, 2015 our office
6   received a bona fide offer to purchase the Sullivan
7   winery and assets for the sum of $18 million.  The
8   purchaser is a well-known vintner and winery owner in
9   the Napa Valley.  I have attached a true and correct
10  copy of the bona fide offer to this declaration
11  attached hereto as Exhibit A.  The identity of the
12  buyer has been redacted.
13      Number 7, please note that the offer is
14  of a 45-day close.  I am of the opinion that if the
15  seller does not respond quickly that we will lose this
16  offer and may not be able to readily obtain this price
17  from any other buyer at this time.
18      Q.  (BY MR. ROSE)  Mr. Zepponi, as you are
19  testifying today, are all of those statements contained
20  in Exhibit HH true and correct as to your own knowledge
21  under penalty of perjury in the State of California?
22      A.  Yes, that's correct.  The only thing that
23  I would add to that is that the person that submitted
24  that offer has made repeated inquiries as to the status
25  of the winery, so they continue to be interested in

87 (Pages 345 to 348)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 91 of 110

349

1    performing under the letter of intent that was signed
2    back in June, or whenever. May. Excuse me.
3        Q.  Okay. The buyer whose name was redacted,
4    have you had prior dealings with this buyer?
5        A.  I have.
6        Q.  Okay. Does that buyer, to your
7    knowledge, have any business relationship at all with
8    Mr. Stephen Finn?
9        A.  No.
10        MR. BERTRAND: Just for the record, the
11    letter of intent is Exhibit II.
12        MR. ROSE: Yes. Your Honor, we will next
13    refer to Exhibit II.
14        Q.  (BY MR. ROSE) And, Mr. Zepponi, your
15    declaration which was signed on June 22, 2015 had an
16    Exhibit A attached, correct?
17        A.  That's correct.
18        Q.  Yes. And the letter of intent was dated
19    June 17, 2015?
20        A.  I don't have it in front of me, but if
21    that's the date of it, that's certainty -- I would
22    assume that that would be the case, yes.
23        Q.  Yes. And Exhibit A was attached to the
24    sworn declaration that you just ratified in --
25        A.  Yes.

350

1        Q.  -- under testimony?
2        A.  That's correct.
3        MR. ROSE: Your Honor, I would move both
4    HH and II into evidence at this time.
5        THE COURT: Is there any objection?
6        MR. LASS: Object to HH on the grounds
7    that it was a prior consistent statement that has now
8    come into evidence, and I object to it for those same
9    grounds. I would object to the first two page of II,
10    because that's the declaration again. I do not object
11    to the -- pages 4 through 8 of Exhibit II.
12        THE COURT: Thank you. Both Exhibits HH
13    and II will be admitted.
14        (Exhibits HH and II were admitted.)
15        Q.  (BY MR. ROSE) Further, Mr. Zepponi --
16    and I'm going to refer in the record to Exhibit JJ,
17    which is a personal and confidential engagement letter
18    dated May 20, 2015 addressed to Stephen A. Finn,
19    Sullivan Vineyard Partners. Did you have a chance to
20    review that document prior to your testimony today?
21        A.  Yes.
22        Q.  Okay. And, to your recollection, did you
23    execute that document on or about May 22, 2015?
24        A.  That would be on or about that date.
25        MR. ROSE: Okay. Your Honor, I would

351

1    move Exhibit JJ into evidence at this time.
2        THE COURT: Any objection?
3        MR. LASS: No objection.
4        THE COURT: Thank you. JJ will be
5    admitted.
6        (Exhibit JJ was admitted.)
7        MR. ROSE: Your Honor, I have nothing
8    further of Mr. Zepponi.
9        THE COURT: Thank you.
10    Cross-examination.
11        MR. LASS: Yes, please.
12        CROSS-EXAMINATION
13    BY MR. LASS:
14        Q.  Mr. Zepponi, hi. This is Steve Lass.
15    I'm one of the attorneys representing Kelly Sullivan
16    Finn. And I appreciate the fact that you were willing
17    to speak with me on the phone yesterday. I would like
18    to ask you some questions about changes to -- to the
19    situation since you signed your sworn declaration on
20    June 22 of 2015, okay? Do you understand that?
21        A.  Yes.
22        Q.  Okay. First of all, who was the
23    potential buyer of this property?
24        A.  I -- excuse me. Did you ask who's the
25    identity of the buyer?

352

1        Q.  Yes.
2        A.  Foley Family Wines.
3        (Court reporter interruption.)
4        Q.  (BY MR. LASS) Could you say that again,
5    please? The court reporter couldn't hear you.
6        A.  Foley, F-o-l-e-y, Family Wines. The
7    principal's name is Bill Foley.
8        Q.  Okay. And the letter of intent that you
9    spoke about from Foley was, in fact, a letter of intent
10    and not a firm contract to purchase property, correct?
11        A.  That's correct. It's a nonbinding letter
12    of intent.
13        Q.  Okay. And the purchaser, potential
14    purchaser, had, among other things, the right to
15    inspect the books and records of Sullivan Vineyards
16    before making a firm offer, correct?
17        A.  The way I would term that would be that
18    the letter of intent was signed so that in the next 30
19    days the parties would negotiate an asset purchase
20    agreement, but during that same period of time due
21    diligence would already start since there's a signed
22    letter of intent. So the deal -- yes, the deal could
23    change.
24        Q.  Depending on the due diligence that the
25    buyer conducted, correct?

353

1     A.   That's correct.
2     Q.   And the buyer -- part of the buyer's due
3   diligence would be to review the financial records of
4   Sullivan Vineyards, correct?
5     A.   Correct, yes.
6     Q.   And part of the other due diligence may
7   be -- might have been for the potential buyer to
8   inspect the property, the real estate?
9     A.   Correct.
10    Q.   And you've described it as a nonbinding
11  letter of intent.  Does that mean -- doesn't that mean
12  that the buyer would have the right to -- potential
13  buyer would have the right to withdraw and make no
14  further offer?
15    A.   Correct.
16    Q.   In your long experience in brokering
17  these kinds of deals, is the final sales price usually
18  higher or lower than the price that's set forth in the
19  letter of intent?
20    A.   Lower.  I mean, it -- it will never --
21  usually never be higher, because that usually sets the
22  high-water mark.  So if there's going to be a due
23  diligence process, the best outcome would be that the
24  sales price will stay at the price that's in the letter
25  of intent or if items are discovered during due

354

1   diligence, the purchase price can be negotiated to a
2   lower value.
3     Q.   And that -- the final purchase price is
4   still a negotiation between the potential buyer and the
5   seller, right?  Correct?
6     A.   Correct.
7     Q.   Okay.  Were you aware -- were you aware
8   of the marital problems at the time Mr. Finn signed
9   your engagement letter?
10    A.   I had an understanding of them.  I didn't
11  understand the scope of them --
12    Q.   Sure.
13    A.   -- of the marital problems.
14    Q.   Sure.  If a -- if a potential purchaser
15  becomes aware that property is an issue in a divorce
16  proceeding, does that affect the value of the price?
17  Can it affect the value of the price?
18    A.   It can.  It can.
19    Q.   And would that raise or lower the
20  potential sales price?
21    A.   Lower.
22    Q.   Did you send a representative of a
23  potential buyer of the Sullivan Vineyards to visit the
24  property on June 22, 2015?
25    A.   I don't remember the exact date, but we

355

1   have sent potential buyers, including Foley Family
2   Wines.  And there have been two or three others that we
3   have sent over.  So --
4     Q.   Okay.  And -- go ahead.
5     A.   So you are asking if it was -- if you are
6   asking if it was Foley Family Wines, I don't recall
7   that, but I do know that Foley Family Wines had toured
8   the property twice, I believe.
9     Q.   Okay.  And when you have a potential --
10  have had potential buyers interested in looking at the
11  property, have you communicated that to Mr. Finn?
12    A.   That -- could you please repeat that?
13    Q.   Sure.  That's -- maybe that wasn't a
14  clear question.  In the past, when you've had -- sounds
15  like you've had more than one potential buyer want to
16  look at the property.  I assume you have to schedule
17  that with Sullivan Vineyards, correct?
18    A.   Correct.
19    Q.   And have you scheduled those views
20  with -- by speaking with Mr. Finn?
21    A.   Sometimes we'll go directly to Angelica.
22  I just don't -- I truthfully don't remember the
23  protocol.  Probably, more often than not, we would call
24  Angelica, who is the general manager, and then follow
25  up to give Mr. Finn a call to say that we -- we have

356

1   shown or are intending to show it to, you know, this
2   potential buyer and that we've scheduled something or
3   have already shown it with Angelica.  But one way or
4   the other, Mr. Finn would be apprised of the activity.
5     Q.   And if some of that -- and did some of
6   that activity happen after June 9 of this year?
7     A.   Whoo, it's possible.  I just don't -- I
8   don't -- don't recall.
9     Q.   Okay.
10    A.   Based on that cutoff date.  It's
11  possible, though.
12    Q.   Okay.  Then you had a -- your signed --
13  bear with me -- your signed retainer agreement letter
14  that is between your firm and Mr. Finn, correct?
15    A.   Yes.
16    Q.   Okay.  And this provided for a commission
17  potentially to be earned by you, correct?
18    A.   Correct.
19    Q.   Have the terms of -- has the term of this
20  engagement letter expired yet?
21    A.   I don't believe it has.  Our typical
22  engagement letters run for one year.
23    Q.   Do you claim that you are currently
24  entitled to any kind of commission from Sullivan
25  Vineyards?

89 (Pages 353 to 356)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 93 of 110

357

1          A.   Well, to the extent that there's a
2   transaction that closes during our engagement period,
3   we would be entitled to a transaction.
4          Q.   Do you claim that you are, as of today,
5   entitled to a commission?
6          A.   No.
7          Q.   The -- jumping back to the letter of
8   intent from Foley.  And has that letter of intent
9   expired?
10          A.   Yes, it has.
11          Q.   Did you change -- well, strike that.
12              How did you change your -- how did you
13   change your involvement or efforts to market property
14   after you learned that there was a divorcing proceeding
15   going on between Mr. and Mrs. Finn?
16          A.   It became very difficult to market it.  I
17   mean, it's -- and -- and then once we heard that there
18   was a dispute that would call into question whether
19   there was even a right to sell it, it hampered the
20   marketing efforts to the point where we really couldn't
21   market it --
22          Q.   Okay.
23          A.   -- practically.
24          Q.   Right.  I understand.
25              MR. LASS:  Nothing further, Your Honor.

358

1              THE COURT:  Thank you.  Redirect.
2              MR. ROSE:  I have nothing, Your Honor.
3              THE COURT:  Thank you.  Mr. Zepponi,
4   thank you very much.
5              MR. LASS:  Mr. Zepponi, that was the
6   judge.  He thanked you.  And we are going to hang up
7   now.
8              THE WITNESS:  Okay.  Thank you very much.
9              THE COURT:  So Mr. Sullivan can --
10              MR. LASS:  Can I go grab him?
11              THE COURT:  Yes.  He can take the stand.
12              Mr. Rose, you may proceed.
13              MR. ROSE:  Thank you, Your Honor.
14                  CROSS-EXAMINATION
15   BY MR. ROSE:
16          Q.   Mr. Sullivan, you testified that between
17   2011 and 2013 that you were the CEO/president of
18   Sullivan Vineyards; is that correct?
19          A.   Yes, sir.
20          Q.   And at that time that you were acting as
21   the CEO Mr. Finn had acquired your mother's, as you
22   testified, 51 percent interest?
23          A.   No.  I became president and CEO after
24   Mr. Finn acquired.
25          Q.   Okay.  During that time period that Mr.

359

1   Finn owned the 51 percent of your mother's interest
2   that you've testified to, you became the CEO and
3   president during the time that he had that ownership
4   interest?
5          A.   Correct.
6          Q.   Okay.  So you were working for Mr. Finn,
7   in a sense?
8          A.   In a sense, yes.
9          Q.   Okay.  And is it not true that in 2013
10   that your services were terminated because Mr. Finn was
11   disappointed with your performance?
12          A.   No.
13          Q.   You were not terminated?
14          A.   No.
15          Q.   Were you fired?
16          A.   No.
17          Q.   How did it come that you no longer worked
18   for Sullivan Vineyards after 2013?
19          A.   Mr. Finn wanted to hire a different CEO.
20          Q.   So you were replaced with Angelica
21   de Vere?
22          A.   Yes.
23          Q.   Okay.  And you were no longer -- after
24   the time that Angelica de Vere became the CEO of
25   Sullivan Vineyards, you were no longer president or CEO

360

1   of Sullivan Vineyards?
2          A.   Well, that's ambiguous, because I have a
3   letter from Mr. Finn and his handler at the time, David
4   Berry, saying that I would remain president during that
5   time.
6          Q.   Were you acting president after Angelica
7   de Vere came in and became acting CEO?
8          A.   No.
9          Q.   Okay.  So you signed no documents on
10   behalf of the corporation as president?
11          A.   That is not correct.
12          Q.   Okay.  Did you sign documents as
13   president?
14          A.   I did.
15          Q.   Did you do so with the consent and
16   approval of Mr. Finn?
17          A.   Yes, I did.
18          Q.   Okay.  What documents were those?
19          A.   I signed the Amendment Number 4 to the
20   Silicon Valley Bank agreement.  I also signed many
21   compliance documents with the TTB as president.
22          Q.   Okay.  So after Angelica de Vere became
23   the CEO of Sullivan Vineyards were you continuing to
24   pull a salary or any type of a payroll from Sullivan
25   Vineyards?

**361**

1   A. Yes, I was.

2   Q. Okay. Isn't it true that you received a

3 severance package after Angelica de Vere became the

4 CEO? Didn't you get a year's salary after Mr. Finn let

5 you go?

6   A. I received one year's salary. I received

7 my salary for the period of one year.

8   Q. Okay. Including medical benefits?

9   A. Including medical benefits.

10   Q. Okay. Separate from the severance

11 package of the one-year salary and medical benefits,

12 did you receive after you were let go as CEO of

13 Sullivan Vineyards any compensation for any services

14 that you provided to Sullivan Vineyards?

15   A. Other than ones described, no.

16   Q. Isn't it true that when Ms. de Vere

17 replaced you as CEO of Sullivan Vineyards that you

18 resented her coming on board and taking your job?

19   A. No. Do you want me to . . .

20   Q. Mr. Sullivan --

21   A. I'm sorry.

22   Q. -- since being replaced as CEO in 2013 by

23 Angelica de Vere are you working in the wine industry?

24   A. Yes, I am.

25   Q. In what capacity?

**362**

1   A. I consult on laboratory developments for

2 wineries and ETS Laboratories, which is an analytical

3 laboratory for the wine industry.

4   Q. Are you currently consulting with ETS

5 Laboratories?

6   A. Yes.

7   Q. Okay. Since being replaced as the CEO

8 for Sullivan Vineyards have you acted in the capacity

9 in management for any wineries?

10   A. No.

11   Q. Either as general manager, CEO, vice

12 president, or the like?

13   A. No, I haven't.

14   Q. But you've indicated that you are

15 consulting with laboratories?

16   A. Yes.

17   Q. Okay. Did you bring any -- strike that.

18   You testified earlier that as you sit

19 here today you don't know how much money that Mr. Finn

20 has actually loaned the business, you don't know how

21 much money he's actually been paid back? Is that an

22 accurate statement of your earlier testimony?

23   A. Yes, it is.

24   Q. Okay. You testified regarding the board

25 meeting where there was a vote taken to approve going

**363**

1 forward with the potential sale of assets of Sullivan

2 Vineyards. You testified regarding various minutes of

3 those meetings. Do you recall that testimony?

4   A. Yes.

5   Q. Okay. Do you recall after that meeting

6 that you sat down with Angelica de Vere and myself and

7 discussed the financial condition of Sullivan

8 Vineyards?

9   A. I remember meeting with you. Now, let's

10 back up. To which board meeting are you referring to?

11 When votes were taken regarding --

12   Q. I'll withdraw the question. Do you

13 recall a board meeting where after the board meeting

14 was concluded you sat down with myself and Angelica de

15 Vere to discuss the financial problems facing Sullivan

16 Vineyards?

17   A. Yes.

18   Q. Okay. Do you recall making a

19 representation that you were prepared to loan $300,000

20 to the winery that day?

21   A. That's not accurate.

22   Q. Okay. What was your statement to both

23 myself and Angelica de Vere regarding you loaning any

24 amount of money to Sullivan Vineyards?

25   A. I believe I said, under certain

**364**

1 circumstances it's possible that the family could loan

2 some money to Sullivan Vineyards.

3   Q. You never indicated that you wanted a

4 note prepared for the sum of $300,000?

5   A. I did indicate that I would -- that I

6 would like to look at a promissory note.

7   Q. Okay. Since Mr. Finn acquired the

8 ownership interest of your mother in the winery has any

9 member of the Sullivan family put one penny into this

10 winery either as debt or equity?

11   A. Not that I'm aware of.

12   Q. Okay. As you sit here today do you

13 recall any requests of the Sullivan family at any time

14 to put money into the Sullivan Vineyards operation as

15 either debt or equity to assist in meeting current

16 obligations?

17   A. There's been no formal request.

18   Q. Have there been informal requests?

19   A. There have been inferences to that

20 effect, yes.

21   Q. Okay. As you sit here today is there any

22 commitment to put any -- place any money into Sullivan

23 Vineyards either as debt or equity to assist in meeting

24 Sullivan Vineyards' current debt obligations?

25   A. Yes.

91 (Pages 361 to 364)

---

365

1    Q. All right. How much?
2    A. I know that $90,000 was promised.
3    Q. Okay. Other than 90,000 -- just back up
4 a bit. I'll withdraw the question.
5      Who promised to loan or commit $90,000 to
6 the Sullivan Vineyards operation?
7    A. Kelly Sullivan promised a loan. No.
8 Kelly Sullivan promised to provide $90,000 --
9    Q. Okay.
10    A. -- towards some of the outstanding debts.
11    Q. Okay. Other than the $90,000, has the
12 Sullivan family, individually or collectively, to your
13 knowledge, committed to pay any money either as debt or
14 equity into the Sullivan Vineyards operation? As we
15 are sitting here today, as of this moment in time, are
16 you aware of any commitment to do -- to do that?
17    A. That is very broad question, because yes,
18 the Sullivan family is totally committed to paying back
19 all of the debt to the Silicon Valley Bank, to Steve
20 Finn, and to any other shareholders.
21    Q. And what is the source of that money?
22    A. The source of that money would be
23 operations of -- proper operations of Sullivan
24 Vineyards Corporation, Sullivan Vineyards Partners.
25    Q. Okay. So what you are saying is, is that

---

366

1 the approximate $15 million of outstanding loans to the
2 winery are going to be paid back through revenues
3 generated by the Sullivan Vineyards winery?
4    A. That is the commitment.
5    Q. Okay. You testified in direct
6 examination that you believe that the employees at
7 Sullivan Vineyards are focusing more on the divorce
8 action between Kelly and Steve as opposed to running
9 the winery. Do you recall that testimony?
10    A. Yes.
11    Q. Okay. Can you name the employees that
12 are focusing more on the divorce of Steve and Kelly as
13 opposed to running the winery?
14    A. Angelica de Vere.
15    Q. Okay. That's one.
16    A. Teresa Sullivan.
17    Q. Okay. That's two. Any others?
18    A. Not at this time.
19    Q. Okay. As it relates to Angelica de Vere,
20 can you inform the Court what actions that Angelica
21 de Vere has done on behalf of Steve Finn and Kelly
22 Finn's divorce that has detracted from her ability to
23 operate the winery?
24    A. Quite simply, the fact that she's here
25 now and not at the place of business.

---

367

1    Q. Okay. So she's here today testifying.
2 Other than the fact that she is here today testifying,
3 what else has she done to get involved in the Kelly and
4 Steve divorce that has detracted her from operating
5 this winery effectively?
6    A. She's appeared in court several times.
7 She's met with you on many occasions.
8    Q. Okay. So the fact that she has
9 participated as a witness in pending actions involving
10 the disposition and sale of the assets of the winery,
11 you believe that that is a detraction from her ability
12 to operate the winery effectively?
13    A. The -- the proof of that is in the fact
14 that she claims we are now insolvent.
15    Q. Okay. You do not believe the winery is
16 insolvent?
17    A. I believe the winery has some very
18 serious problems.
19    Q. Okay. In fact, Mr. Sullivan, during the
20 time period you were CEO and president the winery was
21 operating at a loss every year?
22    A. That is correct.
23    Q. Okay.
24    A. However -- however, those losses were
25 also planned.

---

368

1    Q. Okay. So it's a conspiracy by somebody?
2    A. I -- I'm sorry? The losses that I
3 operated under were anticipated losses.
4    Q. Okay. And weren't the losses around a
5 half a million to $600,000 a year in operating losses?
6 Do you have a recollection of that?
7    A. Again, it was -- let's define -- can
8 we -- are we going to define those losses?
9    Q. The only question is, is were there
10 operating losses?
11    A. Anticipating operating losses, yes.
12    Q. Okay. So they were anticipated operating
13 losses. As you sit here today do you have an
14 understanding as to what the current obligations are
15 that the winery owes today on accounts payable?
16    A. I have a very limited information on
17 what's on accounts payable. There was some recent
18 listing of those accounts payable, and they have not
19 been updated -- that information has not been
20 disseminated to -- directly to the board, to me, or to
21 the shareholders.
22    Q. Okay. Mr. Sullivan, were you in court
23 approximately a month ago --
24    A. Uh-huh.
25    Q. -- where --

92 (Pages 365 to 368)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 96 of 110

369

1    A.  Are you -- can I ask a question?  Are you
2  implying that what was listed in court a month ago is
3  accurate today?
4    **Q.  I'm not saying anything.  I haven't**
5  **finished my question.  Were you in court where -- in**
6  **one of the hearings before Judge Stone where there were**
7  **discussions on whether or not the corporation should be**
8  **allowed to go forward to sell its assets?  Were you in**
9  **those hearings?**
10    A.  Yes.
11    **Q.  Do you recall a statement from myself to**
12  **Judge Stone where I asked the Sullivan family to retain**
13  **an auditor to come in and that the corporation would**
14  **make the books available the following day to that**
15  **auditor?**
16    MR. LASS:  Objection, hearsay and
17  irrelevant.
18    MR. ROSE:  He was present in court.
19    THE COURT:  That will be sustained.
20    **Q.  (BY MR. ROSE)  Do you have an**
21  **understanding or a belief that such an offer has been**
22  **made to the Sullivan family?**
23    A.  I don't believe it was a sincere offer.
24  And I --
25    **Q.  Did you or any of your family members**

370

1  **take any steps to retain an auditor to make an**
2  **appointment with Teresa Sullivan to go over the books**
3  **and records of Sullivan Vineyards?  You are a member of**
4  **the board, are you not?**
5    A.  I'm -- I'm -- I'm thinking of the
6  instances and the circumstances under which that was --
7  that was made and whether or not -- there has been some
8  effort to get that done.
9    **Q.  Okay.  Have you or anyone in the Sullivan**
10  **family, to your knowledge, engaged an auditor of any**
11  **kind to visit the winery to go over the books and**
12  **records?**
13    A.  Yes.
14    **Q.  Okay.  And what auditor is that?**
15    A.  Tom Harnett.
16    **Q.  Okay.  And when did you retain**
17  **Mr. Harnett?**
18    A.  Mr. Harnett does the tax accounting for
19  both the corporation and the partnership.  He's been
20  retained for many years in that capacity.
21    **Q.  When did you reach out to Mr. Harnett to**
22  **ask him to go review the books and records at Sullivan**
23  **winery?**
24    A.  I remember having that discussion with
25  him after the meeting, or after that court hearing,

371

1  that that would need to be done.
2    **Q.  Did you ask him to contact anybody at**
3  **Sullivan Vineyards to make an appointment?**
4    A.  No.
5    MR. ROSE:  Okay.  I have nothing further,
6  Your Honor.
7    THE COURT:  Thank you.  Redirect.
8    MR. LASS:  Yes, Your Honor.
9    REDIRECT EXAMINATION
10  BY MR. LASS:
11    **Q.  Mr. Sullivan, are you employed?**
12    A.  Yes, I am.
13    **Q.  What's your employment?**
14    A.  I'm a professional pilot.
15    **Q.  Full-time employment?**
16    A.  Full-time employment.
17    **Q.  When you were asked if you resented**
18  **Ms. de Vere becoming the CEO of Sullivan Vineyards, you**
19  **said no, you did not resent that, correct?**
20    A.  That is correct.
21    **Q.  Why not?**
22    A.  I was quite happy to let somebody else
23  carry the reins to -- to deal with Mr. Finn directly.
24    **Q.  Why is that?**
25    A.  Because we did not agree on how Sullivan

372

1  should be run.
2    MR. LASS:  Nothing further, Your Honor.
3  Thank you.
4    THE COURT:  Thank you.  Recross.
5    MR. ROSE:  Nothing further.
6    THE COURT:  Thank you.  You can step
7  down.
8    THE WITNESS:  Thank you, Your Honor.
9    MR. LASS:  That's the scope of our
10  rebuttal case.  We have no other witnesses.
11    THE COURT:  Thank you.  Any other
12  witnesses?
13    MR. FOX:  No, Your Honor.  We are
14  finished with our presentation as well and -- give me
15  one moment, Your Honor.
16    MR. ROSE:  One more question, Your Honor.
17    THE COURT:  Sure.
18    MR. ROSE:  I'm being rhetorical.
19    THE COURT:  I understand.
20    MR. FOX:  I'll go ahead and get him?
21    MR. ROSE:  Yeah.
22    MR. LASS:  Your Honor, they apparently
23  wish to call another witness.  I'm going to object.  I
24  know the Court has some discretion.  But there's been
25  our case in chief.  There's been the -- the

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 97 of
110

**373**

1    respondent's case in chief. And there's been --
2          MR. BERTRAND: Rebuttal witness.
3          MR. LASS: -- our rebuttal case has been
4    presented. And I don't -- I suppose the Court has
5    discretion, and I know we've been here a long time, so
6    I've appreciated that, but I do object to now calling
7    some other witness in. And I don't know what we would
8    call it in the procedural parlance.
9          THE COURT: I think you call it
10   surrebuttal.
11         MR. LASS: Surrebuttal, that's what it
12   is.
13         THE COURT: And what testimony
14   specifically is he going to be rebutting? I'm not
15   going to allow continued testimony to the same things
16   we've heard. So I'm not going to allow additional
17   testimony on that.
18         MR. BERTRAND: Right. He's going to
19   testify to rebut Mr. Sullivan's testimony as to had no
20   idea as to the amount of loans that Mr. Finn made to
21   the company. Mr. Sullivan received on a monthly basis
22   financial statements that contained a summary of the
23   loans that Mr. Finn had made. So --
24         THE COURT: I'll allow him to testify to
25   the extent that it's specific. If it becomes general,

**374**

1    I'm going to call a stop to it.
2          MR. BERTRAND: Okay. Very good.
3          (Recess taken, 6:35 p.m. to 6:37 p.m.)
4          DOUGLAS THAXTON,
5    having been first duly sworn to state the whole truth,
6    was examined and testified as follows:
7          DIRECT EXAMINATION
8    BY MR. BERTRAND:
9          Q. Mr. Thaxton, can you state your full name
10   and address for the record, please.
11         A. Yes. Douglas D. Thaxton. 15652 East
12   Saratoga Place, Aurora, Colorado 80015.
13         Q. All right. And have you acted as the CFO
14   to Sullivan Vineyards Corporation and Sullivan
15   Vineyards Partnership?
16         A. Yes.
17         Q. All right. And as part of your
18   activities as the CFO did you assist in the preparation
19   of monthly financial statements that were distributed
20   to the shareholders and partners of those entities?
21         A. I oversaw them, yes.
22         Q. All right. And they were sent out on a
23   monthly basis, correct?
24         A. Yes.
25         Q. All right. And in those financial

**375**

1    statements did they contain information regarding the
2    amount of loans that Mr. Finn had made to those
3    entities?
4          A. Yes, in three different places.
5          Q. All right. And was one of the
6    individuals who you sent those financial statements
7    Ross Sullivan?
8          A. Yes.
9          Q. All right. And you were CFO for what
10   period of time?
11         A. From -- it was October of 2013 through
12   June of 2014.
13         Q. Okay. And before that did you assist the
14   prior CFO with respect to the financial statements?
15         A. No, I didn't.
16         Q. Okay. Now, in the time that you were CFO
17   and where you were sending this information to Mr. Ross
18   Sullivan, did he ever once call you up and say, I don't
19   understand what these loans are reflected as to Mr.
20   Finn?
21         A. No.
22         Q. Okay. Did he ever say he questioned any
23   of the loan amounts?
24         A. Not to me, no.
25         Q. Okay. All right. Did you create a

**376**

1    summary of the loans?
2          A. Yes, I did.
3          Q. With backups?
4          A. Yes.
5          Q. All right. Did --
6          MR. RAMP: Your Honor, I'm going to
7    object to this line of questioning. Mr. Sullivan did
8    not testify as to the amounts. He's been called as a
9    rebuttal witness to say he sent him the information.
10   That's it. That should be as far as this line of
11   questioning goes.
12         THE COURT: I'll let it go a little bit
13   further, but I am keeping a close watch as to what we
14   are going into.
15         MR. BERTRAND: Very good, Your Honor.
16         Q. (BY MR. BERTRAND) Can you go to Exhibit
17   LL, please. It will be in one of the big binders.
18         Is that a summary you've prepared of the
19   loans that Mr. Finn made to Sullivan Vineyards
20   Corporation and Sullivan Vineyards Partnership?
21         A. Yes, it is.
22         Q. All right. And then did you attach
23   source documentation that's also included in that, in
24   Exhibit LL?
25         A. Yes, for each one of the loans.

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 98 of 110

377

1    Q.   Okay.  Has any one of the members of the
2  Sullivan family ever told you that they did not
3  understand the amount of loans that were made?
4        MR. RAMP:  Objection.  It calls for
5  hearsay.
6        THE COURT:  That will be overruled.
7    Q.  (BY MR. BERTRAND)  You can answer.
8    A.   No.
9    Q.   All right.  I would like to go -- have
10  you go to Exhibit -- it will be Tab FFF.  Can you
11  identify what Exhibit FFF is for the record?
12    A.   Yes.  It's the monthly financial
13  statements that were sent out for December of 2012.
14    Q.   All right.  And with respect to
15  Exhibit --
16        MR. RAMP:  Your Honor --
17    Q.  (BY MR. BERTRAND)  -- FFF --
18        THE COURT:  Is this an objection?
19        MR. RAMP:  This is an objection.  We are
20  going way beyond the scope of the -- of the rebuttal
21  witness here.  We are now getting into substantive
22  financial information.  Way beyond rebuttal.
23        THE COURT:  Well, actually, we haven't.
24  All we've done is identified an exhibit.  I -- I do
25  recognize that this witness is being presented as it

378

1  would affect the credibility of Mr. Sullivan.  And when
2  you are getting into a witness to affect credibility,
3  you are not permitted to go into extrinsic items.  So
4  I'm not going to allow him to go further as far as
5  documents are concerned, but he can identify documents
6  that he has personal knowledge were sent.
7    Q.  (BY MR. BERTRAND)  All right.  So Exhibit
8  FFF is a monthly financial report for Sullivan
9  Vineyards.  Was that sent to Mr. Ross Sullivan?
10    A.   Yes.
11    Q.   Okay.  And can you point to the pages
12  where there is a description of the loans that have
13  been obtained from Mr. Finn?
14    A.   Yes.  They aren't numbered, but there's
15  the one page that says the "Sullivan Vineyards debt
16  analysis."  And then next page is the "Sullivan
17  Vineyards amounts payable to Steve Finn."  Then in the
18  balance sheet it shows "Notes payable to shareholders."
19    Q.   And is this an example of the types of
20  information that you provided on a monthly basis to
21  Ross Sullivan?
22    A.   Yes.
23    Q.   Okay.  And at no time did he ever contact
24  you and say, I don't understand what these loans are,
25  or ever question the loans that Mr. Finn had made to

379

1  the company?
2    A.   No.
3        MR. BERTRAND:  Okay.  Nothing further,
4  Your Honor.
5        THE COURT:  Thank you.
6  cross-examination.
7        MR. FOX:  Do you want to admit those?
8        MR. BERTRAND:  Oh, Your Honor, can we
9  admit Exhibit FFF, please?
10        THE COURT:  Is there any objection to the
11  admission of FFF?
12        MR. RAMP:  Yes, objection.
13        THE COURT:  That objection will be
14  sustained.  It won't be admitted.  And the reason is
15  not as -- it's an extrinsic exhibit based upon a
16  witness called for the credibility of a prior witness.
17        CROSS-EXAMINATION
18  BY MR. RAMP:
19    Q.   Good evening now, Mr. Thaxton.  You said
20  you were CFO from October of 2013 to June of 2014,
21  correct?
22    A.   Yes.
23    Q.   And you testified on direct that when you
24  were the CFO you oversaw distributing these documents
25  to Mr. Ross Sullivan, correct?

380

1    A.   Production and distribution.
2    Q.   And so you don't know what documents
3  Mr. Sullivan received prior to October 2013, correct?
4    A.   Just by review of my predecessor.
5    Q.   And you don't know what documents that
6  he's received since June of 2014, correct?
7    A.   That's correct.
8    Q.   And you -- on direct examination opposing
9  counsel asked whether Mr. Sullivan had ever called you
10  up and objected to these loans, and you said no, he had
11  never called you up and objected to these, correct?
12    A.   That's correct.
13    Q.   But you didn't have any conversations
14  with him at all about these loans?
15    A.   Not about the loans, no.
16        MR. RAMP:  Nothing further.
17        MR. BERTRAND:  Nothing further, Your
18  Honor.
19        THE COURT:  Thank you.  Any further
20  testimony at this time?
21        MR. LASS:  No, Your Honor.
22        THE COURT:  What I would suggest is that
23  we take half an hour break to give counsel an
24  opportunity to put their summations together.  And then
25  I'm looking for argument on the motion to reconsider

95 (Pages 377 to 380)

Case: 17-10065     Doc# 86     Filed: 04/05/17     Entered: 04/05/17 17:46:12     Page 99 of
110

381

1  the injunction -- and I will tell you as a preliminary
2  matter that I am going to reconsider that injunction --
3  and then also on the motion for expedited ordering of
4  the decree.
5        And how much time does counsel think
6  they're going to need for argument?
7        MR. LASS:  I think we should keep it
8  short because, you know, you've read a lot.
9        THE COURT:  And I've heard a lot.
10       MR. LASS:  So I'm not sure we should go
11 for more than ten minutes.
12       MR. BERTRAND:  That's fine.
13       THE COURT:  We'll say 15 minutes each.
14 So let's take a half-hour recess, give everybody a
15 chance to stretch and gather their thoughts, because
16 it's easy to make an hour argument, it's hard to make a
17 15-minute argument.
18       (Recess taken, 6:49 p.m. to 7:20 p.m.)
19       MR. FOX:  Your Honor, are you ready?
20       THE COURT:  Yes.
21       MR. FOX:  Your Honor, thank you very much
22 for your time and thank you for indulging us by letting
23 us go way past the normal work day.
24       As I mentioned to you a little bit off
25 the record, Mr. Bertrand and I are going to split our

382

1  time.  I am going to address primarily the domestic
2  issues related to the marital agreement and the second
3  issue you addressed, which is related to the entry of
4  the decree.  Mr. Bertrand will touch on more the
5  financial issues related to the entity.
6        Your Honor, this is a case with a marital
7  agreement that has -- that made it very clear that
8  14-10-113, allocation and valuation of property, does
9  not apply.  The parties contracted with competent
10 counsel on how they wanted to allocate their separate
11 and marital property in the event of a divorce.
12       The central issue in this case is whether
13 or not Mr. Sullivan's -- Mr. Finn's -- I apologize.  I
14 told you I would do that -- Mr. Finn's interest in the
15 Sullivan Vineyards, the partnership and the
16 corporation, were acquired as his separate property,
17 remain his separate property, and today still are his
18 separate property.
19       One of the things we'd ask you to note is
20 that throughout the testimony today, wife and
21 Mr. Sullivan both acknowledge that the interest
22 transfers on the entry of a decree.  This is stark
23 contrast to the representations in the motion for an
24 injunction.  The assertion was that this is my asset
25 and it's all I'm going to get from the marriage.  And

383

1  that we demonstrated, I think, convincingly, was not
2  true.
3        The marital agreement sets forth
4  approximately $4 million of assets that go to Ms.
5  Sullivan -- Ms. Finn.  And she came into the marriage
6  with $400,000, according to her disclosure statement.
7        The marital agreement itself, it is a
8  contract between the parties, and it sets the rules
9  here.  And I do want to go through some of those rules,
10 because there's a huge distinction between what happens
11 on the filing of a petition and what happens on the
12 entry of a decree, or what happens on the death of
13 Mr. Sullivan -- Mr. Finn.
14       You can hit me later.
15       Mr. Finn pointed to the marital agreement
16 where it defined termination of marriage as death or
17 decree.  And the transfer of the interest in Sullivan
18 Vineyards to Ms. Sullivan occurs on the termination of
19 the marriage, not before.
20       Paragraph 3.1 and 5.4 of the marital
21 agreement set forth specific provisions that Mr. Finn
22 is allowed to do, as is Ms. Finn, anything they want to
23 with their separate property.  The Court raised an
24 issue of fiduciary obligation between the parties.
25 Their fiduciary obligations to each other do not mean

384

1  that they are to ignore the financial realities of
2  their separate property and their businesses.  Her
3  financial -- or her fiduciary obligation to Mr. Finn
4  and his fiduciary obligation to her is to honor the
5  agreement that they entered into.
6        Paragraph 3.1, again, says, just
7  generally, separate property, do with as you wish.
8  Contrary to Ms. Finn's statement, paragraph 5.4 says,
9  upon the filing of a petition, you still can do what
10 you want with your separate property.  It specifically
11 says, upon the filing of a petition, the parties shall
12 retain exclusive control and management and rights over
13 their separate property to sell, liquidate, gift as
14 they deem appropriate.
15       That gift language, I think, was very
16 telling, because there is a provision for an annual
17 gift in the marital agreement, paragraph 4.2, a
18 half-a-million-dollar-per-year gift.  The way the
19 marital agreement is written, when you look at
20 paragraph 4.2, if we are -- after an anniversary date
21 when the petition is filed, Mr. Finn still has a
22 prorated obligation on that half a million dollars.
23 And that provision is very clear.  You have the right
24 to ask, I'm going to -- I want to gift in satisfaction
25 of that my separate property interest in the vineyard.

96 (Pages 381 to 384)

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 100 of 110

385

1  Now, you don't have to accept that, but I have the
2  right to gift it. If he has the right to gift it, that
3  means it's his.
4  Ms. Finn, I'm assuming, through her
5  counsel has decided to argue that -- and I'm going to
6  pronounce this wrong -- "Imel" is how I pronounce it --
7  Imel controls and creates a vested interest for her in
8  Mr. Finn's separate property. Imel -- and we have
9  copies of the case if the Court would like it -- is not
10  applicable in any way whatsoever to this case. Imel
11  was a 30-year marriage in which the parties created a
12  marital estate together, where the parties agreed that
13  they both equally contributed to that marital estate
14  and they agreed to equally divide their marital asset.
15  What the court found -- the trial court
16  found was that there was no question that there was
17  substantial contribution by wife to assets that just
18  happen to have been left in husband's name. This is a
19  case from the '70s. Their marriage began in the '50s
20  and '60s. I don't want to talk negatively about other
21  generations, but that is sort of how things were done
22  back then, the husband maintained titled assets.
23  The Court found, no question, Wife, you
24  contributed, you are entitled; husband agreed. This
25  was a dispute between the IRS and the parties. The IRS

386

1  was trying to say, Husband, when you transferred your
2  interest in this business to wife, there was a capital
3  gains and you should pay taxes. And what the Colorado
4  Supreme Court said, when you are dividing a marital
5  estate, it's just a transfer effectively between
6  co-owners.
7  The marital agreement controls here.
8  They are not co-owners. They have separate estates.
9  He has his assets. She has her assets. The transfer
10  of those assets, if it occurs, is not a transfer of
11  co-owned assets. He owns 60.8 percent. She owns 9
12  percent. Those are distinct separate property
13  interests.
14  I mentioned that the marital agreement
15  does set forth specific provisions for things dealing
16  with the trigger point of a petition and things dealing
17  with the trigger point of a termination. And I think
18  it's important to go over those. Paragraphs 4.3, 5.4,
19  5.5, 5.7.3 all say maintenance will start on the date
20  of the petition, housing will start on the date of
21  petition, expense splitting will actually stop on the
22  date of the petition. Very, very clear and very common
23  with marital agreements. We have a triggering event
24  that starts on the filing of the petition. Contrary to
25  that standard, we have the provision for the vineyard,

387

1  that it would occur on the termination of the marriage.
2  Now, Mr. Finn testified, I think very
3  credibly, that there was built into this agreement some
4  waiting time. Mr. Finn actually assumed if they were
5  going to get divorced it would be in California, and he
6  was under the impression that would take up to a year,
7  but the agreement says at least six months of time that
8  we would spend trying to work on our marriage. That is
9  clear that he had time to liquidate his interest if he
10  so chose to do so.
11  Mr. Finn testified convincingly that he
12  could no longer stomach putting a million dollars into
13  a failing business on an annual basis if his heirs
14  would not receive that in the event of his death. And
15  he started negotiations to change that. And there was
16  no contradiction or no argument that that was not
17  his -- the gist of his conversations.
18  In her motion for the injunction, Ms.
19  Finn -- I think, if you look at the exhibit --
20  stretched the truth a little bit here. She said this
21  is done in retaliation, he's going to sell it out from
22  under us. We heard from Mr. Zepponi. We heard from
23  Mr. Finn. And we saw text messages that Ms. Finn
24  introduced that the discussion regarding placing the
25  vineyard on the market began in February or March.

388

1  She filed in May -- May 13, I believe, to
2  be exact. He started discussions with a Realtor in
3  February or March. He signed the listing agreement
4  before he knew that she was filing for divorce. And
5  after their marathon counseling session he sent
6  messages that, I think, can only be read as, look, I
7  want this -- I want to know where we are. I want to
8  know, are we working on this, if we are going to be --
9  if we're not together, that makes it more difficult.
10  This is a gentleman who has honored his
11  obligations. And we would ask the Court find that the
12  request for the injunction is nothing more than what
13  the text messages make clear, that it's a money grab.
14  This is not somebody trying to get her ancestral
15  vineyard. Give me enough money and I'll go away. And
16  that's what page 31 of Exhibit 7 says.
17  Your Honor, I'm going to turn it over to
18  Mr. Bertrand and then I'll come back and talk very
19  briefly on the decree.
20  THE COURT: Thank you.
21  MR. BERTRAND: Thank you, Your Honor.
22  First off, I would like to thank Your Honor for
23  allowing myself and Jim Rose to appear in this
24  proceeding. We appreciate it. And we hope that we
25  brought value in terms of bringing certain of the

389

1   issues presented to you greater clarity.
2          The point that I would like to address is
3   the injunction was improper and it was based upon three
4   significant misrepresentations that were made to the
5   judge that issued it. The first misrepresentation was
6   that the winery was being sold in retaliation to the
7   filing of the divorce petition. Mrs. Finn knew that
8   was untrue. She received texts from Steve Finn going
9   back to February talking about, I'm not going to be
10  dumping more money into this, you need to let your
11  siblings know. So that was the first
12  misrepresentation.
13         The second misrepresentation was this was
14  going to be her primary asset, the main thing that she
15  was going to take out of the marriage was the -- was
16  the winery, when, in fact, her lawyer in California
17  admitted that it's insignificant. And, in fact, when
18  we went through the testimony, there's $4 million in
19  assets that are going to Mrs. Finn, in addition to the
20  millions of dollars of assets she received over the
21  four-year term of the marriage.
22         So to come before the Court and say this
23  is being sold in retaliation to me filing a dissolution
24  petition, number one and, number two, this is all I'm
25  getting out of the marriage, those are two significant

390

1   misrepresentations to the Court. And given that an
2   injunction is an equitable remedy, you cannot have
3   unclean hands and come before the Court and ask for
4   equity.
5          The other thing that I would point out,
6   and I think it's important for Your Honor to
7   understand, is the California actions were necessitated
8   because of this ongoing game playing that was going on
9   where for over eight weeks Mrs. Finn refused to sign
10  the one-page document agreeing to appoint Your Honor or
11  the other retired judge who was selected by her
12  counsel -- we said, Select whoever you want. We want
13  to -- you know, we had a hearing that was going to be
14  set before the judge, and it was continued based upon
15  the representation that we would be able to get this
16  before a Colorado court.
17         And I can show you transcript after
18  transcript where we said to the California judge, We
19  would like to get this resolved in Colorado, but we are
20  frozen out of the courts. So I think that that's also
21  another aspect that the Court needs to take into
22  consideration, the way that they constantly have
23  misrepresented the record or the testimony that's come
24  in has been untruthful, at best.
25         The other thing that I think that our

391

1   case presents is our case is based upon economic
2   reality rather than fantasy. I know when we go to the
3   movies, you know, you suspend disbelief. And Ross
4   Sullivan's testimony that all the -- all the debt is
5   going to be paid back, $16 million of debt is going to
6   be paid back based out of the operations of the winery.
7          When he was -- when he was in control of
8   the winery it consistently lost five hundred to six
9   hundred thousand dollars a year. Suddenly, it's now
10  going to generate enough to pay off $15 million of debt
11  which is going to be due immediately? I mean, the loan
12  agreement with Silicon Valley Bank, in and of itself,
13  provides that as soon as Mr. Finn's ownership interest
14  is transferred to Mrs. Finn, it's an event of default.
15  So you are going to suddenly have $10 million that's
16  going to be due and Mr. Finn's debts are -- are
17  immediately due as well.
18         So one of the things that I do is I do
19  specialize in representing financial institutions. And
20  I have a lot of experience foreclosing on wineries, and
21  I can tell you exactly what's going to happen in this
22  case --
23         MR. LASS: Your Honor, I object. That's
24  beyond the scope of closing argument.
25         MR. BERTRAND: Well, great, but what I

392

1   would say is --
2          MR. LASS: Well, Your Honor, I object.
3          MR. BERTRAND: -- the economic -- the
4   economic reality of what we are presented with here is
5   that this winery is going to shut its doors and its
6   inventory is going to be foreclosed upon. And it takes
7   three years to be able to get another vintage that will
8   be available to sell to generate a penny of income.
9   That's what we are looking at. This is the economic
10  reality of what is presented here.
11         We called the CEO, the chief financial --
12  the VP of finance, and the CFO. And you look at their
13  credentials and their experience in this industry. And
14  they know what they're talking about. And they --
15  every one of them testified that this is not a viable
16  business, and there was no counter to it. They put up
17  no contrary evidence. And the only evidence that they
18  would put up is some supposed letter of intent that
19  somebody is going to somehow come in and rescue and
20  save -- save the residence, you know, or the -- the
21  winery. Well, where -- where is that person? Where is
22  the evidence before the -- Your Honor that you could
23  consider?
24         So the -- the other thing that I would
25  just say briefly is, is that we understand that -- that

393

1 this is very emotional, and we are not -- we are not,
2 you know, discounting it, that we know this is very
3 emotional to the family members. But the decision
4 that's presented to this Court cannot be based upon,
5 well, I would like to go back to my family home. I
6 mean, if that's going to be the standard, then, you
7 know, you have to throw the marital agreement out, and
8 you have to allow an economic circumstance that will
9 result in loss of jobs, loss of going concern, economic
10 value, which I refer to this case as my "Solomon" case,
11 because we are here trying to save the baby, and their
12 actions, everything that they've been doing, is
13 designed to destroy the baby.
14        So, with that, I'm going to kick it over
15 to Mr. Fox.
16        MR. LASS: I assume -- I assume the Court
17 is keeping careful track of the time.
18        THE COURT: Yeah. I think there's about
19 two minutes left.
20        MR. FOX: Thank you, Your Honor. Your
21 Honor, the issue of the entry of the decree is really,
22 I think, clearly, an end run around the realities of
23 the marital agreement. Ms. Finn was faced with the
24 knowledge that -- as she acknowledged -- that she
25 doesn't get this until the entry of the decree, so she

394

1 seeks an injunction and then stalls for three months.
2 When they asked for the entry of decree, that clearly
3 says, I want to play games. I know I'm not entitled to
4 it until the decree, so, Judge, give me the decree, and
5 then it's mine and then it doesn't matter.
6        This is a court of equity. She stalled
7 for two or three months. She filed for the injunction
8 in June. We had a hearing set in front of Judge
9 McGahey in Denver in July. We are now in October. We
10 have been trying to get in front of a judge to have
11 somebody hear the request to vacate the restraining
12 order. In inequity, entering a decree at this time
13 would be a complete disregard for the marital
14 agreement.
15        The standard for a request for a decree
16 prior to the resolution of all the issues really is
17 looking for an exigent circumstance, and there is none
18 here. The question is, is it equitable to the parties,
19 is it fair to the parties, to enter the decree.
20 Nobody's dying, nobody's getting married, nobody's
21 pregnant, that we've heard from -- that would require
22 them to end the marriage and start a new relationship.
23 This is nothing more than an attempt to end-run around
24 the marital agreement and to reward her for the delay.
25        We would ask that the Court set aside the

395

1 injunction on the grounds that the marital agreement
2 clearly says that this is a separate property. And we
3 would ask the Court to recognize the economic realities
4 that the business isn't solvent, and that as a
5 corporate director, he has a fiduciary obligation to
6 the shareholders, the entity, and to himself as well,
7 to maximize the profit.
8        We would ask the Court to not reward her
9 for the delay. And we would ask for the Court to deny
10 the request for decree. Thank you.
11        THE COURT: Thank you.
12        Mr. Lass.
13        MR. LASS: Thank you, Your Honor. I do
14 also thank you for taking the extra time today, and
15 also thanks to Maria for putting in overtime.
16        This case really is, this hearing really
17 is, about whether the Sullivan family will have the
18 opportunity to continue to own and operate the family
19 business that was founded by their parents or whether
20 the husband will be entitled, or able, to unilaterally
21 and against the will of all of the family members, all
22 of the shareholders, all of the partners, kill it.
23 Because that's what he intends to do, primarily for his
24 own personal benefit as a creditor of the entities.
25        I want to first address the issue that

396

1 the husband claimed he had negotiated a six-month time
2 period for -- to sell the winery. There was never any
3 evidence -- any evidence from anybody, including him,
4 that if that was his intention it was ever communicated
5 to the wife. And there's nothing in the agreement,
6 nothing at all, that says the husband after the
7 petition is filed has the right to sell the winery
8 before the decree is entered. It's not there. And if
9 he wanted it to be there, it should have been there, or
10 at least it should have been expressed to the wife.
11 And it's not there.
12        The theory that five months now, four or
13 five months after the petition was filed, he now is
14 willing to do counseling with the wife after he'd never
15 proposed it before and after the marriage is clearly
16 dead, is -- is silly, quite frankly. It's an effort by
17 him to buy time so that he can sell the winery.
18 There's no -- and that -- and that clause, I would
19 suggest, in the marital agreement, if it's enforceable,
20 has got to be against public policy to require people
21 to do six months of counseling before the decree can be
22 entered. There has been proposed legislation over the
23 last few years where legislators have tried to propose
24 that, and they were killed -- the legislation, not the
25 legislators.

397

1        What is the status of the winery?  Now,
2  I'm -- I don't want to spend much time on it because I
3  don't think it's relevant.  Who knows what the status
4  of the winery is.  There was testimony that it's
5  insolvent.  There was also an April letter from one of
6  the people running the winery that said the winery is
7  doing just fine.
8        There was also a July cash flow
9  spreadsheet that seemed to indicate the winery was
10  doing just fine, that it showed a positive cash flow.
11  Teresa Sullivan testified, despite that evidence and
12  despite, frankly, Mr. Finn's evidence -- testimony that
13  he had -- you know, had created a great winery, she
14  testified that a year ago she was -- she was told that
15  it was in a turnaround situation.  Angelica de Vere
16  testified that she'd increased the revenues threefold.
17        Who knows what the status of the winery
18  really is, the financial status of the winery really
19  is.  But it doesn't matter.  The marital agreement
20  doesn't say that Ms. -- Mrs. Finn gets the winery only
21  if it's in good financial condition, or that Mr. -- or
22  that it should be sold if it's not in good financial
23  condition.
24        It's also interesting to note that since
25  June, and actually since earlier in the spring, in text

398

1  messages and in his June 11 letter, Mr. Finn insisted
2  that the writing was on the wall, that the business was
3  in trouble, the bankruptcy was imminent, where four
4  months later, the bank hasn't foreclosed, nothing
5  dramatically bad has happened, so grapes still get
6  bought, and, as I said, the loan hasn't been called.
7        What should happen, we believe, is that
8  Mrs. Finn should be awarded her interest in the winery
9  now and then the dispute will be where it should be,
10  which is a dispute between the bank, perhaps, if the
11  bank chooses to pursue its remedy, if -- if there's a
12  default on the bank loans or if there's a default on
13  the conditions, and Mr. Finn, as a creditor, will have
14  a claim, presumably, against the corporation or the
15  partnership to try to determine how much is owed to
16  him.  That's where the dispute belongs.  But none of
17  that means that the ownership interest should remain in
18  his hands and not be awarded to the Sullivan family.
19        We don't disagree that the marital
20  agreement, to a large extent, controls what the Court
21  is to do.  We disagree as to what it says.  We know
22  that the specific provisions of a contract, including a
23  marital agreement, govern over the general provisions.
24  We know that Section 2.2 of the agreement talks about
25  what is separate property -- what is separate property

399

1  -- I'm sorry -- 2.2 -- except as specifically provided
2  in this agreement, all property that's owned in our
3  separate names is separate property, except as
4  otherwise provided in this agreement.
5        2.3 provides that without limiting the
6  general provisions of this agreement, with respect to
7  each of us, separate property means property acquired
8  during the marriage.  But there is another provision,
9  and that's 5.7.2.  And that's the provision that
10  says -- does say upon entry of the decree the -- any
11  interest that Mr. Finn has acquired in the winery will
12  be -- become Mrs. Finn's -- Mrs. Finn's property.
13        That doesn't mean that she doesn't have a
14  vested interest in the property right now, because she
15  does, both under the Imel case -- and while Mr. Finn
16  likes to -- likes to characterize his interest as his
17  separate property, we don't think it is, even when it
18  was signed, because there is a special provision in
19  here that governs her rights to obtain his interest in
20  the winery.
21        It is, I think, important to note two
22  things.  One of them is that Mrs. Sullivan, the elderly
23  Mrs. Sullivan, waited, apparently, until after the
24  marital agreement was in place to transfer her interest
25  to Mr. Finn.  And I think the inference is clear from

400

1  the evidence that she wanted it kept in the family.
2  And the inference, I think, is clear that she would not
3  have transferred that interest if she hadn't have known
4  that there was some protection for the family in the
5  marital agreement.
6        I think that Mr. Finn's text messages,
7  while clearly under some stress, belie his current
8  claim that he always thought he had time to sell the
9  winery after the petition was filed.  If he'd always
10  thought he had the time to file -- or to sell the
11  winery after the petition was filed, he wouldn't have
12  said what he said in the marital agreements [sic], that
13  you don't deserve 60 percent, you -- I would never have
14  made it so successful if I would have known that's what
15  the marital agreement had said, I'm inclined to run it
16  into the ground.  If he thought he could sell it, then
17  he could have sold it, and he didn't.
18        I think for reasons that we've explained
19  in our written briefs, again, we don't think that the
20  amount of the debt owed is properly an issue before the
21  Court today.  We don't think that his percentage of
22  ownership is before the Court today.  Whatever that
23  percentage is should go to Mrs. Finn.  And then she may
24  have to work that out between herself and her siblings
25  as to what that is, but that's not before the Court

scheduling@huntergeist.com          HUNTER + GEIST, INC.          303-832-5966/800-525-8490

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 104 of 110

401

1  today.
2      I would also wonder why, if there's no
3  equity in the winery, and it's, in fact, insolvent, why
4  doesn't he just give it to her. And the Court should
5  probably do that. And then he can pursue his rights as
6  a creditor of the business. That's what he's really
7  looking out for here. He's not looking out for the
8  best interest of the other shareholders or the other
9  partners. He's looking out to try to make sure he gets
10  to collect what he wants to collect on his claim to
11  debts from the winery.
12      And maybe the bank will call a default,
13  maybe it won't. Maybe there will be other financing to
14  put in place. But the point is that the Sullivan
15  family should have the opportunity to try to do that,
16  to take care of it.
17      I wanted to address the allegation that
18  somehow Mrs. Finn, or maybe her former counsel, somehow
19  colluded to prevent -- to prevent this case from
20  proceeding. Mr. Finn always had the right to go back
21  to Judge McGahey. Judge McGahey always had
22  jurisdiction over this case. And the one thing that is
23  clear is that no one ever told Mrs. Finn that Judge
24  Berryhill, a wonderful judge, used to practice with
25  Mr. Fox. That's --

402

1      MR. FOX: I'm going to object, Your
2  Honor. That's -- ignoring the fact that that's not
3  true, that's not before the Court.
4      THE COURT: There has not been evidence
5  of that.
6      MR. LASS: There was ample reason for her
7  not to want to use Judge Berryhill. And if they were
8  concerned about -- if they were concerned about not
9  getting to court fast enough, then they could have gone
10  back to see Judge McGahey and raised the problem with
11  him.
12      One thing that's not been mentioned to
13  much extent is that Judge -- excuse me -- that Mr. Finn
14  really disregarded the injunction. After knowing the
15  injunction was in place, he instigated and paid for and
16  hired lawyers to pursue lawsuits to try to do the very
17  thing that the injunction prevented him from doing, and
18  he pursued selling the winery. He signed the -- or
19  allowed the property to continue to be listed for sale
20  and attempted to sell it and attempted to instigate a
21  litigation, two different kinds of litigation, to get
22  it sold.
23      Mr. Finn -- strike that.
24      Mr. Finn testified that foreclosure is
25  imminent if his wife becomes owner of the winery.

403

1  What's clear is that everything -- the loss of
2  everything is certain if he's allowed to sell it. We
3  think she should have the permission and has the -- and
4  has the right under the marital agreement to get the
5  interest in the winery right now and to do with it as
6  she and her family can and not -- and shouldn't be
7  sold.
8      The Burford case does talk about the
9  factors that the Court should consider when deciding
10  whether to enter the decree before entry of permanent
11  orders. And those factors include the complexity and
12  magnitude of the financial issues. You've heard much
13  testimony about that today. I'm not sure any of that
14  is particularly relevant, that is, the financial status
15  of the -- of the business, but there are other
16  financial issues that are pretty apparent from the
17  marital agreement. The extremely litigious nature of
18  the parties is pretty apparent, I think, given what's
19  happened in this case. The fact that the assets of the
20  estate are being dissipated by fees is also pretty
21  apparent.
22      The -- those are the factors that the
23  Court should look at. And we believe the Court should
24  enter the decree at this time, without delay. There's
25  been no -- there's no reason -- the jurisdictional

404

1  reasons and the irretrievable breakdown is not
2  disputed. We see no reason why there's any particular
3  harm to Mr. Finn, because, again, his rights are
4  primarily those as a creditor. And he will have the
5  right to assert those rights if there's a default on
6  his loan obligations. And if he doesn't get paid,
7  there will be perhaps more litigation, probably in
8  California, about how much is owed to him.
9      I'm trying not to repeat things that
10  we've written many times before.
11      THE COURT: Your time's just about up.
12      MR. LASS: Okay. I think if there's been
13  any games-- gamesmanship here, it's really been on
14  the part of the husband playing games with the
15  restraining order and the injunction. We would ask
16  that the -- we would ask, first of all, that the Court
17  enter the decree at this time, preserving other issues
18  for permanent orders by transferring ownership of the
19  shares to Mrs. Finn at this time.
20      If that happens, the litigation in
21  California goes away and all of the other issues are
22  greatly simplified. If the Court doesn't do that and
23  leaves Mr. Finn in control, we don't know what he's
24  going to do. We know what he's threatened to do. And
25  we think the Court should take that threat seriously

Case: 17-10065     Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 105 of 110

405

1  and not allow him to remain in control until the
2  permanent orders hearing that we now have set.  Thank
3  you.
4           THE COURT:  Thank you.
5           First of all, I want to thank counsel and
6  parties.  You've been able to come here today and
7  disagree without being disagreeable.  And that is, in
8  my opinion, the finest thing that can happen as far as
9  advocating for each other's clients.  And the demeanor
10 of the parties was particularly admirable; and I
11 appreciate that.
12          I am going to make oral orders and they
13 will be followed by written orders.  If there is
14 anything in my written order that is inconsistent with
15 what I have to say now, the written order will control.
16          I do believe that it was necessary to
17 reconsider the injunction.  I do find that there are
18 legal and factual issues that support the continuation
19 of the injunction enjoining any party from selling or
20 transferring any interest in Sullivan Vineyards
21 property or corporation.  Colorado law prevents the
22 sale of assets during the pendency of dissolutions.
23 This injunction does not prevent the operation of
24 Sullivan Vineyards in regard to the day-to-day
25 operation and sale of product in the ordinary course of

406

business.

          In regard to the entry of decree, the
Court does order the entry of the decree at this time.
All ownership interests in SVP and SVC currently in
husband's name are transferred to the wife.  These
interests are subject to all outstanding debts.

          Mr. Lass, I would ask you to prepare the
form of decree and include within that form of decree
the date that was set for permanent orders.

          Thank you.  We will be in recess.

          WHEREUPON, the within proceedings were
concluded at the approximate hour of 7:58 p.m. on the
7th day of October, 2015.

          *     *     *     *     *

407

                    REPORTER'S CERTIFICATE
STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER  )

          I, MARIA M. ORTON, Registered
Professional Reporter and Notary Public ID 20004018922,
State of Colorado, do hereby certify that the within
proceedings were taken in machine shorthand by me at
the time and place aforesaid and was thereafter reduced
to typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given, and
proceedings had.

          I further certify that I am not
employed by, related to, nor of counsel for any of the
parties herein, nor otherwise interested in the outcome
of this litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 20th day of October, 2015.


          My commission expires June 28, 2016.


_____ Reading and signing was requested.

_____ Reading and signing was waived.

__X_ Reading and signing is not required.

Case: 17-10065    Doc# 86    Filed: 04/05/17    Entered: 04/05/17 17:46:12    Page 106 of
110

REPORTER'S CERTIFICATE

STATE OF COLORADO            )
                            ) ss.
CITY AND COUNTY OF DENVER    )

          I, MARIA M. ORTON, Registered
Professional Reporter and Notary Public ID 20004018922,
State of Colorado, do hereby certify that the within
proceedings were taken in machine shorthand by me at
the time and place aforesaid and was thereafter reduced
to typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given, and
proceedings had.

          I further certify that I am not
employed by, related to, nor of counsel for any of the
parties herein, nor otherwise interested in the outcome
of this litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 20th day of October, 2015.


          My commission expires June 28, 2016.


_____  Reading and signing was requested.

_____  Reading and signing was waived.

___X_  Reading and signing is not required.



                    _Maria M. Orton_____
                    Maria M. Orton
                    Registered Professional Reporter

PHILIP S. WARDEN (SBN 54752)
  philip.warden@pillsburylaw.com
CECILY DUMAS (SBN 111449)
  cecily.dumas@pillsburylaw.com
JUDY J. BAO (SBN 305560)
  judy.bao@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:    415.983.1000
Facsimile:    415.983.1200

Attorneys for Secured Creditors
Stephen A. Finn and Winery Rehabilitation, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>SULLIVAN VINEYARDS<br>CORPORATION,<br><br>      Debtor-in-Possession.<br><br>_____<br><br>SULLIVAN VINEYARDS<br>PARTNERSHIP,<br><br>      Debtor-in-Possession.<br>_____ | Case No. 17-10065-AJ<br><u>(Jointly Administered)</u><br><br>(Chapter 11)<br><br>CERTIFICATE OF SERVICE<br><br><br>Date:      April 11, 2017<br>Time:     9:00 a.m.<br>Courtroom:  99 E Street<br>          Santa Rosa, CA 95404<br>Judge:   Hon. Alan Jaroslovsky |

- 1 -

4820-8363-2966.v1

1   I, Candace J. Kleiner, hereby declare:

2   I am over the age of 18 years and not a party to or interested in the within entitled cause.  On April
    5, 2017, I served the following document:
3
4   **NOTICE OF LODGMENT OF REPORTER'S TRANSCRIPT DATED OCTOBER 7, 2015;
    DISTRICT COURT, COUNTY OF DENVER, COLORADO; CASE NO:  15DR30434; IN
    RE MARRIAGE OF FINN**
5
6   had notice provided through ECF notification on all persons of whom are registered participants in
    the Court's ECF system, or by deposit in the United States Mail, postpage-prepaid, and addressed
    as indicated on the attached service list.
7
    I declare under penalty of perjury under the laws of the United States of America that the foregoing
8   is true and correct and that this declaration was executed at San Diego, California on April 5, 2017.

9
                                        _/s/ Candace J. Kleiner_____
10                                       Candace J. Kleiner

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            - 2 -

4820-8363-2966.v1

## SERVICE LIST

**_By ECF Notification:_**

- Cecily A. Dumas    cecily.dumas@pillsburylaw.com
- Michael C. Fallon    mcfallon@fallonlaw.net, manders@fallonlaw.net
- Lynette C. Kelly    lynette.c.kelly@usdoj.gov, ustpregion17.oa.ecf@usdoj.gov
- Austin P. Nagel    melissa@apnagellaw.com
- Office of the U.S. Trustee / SR    USTPRegion17.SF.ECF@usdoj.gov, ltroxas@hotmail.com
- Steven M. Olson    smo@smolsonlaw.com
- Philip S. Warden    philip.warden@pillsburylaw.com

**_By Personal Delivery:_**

Lynette C. Kelly
Office of the United States Trustee
Phillip J. Burton Federal Building
450 Golden Gate Avenue, 5th Floor
#05-0153
San Francisco, CA  94102
Email:  lynette.c.kelly@usdoj.gov

**_By U.S. Mail:_**

Ross Sullivan
1322 El Bonita Avenue
St. Helena, CA  94574

UBF Consulting, Inc.
2033 North Main Street, Suite 700
Walnut Creek, CA  94596

- 3 -

4820-8363-2966.v1